# EXHIBIT A

# LEASE AGREEMENT

This Lease Agreement (the "Lease") is entered this 27ᵗʰ day of October 2023 (the "Effective Date") by and between **R & J Group Holdings, LLC** (the "**Landlord**"), with an address of 9930 Whittier Street, Detroit, MI 48224 and **Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones** (collectively, the "**Tenant**"), with an address of 341 Corrie Rd., Ann Arbor, MI 48105. Landlord and Tenant may each hereafter be referred to as a "Party" and collectively as the "Parties".

**NOTICE:  Michigan law establishes rights and obligations for parties to rental agreements. This agreement is required to comply with the Truth in Renting Act. If you have a question about the interpretation or legality of a provision of this agreement, you may want to seek assistance from a lawyer or other qualified person.**

That for and in consideration of the mutual agreements herein contained, for adequate consideration, the receipt and sufficiency of which is acknowledged by Landlord and Tenant, Landlord and Tenant hereby agree, covenant, represent and promise to and with each other, as follows:

1. **Leased Premises, Term, Use, Inspection and Incorporation of Recitals.**

   **1.1   Leased Premises.**   Landlord shall hereby lease to Tenant, and Tenant shall rent from Landlord, the entire premises located in the Village of Barton Hills, County of Washtenaw, State of Michigan, commonly known as 341 Corrie Rd., Ann Arbor, MI 48105 (the "**Premises**"), Tax Parcel Number IB-09-08-380-005, and as legally described on the attached Exhibit A.

   **1.2   Original Term.**   This Lease shall commence on November 1, 2023 and, unless sooner terminated pursuant to law or any of the terms herein, shall continue for a lease term of 13 months expiring on November 30, 2024 (the "**Lease Term**").

   **1.3   Conditional Renewal Option.** This Lease includes a conditional option to renew the Lease Term for an additional term of 12 months only upon the mutual agreement of the Parties as to the terms of such extension. Tenant must notify Landlord of Tenant's intent to renew the Lease Term at least 30 days in advance of the end of the Lease Term and the Parties must mutually agree upon all material terms of such renewal prior to the end of the Lease Term.

   **1.4   Use of Premises.**   Tenant shall use the Premises as their residence for themselves and their immediate family only, and for no other purpose without the prior written consent of the Landlord. Tenant will comply with all applicable laws, rules, ordinances, statutes and orders regarding the use of the Premises, including all ordinances, rules and regulations of the local municipality.

*Initials:*   Landlord _____   Tenant _____

**1.5    Inspection / Condition of Premises.** Tenant has inspected the Premises, the fixtures, the grounds, building and improvements and acknowledges that the Premises are in good and acceptable condition and are habitable and completed the Premises Inspection Inventory Checklist attached hereto as Exhibit B. If the condition of the Premises changes at any time during the Lease Term, Tenant shall promptly provide reasonable notice to Landlord. Tenant hereby <u>accepts the Premises in its current "AS-IS" condition</u>.

**2.    Rent, Late Payments, Real Estate Taxes and Security Deposit.**

**2.1    Rent.** Tenant shall pay to Landlord during the Lease Term, as rent for the Premises, the amount of Five Thousand and 00/100 ($5,000.00) per month for 12 consecutive months beginning on December 1, 2023 ("**Rent**") and continuing on the 1st of each calendar month thereafter through the end of the Lease Term, for a total Rent payment for the Lease Term of Sixty Thousand and 00/100 Dollars ($60,000.00).

**2.2    Manner of Payment.** Rent shall be paid by Tenant to the Landlord each month, in advance of the first day of each month at the address listed above.

**2.4    Late Fees.** If any amount due under the Lease is more than 5 days late, Tenant agrees to pay a late fee of $50.00 for each incident or occurrence.

**2.5    Real Estate Taxes.** During the Lease Term, Tenant shall be responsible for and pay all real estate taxes and assessments for the Premises as additional Rent.

**2.6    Security Deposit.** On execution of this Lease, Tenant shall deposit with Landlord a security deposit of $10,000.00 (the "**Deposit**"), as security for the performance of Tenant's obligations under this Lease. Landlord may (but shall have no obligation to) use the Deposit or any part thereof to cure any breach or default of Tenant under this Lease, or to compensate Landlord for any damage that it incurs as a result of Tenant's failure to perform any of Tenant's obligations hereunder. Landlord is not limited to the Deposit to recoup damage costs, and Tenant remains liable for any balance due or damages to the Premises at the end of the Lease Term. Tenant shall not apply or deduct any portion of the Deposit from any month's Rent, including the last month of the Lease Term. If Tenant breaches any of the terms or conditions of this Lease, Tenant shall forfeit the Deposit, as permitted by law. **You must notify your Landlord in writing within 4-days after you move of a forwarding address where you can be reached and where you will receive mail; otherwise your Landlord shall be relieved of sending you an itemized list of damages and the penalties adherent to that failure.**

**2.7    Return of Deposit.** In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, and shall not purchase the Premises in accordance with the option to purchase contained herein, the Deposit shall be returned to Tenant at the end of the Lease Term and after delivery of

| Initials:   Landlord _____ | Tenant _____ |

possession of the entire Premises to Landlord, subject, however, to any balance for unpaid Rent or damages to the Premises.

**3.    Option to Purchase.** The Tenant is hereby granted the option of purchasing the Premises at the end of the Lease Term (the "Purchase Option").

   **3.1    Purchase Price.** The purchase price shall be One Million Fifty Thousand and 00/100 Dollars ($1,050,000.00) (the "**Purchase Price**") after the final Rent payment is made to Landlord, only if Tenant is not default of this Lease. To exercise the option, the Tenant must deliver to the Landlord written notice of Tenant's intent to purchase in advance of the expiration of the Lease Term and such written notice must specify a valid closing date which must occur within thirty (30) days of the expiration of the Lease Term, unless otherwise agreed to by Landlord in writing. Provided that the sale of the Premises closes within thirty (30) days of the expiration of the initial Lease Term, Tenant shall receive a credit of $50,000.00 toward the Purchase Price, which includes Landlord's retention of the Security Despoit as part of this credit. Landlord further agrees to apply a portion of the Purchase Price received by Landlord at the Closing of the sale contemplated herein to pay off any remaining balance due and owing to Landlord from Tenant under the Promissory Note dated October 27, 2023.

   **3.2    Closing.** Landlord shall determine the title company at which settlement shall occur and shall inform Tenant of this location. Tenant agrees that closing costs in their entirety, including all taxes and assessments, the cost of title insurance, attorney fees, transfer taxes or other charges, shall be the sole responsibility of Tenant. No real estate commissions or any other commissions shall be paid in connection with the purchase/sale transaction contemplated by this Section.

   **3.3    Exclusivity.** This option to purchase is exclusive to the Tenant named herein, is non-assignable and exists solely for the benefit of the Tenant. Should Tenant attempt to assign, convey, delegate, or transfer this option to purchase without the Landlord's express written permission, any such attempt shall be deemed null and void.

   **3.4    Title to Premises.** The Landlord shall convey title to the Premises to Tenant by a warranty deed at closing. Tenant may obtain a title insurance policy for the Premises at Tenant's sole expense.

**4.    Default.**

| *Initials:*   Landlord _____ | Tenant _____ |

**4.1    Event of Default.**   The occurrence of any of the following events shall be deemed a "Default" under the terms of this Lease:

   A.  Any representation or warranty of the Tenant made in this Lease shall be untrue when made, or shall, during the term of this Lease, become impaired, untrue or misleading;

   B.  Tenant shall fail to pay Rent when due or perform or observe any term, condition, covenant or agreement set forth in this Lease;

   C.  If Tenant files a bankruptcy petition under any chapter of Title 11 of the United States Bankruptcy Code, Tenant stipulates in advance to relief from the automatic stay provision, 11 U.S.C. § 362 in favor of Landlord for all purposes and by execution of this Lease, Tenant consents to entry of a stipulated order for relief from the automatic stay as set forth herein;  and

   D.  If Tenant defaults, as defined herein, Landlord may have all remedies legally permitted, including termination of this Lease and the Purchase Option. Landlord shall serve a written, seven (7) day notice on Tenant specifying the nature of said default and if Tenant does not cure a default of which Tenant has been notified, or if the default cannot be completely cured or remedied in seven days, Landlord may at Landlord's option: (i) cure such default and add the cost of such cure to Tenant's financial obligations under this Lease; or (ii) declare Tenant in default and evict Tenant from the Premises in accordance with the laws of the State of Michigan. Landlord also may terminate this Lease and the Purchase Option if Tenant, a member of Tenant's household, or other person under Tenant's control, unlawfully manufactures, delivers, possesses with intent to deliver, or possesses a controlled substance on the Premises.

**4.2    Physical Remedies.**  If the notice provided for in Section 4.1(D) has been given, the Lease Term shall expire as defined herein, or if Tenant shall be in default of this Lease, then Landlord may, as permitted by law, dispossess Tenant by summary proceedings or otherwise, and retake possession of the Premises.

**4.3    Financial Remedies.**  In the event of any Default, re-entry, expiration and/or dispossession by summary proceedings or otherwise: (i) the Rent shall become due thereupon and be paid up to the time of such re-entry, dispossession or expiration, together with such damages and/or expenses Landlord may incur for legal expenses, attorney fees, costs, expenses or brokerage, and/or putting the Premises in good order to the extent permitted by the law of the State of Michigan; and/or (ii) Landlord may re-let the Premises or any part or parts thereof. Landlord may, at its sole option, hold Tenant liable for any difference between the Rent payable under this Lease during the balance

| Initials:  Landlord_____ | Tenant_____ |

of the Lease Term, and any Rent paid by a successive Tenant if the Premises are re-let. In the event that after default by Tenant, Landlord is unable to re-let the Premises during any remaining portion of the Lease Term, Landlord may at Landlord's option hold Tenant liable for the balance of the unpaid Rent under this Lease for the remainder of the Lease Term.

**5.      Quiet Enjoyment.** Landlord covenants and agrees with Tenant that upon Tenant timely remitting all required Rent to Landlord, and Tenant observing and materially performing all of the terms, covenants and conditions to be performed under this Lease and under any applicable ordinances, rules and regulations, Tenant may peaceably and quietly enjoy the Premises.

**6.      Assignment.** Tenant expressly covenants that Tenant shall not assign this Lease, including the Purchase Option, or sublease the Premises without the prior written consent of the Landlord. Landlord reserves the sole right and subjective discretion to approve or deny any assignment of this Lease or any sublease to any potential or prospective tenant. Any assignment or sublease without Landlord's written prior consent shall, at Landlord's option, terminate this Lease. No assignment, subleasing, occupancy or collection shall be deemed a waiver of the provisions of this Lease, or a release of Tenant from the further performance of covenants in this Lease. Landlord shall be free to sell, mortgage, assign, transfer or sell all or part of Landlord's interest in the Premises and/or the Lease without the approval or consent of the Tenant.

**7.      Possession and Tenant Responsibilities.**

     **7.1      Possession and Surrender.** At the expiration of the Lease Term, if Tenant shall not have exercised the Purchase Option, Tenant shall peaceably surrender the Premises to Landlord in the same good condition as it was at the commencement of the Lease, subject only to ordinary wear and tear, and free of all debris and trash.

     **7.2      Utilities and Services.** Tenant will be responsible for all utilities and services required on the Premises. Tenant shall put all utilities for the Premises in their name, maintain uninterrupted service throughout the Lease Term, and timely pay all utility bills. Tenant shall pay any penalties imposed by utility providers because of late payment of original bills. The utilities include, but are not limited to, water, electric, gas, cable, internet and cost of trash removal, if any. Tenant shall periodically, upon request of the Landlord, submit written proof that all utilities have been paid and are current with no past due amounts owed to any utility provider. Failure to do so shall be an event of Default of this Agreement.

     **7.3      No Pets.** Tenant is not permitted to keep any pets on the Premises without the express prior written consent of Landlord, such consent being within the sole discretion of Landlord. The Tenant shall be responsible for all expenses, damages, destruction or other wear and tear caused by the pets.

*Initials:*    Landlord _____    Tenant _____

**7.4    Dangerous Materials.**  Tenant shall not keep or have on or around the Premises any item of a dangerous, flammable or explosive nature that might unreasonably increase the risk of fire or explosion on or around the Premises or that might be considered hazardous by any responsible insurance company.

**7.5    Alterations and Improvements.** Tenant agrees not to make any alterations or additions to the Premises without the prior written consent of Landlord.  If any alterations, additions, improvements or changes are made to or built on or around the Premises, same shall become the property of Landlord and remain as part of the Premises at the expiration or termination of this Lease, unless otherwise agreed to by the Parties in writing.

**7.6    Maintenance, Repair and Damage to Premises.** Tenant shall use and maintain the Premises in accordance with all applicable sanitary, housing, health, police and all other regulations imposed by governmental authorities. Tenant shall maintain the Premises in a clean and orderly manner; remove all garbage from the Premises in a clean and sanitary manner. Tenant shall also be responsible for all required and preventative maintenance to the Premises, including all plumbing, electrical, sewage and HVAC system, and any fire and flood damage repairs. Tenant shall pay for all damage caused to the Premises by Tenant, their guests and/or their invitees.

**7.7    Personal Property (Appliances).**  Tenant acknowledges that any personal property of the Landlord situated or affixed to the Premises, such as appliances, window covers and other fixtures, shall be maintained by Tenant and remain upon the Premises upon vacating, in good condition, reasonable wear and tear excepted. Landlord shall retain all remedies against Tenant for any unlawful removal or conversion of such items/property.

**7.8    Smoke Detectors.** Smoke detectors have been installed within the Premises. During the Lease Term, Tenant is required to maintain all smoke detectors. Battery maintenance and verification of operation of the smoke detectors after the Lease Term commences are Tenant's responsibility.

**7.9    Damage to Premises.** In the event the Premises, or a portion thereof, are destroyed by fire, storm, earthquake or other casualty not caused by the negligence of Tenant, such that the entire Premises is rendered wholly uninhabitable, this Lease and the Purchase Option shall terminate from such time except for the purpose of enforcing rights that may have accrued hereunder. The Rent provided for herein shall then be accounted for by and between Landlord and Tenant up to the time of such injury, destruction or un-inhabitability of the Premises and Landlord shall refund to Tenant, pro-rata, previously paid Rent for periods occurring after such date. Should a portion of the Premises thereby be rendered uninhabitable, the Landlord shall have the option of either

| Initials: | Landlord | Tenant |
|-----------|----------|--------|

terminating this Lease and refunding Tenant's pro rata share of Rent commensurate with the time remaining under the Lease Term.

**7.10   Smoking.** Smoking on the Premises and in any buildings or structures upon the Premises is not permitted at any time.

**8.      Inspection of Premises.** Landlord and Landlord's agents, including, but not limited to, any management company of Landlord, shall have the right at all reasonable times during the Lease Term and any renewal thereof to enter the Premises for the purpose of inspecting the Premises and all buildings and improvements thereon. Tenant agrees to make the Premises available to Landlord for such inspections or to address an emergency. Except in an emergency situation, Landlord shall give Tenant a forty-eight (48) hour notice of Landlord's intent to enter.

**9.      Abandonment.** If at any time during the Lease Term,  the Tenant abandons the Premises or any part thereof, Landlord may at Landlord's option obtain possession of the Premises by any legal means without liability to Tenant and may, at Landlord's option, terminate this Lease. Abandonment is defined as absence of the Tenant from the Premises for at least 30 days without notice to Landlord.

**10.     Security System.** Tenant understands that Landlord is not responsible to provide any security alarm system or other security for Tenant or the Premises.  In the event any alarm system is provided, Tenant understands that such alarm system is not warranted to be complete in all respects or to be sufficient to protect Tenant or the Premises. Tenant releases Landlord from any loss, damage, claim or injury resulting from the failure of any alarm system, security or from the lack of any alarm system or security.

**11.     Insurance.** Tenant shall each be responsible for maintaining appropriate insurance for the entire Premises, including standard hazard, fire and flood insurance for the full replacement value of the Premises and the personal property therein, as well as general liability insurance coverage. Tenant understands that Landlord will not provide any insurance coverage whatsoever for the Premises or for Tenant's property. Landlord will not be responsible for any loss of Tenant's property or damages to the Premises, whether by theft, fire, riots, strikes, acts of God or otherwise, and the liability for any such damages will be that of Tenant. Tenant shall provide Landlord, on a monthly basis, written proof that the Premises are properly insured in a manner satisfactory to Landlord.

**12.     Intent to Purchase.** As of the Effective Date, it is the Tenant's herein intent to purchase the Premises from Landlord in accordance with the terms and conditions of this Lease prior to or after the expiration of the Lease Term. All of the terms and conditions of the purchase/sale of the Premises are governed by this Lease and nothing to the contrary shall be deemed as part of the sale/purchase of the Premises or otherwise alter the terms of this Lease unless a written addendum to this Lease is signed by both Landlord and Tenant.

*Initials:*   Landlord _____   Tenant _____

Residential Lease, 341 Corrie Rd., Ann Arbor, MI 48105                    Page 8 of 10

**13.   No Other Representations, Construction; Governing Law; Consents; Acknowledgements.**

**13.1   No Other Representations.** Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant in executing and delivering this Lease is not relying upon, any warranties, representations, promises, understandings or statements, except to the extent that they are expressly set forth in this Lease.

**13.2   Entire Agreement.** THIS WRITTEN LEASE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH REGARD TO THE TENANT'S LEASE OF THE PREMISES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. The Parties make no representations or warranties to each other, except as contained in this Lease. All prior agreements and understandings between the Parties hereto with respect to the transactions contemplated hereby, whether verbal or in writing, are superseded by, and are deemed to have been merged into, this Lease unless otherwise expressly provided herein.  This Lease shall be binding on, and inure to the benefit of, the Parties hereto and their permitted successors and assigns as stated in this Lease, but no other party shall have or claim any third party beneficiary rights under this Agreement.

**13.3   Construction and Severability.** If any of the provisions of this Lease, or the application thereof to any person or circumstances, shall, to any extent, be held invalid or unenforceable for any reason, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**13.4   Counterparts or E-mail.** This Lease may be executed in counterparts, including by e-mail transmission, each of which shall be deemed an original and all of which together shall constitute one document.

**13.5   Time of Essence.** Time and strict and punctual performance are of the essence with respect to each provision of this Lease.

**13.6   Survival of Representations and Warranties.** The representations, warranties and covenants of the Parties contained herein shall survive the consummation of the transactions contemplated in this Lease, subject to any time period limitations specified herein.

**13.7   Further Cooperation.** The Tenant shall each execute and deliver to the Landlord all further documents or instruments reasonably requested by Landlord to effect

Initials:   Landlord _____   Tenant _____

the intent of this Lease. Any request by Landlord under this Section shall be accompanied by the document proposed for signature, in form and substance satisfactory to Landlord.

**13.8   Venue and Choi⸗ e of Law.**  The Parties agree that any litigation between the Parties concerning this Lease shall be brought in the State of Michigan, County of Oakland, in the appropriate Circuit or District Court. This Agreement shall be interpreted in accordance with and any dispute shall be governed by the laws of the State of Michigan.

**13.9   Modifications.**  This Lease may be amended, waived, discharged or terminated only by and through a written instrument signed by all Parties.

**13.10  Binding Effect.**  The covenants and conditions contained in this Lease shall apply to and bind the Parties and the heirs, legal representatives, successors and permitted assigns of the Parties.

**13.11  No Waiver.**  The failure of Landlord to insist in any instance upon the strict keeping, observance or performance of any provision of this Lease or to exercise any election in this Lease shall not be construed as a waiver or relinquishment of such provision in the future, but the same shall continue and remain in full force and effect. No waiver or modification by either Party of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by the Party to be charged. The receipt and retention by the Landlord of Rent with knowledge of the breach of any provision of this Lease shall not be deemed a waiver of such breach.

**13.12  Cumulative Rights.**  Landlord and Tenant's rights under this Lease are cumulative and shall not be construed as exclusive of each other unless otherwise required by law.

**13.13  Notice.**  Any notice required or otherwise given pursuant to this Lease shall be given in writing and delivered by first-class mail or a reputable overnight delivery service, if to Tenant, at the Premises and if to Landlord, at the address stated above. Either Party may change such addresses from time to time by providing written notice as set forth above.

**13.14  Headings.**  The headings of the Sections of this Lease are for convenience only and are not to be considered in construing said Sections.

**13.15  Holdover.**  If Tenant holds-over in the Premises after the expiration or termination of this Lease without the consent of the Landlord, Tenant shall pay as hold-over rent a monthly rental rate of $5,500.00, unless otherwise agreed by the Parties in writing; provided, however, that nothing contained herein shall be construed to limit or preclude any other rights or remedies available to the Landlord at law or in equity by reason of such holding-over by Tenant, including, without limitation, the recovery of any

*Initials:*  Landlord _____  Tenant _____

sums or damages to which, in addition to the damages specified above, the Landlord may lawfully be entitled. A month-to-month tenancy shall be created by Tenant's hold-over, subject to the same terms and conditions of this Lease and shall be terminable on a thirty (30) day-notice by either Party, or on longer notice if required by law.

**13.16  Indemnification.** To the extent permitted by law, Tenant indemnifies and holds Landlord, Landlord's agents and the Premises, harmless from any and all liability for loss, claims, injury to or death of any person, including Tenant, or for damage to property arising from Tenant's use and occupation of the Premises, or from the acts or omissions of any person or persons, including Tenant, in or about the Premises with Tenant's express or implied consent, except Landlord's act of negligence.

**13.17  Neutral Construction.** Any ambiguities and/or inconsistencies in any of the terms of this Lease will be given neutral construction and shall not be construed against any particular Party as the "drafter" of such language.

**13.18  References in this Lease**. Whenever the context of this Lease requires, references to the singular number shall include the plural, and the plural shall include the singular, where appropriate; words denoting gender shall be construed to include the masculine, feminine and neutral where appropriate; and specific enumeration shall not exclude the general, but shall be considered as cumulative.

IN WITNESS WHEREOF, the Parties to this Lease have executed and delivered this Lease as of the Effective Date.

**LANDLORD:**

R & J GROUP HOLDINGS LLC

By: Jerry Watha
Its: Member

**TENANT:**

Azar Sadeghi-Staffeld, an individual

Ghazal Staffeld a/k/a Ghazal Jones, an individual

| Initials: | Landlord | Tenant |
|-----------|----------|--------|

**EXHIBIT A**
**LEGAL DESCRIPTION**

Real property located in the Village of Barton Hills, County of Washtenaw, State of Michigan, described as:

Commencing at an iron pipe in the South line of Section 8 at its intersection with the West line of Lot 4, Block 3, Supervisor's Plat of Barton Hills; thence North 20 degrees 12 minutes East 198.16 feet to a concrete monument for a PLACE OF BEGINNING; thence North 20 degrees 12 minutes 00 seconds East 217.77 feet to a concrete monument; thence North 20 degrees 12 minutes 00 seconds East 133.73 feet to a concrete monument, thence North 35 degrees 01 minute East 94.97 feet to a point on a curve; thence Easterly along a curve concave Southerly having a radius of 45.99 feet and central angle of 48 degrees 42 minutes 30 seconds 39.10 feet to a concrete monument in the Southerly right-of-way line of Conic Road at its Westerly end; thence North 83 degrees 49 minutes 0 seconds East 120.00 feet along the South line of Corrie Road to a concrete monument; thence South 6 degrees 00 minutes West 250.00 feet to a concrete monument; thence South 28 degrees 11 minutes 10 seconds West 227.14 feet to a concrete monument; thence North 87 degrees 02 minutes 42 seconds West 193.40 feet to the PLACE OF BEGINNING, being a part of parcel one of Lot 4 in Block 3 of Supervisor's Plat of Barton Hills, as recorded in Liber 9 of Plats, Pages 58, 59, and 60, Washtenaw County Records.

Tax Parcel Number IB-09-08-380-005

This agreement is made between the purchaser and the seller on November 11, 2024

For the property located at 341 Corrie Rd Ann Arbor, MI.

Buyer agrees to present a valid Purchase Agreement no later than Wednesday November 13,2024 @ 5pm

The P.A must present a Purchase price No less than $1,148,581.72

Must have a closing date No later than January 31,2025

Purchaser to pay all taxes, Recording fees, and transfer taxes .

There will be No Tax prorations.

**Any and all additional expenses incurred by seller  pertaining to the property From October 31,2024 thru January 31,2025 will be paid by the purchaser.**

Purchaser currently Resides in the home

This is an AS IS WHERE IS SALES

Seller to provide Free and clear title at the time of closing

Seller agrees to extend the current lease until January 31,2025

Purchaser agrees to continue making agreed monthly payments. Until the loan closes.

# EXHIBIT B

                         STATE OF MICHIGAN

           14A-1 JUDICIAL DISTRICT COURT (ANN ARBOR, MICHIGAN)


R & J GROUP HOLDINGS,

                Plaintiff,

v                                        File No. 251C0573 LT

AZAR SADEGHI-STAFFELD

and

GHAZAL STAFFLED,

                Defendants.
_____/


                          BENCH TRIAL

         BEFORE THE HONORABLE J. CEDRIC SIMPSON, DISTRICT JUDGE

             Ann Arbor, Michigan – Tuesday, April 8, 2025


APPEARANCES:

For the Plaintiff:        MR. ANTHONY G. MAMMINA (P37684)
                          Mammina & Ajlouny PC
                          370 E. Maple Road, Suite 230
                          Birmingham, Michigan  48009
                          (248) 642-1330

Appearing in Pro Per:     MS. AZAR SADEGHI-STAFFELD
                          341 Corrie Road
                          Ann Arbor, Michigan  48105
                          (734) 929-6969

RECORDED AND
TRANSCRIBED BY:           Ms. Emily Hartwick, CER 9448
                          Certified Electronic Recorder
                          (734) 973-4516

                               1

TABLE OF CONTENTS

<u>PAGE</u>

<u>WITNESSES:     PLAINTIFF</u>

NONE


<u>WITNESSES:     DEFENDANT</u>

NONE


<u>EXHIBITS:</u>                          <u>MARKED</u>           <u>ADMITTED</u>

NONE

```
CLERK NOTE
***** Any discrepancy where the audio for the participants was
unclear due to electronic failure or distortion, or to the speaker
not being picked up by the microphone is marked as
[indiscernible].
```

| | |
|---|---|
| 1 | Ann Arbor, Michigan |
| 2 | Tuesday, April 8, 2025 – 10:34 a.m. |
| 3 | THE COURT:  Court does call the case of *R and J* |
| 4 | *Group Holdings versus Staffeld*.  Azar Staffeld. |
| 5 | MR. MAMMINA:  Anthony Mammina appearing on behalf |
| 6 | of R and J Group Holdings, the plaintiff. |
| 7 | MS. SADEGHI-STAFFELD:  Good morning, your Honor. |
| 8 | Azar Staffeld on behalf of myself. |
| 9 | THE COURT:  All right. |
| 10 | Have the parties tried to talk at all, or no?  Or |
| 11 | are we going to go to trial? |
| 12 | MR. MAMMINA:  No, we -- there's no talking, |
| 13 | unfortunately in this case.  I'd be willing if the Court |
| 14 | would direct us to, but I don't think there's anything that |
| 15 | we can discuss. |
| 16 | This is a termination of tenancy case there's |
| 17 | nothing to talk about here. |
| 18 | THE COURT:  Okay. |
| 19 | MS. SADEGHI-STAFFELD:  Your Honor, I'm open to |
| 20 | talks -- and the communication is not a good strategy.  But |
| 21 | this is not a tenancy termination.  This is a purchase |
| 22 | agreement, a subsequent tenancy. |
| 23 | We signed, this Exhibit G, with -- with this |
| 24 | gentleman's client, and it started November 17th of 2024.  We |
| 25 | signed the purchase agreement that we want this to be |

4

1    enforced as a matter of fact.

2              THE COURT:  Yeah.  But you -- I can't enforce the

3    purchase agreement.

4              You've been to other courts to enforce that

5    purchase agreement, correct?

6              MS. SADEGHI-STAFFLED:  No.

7              THE COURT:  Then what was the complaint in federal

8    court?

9              MS. SADEGHI-STAFFELD:  The federal court case, your

10   Honor, is a wrongful foreclosure suit against Wells Fargo,

11   that subsequently we added an amended complaint and added R

12   and J to that case.  That's why we filed the motion first.

13             THE COURT:  And then that case -- did he give you

14   that?

15             THE COURT:  Wonderful.

16             Hold on.  Where did Mr. Chavez go?

17             I'm going to break in this case.  Recall Evergreen

18   --

19             (At 10:37 a.m., case is passed)

20             (At 10:38 a.m., case is recalled)

21             THE COURT:  All right.

22             We're back on the R and J Group Holdings -- all

23   right.

24             The question -- you added R and J to the federal

25   case, correct?

1              MS. SADEGHI-STAFFELD:  Excuse me, your Honor.

2      Correct.

3              THE COURT:  And then that case was dismissed?

4              MS. SADEGHI-STAFFELD:  It was not.

5              THE COURT:  Okay.  Is it pending?

6              MS. SADEGHI-STAFFELD:  Yes.

7              THE COURT:  And did you get a stay of these

8      proceedings in federal court?

9              MS. SADEGHI-STAFFELD:  I didn't petition for a stay

10     in federal court.  I'm petitioning to this court for a stay,

11     your Honor.

12             THE COURT:  That stay is denied.  I'm not issuing a

13     stay.

14             MS. SADEGHI-STAFFELD:  Okay.

15             THE COURT:  So, ma'am, I'm trying to figure out --

16     what's your claim?  Because I read through everything that

17     you filed before the Court.  Much of it, which was also

18     stricken, but then you filed other things you haven't

19     complied with that.  As to the issue of possession, I don't

20     see that there's an issue for me to try.

21             MS. SADEGHI-STAFFELD:  The issue of possession is a

22     non-issue.

23             First of all, according to the lease, the Court

24     that is -- has jurisdiction that we agreed on that, is the

25     Circuit Court of Oakland County.  Section 13 of the lease.

6

1           Excuse me, your Honor.

2           THE COURT:  I don't --

3           MS. SADEGHI-STAFFELD:  The second issue --

4           THE COURT:  -- think you can't confer jurisdiction

5     that way.

6           MS. SADEGHI-STAFFELD:  Well, they have.

7           THE COURT:  They have what?

8           MS. SADEGHI-STAFFELD:  They have put in the lease

9     agreement that in case of conflict, we have to go to Oakland

10    County Circuit Court.

11          THE COURT:  Yes, but the property resides in

12    Washtenaw.

13          MS. SADEGHI-STAFFELD:  Correct.  I agree with you.

14          THE COURT:  Then venue and jurisdiction is here.

15          MS. SADEGHI-STAFFELD:  Correct.

16          THE COURT:  You can't -- you can't do it that way

17    even if -- even if that was agreed to.  It's unenforceable.

18          MS. SADEGHI-STAFFELD:  I agree.

19          THE COURT:  Okay.  So, we're here so everybody

20    doesn't have to head to Oakland County.

21          MS. SADEGHI-STAFFELD:  Okay.

22          THE COURT:  Might make my day easier if you would,

23    but you can't.  Okay.

24          MS. SADEGHI-STAFFELD:  [Indiscernible].

25          THE COURT:  So, it's here but -- and so, when I

1    look at everything, I don't see -- as to these two parties,

2    that there's anything for me to try.  That they're entitled

3    to possession of the premises.

4              MS. SADEGHI-STAFFELD:  Despite the purchase

5    agreement we signed?

6              THE COURT:  The purchase agreement, you're making

7    that part of -- did you file an action in Circuit Court

8    regarding the purchase agreement?

9              MS. SADEGHI-STAFFELD:  I'm intending to do that.

10             THE COURT:  But -- you have to and you're --

11   they're saying you defaulted on the purchase agreement.

12             MS. SADEGHI-STAFFELD:  We are not.

13             THE COURT:  Okay.  But if you're seeking to enforce

14   the purchase of the property, can't do that here.

15             MS. SADEGHI-STAFFELD:  The lease agreement has a

16   provision, that within a year, we are entitled to purchase

17   the property.  That's what we're trying to do.  To buy the

18   property.

19             THE COURT:  Okay.  Have you purchased it?

20             MS. SADEGHI-STAFFELD:  We secure the loan.  We

21   ordered the title work -- the title work shows that there's a

22   lien on the property and the mortgage company would not issue

23   any loans to me unless the lien is removed by Mr. Mammina's

24   client.

25             THE COURT:  Sir, what's your position?

8

1          MR. MAMMINA:  That's simply not true, your Honor.

2          There were two liens on the property.  One of them

3     was a mortgage lien that was paid at closing --

4          THE COURT:  Right.

5          MR. MAMMINA:  -- from the proceeds of the sale.

6     The other was a lien that was placed on the property by the

7     Homeowners Association by virtue of her actions while she was

8     in the property before.

9          That aside, we did obtain title commitment -- of

10     title commitment guaranteeing her clear title at the closing

11     and I've got documentation and we submitted that to the --

12     her mortgage agent and her prior to the date the closing had

13     to occur.

14          So, that's simply not a true statement

15          THE COURT:  And the closing hasn't occurred?

16          MR. MAMMINA:  No.

17          MS. SADEGHI-STAFFELD:  We submitted the documents

18     that they gave us to our mortgage person and to the title

19     company and neither one of them accepted --

20          THE COURT:  Let me ask you this; are you gonna

21     (sic) let her buy the property or do you want it back?

22          MR. MAMMINA:  Today, we want it back.  If she wants

23     to negotiate or buy it later, that's fine with us.  We're not

24     opposed to her having the property, but what we're opposed to

25     is her staying in it for free subsequent to the chronological

1    termination of the lease.

2          So, my client does want it back and I'm not sure at

3    this point whether he wants to sell it to her.  I shouldn't

4    say that he does, but there's nothing personal, here your

5    Honor.  We just want our property back because we're entitled

6    legally to it and there was no breach on our side of the

7    purchase agreement period.  In our opinion.  I have

8    documentation --

9          THE COURT:  No.  I -- I looked at everything.  I

10    don't see any breach regarding the purchase agreement.  It's

11    just --

12          MS. SADEGHI-STAFFELD:  It is, your Honor.

13          May I speak?

14          THE COURT:  Well, why haven't you brought an action

15    for the breach of the purchase agreement?

16          MS. SADEGHI-STAFFELD:  Because they brought an

17    action for possession and I'm busy responding to that.

18          THE COURT:  Go ahead.  What do you wanna (sic) say?

19    What do you wanna (sic) say?

20          MS. SADEGHI-STAFFELD:  I'm sorry.  What?

21          THE COURT:  What do you want to say?

22          MS. SADEGHI-STAFFELD:  What I want to say is, the

23    gentleman's statements absolutely incorrect.  We have paid

24    money to run the title and since they purchased the property,

25    they are the violator of the lease agreement, because they

1    were not supposed to get a mortgage on this property.  They

2    have.

3              Also, there is a -- there is a lien on the

4    property, that prevents us from going forward with the

5    purchase of the property because of the lien and the lien is

6    not removed and it happened when they owned the property not

7    -- we owned the property.

8              THE COURT:  The lease has expired.

9              MS. SADEGHI-STAFFELD:  The lease has expired.  But

10   the purchase agreement --

11             THE COURT:  Hold on a second.

12             The lease has expired, you're seeking to enforce

13   this purchase agreement.

14             MS. SADEGHI-STAFFELD:  Correct.

15             THE COURT:  That's not done here.  That's why I'm

16   saying I don't have a triable issue.  The lease has expired,

17   they filed proper notice.  They're entitled to possession of

18   the premises.

19             If you wish then to enforce your rights regarding

20   that purchase agreement, that's gonna (sic) have to be filed

21   in another court.

22             MS. SADEGHI-STAFFELD:  Okay.

23             THE COURT:  I mean, I think it's as simple as that.

24             Is there anything else you want to tell me?

25             MS. SADEGHI-STAFFELD:  Yes, your Honor.

1          I'm here today, fighting for roof over my head.

2    This is my private residence.  They promised they're gonna

3    (sic) sell it to me.  They're backing up from their promise.

4    They broke every single provision in that agreement.

5               THE COURT:  Okay.

6               Ma'am, you can tell me that all day and night long

7    --

8               MS. SADEGHI-STAFFELD:  That's fine.

9               THE COURT:  -- and the problem is that has to be

10   heard someplace else.  I -- it can't be heard here because

11   the lease expired.  They're seeking possession of the

12   premises.

13              So, Court after hearing is finding no triable

14   issue, grant a judgment for possession to the plaintiff.

15   There is no redemption amount per se.

16              What I will do, ma'am, is normally a writ would

17   issue in 10 days, but you can --

18              I'll indicate that a writ may issue April 30th.

19   Then if you wish to file some action or to seek a stay you

20   can do whatever you wanna (sic) do.  But I'm gonna (sic) have

21   a writ issue April 30th.

22              MS. SADEGHI-STAFFELD:  Certainly, your Honor.

23              Also, I put a $5,000.00 in escrow.  Can that be

24   released?

25              THE COURT:  To whom?

1              MS. SADEGHI-STAFFELD:  To myself.

2              MR. MAMMINA:  Your Honor, if I may briefly?

3              THE COURT:  You could say what -- go ahead.

4              MR. MAMMINA:  Rent is due prior to the end of the

5      termination of the lease.  So, we're not accepting any rent

6      for periods that after the expiration.

7              So, I believe my client's entitled to that rent.

8              MS. SADEGHI-STAFFELD:  I beg the difference, your

9      Honor.  They are saying that this was terminated as of

10     November 1st, and I paid them October payment.  So, as of

11     November 1st, they are not entitled.  If they claim this

12     lease is void and null -- excuse me.

13             THE COURT:  You guys done?

14             Because here's what I'm gonna (sic) do.

15             MS. SADEGHI-STAFFELD:  I'm sorry, I --

16             THE COURT:  I'm gonna (sic) issue the judgment.

17             MS. SADEGHI-STAFFELD:  Okay.

18             THE COURT:  Okay.

19             Writ date of April 30th.  I'll set a hearing on the

20     release of escrow for May 20, 2025, after I see where the

21     landscape is.  All right.

22             MS. SADEGHI-STAFFELD:  Thank you, your Honor.

23             MR. MAMMINA:  Same time the appeal period?  Same

24     time the appeal period --

25             THE COURT:  In the judgment, you mean?

1                    Yes.

2                    MR. MAMMINA:  Thank you, Judge.

3                    THE COURT:  Thank you.

4                    MR. MAMMINA:  I'll prepare and submit it to your

5         clerks.

6                    THE COURT:  All right.

7                    MR. MAMMINA:  Have a nice day, Judge.

8                    MS. SADEGHI-STAFFELD:  Thank you, Judge.

9                    THE COURT:  Thank you.

10                   (At 10:50 a.m., proceedings concluded)

I certify that this transcript, consisting of 15 pages is a complete, true, and correct transcript of the Bench Trial and testimony taken in the case of the *R & J Group Holdings vs Azar Sadeghi-Staffeld and Ghazal Staffeld*, file number 251C0573 LT on Tuesday, April 8, 2025.

Date: April 23, 2025

*Emily L. L. Hartwick*

Emily Hartwick, CER 9448
Certified Electronic Recorder
14A-1 District Court
4133 Washtenaw Avenue
Ann Arbor, Michigan  48108
(734) 973-4516

**\*\*\*\* THIS COPY IS NOT CERTIFIED WITHOUT A LIVE SIGNATURE FROM THE TRANSCRIBING C.E.R LISTED ABOVE \*\*\*\***

# EXHIBIT C


**REALTOR**


EQUAL HOUSING OPPORTUNITY

# PURCHASE AGREEMENT

42705 Grand River Ave, Ste 201 Novi MI 48374 | 888.304.1447
www.3dxrealestate.com

**1. AGREEMENT TO SELL.** The undersigned Seller and Purchaser agree to sell and purchase the following real property located in the [City, Village, Township] of: __ANN ARBOR_____, __Washtenaw County_____ County, Michigan, described as follows: [legal description/tax ID No.] SOLD STD . IROB 04D-079-00 BUX 2-29 COM AT SW OF LOT 4, BLK 2, TH N 20 DEG 17 E MR 84 FT FOR PL OF BEG, TH N 20 DEG 17 E 34 SQ FT, TH N 50DEG 0F E 94.92 FT, TH REV ___ known as [address] __341 CORRIE RD_____ together with all improvements and appurtenances, including but not limited to all window treatments, shades, blinds, curtain rods, traverse rods, lighting fixtures, storm windows and doors, screens, awnings, TV antenna, satellite dish and accessories, water softener (rental units excluded), security system, central vacuum system and attachments, garage door openers and transmitters, fireplace enclosures, grates, logs and gas attachments, attached mirrors, landscaping, attached humidifiers and electric air filters, fuel in tanks at the time of possession, carpeting, if any, now on the premises, and: _____ (the "Property").
Seller and Purchaser agree that the personal property identified in this Purchase Agreement is being sold together with the Property and that the consideration for the personal property is contained in the Purchase Price for the Property. Seller agrees to provide Purchaser with a bill of sale containing standard warranties of title for the personal property being sold to Purchaser as so identified. Seller further agrees to transfer to Purchaser, to the extent such transfer or assignment is permitted, all warranties and guaranties relating to any equipment, fixtures, or personal property affixed to the Property, and/or to be conveyed to Purchaser. Seller further agrees to deliver to Purchaser all service manuals, operating instructions, owner's manuals, repair records, service records, and the like in Seller's possession relating to the Property or any personal property, fixtures, or equipment to be sold or conveyed to Purchaser.

Purchaser agrees to pay Seller the sum of: $1,148,581.72 _____ (One Million One Hundred Forty Eight Thousand Five Hundred Eighty One Dollars Seventy Two Cents_____) Dollars (the "Purchase Price") subject to the existing building and use restrictions, easements, and zoning ordinances, if any, in accordance with the terms and subject to the conditions set forth in this Purchase Agreement.

**2. PURCHASER'S CLOSING COSTS.**
Seller agrees to contribute: __0.00_____ of final sales price towards Purchasers: ☐ Pre-Paids ☐ Closing Costs ☐ Escrows

**3. PAYMENT.** This transaction shall be consummated by the subparagraph checked below: (Check box that applies)
☐ **A. CASH SALE.** Purchaser will pay the sales price in cash or certified funds, after delivery by Seller, of a Warranty Deed conveying marketable title.
☑ **B. NEW MORTGAGE.** This Agreement is contingent upon Purchaser's ability to secure a __Conventional__ mortgage in the amount of $ __1,148,581.72__. Purchaser agrees to pay the required down payment plus all prepaid items, mortgage costs, escrows and adjustments. Seller shall deliver to Purchaser the usual Warranty Deed conveying marketable title upon tender of the Purchase Price. Purchaser agrees to apply for said mortgage, within __5__ days from the date of Seller's acceptance of this Agreement. Purchaser agrees to promptly and in good faith comply with the lender's request for necessary information required to process the loan application. If a firm commitment for the specified mortgage cannot be obtained within __75__ days from the date of Seller's acceptance, this Agreement shall be null and void and the Deposit shall be returned to Purchaser. Denial of the specified mortgage shall render this Agreement null and void and the Deposit shall be returned to Purchaser.
☐ **C. LAND CONTRACT/OTHER. – SEE ADDENDUM.**

**4. APPRAISAL.** This transaction is subject to the property appraising at the agreed upon sales price, or higher. If property appraises below the sales price, Purchaser shall have the option to declare this offer null and void with a full refund of deposit.

**5. DEPOSIT.** The Broker is hereby authorized to present this Purchase Agreement to Seller, and will accept a deposit of $10,000.00____ which is to be held, once received, by Broker under Act No. 299 P.A. of 1980 and applied to the purchase price if the sale is consummated; or returned to Purchaser if the offer is rejected or withdrawn. If the Agreement is terminated pursuant to any conditions set forth within the agreement, parties agree that Selling Broker shall return the Deposit to Purchaser and Seller's remedies, if any, are limited to an award of damages equal to the amount of the Deposit.

**6. HOME PROTECTION PLAN.** Purchaser acknowledges notice of the availability of a home protection plan. **Purchaser:** ☑ Declines ☐ Accepts
Protection through: _____ [at]: ☐ Purchaser's expense ☐ Seller's expense. Cost Not to Exceed: $_____.

**7. FLOOD INSURANCE.** Purchaser may, at his expense, obtain a Flood Plain Certification within seven (7) days from the date of Seller's acceptance of this Agreement. If the Certification discloses that the property is in a Special Flood Hazard Area, Purchaser may notify Seller, in writing, within three (3) days from the date of the Certification, that Purchaser declares this Agreement null and void, and the deposit shall then be returned to Purchaser.

**PURCHASER(S) INITIALS:** _____ / _____    **SELLER(S) INITIALS:** _____ / _____

**8. SELLER DISCLOSURES.** Purchaser acknowledges Seller's Disclosure Statements have been provided by Seller and, if the Property is residential housing built before 1978, a Lead-Based Paint and Lead-Based Paint Hazards Disclosure, prior to signing this Agreement. Furthermore, Purchaser acknowledges these and any other disclosures are (a) based upon Seller's knowledge and is not a warranty of any kind by Seller or Listing and Selling Brokers and their salespeople; (b) not substitution for any inspections or warranties Purchaser wishes to obtain; (c) provided solely by Seller and is not a representation made by Listing and Selling Brokers and their salespeople; and (d) a disclosure only and not intended to be a part of this Agreement. Seller authorizes Broker to distribute copies of the disclosures to any lender, appraiser and municipality, upon Purchaser's request. Seller represents, that there are no underground storage tanks, hazardous or toxic substances existing on, under, or above the Property as defined in any federal, state, or local law, regulation, rule, statute, or directive, nor is there any asbestos, urea formaldehyde insulation and the property does not contain any pollution or other environmental hazards other than any the Sellers disclosed on the Sellers Disclosure Statements. Furthermore, there are no undisclosed or latent defects affecting the Property and its improvements other than as set forth and identified on Seller's Disclosure Statement.

**9. HOMEOWNERS/CONDOMINIUM ASSOCIATION.** If there is a Homeowners/Condominium Association that has authority over the property, Seller is to provide Purchaser with a copy of the most recent financial statement, Master Deed (if any), by-laws and assessments and any other related information within seven (7) days of acceptance. If Purchaser does not notify Seller in writing within nine (9) days from the date of receipt of said documents that the Purchaser is dissatisfied with said documents, this Agreement shall be binding without regard to said documents. If Purchaser notifies Seller in writing that Purchaser is dissatisfied with said documents within the above specified time, then Purchaser may declare this Agreement void and any deposits shall be refunded.

**10. OCCUPANCY.**
☑ **A. Keys Immediately at Closing** ☐ **B. Within** _____ **days after closing by 5 p.m.** From the date of closing to and including the date of vacating, Seller shall pay Purchaser $_____ per day as an occupancy charge. At closing, Seller shall deposit with Title Company $_____ to hold in escrow as an occupancy deposit and $_____ to hold in escrow as a damage deposit. Title Company shall pay to the Purchaser the amount of the occupancy charge and then reimburse Seller for any unused days upon Seller vacating the property.
**C. If tenants occupy the property, then:**
☐ Seller will have the tenants vacate the property before closing.

☐ Purchaser will be assigned all Landlord rights and security deposit and rents prorated to date of closing, with Purchaser assuming Landlord rights and obligations after date of closing.

Seller agrees to pay or reimburse Purchaser for all costs and expenses and incidental and consequential damages sustained by Purchaser incurred in recovering possession of the Property, which shall include, but not be limited to, mortgage payments, taxes, utilities, housing expense, storage fees, actual attorneys fees and any other costs or expenses which either arise out of or are connected with Seller's failure to vacate the Property as required by this Agreement. Furthermore, any material damage to property caused by Seller during occupancy period, will result in monies escrowed for damage deposit, to be released to Purchaser for repair expenses. Seller shall have discretion to determine and define what constitutes material damage. If material damage amounts exceed deposit, Seller will be responsible for reimbursing for any additional monies directly to Purchaser. (The Escrow Agent or Broker has no obligation, implied or otherwise, for seeing that the premises are vacated or for the condition of the premises, etc.)

**11. TAXES/DUES/ASSESSMENTS.** Seller shall pay the following:
**A. Taxes.** All current year real estate taxes which are due before date of closing, prorated and adjusted as of the date of closing in accordance with the Due Date basis of the municipality or taxing unit in which the property is located.
**B. Assessments.** Any and all assessments associated with the property, until the time of closing.
**C. Association.** All current year Current Homeowners, Subdivision or Condominium Association dues which are due before date of closing prorated between Seller and Purchaser as of the closing date on a due date basis. Capital or lateral charges shall be paid by Seller at closing.
**D. Water/Sewer.** Final water and sewage charges which are due up to the final day of occupancy, prorated and adjusted between Seller and Purchaser as of the date on which Seller vacates the Property and surrenders the keys to Purchaser. Escrow Agent shall retain and hold in escrow a minimum of $800 from the amount due Seller at closing for these charges. Escrow Agent shall remit the amount allocated to Seller and return the balance, if any, to Seller after receipt of the final bill or meter reading.

**12. EVIDENCE OF TITLE AND TITLE INSURANCE.**
**A. Commitment.** As evidence of title, Seller, at Seller's expense, agrees to furnish Purchaser within ten (10) days of Seller's acceptance of this Agreement, a commitment for title insurance in an amount not less than the Purchase Price and bearing a date later than the acceptance date of this Agreement, with the owner's policy to be issued pursuant to the commitment insuring marketable title (as defined below) to the Property in Purchaser.
**B. Without Standard Exceptions.** Seller agrees that the commitment for title insurance and the subsequent policy shall be issued without standard exceptions and that the policy issued will be updated to close any "gap" period between the date of closing and the date of the recording of the deed to Purchaser. Seller shall also provide Purchaser with a marked-up commitment for title insurance at the closing of this transaction guaranteeing that title is in the condition required under this paragraph.
**C. Owner Affidavit.** Seller shall execute an owner's affidavit and such other documents as the title insurance company or its agent typically requires for the issuance of a policy without standard exceptions, provided, however, that Purchaser shall pay for the cost of any survey required for the deletion of the standard exceptions.
**D. Marketable Title.** For purposes of this Agreement, marketable title shall mean fee simple title free and clear of any and all liens and encumbrances whatsoever, excepting only recorded and enforceable building and use restrictions, public utility easements of record, and zoning ordinances. Purchaser, at Purchaser's sole option, may elect to accept title in whatever condition it may be in and, in such event, marketable title shall mean the condition of title which Purchaser has elected to accept.
**E. Objection.** If objection to the title is made in writing, Seller, at Seller's sole option, shall have thirty (30) days from the date Seller is notified in writing of particular defects claimed, either (1) to fulfill the requirements or to remedy the title defects or (2) to refund the deposit in full termination of this Agreement. If Seller is able to comply with such requirements or remedy such defects within the time specified, as evidenced by written notification, revised commitment, or endorsement to commitment, Purchaser agrees to complete the sale within fourteen (14) days of receipt of a revised commitment or endorsement to commitment, subject to any other contingency contained in this Agreement. If, after reasonable efforts, Seller is unable to furnish satisfactory title within the time specified, the deposit shall be immediately refunded to Purchaser in full termination of this Agreement, unless Purchaser elects to proceed with the sale accepting such title as Seller is able to convey.

**PURCHASER(S) INITIALS:** _____ / _____          **SELLER(S) INITIALS:** _____ / _____
VS 3.0 | Rev. 11/22 | 3DX Real Estate, LLC – Form for use by active 3DX Real Estate Associates only, any other use is prohibited.
**Page 2 of 4**

**13. PROPERTY INSPECTION.** Purchaser: ☐ DOES ☑ DOES NOT choose to have the Property inspected at Purchaser's expense, as Broker recommends. Seller shall grant an inspector of Purchaser's choice access to the Property to inspect and report upon the general condition of the Property, including but not limited to, any structure/s, plumbing, heating, mechanical, mold, radon, environmental, water, well, septic, lead based paint, electrical systems, etc. and determination of square footage. If the Property has been winterized, Seller shall, at his expense, de-winterize the Property and turn any utilities on prior to the inspection. The inspection shall be concluded within _____ calendar days from the date of Seller's acceptance of this Agreement. If the inspection discloses any defect in the Property which results in the Purchaser having cause to be dissatisfied with the Property, Purchaser shall notify Seller, in writing, within _____ days following the inspection, that Purchaser (a) declares this Agreement null and void and the Deposit shall be returned or (b) requests Seller to remedy the defect. Failure to notify Seller of a defect within this time period shall constitute a waiver of this paragraph by the Purchaser and he shall accept the Property AS IS. If the Seller is notified of a defect, Seller shall notify Purchaser, in writing, within _____ days, that Seller (a) will repair or provide for repair to eliminate the defect disclosed on the inspection report or (b) is unwilling to repair or provide for repair. If Seller declares his unwillingness to repair or provide for repair, Purchaser may (a) accept the Property AS IS or (b) declare this Agreement null and void and the Deposit shall be returned.

**14. MUNICIPALITY INSPECTION.** If the property is located in a municipality that requires an inspection prior to a sale, ~~Seller~~ will pay for necessary inspections and/or required repairs, if any, to obtain written approval of the municipality.                                                    *Buyer    Ronan/atah*

**15. WALK-THROUGH INSPECTION/PROPERTY CONDITION.** Seller agrees to keep the property and land in substantially the same condition as of the date of this Agreement and agrees to maintain heating, sewer, plumbing and electrical systems and any built-in appliances and equipment in normal working order, to keep the roof watertight and maintain the grounds. Seller further agrees to keep all utility services (electric, gas, water, etc.) operating until date of possession, and to provide the Purchaser with sufficient notification of occupancy date in order to arrange a transfer of the services. Seller agrees to leave the premises "broom clean" and free of occupants and debris upon vacating. Purchaser shall have the right to a walk-through inspection of the premises within forty-eight hours prior to closing in order to determine the property has been maintained in the condition agreed. Seller is responsible for any damage to the property, except for normal wear and tear, from the date of this offer until closing or vacating, whichever is later. If there is material damage, Purchaser has the option to cancel this Purchase Agreement and the deposit shall be immediately refunded to Purchaser, or Purchaser can proceed with the closing and either require that Seller repair the damage before the closing or deduct from the purchase price a fair and reasonable estimate of the cost to repair the property and assume the responsibility for the repair, thereby releasing Seller. Purchaser shall have discretion to determine and define what constitutes material damage or destruction. *Buyer occupies premises*

**16. PURCHASER SIDE TITLE.** Purchaser: ☑ Elects to have **Speedy Title** _____ provide Purchaser Side Title Insurance Policy and Closing Services.

**17. CLOSING.** The closing of this sale shall take place at a location designated by the mortgage lender, or absent that, at a place designated by the Listing Broker. Closing is to occur, on or before: **January 31st, 2025** . Seller shall provide a complete package of every document (other than loan documents) to be executed by Purchaser to Purchaser's Realtor or other designated representative within 48 hours of closing.

**18. CLOSING COSTS.** Purchaser agrees to pay customary closing fees to the title company or closing Agent who supervises the closing. Purchaser shall also pay all recording fees for the deed, security instrument, and mortgage loan costs. The Seller shall pay all transfer taxes and costs to convey clear title. ~~Purchaser agrees to pay to 3DX Real Estate, a Broker Compliance Fee of $495 at time of closing. Title fee is in addition to any commissions due to 3DX Real Estate.~~

**19. SELLER'S REPRESENTATIONS.** Seller represents and warrants to Purchaser as follows:
**A. No Litigation.** There is no pending litigation affecting all or any part of the Property, or Seller's interest in it.
**B. No Violations.** There are no uncorrected violations of any building codes and regulations, health codes, or zoning ordinances affecting the Property or the use or enjoyment of it.
**C. Division Rights.** Seller holds all possible division rights to the Property and will transfer all such division rights to Purchaser with the Deed. All representations and warranties shall survive the closing of this transaction and shall not be deemed merged into the Deed.

**20. MISCELLANEOUS.**
**A. AGREEMENT.** This Purchase Agreement supersedes any and all understandings and agreements and constitutes the entire agreement of all parties. No oral representations or statements through email, text message or other electronic transmission shall be considered a part of this agreement, unless specifically included in this document or similar addendum. All addendums must be in writing and signed by all parties to this Purchase Agreement.
**B. FACSIMILE/ELECTRONIC SIGNATURES.** The parties acknowledge and agree that facsimile or electronic signatures and initials are legally enforceable and binding.
**C. SUCCESSORS.** This Purchase Agreement binds Purchaser, Seller, their personal representatives, beneficiaries and heirs, and anyone succeeding to their interest in the property.
**D. LEGAL COUNSEL.** Broker recommends that Purchaser and Seller retain an attorney to protect their interests.
**E. DUE DILIGENCE.** Purchaser and Seller have the responsibility to perform their own due diligence in all matters of transaction. This includes verifying information such as, but not limited to contracts, disclosures, MLS data, advertisements, public record, municipality requirements and title work. Purchaser acknowledges that Broker has advised them to have the Property privately inspected by a qualified inspector. Purchaser acknowledges that Broker advised them to seek professional advice from experts of their choice, in the areas of law, tax, finance, lending, insurance, surveying, building, property inspection, hazardous material and/or structural engineering. Broker, Salespeople and its employees are not experts in these areas and cannot give such advice.
**F. HOLD HARMLESS.** Listing and Selling Brokers and their salespeople are not parties to this agreement. Furthermore, Listing and Selling Brokers specifically disclaim any responsibility for the condition of the Property, preparation of documents, the performance of this Agreement by the parties, or the outcome of this transaction. Purchaser and Seller hold Broker and their salespeople, brokers and employees harmless and do hereby indemnify them against all claims, actions or suits for damage of any nature.
**G. GOVERNING LAW.** This Agreement shall be governed by and construed according to the law of the State of Michigan, the state in which the Property is located.

PURCHASER(S) INITIALS: _____ / _____                          SELLER(S) INITIALS: _____ / _____

**21. DEFAULT.** Willful failure to perform by Seller or Purchaser shall be an event of default under this Agreement. If Purchaser defaults, Seller may, at Seller's option, pursue all available legal and equitable remedies or terminate the Agreement and seek forfeiture of the Deposit as liquidated damages. If Seller defaults, Purchaser may at Purchaser's option, elect to enforce the terms of this Agreement, pursue all available legal and equitable remedies and may also terminate the Agreement and seek a refund of his Deposit. Seller and Purchaser agree that Listing and Selling brokers and their salespeople shall not be made parties to any action taken to enforce or terminate this Agreement.

**22. NOTICE OF AGENCY.** Seller and Purchaser acknowledge that they have received the form Disclosure Regarding Real Estate Agency Relationships explaining the different types of agency relationships. The following agency relationship(s) is/are hereby confirmed for this transaction:

Listing Agent (Broker) is acting as an agent of the:
Seller [____] Dual [____] Non-Agent

Selling Agent (Broker) is acting as an agent of the:
[____] Purchaser [____] Dual [____] Seller [____] Non-Agent

**23. ADDITIONAL CONDITIONS:**

**24. EXPIRATION OF OFFER.** This offer shall expire unless it is accepted by Seller prior to [time] _____ am / pm [date] _____ and may be withdrawn at any time prior to Seller's acceptance.

ATTENTION: There are many steps to a real estate transaction before a transaction is finalized. Purchaser and Seller are strongly cautioned to avoid incurring moving and other out-of-pocket expenses in reliance on the transaction, until the transaction is made final through a formal closing. Purchaser and Seller agree that 3DX Real Estate, its brokers, salespeople, and employees shall not be responsible or liable for any loss or damage of any sort incurred or claimed, as the result of any such reliance - including but not limited to moving expenses, property improvements, employment, lost wages or time lost marketing a property. Purchaser and Seller have agreed to hold harmless and indemnify 3DX Real Estate, its Brokers, Salespeople and Employees for any such reliance loss or damage.

**PURCHASER SIGNATURE:** By affixing Purchaser signature hereto, Purchaser makes the forgoing offer to purchase and acknowledges receipt of a copy of this offer.

Witness _____

Purchaser Signature X _____ Date 11 / 15 / 24
Purchaser Name Azar Staffeld                                    Time _____

Purchaser Signature X _____ Date ____ / ____ / ____
Purchaser Name _____ Time _____

**SELLER ACCEPTANCE:** By affixing Seller signature hereto, Seller accepts this offer to purchase and acknowledges receipt of a copy hereof. Seller directs that no further offers be presented after acceptance of this offer. Seller agrees that the Broker has procured said Purchase Agreement and has brought about this sale and agrees to pay Broker for services rendered a commission of: _____. (If blank, compensation paid as listed in MLS).

Witness _____

Seller Signature X _____ Date 11 / 17 / 24
Seller Name Rana Matar                                    Time 11

Seller Signature X _____ Date 11 / 17 / 24
Seller Name R & J GROUP HOLDINGS LLC                                    Time ___

The undersigned Purchaser hereby acknowledges receipt of a copy of the Seller's acceptance of the foregoing Purchase Agreement.

Purchaser Signature X _____ Date ____ / ____ / ____

Purchaser Signature X _____ Date ____ / ____ / ____

# ADDENDUM

### For the property located at:
### 341 CORRIE RD, ANN ARBOR, MI 48105

Purchaser to pay all taxes, recording fees and transfer taxes.
There will be no proration of taxes
Purchaser is responsible for any and all seller incurred expenses from October 31, 2024 to January 31, 2025 or closing whichever is sooner.
Seller agrees to extend current lease at $5,000 per month to January 31, 2025.
Purchaser agrees to continue to make all rent payments as agreed till closing.
Seller and purchaser agree that current security deposit of $10,000 will be used as Purchaser's EMD. If the transaction does not close for any reason the money will revert back to security deposit.
Property to be sold in it's as is condition.
All other terms remain the same.

X _____  Buyer    11 / 15 / 24  Date

X _____  Witness    11 / 15 / 24  Date

X _____  Seller    11 / 17 / 24  Date

X _____ R & J Group Holdings LLC    11 / 17 / 24  Seller    Date

This agreement is made between the purchaser and the seller on November 11, 2024

For the property located at 341 Corrie Rd Ann Arbor, MI.

Buyer agrees to present a valid Purchase Agreement no later than Wednesday.November 13,2024 @ 5pm

The P.A must present a Purchase price No less than $1,148,581.72

Must have a closing date No later than January 31,2025

Purchaser to pay all taxes, Recording fees, and transfer taxes .

There will be No Tax prorations.

**Any and all additional expenses incurred by seller  pertaining to the property From October 31,2024 thru January 31,2025 will be paid by the purchaser.**

Purchaser currently Resides in the home

This is an AS IS WHERE IS SALES

Seller to provide Free and clear title at the time of closing

Seller agrees to extend the current lease until January 31,2025

Purchaser agrees to continue making agreed monthly payments. Until the loan closes.

# EXHIBIT D

 First American Title™

## ALTA COMMITMENT FOR TITLE INSURANCE
### issued by
### FIRST AMERICAN TITLE INSURANCE COMPANY

### NOTICE

**IMPORTANT – READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I – Requirements; Schedule B, Part II – Exceptions; and the Commitment Conditions, First American Title Insurance Company, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

If all of the Schedule B, Part I – Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____
**Kenneth D. DeGiorgio, President**

By: _____
**Lisa W. Cornehl, Secretary**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I – Requirements; and Schedule B, Part II – Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



Form 50245826 (4-26-24)

*First American Title*™

Commitment for Title Insurance
Michigan - 2021 v. 01.00 (07-01-2021)

## COMMITMENT CONDITIONS

1. **DEFINITIONS**
   a. "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.
   b. "Knowledge" or "Known": Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.
   c. "Land": The land described in Item 5 of Schedule A and improvements located on that land that by State law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   d. "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.
   e. "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   f. "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.
   g. "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   h. "Public Records": The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.
   i. "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.
   j. "Title": The estate or interest in the Land identified in Item 3 of Schedule A.

2. If all of the Schedule B, Part I — Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   a. the Notice;
   b. the Commitment to Issue Policy;
   c. the Commitment Conditions;
   d. Schedule A;
   e. Schedule B, Part I — Requirements;
   f. Schedule B, Part II — Exceptions; and
   g. a counter-signature by the Company or its issuing agent that may be in electronic form.

4. **COMPANY'S RIGHT TO AMEND**
   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance Issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I — Requirements; and Schedule B, Part II — Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.
Form 50245826 (4-26-24)



First American Title™

5.   LIMITATIONS OF LIABILITY

    a.   The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

        i.   comply with the Schedule B, Part I – Requirements;

        ii.   eliminate, with the Company's written consent, any Schedule B, Part II – Exceptions; or

        iii.   acquire the Title or create the Mortgage covered by this Commitment.

    b.   The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

    c.   The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

    d.   The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.

    e.   The Company is not liable for the content of the Transaction Identification Data, if any.

    f.   The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I – Requirements have been met to the satisfaction of the Company.

    g.   The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.

6.   LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT; CHOICE OF LAW AND CHOICE OF FORUM

    a.   Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

    b.   Any claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment. Any litigation or other proceeding brought by the Proposed Insured against the Company must be filed only in a State or federal court having jurisdiction.

    c.   This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

    d.   The deletion or modification of any Schedule B, Part II – Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

    e.   Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

    f.   When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7.   IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for closing, settlement, escrow, or any other purpose.

8.   PRO-FORMA POLICY

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9.   CLAIMS PROCEDURES

This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. Commitment Condition 9 does not modify the limitations of liability in Commitment Conditions 5 and 6.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I – Requirements; and Schedule B, Part II – Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.

Form 50245826 (4-26-24)



*First American Title™*

Commitment for Title Insurance
Michigan - 2021 v. 01.00 (07-01-2021)

10. CLASS ACTION
ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I — Requirements; and Schedule B, Part II — Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



Form 50245826 (4-26-24)

 *First American Title™*

Commitment for Title Insurance
Michigan – 2021 v. 01.00 (07-01-2021)

**Transaction Identification Data, for which the Company assumes no liability as set forth in Commitment Condition 5.e.:**

Issuing Agent: Title Connect LLC
Issuing Office: 28470 West 13 Mile Road, Suite 325
               Farmington Hills, MI 48334
Issuing Office's ALTA® Registry ID:
Loan ID Number:
Commitment Number: TC02-116842
Issuing Office File Number: TC02-116842
Property Address: 341 Corrie Road, Ann Arbor Township, MI 48105
Revision Number:

## SCHEDULE A

1. Commitment Date: January 10, 2025 8:00 AM

2. Policy to be issued:

    a.    2021 ALTA Owner's Policy
            Proposed Insured:          **Azar Staffield**
            Proposed Amount of Insurance:  **$1,148,581.72**
            The estate or interest to be insured:  **fee simple**

    b.    2021 ALTA Loan Policy
            Proposed Insured:          **TBD**
            Proposed Amount of Insurance:  **$1,148,581.72**
            The estate or interest to be insured:  **fee simple**

3. The estate or interest in the Land at the Commitment Date is:
    fee simple

4. The Title is, at the Commitment Date, vested in:
    <u>R & J Group Holdings LLC, a Michigan Limited Liability Company</u>

5. The Land is described as follows:
    See Exhibit A attached hereto and made a part hereof.

**TITLE CONNECT LLC**
28470 West 13 Mile Road, Suite 325, Farmington
Hills, MI 48334
Telephone: (248) 642-3256

Countersigned by:

_Walter D. Quillico_
Walter D. Quillico
Title Connect LLC, License #0041442

**FIRST AMERICAN TITLE INSURANCE COMPANY**
1 First American Way, Santa Ana, CA 92707

By:_____
    Kenneth D. DeGiorgio, President

By:_____
    Lisa W. Cornehl, Secretary

---

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I – Requirements; and Schedule B, Part II – Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association. 

Form 50245826 (4-26-24)

*First American Title™*

## SCHEDULE B, PART I – Requirements

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

    Duly Authorized and Executed Warranty Deed from R & J Group Holdings LLC, a Michigan Limited Liability Company to Azar Staffield to be executed and recorded at closing.

    Record mortgage, if any, to be insured from Azar Staffield to Proposed Insured Lender.

5.  Pay unpaid taxes and assessments unless shown as paid.

6.  The full gap coverage set forth in the 2021 ALTA Loan Policy (the "Policy") will be provided to the insured lender provided that the Title Agent closes and disburses the loan secured by the mortgage to be insured and the insured lender has in its possession a closing protection letter which has not been canceled. This gap coverage is specifically referenced in paragraph 14 of the Covered Risks of the Policy and provides "Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records". The Policy will only include exceptions disclosed by this commitment and any amendments to or updates of this commitment provided to you prior to closing.

7.  Provide Company with fully executed copy of Purchase Agreement.

8.  Provide company with a final meter reading and a receipt indicating all amounts are paid in full prior to closing. If the final meter reading and a paid in full receipt is not provided before closing the following Exception will appear on the final Policy.

    NOTE: This Policy does not insure against any delinquent, past due or current water/sewer charges pertaining to the subject matter property as the parties failed to produce a final meter reading and/or final paid water/sewer bill prior to Closing.

9.  Our review of the current vesting deed as shown in the Public Records indicate a substantial increase in the value of the captioned land since the recording of the prior vesting deed in the Public Records, Since this may be the result of recent improvements to the captioned land, we will require our Questionnaire Regarding Property Improvements. This Questionnaire must be filled out and signed by the currently vested owner and returned to us before we can schedule a closing. After our review thereof, additional documentation/information may then be deemed necessary.

    AS A REMINDER: WE CANNOT SCHEDULE A CLOSING BEFORE OUR RECEIPT AND REVIEW OF THE AFOREMENTIONED QUESTIONNAIRE.

10. Submit a copy of the Operating Agreement of R & J Group Holdings LLC, a Michigan Limited Liability Company.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I – Requirements; and Schedule B, Part II – Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



Form 50245826 (4-26-24)

 *First American Title*™

Commitment for Title Insurance
Michigan - 2021 v. 01.00 (07-01-2021)

Further Requirements may be made upon review of the Operating Agreement.

Submit Limited Liability Company's Resolution from R & J Group Holdings LLC, a Michigan Limited Liability Company, authorizing said Limited Liability Company's to buy/sell/mortgage captioned property and further authorizing a designated member(s) to act on behalf of said company.

Submit evidence that R & J Group Holdings LLC, a Michigan Limited Liability Company is in good standing. Certificate of Good Standing should not be older than six (6) months.

11. Record Discharge of Future Advance Mortgage executed by R & J Group Holdings LLC, a Michigan Limited Liability Company in the amount of $640,000.00 to Oxford Bank dated October 27, 2023 and recorded October 31, 2023 in Liber 5536, Page 608, Washtenaw County Records.

12. Record Discharge of the Assignment of Leases and Rents executed by R & J Group Holdings LLC, a Michigan Limited Liability Company to Oxford Bank, a Michigan Banking Corporation dated October 27, 2023, and recorded October 31, 2023, in Liber 5536, Page 609. Washtenaw County Records.

13. Record Discharge of Affidavit and Notice of Lien for Recovery of Nuisance Abatements Costs filed by Barton Hills Maintenance Corporation, a Michigan non-profit Corporation dated April 22, 2024 and recorded April 24, 2024 in Liber 5551, Page 595, Washtenaw County Records.

14. NOTICE: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

15. NOTE: Taxes are described on tax rolls as: *OLD SID - IB 09-540-029-00 BHV 2-29 COM AT SW COR OF LOT 4, BLK 3, TH N 20 DEG 12' E 268.84 FT FOR PL OF BEG, TH N 20 DEG 12' E 351.50 FT, TH N 35DEG 01' E 94.97 FT, TH NELY 39.10 FT IN ARC OF A CURVE RIGHT OF 44.99 FT RADIUS THRU A CENT ANGLE OF 48 DEG 42' 30", THE CHORD BEARS N 59 DEG 22' 30" E 37.92 FT, TH NORTH 83 DEG 49' E 120 FT, TH S 6 DEG W 250 FT, TH S 28 DEG 11' 30" W 227.14 FT TH N 87-02-40 W 193.4 FT, TO POB, BEINGPART OF LOT 4, BLOCK 3, SUPERVISOR'S PLAT BARTON HILLS

16. PAY THE FOLLOWING TAXES AND ASSESSMENTS AS INDICATED UNLESS SHOWN AS PAID. ALL TAXES INDICATED AS DUE ARE BASE AMOUNTS ONLY. PENALTY AND INTEREST, IF ANY WILL BE ADDED AT TIME OF CLOSING:

Parcel ID Number: IB-09-08-380-005

Taxes are:

2024 Winter Amount: $9,049.28 DUE

2024 Summer Amount: $14,892.92 PAID

Special Assessments: NONE

Principal Residence Exemption (PRE) 0%

17. NOTE: The Property address listed is provided solely for informational purposes, without warranty as to accuracy or completeness and is not hereby insured.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I — Requirements; and Schedule B, Part II — Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



Form 50245826 (4-26-24)

First American Title™

Commitment for Title Insurance
Michigan - 2021 v. 01.00 (07-01-2021)

## SCHEDULE B, PART II – Exceptions

Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.

The Policy will not insure against loss or damage resulting from the terms and conditions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1.  Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.

2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or by making inquiry of persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstances affecting the title, including discrepancies, conflicts in boundary lines, shortages in area, or any other facts that would be disclosed by an accurate and complete land survey of the Land, and that are not shown in the Public Records.

5.  Any lien, or right to a lien for services, labor or material imposed by law and not shown by the Public Records.

6.  Taxes and assessments not due and payable at Commitment Date.

7.  Covenants, conditions and restrictions and other provisions as contained in instrument recorded in <u>Liber 2491, Page 900, Liber 4765, Page 672, Liber 4765, Page 673</u>, Washtenaw County Records.  Please be advised that any provision contained in this document, or in a document that is attached, linked, or referenced in this document, that under applicable law illegally discriminates against a class of individuals based upon personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or any other legally protected class, is illegal and unenforceable.

8.  Subject to the easements, restrictions and reservations contained in the Supervisor's Plat of Barton Hills Plat recorded at Liber 9, Page(s) 58, 59, and 60, Washtenaw County Records.

9.  Interest of others in oil, gas and mineral rights, if any, whether or not recorded in the Public Records.

10. Interest, if any, of the United States, State of Michigan, or any political subdivision thereof, in the oil, gas and minerals in and under and that may be produced from the captioned Land.

11. Taxes which are a lien pursuant to Public Act 143 of 1995 and any other taxes and/or assessments which become a lien or become due and payable subsequent to the date of the Policy, including all assessments for weed cutting, grass cutting or any other matters for which City services were provided but not assessed against the tax rolls prior to the effective date of the Policy.

12. This Policy does not insure against any delinquent, past due or current water/sewer charges pertaining to the subject matter property as the parties failed to produce a final meter reading and/or final paid water/sewer bill prior to Closing.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I – Requirements; and Schedule B, Part II – Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



Form 50245826 (4-26-24)

First American Title™

Commitment for Title Insurance
Michigan – 2021 v. 01.00 (07-01-2021)

13. The lien, if any, of real estate taxes, assessments, blight, civil fines, false alarm fees, sewer and/or water charges, not yet due or payable or that are not shown as existing liens in the records of any taxing authority that levies taxes or assessments on real property or in the Public Records; including the lien for taxes, assessments, and/or water and sewer charges, which may be added to the tax rolls or tax bill after the effective date. The Company assumes no liability for the tax increases occasioned by the retroactive revaluation or changes in the Land usage or loss of any principal residence status for the insured premises.

14. This Policy does not insure against any delinquent, past due or current water/sewer charges pertaining to the subject property resulting from any and all tenant water/sewer account(s) between said tenant(s) and the municipality, which are separate and distinct from any water/sewer account(s) between the owner of the property and the municipality.

15. Rights of tenants under any unrecorded leases.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I – Requirements; and Schedule B, Part II – Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021-2024 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.
Form 50245826 (4-26-24)



 *First American Title*℠

Commitment for Title Insurance<br>Michigan - 2021 v. 01.00 (07-01-2021)

## EXHIBIT "A"

The Land referred to herein below is situated in the County of Washtenaw, State of Michigan and is described as follows:

Land situated in the City of Ann Arbor, County of Wayne, State of Michigan, described as follows:

Commencing at an iron pipe in the South line of Section 8 at its intersection with the West line of Lot 4, Block 3, Supervisor's Plat of Barton Hills; thence North 20 degrees 12 minutes East 198.16 feet to a concrete monument for a Place of Beginning; thence North 20 degrees 12 minutes 00 seconds East 217.77 feet to a concrete monument; thence North 20 degrees 12 minutes 00 seconds East 133.73 feet to a concrete monument, thence North 35 degrees 01 minutes East 94.97 feet to a point on a curve; thence Easterly along a curve concave Southerly having a radius of 45.99 feet and central angle of 48 degrees 42 minutes 30 seconds 39.10 feet to a concrete monument in the Southerly right-of-way line of Corrie Road at its Westerly end; thence North 83 degrees 49 minutes 0 seconds East 120.00 feet along the South line of Corrie Road to a concrete monument; thence South 6 degrees 00 minutes West 250.00 feet to a concrete monument; thence South 28 degrees 11 minutes 10 seconds West 227.14 feet to a concrete monument; thence North 87 degrees 02 minutes 42 seconds West 193.40 feet to the Place of Beginning, being a part of parcel one of Lot 4 in Block 3 of Supervisor's Plat of Barton Hills, as recorded in Liber 9 of Plats, Pages 58, 59, and 60, Washtenaw County Records.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I – Requirements; and Schedule B, Part II – Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021-2024 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



# EXHIBIT E

L: 5551 P: 595   6718546   LN
04/24/2024 09:37 AM   Total Pages: 3
Lawrence Kestenbaum, Washtenaw Co



Time Submitted for Recording,
Date  4-24 20 24 Time 9:32am
Lawrence Kestenbaum
Washtenaw County Clerk/Register

### AFFIDAVIT AND NOTICE OF LIEN FOR
### RECOVERY OF NUISANCE ABATEMENT COSTS

Jeffrey David, being first duly sworn, states as follows:

1. I am the President of the Barton Hills Maintenance Corporation, a Michigan non-profit Corporation (the "Corporation") and am authorized to make this Affidavit and file this lien on its behalf.

2. The Corporation is responsible for maintaining the common areas within the Barton Hills Subdivision and for assuring that Barton Hills property owners comply with the By Laws and Deed Restrictions established by the Corporation.

3. The current occupants of the property described in Paragraph 6 below (the "Property") have permitted to exist on that property certain nuisance conditions that violate the provisions of the Barton Hills Deed Restrictions and the By Laws of the Corporation. Those nuisance conditions remain in existence as of the date of this lien.

4. The Corporation has incurred and will continue to incur costs and expenses in attempting to have the owner and the current occupants of that property remove those nuisance conditions.

5. The Corporation hereby places a lien on the Property to secure reimbursement of the costs and expenses described in Paragraph 4. The Corporation will quantify the then current amount of such costs and expenses, including without limitation, all attorney fees, court costs and other costs incurred in enforcing the Barton Hills Deed Restrictions and the By Laws of the Corporation, upon the request of a party in interest in this matter.

6. The Property is located in the Village of Barton Hills, County of Washtenaw, State of Michigan and is more particularly described as:

> Commencing at an iron pipe in the South line of Section 8 at its intersection with the West line of Lot 4, Block 3, Supervisor's Plat of Barton Hills; thence North 20 degrees 12 minutes East 198.16 feet to a concrete monument for a place of beginning; thence North 20 degrees 12 minutes 00 seconds East 217.77 feet to a concrete monument; thence North 20 degrees 12 minutes 00 seconds East 133.73 feet to a concrete monument; thence North 35 degrees 01 minute East 94.97 feet to a point on a curve; thence Easterly, along a curve concave Southerly having a radius of 45.99 feet and central angle of 48 degrees 42 minutes 30 seconds 39.10 feet to a concrete monument in the Southerly right-of-way line of Corrie Road at its Westerly end; thence North 83 degrees 49 minutes 00 seconds East 120 feet along the South line of Corrie Road to a concrete monument; thence South 06 degrees 00 minutes West 250.00 feet to a concrete monument; thence South 28 degrees 11 minutes 10 seconds West 227.14 feet to a concrete



Page 1 of 3

monument; thence North 87 degrees 02 minutes 42 seconds West 193.40 feet to the place of beginning.   Being a part of Parcel One of Lot 4 in Block 3 of Supervisor's Plat of Barton Hills, as recorded in Liber 9 of Plats, Pages 58, 59 and 60, Washtenaw County Records.  Described for tax purposes as follows: Commencing at the Southwest corner of Lot 4, Block 3, of Supervisor's Plat of Barton Hills; thence North 20 degrees 12 minutes East 268.84 feet for the place of beginning; thence North 20 degrees 12 minutes East 351.50 feet; thence North 35 degrees 00 minutes East 94.97 feet; thence Northeasterly 39.10 feet in the arc of a curve to the right with a radius of 44.99 feet, through a central angle of 48 degrees 42 minutes 30 seconds, the chord of which bears North 59 degrees 22 minutes 30 seconds East 37.94 feet; thence North 83 degrees 49 minutes East 120 feet; thence South 06 degrees West 250 feet; thence South 28 degrees 11 minutes 30 seconds West 227.14 feet; thence North 87 degrees 02 minutes 40 seconds West 193.4 feet to the place of beginning.  Being a part of Lot 4, Block 3, Supervisor's Plat of Barton Hills.

Commonly known as 341 Corrie Road, Ann Arbor, Michigan 48105
Tax Parcel No. 1B-09-08-380-005

7. According to Association's records, the owner of the Property is:
   R&J Group Holdings, LLC
   9930 Whittier, Detroit, Michigan 48224

8. All persons reading this Notice of Lien are advised of the following:

   a. The Corporation may recover its costs and reasonable attorney fees incurred in pursuing reimbursement of the amount described in Paragraph 4 above and/or such other amounts as may subsequently be assessed against the Property in accordance with the provisions of the Corporation Deed Restrictions and By Laws.  All such sums, including late charges, costs, interest, attorney fees and future assessments, are secured by the lien.

   b. Michigan law authorizes foreclosure of the lien by and also authorizes a suit at law for a money judgment without waiving or foreclosing the lien.

   c. A receiver may be appointed in an action to foreclose the lien to take possession of the Property.

   d. The Barton Hills Deed Restrictions and the By Laws of the Corporation provide additional or different remedies to the Association.  These remedies may include denial of the right to vote at meetings of the Corporation.  The Deed Restrictions and By Laws may be referred to for further information and remedies on default.

Page 2 of 3

9. A copy of this lien was served on the owner named in Paragraph 7 above by first class mail, postage prepaid, addressed to it as stated in Paragraph 7 above, which is the last known address for the owner.

Barton Hills Maintenance Corporation

Dated: April 22, 2024

By: _Jeffrey David_

Jeffrey David, President

STATE OF MICHIGAN      )
                       ) ss.
COUNTY OF WASHTENAW )

On the 22rd day of April, 2024, before me personally appeared the aforementioned Jeffrey David, acting as the President for Barton Hills Maintenance Corporation, a Michigan non-profit corporation, and known to me to be the person who executed the above Notice of Lien, on behalf of said corporation, being so duly authorized to execute this Notice of Lien by the Board of Directors of said corporation.

DRAFTED BY & WHEN RECORDED
RETURN TO:
Mark J. Eby
Dever Eby & Issa, PLLC
301 N. Main Street, 2nd Floor
Ann Arbor, MI 48104

_Mark J. Eby_ , Notary Public
Washtenaw County, Michigan
My Commission Expires: 1/31/29
Acting in the County of Washtenaw

(mjs_deverebyissa_com/Documents/Documents/Barton Hills Maintenance Corporation/Notice of Lien-Recovery of Nuisance Abatement.doc)

Page 3 of 3

# EXHIBIT F



December/15/2024
Azar Staffeld
341 Corrie ,Ann Arbor MI, 48105

CONGRATULATIONS! I AM PLEASED TO INFORM YOU THAT YOU ARE PRE-APPROVED FOR A HOME LOAN BASED ON THE FOLLOWING TERMS, THIS PRE-APPROVAL IS VALID FOR 60 DAYS (ABOUT 2 MONTHS) FROM DECEMBER 15TH 2024.

Purchase price of $1,150,000

First Lien Mortgage Loan type: Fixed Term: 360 months (about 30 years)
Property type SFR

Program: Conventional

Additional documents required: valid sales contract, clear title, credit, Appraisal

Please contact me directly as needed.  Thank you for choosing NEXA Mortgage LLC

*Guy V Godboldo*    www.loansbyguy.com

*Guy V Godboldo I Independent LO I Recruiter*

*CELL 313-653-9749*

**313-653-9749**
**ggodboldo@nexamortgage.com**
**132332**
3100 W Ray Road #201 Office #209Chandler, AZ 85226





01/17/2024
Azar Staffeld
341 Corrie Road, Ann Arbor, Michigan 48105

Purchase Price: $1,150,000.00
First Lien Mortgage Loan Type: Fixed Term: 360 months (about 30 years)
Property Type: SFR
Program: FHA
Additional documents provided: valid sales contract, credit, appraisal

To Whom it may Concern,

We are ready to proceed to the next step in closing this loan. We use Title Connect for our Michigan closings and we intend to continue using them. We have ordered the title work and discovered there is a lien on the title. Unless the lien is removed from the title, NEXA Mortgage or any other mortgage or title company cannot legally close this loan. Potential investors or banks cannot become the first lien holder and will not approve financing a mortgage on a property that has a lien on it.

Please inform the Seller that unless the lien is satisfied and the affidavit notice of lien for recovery and discharge of lien form is completed, NEXA Mortgage cannot legally proceed with this loan.

Please contact me directly as needed.  Thank you for choosing NEXA Mortgage LLC

*Guy V Godboldo*     www.loansbyguy.com

*Guy V Godboldo I Independent LO I Recruiter*

*CELL 313-653-9749*

**313-653-9749**
**ggodboldo@nexamortgage.com**
**132332**
3100 W Ray Road #201 Office #209Chandler, AZ 85226



EXHIBIT G

6745565 L: 5578 P: 576 M
Total Pages: 7 02/06/2025 09:15 AM
Lawrence Kestenbaum
Washtenaw County, Michigan



## MORTGAGE

THIS MORTGAGE, made this 27ᵗʰ day of October 2023 (the "**Effective Date**"), by **Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones** (collectively, the "**Mortgagor**"), with an address of 341 Corrie Rd., Ann Arbor, MI 48105, in favor of **R & J Group Holdings, LLC** (the "**Mortgagee**"), with an address of 9930 Whittier Avenue, Detroit, MI 48224.

The Mortgagor, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, including, but not limited to, security for the Secured Debts, as that term is defined hereinbelow, hereby covenants and agrees as follows:

1.      **Mortgaged Property.** The Mortgagor hereby grants and warrants to Mortgagee a mortgage on real property located in the **Twp of Pittsfield** County of Washtenaw, State of Michigan, commonly known as 341 Payeur, Ann Arbor, MI 48108, and legally described as:

Commencing at the North ¼ post of Section, thence South 2085.25 feet in the North and South ¼ line, thence South 54 degrees 19 minutes West 900.2 feet in Southerly line of Payeur Road for a place of beginning; thence South 54 degrees 19 minutes West 250.00 feet; thence South 35 degrees 41 minutes East 350.00 feet, thence North 54 degrees 19 minutes East 250.00 feet, thence North 35 degrees 41 minutes West 350.00 feet to place of beginning, being part of the East ½ of the NW ¼ of Section 21, T3S R6E.

Tax Parcel Number L-12-21-300-004

together with all tenements, hereditaments and appurtenances belonging or in any way appertaining thereto which are now or shall hereafter be placed upon or attached thereto or thereupon (collectively, the "**Property**").

The Mortgagor covenants that Mortgagor is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. The Mortgagor warrants and will defend generally the title to the Property against all claims and demands.

2.      **Secured Debts.** The term "Secured Debts" includes, and this Mortgage will secure, any and all obligations, now existing or hereafter arising, including all extensions,

1

renewals, re-financings, modifications and replacements thereof and all interest, costs or other charges that accrue in connection therewith, due and owing, at any time, from the Mortgagor to the Mortgagee, including, but not limited to, a Promissory Note of even date herewith in favor of the Mortgagee in the principal amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), and any interest, costs and other fees which may accrue thereunder.

3. **Payment of Principal and Interest; Other Charges.** The Mortgagor shall promptly pay when due, all principal, interest, fees and other charges due on the Secured Debts.

4. **Charges; Liens.** The Mortgagor shall timely pay all taxes, assessments, fines and other charges attributable to the Property, including those which may attain priority over this Mortgage. At the request of Mortgagee, the Mortgagor shall upon payment promptly furnish to Mortgagee all notices of amounts to be paid under this Paragraph and shall promptly furnish to Mortgagee receipts evidencing all such payments. If the Mortgagee determines that any part of the Property is subject to a lien which may attain priority over this Mortgage, the Mortgagee may give the Mortgagor a notice identifying the lien and the Mortgagor shall satisfy such lien within 30 days of the date of mailing of such notice.

The Mortgagor shall be responsible for and shall pay, upon execution of this Mortgage, all costs, expenses and fees associated with the preparation of this Mortgage and the related Promissory Note, including all title fees, recording fees and attorney fees associated therewith.

5. **Hazard or Property Insurance.** The Mortgagor shall keep any and all improvements now existing or hereafter existing on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which the Mortgagee requires insurance. This insurance shall be maintained in the amounts (in no event less than the full replacement value) and for the periods that the Mortgagee reasonably requires. The insurance carrier providing the insurance shall be chosen by the Mortgagor, subject to the Mortgagee's approval, which shall not be unreasonably withheld. If the Mortgagor fails to maintain coverage described above, the Mortgagee may, at the Mortgagee's option, obtain coverage to protect the Mortgagee's rights in the Property, with such cost being charged to Mortgagor as a protective advance.

All insurance policies and renewals shall be acceptable to the Mortgagee and shall include a standard mortgage clause, with the Mortgagee named as an additional loss payee. The Mortgagee shall have the right to hold copies of the policies and renewals. The Mortgagor shall promptly give to the Mortgagee proof that such insurance is in place prior to the Effective Date and provide Mortgagee with all receipts of paid premiums and renewal notices. In the event of loss, the Mortgagor shall give prompt notice to the insurance carrier and the Mortgagee. The Mortgagee may make proof of loss if same is not made promptly by the Mortgagor.

2

Unless the Mortgagee and the Mortgagor otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if restoration is practicable. If the restoration or repair is not economically feasible or the Mortgagee's security would be lessened, the insurance proceeds shall be applied to the Secured Debts, whether or not then due, with any excess paid to the Mortgagor. If the Mortgagor abandons the Property or does not answer within thirty (30) days of a notice from the Mortgagee that the insurance carrier has offered to settle a claim, then the Mortgagee may collect the insurance proceeds directly from the insurance carrier. The Mortgagee may use the proceeds to repair or restore the Property or to pay the Secured Debts, whether or not then due. The 30-day period will begin when the notice is given.

Unless the Mortgagee and the Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of scheduled payments or change the amount of any payments required as to the Secured Debts. If the Property is acquired by the Mortgagee, the Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to the Mortgagee to the extent of the balance due on the Secured Debts immediately prior to the acquisition.

6.      **Preservation, Maintenance and Protection of the Property.** The Mortgagor shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. The Mortgagor shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that, in the Mortgagee's good faith judgment, could result in forfeiture of the Property or otherwise materially impair the lien created by this Mortgage.

7.      **Protection of Mortgagee's Rights in the Property**. If the Mortgagor fails to perform the covenants and agreements contained in this Mortgage, or there is a legal proceeding that may significantly affect the Mortgagee's rights in the Property, (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations) then the Mortgagee may do and pay for whatever is necessary to protect the value of the Property and the Mortgagee's rights in the Property. The Mortgagee's actions may include paying any sums secured by a lien which has priority over this Mortgage, appearing in court, paying reasonable attorney fees and costs, and entering on the Property to make repairs. Although the Mortgagee may take action under this Paragraph, the Mortgagee shall not have any duty to do so.

Any amounts disbursed by the Mortgagee under this Paragraph shall become part of the Secured Debts secured by this Mortgage. Unless the Mortgagor and the Mortgagee agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the same rate assessed on advances under the Secured Debts and shall be payable, with interest, upon notice from the Mortgagee to the Mortgagor.

8.      **Inspection.** The Mortgagee or its agent(s) may make reasonable entries upon and inspections of the Property during reasonable hours. The Mortgagee shall give

3

the Mortgagor reasonable notice prior to any such inspection and specify the reasonable cause for the inspection.

9. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to the Mortgagee.

In the event of a total taking of the Property, the proceeds shall be applied to the Secured Debts, whether or not then due, with any excess paid to the Mortgagor. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the Secured Debts, unless the Mortgagor and the Mortgagee otherwise agree in writing, the Secured Debts shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the Secured Debts immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to the Mortgagor. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the Secured Debts immediately before the taking, unless the Mortgagor and the Mortgagee otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the Secured Debts, whether or not the sums are then due.

Unless the Mortgagee and the Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the payments or balances due under the Secured Debts.

10. **Mortgagor Not Released; Forbearance by Mortgagee Not a Waiver.** An extension of the time for payment or modification of amortization of the Secured Debts granted by the Mortgagee to the Mortgagor shall not operate to release the liability of the Mortgagor or the Mortgagor' successors in interest. The Mortgagee shall not be required to commence proceedings against the Mortgagor or any successors in interest, extend time for payment or otherwise modify amortization of the Secured Debts by reason of any demand made by the Mortgagor or the Mortgagor' successors in interest. Any forbearance by the Mortgagee in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

11. **Successors and Assigns Bound.** The covenants and agreements of this Mortgage shall bind and benefit the successors and assigns of the Mortgagee and the Mortgagor, provided, however, that the Mortgagor may not assign or transfer any obligations or liabilities under this Mortgage without the prior written consent of the Mortgagee.

12. **Loan Charges.** If the Secured Debts are subject to a law which sets maximum charges and that law is ultimately interpreted so that the interest or other charges collected or to be collected in connection with the Secured Debts exceed the permitted limits, then: (a) any such charges shall be reduced by the amount necessary to

4

meet the permitted limit; and (b) any sums already collected from the Mortgagor which exceeded permitted limits will be refunded to the Mortgagor, in the form of a credit to any remaining principal or other balance due or if no amount whatsoever remains due under the Secured Debts, then by making a direct payment to the Mortgagor.

13. **Notices.** Any notice(s) to the Mortgagor provided for in this Mortgage shall be given by first class mail unless applicable law requires use of another method. The notice shall be directed to the address hereinabove or any other address the Mortgagor designates by notice to the Mortgagee. Any notice(s) to the Mortgagee shall be given by first class mail to the Mortgagee's address hereinabove or any other address the Mortgagee designates by notice to the Mortgagor. Any notice provided for in this Mortgage shall be deemed to have been given as of the date of mailing as provided in this Paragraph.

14. **Governing Law; Severability.** This Mortgage shall be governed by Michigan law and any action relating to the Property or this Mortgage shall be brought in the jurisdiction in which the Property is located. In the event that any provision or clause of this Mortgage or other documents relating to the Secured Debts conflicts with applicable law, such conflict shall not affect any other provisions of this Mortgage or other documents relating to the Secured Debts which can be given effect without the conflicting provision. To this end, the provisions of this Mortgage and any other documents relating to the Secured Debts are severable.

15. **Transfer of the Property or a Beneficial Interest in Mortgagor.** If all or any part of the Property or any interest in the Property is sold or transferred without the Mortgagee's prior written consent, the Mortgagee may, at its option, require immediate payment in full of all Secured Debts. However, this option shall not be exercised by the Mortgagee if such an exercise is prohibited by federal law as of the date of this Mortgage.

If the Mortgagee exercises this option to accelerate, Mortgagee shall give the Mortgagor notice of such acceleration. The notice shall provide a period of not less than thirty (30) days from the date the notice mailed for the Mortgagor to pay all Secured Debts. If the Mortgagor fails to pay the outstanding balance of the Secured Debts prior to the expiration of this period, the Mortgagee may invoke any remedies permitted by this Mortgage without further notice or demand to the Mortgagor.

16. **Hazardous Substances.** The Mortgagor has not previously and shall not hereafter cause or permit the presence, use, disposal, storage, or release of any hazardous substances, as defined by applicable environmental law, on or in the Property. The Mortgagor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any environmental law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of hazardous substances that are generally recognized to be appropriate to normal residential use or maintenance of the Property.

5

The Mortgagor shall promptly give Mortgagee written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any hazardous substance or environmental law of which the Mortgagor have actual knowledge. If the Mortgagor learn, or are notified by any governmental or regulatory authority, that any removal or other remediation of any hazardous substance affecting the Property is necessary, the Mortgagor shall promptly take all necessary remedial actions in accordance with environmental law.

17.    **Acceleration; Remedies. The Mortgagee shall give notice to the Mortgagor prior to any acceleration following the Mortgagor's breach of any covenant or agreement in this Mortgage or of the Secured Debts under which acceleration is permitted. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than thirty (30) days from the date the notice is given to the Mortgagor, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the Secured Debts and sale of the Property. If the default is not cured on or before the date specified in the notice, the Mortgagee, at its option, may require immediate payment in full of all Secured Debts without further demand and may invoke the power of sale and any other remedies permitted by applicable law. The Mortgagee shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the Mortgagee invokes the power of sale, the Mortgagee shall give notice of sale to the Mortgagor in the manner provided in this Mortgage or as otherwise required by applicable law. The Mortgagee shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. The Mortgagee or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorney fees; (b) to all Secured Debts; and (c) any excess to the person or persons legally entitled to same.**

18.    **Time is of the Essence.** Time is of the essence with respect to this Mortgage, including, but not limited to, the performance of the Mortgagor's obligations hereunder.

IN WITNESS WHEREOF, this Mortgage has been signed and sealed by the Mortgagor.

Azar Sadeghi-Staffeld

(signatures continue on following page)

6

STATE OF MICHIGAN )
)
COUNTY OF Macomb )

Acknowledged before me this 21 day of October 2023 by **Azar Sadeghi-Staffeld** for and on behalf of herself.

**TRACI MEYER** , Notary Public
**MACOMB** County, Michigan
My commission expires: **AUG 30, 2026**
Acting in **MACOMB** County

**Ghazal Staffeld a/k/a Ghazal Jones**

STATE OF MICHIGAN )
)
COUNTY OF Macomb )

Acknowledged before me this 21 day of October 2023 by **Ghazal Staffeld a/k/a Ghazal Jones** for and on behalf of herself.

TRACI MEYER
NOTARY PUBLIC - MICHIGAN
MACOMB COUNTY
ACTING IN THE COUNTY OF Macomb
MY COMMISSION EXPIRES AUG. 30, 2026

, Notary Public
County, Michigan
My commission expires:
Acting in County

**Drafted by and return to**
Anthony G. Mammina
Mammina & Ajlouny, P.C.
370 E. Maple Road, Suite 230
Birmingham, MI 48009

7

# EXHIBIT H

## Cease and Desist Letter

December 30, 2024

Dear Mr. Mammina,

We have received your 7-day notice for possession, and the accompanying letter dated November 27, 2024, where you were kind enough to remind us of our responsibilities. With responsibilities comes rights that are associated with an agreement you call a lease. To us, the agreement is a lease with option to buy. As we learned in law school, while your client made every attempt to enrich themselves by more than 25% markup of an out-of-pocket expense within a year, a predatory lending practice, our signature on that adhesive contract was clearly made under duress.

We would like to suggest to you to make clarification to your client, R&J Holdings, that not only they did not respond to our information on May 24, 2024, that the roof was damaged due to a hail storm in Ann Arbor, that the ceiling of the bathroom collapsed when our 9 years old granddaughter was using the bathroom and almost killed her. Several attempts were made to convince your client to either make an insurance claim or repair the premises and they were fully ignored. The bathroom has remained in the same condition for the last eight months.

While we maintain payments on time the payments were never late, except twice when Azar had heart attacks, the payments were one week late and we paid the $50 late payment according to the contract. However, your client misrepresented the fact that we were late, while we were not, to justify not paying us the $50,000 credit that is due to us.

During your client's ownership, Barton Hills Village put a lien on the subject property, while such lien did not exist during our ownership. I am sure you are aware that the title now has a cloud. Please instruct your client to immediately remove the lien from the title and I instruct you and your office to provide proof of the removal of the lien within the next 30 days. Your client must guarantee a clear title and merchantability of the subject property.

At no time did your client provide us with any invoice pertaining to tax payments, insurance payments, and/or any payments needed to be made by us. Another attestation to the adhesiveness of the contract is that your client has shifted all responsibilities to us who were under duress and the only responsibility they would like to hold is to collect the

payments. In fact, without providing us with any invoices and giving us the opportunity to analyze it, the non-payment of the taxes, which is the responsibility of the Owner, like all other responsibilities has been shifted to us. Also, your client uses and interprets the nonpayment on invoices we never received as a violation of the contract and clearly expressed their intention of not honoring the contract and not giving us the $50,000 credit which is due to us and clearly holds a caveat on the contract. Additionally, Barton Hills Village employees and now the landlord, your client, walk, observe , survey, and surround our primary residence without prior and written notification and without our approval. Over and over again. Therefore, Barton Hills Village employees, Board Members, and maintenance corporation members have deprived us individually and collectively from peaceful enjoyment of the subject property. How do you know our backyard is full of debris? Can you produce written authorization to inspect the property?

Please inform your client that keeping the property in hazardous condition is posing danger to us, the residents of the subject property. Your client is not coming or claiming rights with clean hands.

Our understanding was that we have a purchase agreement with your client, we have $60,000 credit with your client, and we are obtaining a mortgage to re-purchase the property. We have also filed a TRO, temporary restraining order with Federal Court to have Wells Fargo to pay your client directly if we so prevail. This strategy of intimidation by sending 7-day notice and contract violation letter not only does not set well with us but will induce an equal and opposite reaction. Please advise your client to be mindful of their own violations and to wait or engage in "stay" until further notice by us and or the Federal Court.

Respectfully we remain,

Karl and Azar Staffeld

Karl and Azar Staffeld

341 Corrie Road

Ann Arbor, Michigan 48105

azarstaffeld@gmail.com

(734) 929-6969

January 22, 2025

Mr. Mammina,

This is to inform you that only because your client cannot provide a clear title, we cannot secure a mortgage to repurchase the property located at 341 Corrie Road, Ann Arbor, Michigan 48105. Therefore, the attached purchase agreement is expiring. Enclosed please find a preapproval letter from NEXA mortgage company which we completed all the steps in obtaining a mortgage but we cannot close before the lien is removed. Also, we have ordered the title work via Title Connect, which is the only title company we are intending to work with, not Speedy Title. The proof of title work and lien is attached. Additionally, we are providing you with a copy of the signed purchase agreement with your client. Upon researching the title history, we learned that your client has obtained a mortgage and cannot provide clear title to transfer the property, due to the existing mortgage and the lien. Consequently, you ought to instruct your client to sign a new purchase agreement with us and extend this purchase agreement to the future date that they can provide us with a clear title. Also, please instruct your client to report to us the efforts they are engaged in and the approximate date they will be able to remove the lien and pay off the mortgage.

We are sure you know, or should know, since we filed a wrongful foreclosure claim on this property in federal court, the clock stops in all repossessions, evictions, and/or all adverse proceedings against us until the federal court adjudicates our case per MCL – Section 600.2918.

Please let us know as soon as your client is able to pay off the existing mortgage, remove the lien, and provide a new purchase agreement with a more realistic date.

Respectfully we remain,

Karl and Azar Staffeld

# EXHIBIT I

JIS Code: COA

| 14A-1 | STATE OF MICHIGAN<br>☐ JUDICIAL DISTRICT<br>☐ JUDICIAL CIRCUIT<br>COUNTY<br>☐ IN THE COURT OF APPEALS | **CLAIM OF APPEAL** | **CASE NO.**<br>CIRCUIT<br>DISTRICT   251C0573<br>PROBATE |
|---|---|---|---|

**Court address**

4133 Washtenaw Avenue, Ann Arbor, MI 48108

Court telephone no.

734-973-4545

| Plaintiff's/Petitioner's name(s) and address(es)<br><br>R & J Group Holdings, LLC<br>9930 Whittier Street<br>Detroit, MI 48224 | ☐ Appellant<br>☑ Appellee | | Defendant's/Respondent's name(s) and address(es)<br><br>Azar Sadeghi-Staffeld, Ghazal Staffeld a/k/a<br>Ghazal Jones and all other occupants<br>341 Corrie Rd.<br>Ann Arbor, MI 48105   (734) 929-6969 | ☑ Appellant<br>☐ Appellee |
|---|---|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br><br>Anthony G. Mammina (P37684)<br>Mammina & Ajlouny, P.C.<br>370 E. Maple Road, Suite 230<br>Birmingham, MI 48009   (248) 642-1330 | | **v** | Defendant's attorney, bar no., address, and telephone no. | |

In the matter of  Order of Possession for 341 Corrie Rd., ann arbor, MI 48105

Other interested party(ies) of probate matter

1. Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones   claims an appeal from a final judgment or final order entered on
   <br>Name

   April 8, 2025                                        in the 14A-1 District                                        Court of the State of Michigan,
   <br>Date                                                                     Court name and number or county

   by   ☑ district judge   ☐ circuit judge   ☐ probate judge   ☐ district court magistrate

   Honorable Judge J. Cedric Simpson
   <br>Name of judge or district court magistrate                                        Bar no. .

2. Bond on appeal is   ☐ filed.   ☐ attached.   ☐ waived.   ☑ not required.
3. ☑ a. The transcript has been ordered.
   <br>☐ b. The transcript has been filed.
   <br>☐ c. No record was made.

We are within the statutory 10 day appeal period to this order.
We are petitioning to reserve time with the Court.

RECEIVED APR 17 2025 14A-1 DISTRICT COURT ANN ARBOR, MI

Approved, SCAO
Form MC 55, Rev. 9/23
MCL 15.240, MCL 710.65, MCR 4.401(D), MCR 7.104(C),
MCR 7.108(C)(3), MCR 7.204(D)
Page 1 of 2

Distribute form to:
Court of Appeals/Circuit court
Trial court
Appellee
Appellant

SRA

**Claim of Appeal   (9/23)**
Page 2 of 2

Case No. 251C0573

☑ 4. THIS CASE INVOLVES
    ☐ a. A CONTEST AS TO THE CUSTODY OF A MINOR CHILD.
    ☐ b. AN ADULT OR MINOR GUARDIANSHIP UNDER THE ESTATES AND PROTECTED INDIVIDUALS CODE OR
        UNDER THE MENTAL HEALTH CODE.
    ☐ c. AN INVOLUNTARY MENTAL HEALTH TREATMENT CASE UNDER THE MENTAL HEALTH CODE.
    ☑ d. A RULING THAT A PROVISION OF THE MICHIGAN CONSTITUTION, A MICHIGAN STATUTE, A RULE OR
        REGULATION INCLUDED IN THE MICHIGAN ADMINISTRATIVE CODE, OR ANY OTHER ACTION  OF THE
        LEGISLATIVE OR EXECUTIVE BRANCH OF STATE GOVERNMENT IS INVALID.
    ☐ e. AN ADOPTION ORDER UNDER CHAPTER X OF THE PROBATE CODE.
    ☐ f. A FREEDOM OF INFORMATION ACT ISSUE.

04/17/2025
Date

Appellant/Attorney signature

**PROOF OF SERVICE**

I certify that copies of this claim of appeal and bond (if required) were served on

Karl Staffeld      on 04/17/2025    by   ☐ personal service.   ☑ first-class mail.
Name                     Date

     on       by   ☐ personal service.   ☐ first-class mail.
Name                     Date

     on       by   ☐ personal service.   ☐ first-class mail.
Name                     Date

04/17/2025
Date

Signature

# EXHIBIT J

| Approved, SCAO | Original - Court file<br>1st copy - Assignment clerk/Extra<br>2nd copy - Friend of the court/Extra | 3rd copy - Opposing party<br>4th copy - Moving party |
|---|---|---|

| STATE OF MICHIGAN<br>JUDICIAL CIRCUIT<br>JUDICIAL DISTRICT<br>WASHTENAW COUNTY | MOTION FOR RECONSIDERATION<br>OF DISMISSAL OF APPEAL | CASE NO.<br>25-000617-AV |
|---|---|---|

**Court address**
101 E. HURON STREET, ANN ARBOR, MI 48104

Court telephone no.
734-222-3001

| Plaintiff name(s)<br>Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones | | Defendant name(s)<br>R&J Group Holdings |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Azar Sadeghi-Staffeld, Pro Se<br><br>341 Corrie Road<br>Ann Arbor, MI 48105<br>734-929-6181 | v | Defendant's attorney, bar no., address, and telephone no.<br>Anthony G. Mammina          (P37684)<br><br>370 E. Maple Road, Suite 230<br>Birmingham, MI 48009<br>248-642-1330 |

### NOTICE OF HEARING

1. Motion title: Motion for Reconsideration

2. Moving party: Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones

3. This matter has been placed on the motion calendar for:

| Judge | | Bar no. | Date | Time |
|---|---|---|---|---|
| Hearing location<br>☐ Court address above    ☐ | | | | |

4. If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangements.

### MOTION

Plaintiff prays the Honorable Court to reconsider Dismissal of Appeal for the following reasons:

1. The Appeal was filed within the statutory 10-day period.

2. The fee waiver request was submitted to the court simultaneously to the timely Appeal.

Conclusion
The Appeal was filed timely and the fee was waived by the clerk, therefore the Plaintiff prays for the consideration of the Appeal based on its merit.

May 28, 2025
Date

/s/ _Azar Staffeld_
Signature

### CERTIFICATE OF MAILING

I certify that on this date I served a copy of this notice of hearing and motion on the parties or their attorneys by first-class mail addressed to their last-known addresses as defined by MCR 2.107(C)(3).

May 28, 2025
Date

/s/ _Azar Staffeld_
Signature

**MC 326** (3/10)   **NOTICE OF HEARING AND MOTION**

**STATE OF MICHIGAN**
**WASHTENAW COUNTY CIRCUIT COURT**

R & J GROUP HOLDINGS, LLC,
a Michigan limited liability company,

     Plaintiff/Appellee,

          -v-

AZAR SADEGHI-STAFFELD, GHAZAL
STAFFELD a/k/a GHAZAL JONES, and
all other occupants,

     Defendants/Appellants.

Circuit Court Case No.: 25-000617-AV
Lower Court Case No.: 251C0573-LT
Hon. Julia B. Owdziej

---

| | |
|---|---|
| Anthony G. Mammina (P37684) | AZAR SADEGHI-STAFFELD and |
| MAMMINA & AJLOUNY, P.C. | GHAZAL STAFFELD a/k/a GHAZAL JONES |
| Attorney for Plaintiff/Appellee | Defendants/Appellants, *Pro Se* |
| 370 E. Maple Road, Ste. 230 | 341 Corrie Road |
| Birmingham, MI 48009 | Ann Arbor, MI 48105 |
| (248) 642-1330 | (734) 929-6969 |
| amammina@m-apc.com | azarstaffeld@gmail.com |

/

---

**DEFENDANTS' MOTION FOR RECONSIDERATION
OF ORDER ENTERED ON MAY 23, 2025**

    NOW COME Defendants, AZAR SADEGHI-STAFFELD AND GHAZAL STAFFELD A/K/A

GHAZAL JONES , and their Motion for Reconsideration of Order Entered on May 23, 2025

(granting R&J Group Holdings, LLC's Motion to Dismiss Appeal), state as follows:

1. Defendants respectfully seek reconsideration of the Court's decision and Order entered
   in these consolidated cases on May 23, 2025 (Exhibit 1).

2. The Appeal and fee waiver request was submitted to the Court within the 10-day
   statutory period deadline (Exhibit 2).

1

3.  By way of brief background, these consolidated matters relate to two real properties located within the City of Ann Arbor. The first property is located at 341 Corrie Road, Ann Arbor, Michigan 48105 ("First Property"). The second property is located at 341 Payeur Road, Ann Arbor, Michigan 48108 (Second Property"). The Wells Fargo Bank wrongfully foreclosed on the First Property during the pandemic protection period; the case is pending within the United States District Court for the Eastern District of Michigan in Detroit; on a deceased person, Dorothea Vermillion Staffeld. Thereafter, R&J Group Holdings ("R&J") purchased the property during Azar Sadeghi-Staffeld, Karl Staffeld, and Ghazal Staffelds' ("Staffelds") redemption period and simultaneously signed; 1. An exclusive lease with option to buy (case in hand) (Exhibit 3) 2. Put a mortgage lien on the second property and took most of the proceeds to support the sale of the first property simultaneously (case in hand). 3. Staffelds paid R&J for one year according to the contract at $5,000 per month, applied for mortgage, ordered the title work, and discovered there is a lien on the property by Barton Hills Village ("BHV") (Exhibit 4) that is impeding Staffelds' abilities to obtain the mortgage for a property that has a lien on it (Exhibit 5).

4.  Staffelds petitioned before Federal Court against BHV and R&J forced Staffelds to withdraw their complaint on June, 2024, and they promised to clear the title of the lien by October 31, 2024; the expiration date of the first contract (Exhibit 3).

5.  On November 17, 2024 R&J signed the second contract with the Staffelds; Purchase Agreement that expired on January 31, 2025 (Exhibit 6). Seven days after expiration of the second contract, R&J filed for possession and the District Court granted their request after waiting out the expiration of both contracts.

2

6.  On April 8, 2025, the District Court ordered possession (Exhibit 7) and on April 17, 2025 Staffelds submitted their Appeal (Exhibit 2).

7.  The District Court disregarded Staffelds' pleas for; 1. Stay of proceeding pending Federal Court's decision on wrongful foreclosure (Federal Case 4:24-cv-12811). 2. Counter-claim of breach of contract (case in hand). 3. Cross-complaint against Wells Fargo. 4. Demand for Jury.

8.  District Court granted R&J , the breaching party, as a result of the lien on the First Property, a $5,000 a month escrow bond as rent. Staffelds want to refinance the Second Property and use the downpayment to repurchase the First Property. But R&J's lien for $250,000 on the Second Property blocks the refinance unless the circuit court grants the motion by Staffelds for the proceeds of the refinance, up to the amount of $250,000, to be deposited with Court by title company as escrow bond in lieu of the $5,000 a month bond because they are not entitled to receive this amount; they breached both contracts.

9.  Staffelds filed a motion so the Circuit Court orders R&J to post an additional $250,000 within the Court as escrow bond because they are the breaching party.

10. R&J filed a Motion to Dismiss based on a technicality to prevent meritorious adjudication by the Circuit Court. Motion was filed May 23, 2025 without regard for the appeal filed on April 17, 2025, nine days after the possession order was issued is within the statutory period.

11. Staffelds' primary place of residence is the First Property. With many elderly persons, children, and disabled household members.

3

12. In the meantime, Appellant is filing this competing motion for the reconsideration of dismissal of Staffelds' Appeal on May 23, 2025. The appeal was filed timely and the fee waiver was submitted simultaneously. Evidence of such is attached to this motion for reconsideration (Exhibit 2). Appellant prays that the circuit court grants this motion for reconsideration.

13. This is an administrative oversight in response to the opposition; if the merits of the case is not heard it will jeopardize their livelihood and the roof over Staffelds' heads unethically, illegally, and unjustifiably. Staffelds maintain their position acting in good faith and having clean hands.

14. As this Honorable Court is aware, motions for rehearing or reconsideration are governed by MCR 2.119(F), which provides:

> (1) Unless another rule provides a different procedure for reconsideration of a decision (see, e.g., MCR 2.604[A], 2.612), a motion for rehearing or reconsideration of the decision on a motion must be served and filed not later than 21 days after entry of an order deciding the motion.
>
> (2) No response to the motion may be filed, and there is no oral argument, unless the court otherwise directs.
>
> (3) Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted. The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error.

15. The "palpable error" language found in MCR 2.119(F)(3) is not mandatory and only provides guidance to a court for when it may be appropriate to reconsider a motion. See, e.g., *Prentis Family Found, Inc v Barbara Ann Karmanos Cancer Inst*, 266 Mich App 39, 698 NW2d 900 (2005).

4

16. Indeed, it is always within the trial court's discretion to reconsider a decision previously rendered or grant "a second chance" to a motion. *Kokx v Bylenga*, 241 Mich App 655, 617 NW2d 368 (2000).

17. Finally, courts have wide discretion to relieve a party from a final judgment or order for any reason justifying relief from a judgment or order's execution. *MCR 2.612*; *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 600 NW2d 638 (1999).

18. In this case, Defendants clearly articulated in their mislabeled Reply Brief (***Exhibit D***) that case evaluation sanctions are ***not required*** under MCR 2.403(O) and that the Court of Appeals has repeatedly ruled that "it is the ultimate verdict that the parties are left with after appellate review is complete that should be measured against the mediation evaluation to determine whether sanctions should be imposed on a rejecting party pursuant to MCR 2.403(O)." *Van Elslander v. Thomas Sebold & Assocs*., 297 Mich. App. 204, 215; 823 N.W.2d 843 (2012).

19. This interpretation of the case evaluation sanctions court rule has been deemed "harmonious with its purpose, which is to impose the burden of litigation costs upon the rejecting party " as "[t]he cost of two trials was part of the risk assumed . . . when [he or she] rejected the mediation evaluation." *Id*.

20. Likewise, Staffelds filed their appeal timely, applied for fee waiver, and submitted their Brief timely (Exhibit 2).

21. Finally, based on analysis and conclusion of the Court, Staffelds are hereby presenting the Court with proof that the Appeal was filed timely, and Brief was filed timely, and fee waiver was filed timely. Therefore, they are respectfully asking the Honorable Court to decide on merits of the case.

5

WHEREFORE, Staffelds, Appellants, respectfully request that this Honorable Court grant their motion for reconsideration and enter an order granting two outstanding emergency ex parte motions and pending and delaying the refinance of the Second Properties process; Staffelds are praying these reliefs granted and they are found to be entitled.

Respectfully submitted,

By /s/: _____
Azar Sadeghi-Staffeld
Defendant/Appellant, *Pro Se*

By /s/: _____
Ghazal Staffeld a/k/a Ghazal Jones
Defendant/Appellant, *Pro Se*

Dated: May 28, 2025

6

# EXHIBIT 1

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WASHTENAW

R & J GROUP HOLDINGS, LLC,
a Michigan limited liability company,

      Plaintiff/Appellee,

-v-

AZAR SADEGHI-STAFFELD, GHAZAL STAFFELD
a/k/a GHAZAL JONES and all other occupants,

      Defendants/Appellants,

Circuit Court Case No. 25-000617-AV
Lower Court Case No. 251C0573
Judge Julia B. Owdziej

_____

Anthony G. Mammina (P37684)
Mammina & Ajlouny, P.C.
Attorney for Plaintiff/Appellee
370 E. Maple Road, Suite 230
Birmingham, MI 48009
248-642-1330
amammina@m-apc.com

Azar Sadeghi-Staffeld, Ghazal Staffeld
a/k/a Ghazal Jones
Defendants/Appellants, Pro Se
341 Corrie Road
Ann Arbor, MI 48105
734-929-6969
azarstaffeld@gmail.com

_____

## __ORDER GRANTING R & J GROUP HOLDINGS, LLC'S__

## __MOTION TO DISMISS APPEAL__

At a session of said Court, held in
the Washtenaw County Circuit Court
on _____, 2025.
Present: _____
            Circuit Court Judge

1

This matter having come before the Court on R & J Group Holdings, LLC's Motion to Dismiss Appeal and the Court being otherwise fully advised of the premises; and

The Court having found that, based upon the Court records, the Appellants had not filed their Notice of Appeal or requisite appeal fee by the April 18, 2025 filing deadline unequivocally specified in the April 8, 2025 final Judgment upon which this Appeal is taken; and

Based upon MCR 4.201(O)(2) and MCR 7.104(B)(1) and (2);

**It is hereby ordered** that R & J Group Holdings, LLC's Motion to Dismiss Appeal is GRANTED.

**It is further hereby ordered** that Appellant's Appeal of Right pursuant to MCR 7.204 is dismissed with prejudice.

*This Order resolves the last pending claim in this case and closes the case.*

6/4/25 nearing
dete is
Cancelled

_____ 5·23·25
CIRCUIT COURT JUDGE

PROOF OF SERVICE
I hereby certify that I served a copy
of the foregoing document upon the
attorneys of record and/or the parties in
this case on the DATE NOTED below:
PERSONALLY on _____
~~FIRST CLASS MAIL~~ on 5/27/2025
email  VIA FAX on _____
Teresa Killeen

# EXHIBIT 2

JIS Code: COA

| | | | |
|---|---|---|---|
| 14A-1 | **STATE OF MICHIGAN**<br>**JUDICIAL DISTRICT**<br>**JUDICIAL CIRCUIT**<br>**COUNTY**<br>☐ IN THE COURT OF APPEALS | **CLAIM OF APPEAL** | **CASE NO.**<br>**CIRCUIT**<br>**DISTRICT** 251C0573<br>**PROBATE** |

**Court address**

4133 Washtenaw Avenue, Ann Arbor, MI 48108

**Court telephone no.**

734-973-4545

Plaintiff's/Petitioner's name(s) and address(es)      ☐ Appellant   ☑ Appellee

R & J Group Holdings, LLC
9930 Whittier Street
Detroit, MI 48224

v

Defendant's/Respondent's name(s) and address(es)   ☑ Appellant   ☐ Appellee

Azar Sadeghi-Staffeld, Ghazal Staffeld a/k/a
Ghazal Jones and all other occupants
341 Corrie Rd.
Ann Arbor, MI 48105      (734) 929-6969

Plaintiff's attorney, bar no., address, and telephone no.

Anthony G. Mammina (P37684)
Mammina & Ajlouny, P.C.
370 E. Maple Road, Suite 230
Birmingham, MI 48009      (248) 642-1330

Defendant's attorney, bar no., address, and telephone no.

In the matter of  Order of Possession for 341 Corrie Rd., ann Arbor, MI 48105

Other interested party(ies) of probate matter

1. Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones   claims an appeal from a final judgment or final order entered on
   Name

   April 8, 2025                        in the  14A-1 District                        Court of the State of Michigan,
   Date                                        Court name and number or county

   by   ☑ district judge   ☐ circuit judge   ☐ probate judge   ☐ district court magistrate

   Honorable Judge J. Cedric Simpson
   Name of judge or district court magistrate                        Bar no.

2. Bond on appeal is   ☐ filed.   ☐ attached.   ☐ waived.   ☑ not required.
3. ☑ a. The transcript has been ordered.
   ☐ b. The transcript has been filed.
   ☐ c. No record was made.

We are within the statutory 10 day appeal period to this order.
We are petitioning to reserve time with the Court.

*[Stamp: RECEIVED APR 17 2025 14A-1 DISTRICT COURT ANN ARBOR, MI]*

Approved, SCAO
Form MC 55, Rev. 9/23
MCL 15.240, MCL 710.65, MCR 4.401(D), MCR 7.104(C),
MCR 7.108(C)(3), MCR 7.204(D)
Page 1 of 2

Distribute form to:
Court of Appeals/Circuit court
Trial court
Appellee
Appellant

SRA

Claim of Appeal   (9/23)
Page 2 of 2

Case No. 251C0573

☑ 4. THIS CASE INVOLVES
    ☐ a. A CONTEST AS TO THE CUSTODY OF A MINOR CHILD.
    ☐ b. AN ADULT OR MINOR GUARDIANSHIP UNDER THE ESTATES AND PROTECTED INDIVIDUALS CODE OR
          UNDER THE MENTAL HEALTH CODE.
    ☐ c. AN INVOLUNTARY MENTAL HEALTH TREATMENT CASE UNDER THE MENTAL HEALTH CODE.
    ☑ d. A RULING THAT A PROVISION OF THE MICHIGAN CONSTITUTION, A MICHIGAN STATUTE, A RULE OR
          REGULATION INCLUDED IN THE MICHIGAN ADMINISTRATIVE CODE, OR ANY OTHER ACTION  OF THE
          LEGISLATIVE OR EXECUTIVE BRANCH OF STATE GOVERNMENT IS INVALID.
    ☐ e. AN ADOPTION ORDER UNDER CHAPTER X OF THE PROBATE CODE.
    ☐ f. A FREEDOM OF INFORMATION ACT ISSUE.

04/17/2025
Date

_Ann Staffeld_
Appellant/Attorney signature

## PROOF OF SERVICE

I certify that copies of this claim of appeal and bond (if required) were served on

Karl Staffeld      on 04/17/2025     by ☐ personal service.   ☑ first-class mail.
Name            Date

           on _____     by ☐ personal service.   ☐ first-class mail.
Name            Date

           on _____     by ☐ personal service.   ☐ first-class mail.
Name            Date

04/17/2025
Date

_Karl Staffeld_
Signature

EXHIBIT 3

## LEASE AGREEMENT

This Lease Agreement (the "Lease") is entered this 27th day of October 2023 (the "Effective Date") by and between **R & J Group Holdings, LLC** (the "**Landlord**"), with an address of 9930 Whittier Street, Detroit, MI 48224 and **Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones** (collectively, the "**Tenant**"), with an address of 341 Corrie Rd., Ann Arbor, MI 48105. Landlord and Tenant may each hereafter be referred to as a "Party" and collectively as the "Parties".

**NOTICE:  Michigan law establishes rights and obligations for parties to rental agreements. This agreement is required to comply with the Truth in Renting Act. If you have a question about the interpretation or legality of a provision of this agreement, you may want to seek assistance from a lawyer or other qualified person.**

That for and in consideration of the mutual agreements herein contained, for adequate consideration, the receipt and sufficiency of which is acknowledged by Landlord and Tenant, Landlord and Tenant hereby agree, covenant, represent and promise to and with each other, as follows:

1.    **Leased Premises, Term, Use, Inspection and Incorporation of Recitals.**

**1.1    Leased Premises.**   Landlord shall hereby lease to Tenant, and Tenant shall rent from Landlord, the entire premises located in the Village of Barton Hills, County of Washtenaw, State of Michigan, commonly known as 341 Corrie Rd., Ann Arbor, MI 48105 (the "**Premises**"), Tax Parcel Number IB-09-08-380-005, and as legally described on the attached Exhibit A.

**1.2    Original Term.**  This Lease shall commence on November 1, 2023 and, unless sooner terminated pursuant to law or any of the terms herein, shall continue for a lease term of 13 months expiring on November 30, 2024 (the "**Lease Term**").

**1.3    Conditional Renewal Option.** This Lease includes a conditional option to renew the Lease Term for an additional term of 12 months only upon the mutual agreement of the Parties as to the terms of such extension. Tenant must notify Landlord of Tenant's intent to renew the Lease Term at least 30 days in advance of the end of the Lease Term and the Parties must mutually agree upon all material terms of such renewal prior to the end of the Lease Term.

**1.4    Use of Premises.**  Tenant shall use the Premises as their residence for themselves and their immediate family only, and for no other purpose without the prior written consent of the Landlord. Tenant will comply with all applicable laws, rules, ordinances, statutes and orders regarding the use of the Premises, including all ordinances, rules and regulations of the local municipality.

*Initials:    Landlord _____    Tenant _____*

**1.5 Inspection / Condition of Premises.** Tenant has inspected the Premises, the fixtures, the grounds, building and improvements and acknowledges that the Premises are in good and acceptable condition and are habitable and completed the Premises Inspection Inventory Checklist attached hereto as Exhibit B. If the condition of the Premises changes at any time during the Lease Term, Tenant shall promptly provide reasonable notice to Landlord. Tenant hereby accepts the Premises in its current "AS-IS" condition.

## 2. Rent, Late Payments, Real Estate Taxes and Security Deposit.

**2.1 Rent.** Tenant shall pay to Landlord during the Lease Term, as rent for the Premises, the amount of Five Thousand and 00/100 ($5,000.00) per month for 12 consecutive months beginning on December 1, 2023 ("Rent") and continuing on the 1st of each calendar month thereafter through the end of the Lease Term, for a total Rent payment for the Lease Term of Sixty Thousand and 00/100 Dollars ($60,000.00).

**2.2 Manner of Payment.** Rent shall be paid by Tenant to the Landlord each month, in advance of the first day of each month at the address listed above.

**2.4 Late Fees.** If any amount due under the Lease is more than 5 days late, Tenant agrees to pay a late fee of $50.00 for each incident or occurrence.

**2.5 Real Estate Taxes.** During the Lease Term, Tenant shall be responsible for and pay all real estate taxes and assessments for the Premises as additional Rent.

**2.6 Security Deposit.** On execution of this Lease, Tenant shall deposit with Landlord a security deposit of $10,000.00 (the "Deposit"), as security for the performance of Tenant's obligations under this Lease. Landlord may (but shall have no obligation to) use the Deposit or any part thereof to cure any breach or default of Tenant under this Lease, or to compensate Landlord for any damage that it incurs as a result of Tenant's failure to perform any of Tenant's obligations hereunder. Landlord is not limited to the Deposit to recoup damage costs, and Tenant remains liable for any balance due or damages to the Premises at the end of the Lease Term. Tenant shall not apply or deduct any portion of the Deposit from any month's Rent, including the last month of the Lease Term. If Tenant breaches any of the terms or conditions of this Lease, Tenant shall forfeit the Deposit, as permitted by law. **You must notify your Landlord in writing within 4-days after you move of a forwarding address where you can be reached and where you will receive mail; otherwise your Landlord shall be relieved of sending you an itemized list of damages and the penalties adherent to that failure.**

**2.7 Return of Deposit.** In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, and shall not purchase the Premises in accordance with the option to purchase contained herein, the Deposit shall be returned to Tenant at the end of the Lease Term and after delivery of

| *Initials:* | Landlord | Tenant |
|---|---|---|

possession of the entire Premises to Landlord, subject, however, to any balance for unpaid Rent or damages to the Premises.

**3.    Option to Purchase.** The Tenant is hereby granted the option of purchasing the Premises at the end of the Lease Term (the "Purchase Option").

> **3.1    Purchase Price.** The purchase price shall be One Million Fifty Thousand and 00/100 Dollars ($1,050,000.00) (the "**Purchase Price**") after the final Rent payment is made to Landlord, only if Tenant is not default of this Lease. To exercise the option, the Tenant must deliver to the Landlord written notice of Tenant's intent to purchase in advance of the expiration of the Lease Term and such written notice must specify a valid closing date which must occur within thirty (30) days of the expiration of the Lease Term, unless otherwise agreed to by Landlord in writing. Provided that the sale of the Premises closes within thirty (30) days of the expiration of the initial Lease Term, Tenant shall receive a credit of $50,000.00 toward the Purchase Price, which includes Landlord's retention of the Security Despoit as part of this credit. Landlord further agrees to apply a portion of the Purchase Price received by Landlord at the Closing of the sale contemplated herein to pay off any remaining balance due and owing to Landlord from Tenant under the Promissory Note dated October 27, 2023.

> **3.2    Closing.** Landlord shall determine the title company at which settlement shall occur and shall inform Tenant of this location. Tenant agrees that closing costs in their entirety, including all taxes and assessments, the cost of title insurance, attorney fees, transfer taxes or other charges, shall be the sole responsibility of Tenant. No real estate commissions or any other commissions shall be paid in connection with the purchase/sale transaction contemplated by this Section.

> **3.3    Exclusivity.** This option to purchase is exclusive to the Tenant named herein, is non-assignable and exists solely for the benefit of the Tenant. Should Tenant attempt to assign, convey, delegate, or transfer this option to purchase without the Landlord's express written permission, any such attempt shall be deemed null and void.

> **3.4    Title to Premises.** The Landlord shall convey title to the Premises to Tenant by a warranty deed at closing. Tenant may obtain a title insurance policy for the Premises at Tenant's sole expense.

**4.    Default.**

| Initials: | Landlord _____ | Tenant _____ |
|---|---|---|

Residential Lease, 341 Corrie Rd., Ann Arbor, MI 48105                    Page 4 of 10

**4.1    Event of Default.**   The occurrence of any of the following events shall be deemed a "Default" under the terms of this Lease:

A. Any representation or warranty of the Tenant made in this Lease shall be untrue when made, or shall, during the term of this Lease, become impaired, untrue or misleading;

B. Tenant shall fail to pay Rent when due or perform or observe any term, condition, covenant or agreement set forth in this Lease;

C. If Tenant files a bankruptcy petition under any chapter of Title 11 of the United States Bankruptcy Code, Tenant stipulates in advance to relief from the automatic stay provision, 11 U.S.C. § 362 in favor of Landlord for all purposes and by execution of this Lease, Tenant consents to entry of a stipulated order for relief from the automatic stay as set forth herein;  and

D. If Tenant defaults, as defined herein, Landlord may have all remedies legally permitted, including termination of this Lease and the Purchase Option. Landlord shall serve a written, seven (7) day notice on Tenant specifying the nature of said default and if Tenant does not cure a default of which Tenant has been notified, or if the default cannot be completely cured or remedied in seven days, Landlord may at Landlord's option: (i) cure such default and add the cost of such cure to Tenant's financial obligations under this Lease; or (ii) declare Tenant in default and evict Tenant from the Premises in accordance with the laws of the State of Michigan. Landlord also may terminate this Lease and the Purchase Option if Tenant, a member of Tenant's household, or other person under Tenant's control, unlawfully manufactures, delivers, possesses with intent to deliver, or possesses a controlled substance on the Premises.

**4.2    Physical Remedies.**  If the notice provided for in Section 4.1(D) has been given, the Lease Term shall expire as defined herein, or if Tenant shall be in default of this Lease, then Landlord may, as permitted by law, dispossess Tenant by summary proceedings or otherwise, and retake possession of the Premises.

**4.3    Financial Remedies.**   In the event of any Default, re-entry, expiration and/or dispossession by summary proceedings or otherwise: (i) the Rent shall become due thereupon and be paid up to the time of such re-entry, dispossession or expiration, together with such damages and/or expenses Landlord may incur for legal expenses, attorney fees, costs, expenses or brokerage, and/or putting the Premises in good order to the extent permitted by the law of the State of Michigan; and/or (ii) Landlord may re-let the Premises or any part or parts thereof. Landlord may, at its sole option, hold Tenant liable for any difference between the Rent payable under this Lease during the balance

| Initials:   Landlord_____ | Tenant_____ |

of the Lease Term, and any Rent paid by a successive Tenant if the Premises are re-let. In the event that after default by Tenant, Landlord is unable to re-let the Premises during any remaining portion of the Lease Term, Landlord may at Landlord's option hold Tenant liable for the balance of the unpaid Rent under this Lease for the remainder of the Lease Term.

**5.     Quiet Enjoyment.** Landlord covenants and agrees with Tenant that upon Tenant timely remitting all required Rent to Landlord, and Tenant observing and materially performing all of the terms, covenants and conditions to be performed under this Lease and under any applicable ordinances, rules and regulations, Tenant may peaceably and quietly enjoy the Premises.

**6.     Assignment.** Tenant expressly covenants that Tenant shall not assign this Lease, including the Purchase Option, or sublease the Premises without the prior written consent of the Landlord. Landlord reserves the sole right and subjective discretion to approve or deny any assignment of this Lease or any sublease to any potential or prospective tenant. Any assignment or sublease without Landlord's written prior consent shall, at Landlord's option, terminate this Lease. No assignment, subleasing, occupancy or collection shall be deemed a waiver of the provisions of this Lease, or a release of Tenant from the further performance of covenants in this Lease. Landlord shall be free to sell, mortgage, assign, transfer or sell all or part of Landlord's interest in the Premises and/or the Lease without the approval or consent of the Tenant.

**7.     Possession and Tenant Responsibilities.**

**7.1     Possession and Surrender.** At the expiration of the Lease Term, if Tenant shall not have exercised the Purchase Option, Tenant shall peaceably surrender the Premises to Landlord in the same good condition as it was at the commencement of the Lease, subject only to ordinary wear and tear, and free of all debris and trash.

**7.2     Utilities and Services.** Tenant will be responsible for all utilities and services required on the Premises. Tenant shall put all utilities for the Premises in their name, maintain uninterrupted service throughout the Lease Term, and timely pay all utility bills. Tenant shall pay any penalties imposed by utility providers because of late payment of original bills. The utilities include, but are not limited to, water, electric, gas, cable, internet and cost of trash removal, if any. Tenant shall periodically, upon request of the Landlord, submit written proof that all utilities have been paid and are current with no past due amounts owed to any utility provider. Failure to do so shall be an event of Default of this Agreement.

**7.3     No Pets.** Tenant is not permitted to keep any pets on the Premises without the express prior written consent of Landlord, such consent being within the sole discretion of Landlord. The Tenant shall be responsible for all expenses, damages, destruction or other wear and tear caused by the pets.

*Initials:*   Landlord _____   Tenant _____

**7.4     Dangerous Materials.**  Tenant shall not keep or have on or around the Premises any item of a dangerous, flammable or explosive nature that might unreasonably increase the risk of fire or explosion on or around the Premises or that might be considered hazardous by any responsible insurance company.

**7.5     Alterations and Improvements.**  Tenant agrees not to make any alterations or additions to the Premises without the prior written consent of Landlord.  If any alterations, additions, improvements or changes are made to or built on or around the Premises, same shall become the property of Landlord and remain as part of the Premises at the expiration or termination of this Lease, unless otherwise agreed to by the Parties in writing.

**7.6     Maintenance, Repair and Damage to Premises.**  Tenant shall use and maintain the Premises in accordance with all applicable sanitary, housing, health, police and all other regulations imposed by governmental authorities. Tenant shall maintain the Premises in a clean and orderly manner; remove all garbage from the Premises in a clean and sanitary manner. Tenant shall also be responsible for all required and preventative maintenance to the Premises, including all plumbing, electrical, sewage and HVAC system, and any fire and flood damage repairs. Tenant shall pay for all damage caused to the Premises by Tenant, their guests and/or their invitees.

**7.7     Personal Property (Appliances).**  Tenant acknowledges that any personal property of the Landlord situated or affixed to the Premises, such as appliances, window covers and other fixtures, shall be maintained by Tenant and remain upon the Premises upon vacating, in good condition, reasonable wear and tear excepted. Landlord shall retain all remedies against Tenant for any unlawful removal or conversion of such items/property.

**7.8     Smoke Detectors.**  Smoke detectors have been installed within the Premises. During the Lease Term, Tenant is required to maintain all smoke detectors. Battery maintenance and verification of operation of the smoke detectors after the Lease Term commences are Tenant's responsibility.

**7.9     Damage to Premises.**  In the event the Premises, or a portion thereof, are destroyed by fire, storm, earthquake or other casualty not caused by the negligence of Tenant, such that the entire Premises is rendered wholly uninhabitable, this Lease and the Purchase Option shall terminate from such time except for the purpose of enforcing rights that may have accrued hereunder. The Rent provided for herein shall then be accounted for by and between Landlord and Tenant up to the time of such injury, destruction or un-inhabitability of the Premises and Landlord shall refund to Tenant, pro-rata, previously paid Rent for periods occurring after such date. Should a portion of the Premises thereby be rendered uninhabitable, the Landlord shall have the option of either

*Initials:*   Landlord _____   Tenant _____

terminating this Lease and refunding Tenant's pro rata share of Rent commensurate with the time remaining under the Lease Term.

**7.10   Smoking.** Smoking on the Premises and in any buildings or structures upon the Premises is not permitted at any time.

**8.   Inspection of Premises.** Landlord and Landlord's agents, including, but not limited to, any management company of Landlord, shall have the right at all reasonable times during the Lease Term and any renewal thereof to enter the Premises for the purpose of inspecting the Premises and all buildings and improvements thereon. Tenant agrees to make the Premises available to Landlord for such inspections or to address an emergency. Except in an emergency situation, Landlord shall give Tenant a forty-eight (48) hour notice of Landlord's intent to enter.

**9.   Abandonment.** If at any time during the Lease Term,  the Tenant abandons the Premises or any part thereof, Landlord may at Landlord's option obtain possession of the Premises by any legal means without liability to Tenant and may, at Landlord's option, terminate this Lease. Abandonment is defined as absence of the Tenant from the Premises for at least 30 days without notice to Landlord.

**10.   Security System.** Tenant understands that Landlord is not responsible to provide any security alarm system or other security for Tenant or the Premises.  In the event any alarm system is provided, Tenant understands that such alarm system is not warranted to be complete in all respects or to be sufficient to protect Tenant or the Premises. Tenant releases Landlord from any loss, damage, claim or injury resulting from the failure of any alarm system, security or from the lack of any alarm system or security.

**11.   Insurance.** Tenant shall each be responsible for maintaining appropriate insurance for the entire Premises, including standard hazard, fire and flood insurance for the full replacement value of the Premises and the personal property therein, as well as general liability insurance coverage. Tenant understands that Landlord will not provide any insurance coverage whatsoever for the Premises or for Tenant's property. Landlord will not be responsible for any loss of Tenant's property or damages to the Premises, whether by theft, fire, riots, strikes, acts of God or otherwise, and the liability for any such damages will be that of Tenant. Tenant shall provide Landlord, on a monthly basis, written proof that the Premises are properly insured in a manner satisfactory to Landlord.

**12.   Intent to Purchase.** As of the Effective Date, it is the Tenant's herein intent to purchase the Premises from Landlord in accordance with the terms and conditions of this Lease prior to or after the expiration of the Lease Term. All of the terms and conditions of the purchase/sale of the Premises are governed by this Lease and nothing to the contrary shall be deemed as part of the sale/purchase of the Premises or otherwise alter the terms of this Lease unless a written addendum to this Lease is signed by both Landlord and Tenant.

| Initials:   Landlord | Tenant |
|---|---|

**13.    No Other Representations, Construction; Governing Law; Consents; Acknowledgements.**

**13.1   No Other Representations.** Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant in executing and delivering this Lease is not relying upon, any warranties, representations, promises, understandings or statements, except to the extent that they are expressly set forth in this Lease.

**13.2   Entire Agreement.** THIS WRITTEN LEASE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH REGARD TO THE TENANT'S LEASE OF THE PREMISES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. The Parties make no representations or warranties to each other, except as contained in this Lease. All prior agreements and understandings between the Parties hereto with respect to the transactions contemplated hereby, whether verbal or in writing, are superseded by, and are deemed to have been merged into, this Lease unless otherwise expressly provided herein.  This Lease shall be binding on, and inure to the benefit of, the Parties hereto and their permitted successors and assigns as stated in this Lease, but no other party shall have or claim any third party beneficiary rights under this Agreement.

**13.3   Construction and Severability.** If any of the provisions of this Lease, or the application thereof to any person or circumstances, shall, to any extent, be held invalid or unenforceable for any reason, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**13.4   Counterparts or E-mail.** This Lease may be executed in counterparts, including by e-mail transmission, each of which shall be deemed an original and all of which together shall constitute one document.

**13.5   Time of Essence.** Time and strict and punctual performance are of the essence with respect to each provision of this Lease.

**13.6   Survival of Representations and Warranties.** The representations, warranties and covenants of the Parties contained herein shall survive the consummation of the transactions contemplated in this Lease, subject to any time period limitations specified herein.

**13.7   Further Cooperation.** The Tenant shall each execute and deliver to the Landlord all further documents or instruments reasonably requested by Landlord to effect

Initials:   Landlord _____   Tenant _____

the intent of this Lease. Any request by Landlord under this Section shall be accompanied by the document proposed for signature, in form and substance satisfactory to Landlord.

**13.8   Venue and Choice of Law.**  The Parties agree that any litigation between the Parties concerning this Lease shall be brought in the State of Michigan, County of Oakland, in the appropriate Circuit or District Court. This Agreement shall be interpreted in accordance with and any dispute shall be governed by the laws of the State of Michigan.

**13.9   Modifications.**  This Lease may be amended, waived, discharged or terminated only by and through a written instrument signed by all Parties.

**13.10  Binding Effect.**  The covenants and conditions contained in this Lease shall apply to and bind the Parties and the heirs, legal representatives, successors and permitted assigns of the Parties.

**13.11  No Waiver.**  The failure of Landlord to insist in any instance upon the strict keeping, observance or performance of any provision of this Lease or to exercise any election in this Lease shall not be construed as a waiver or relinquishment of such provision in the future, but the same shall continue and remain in full force and effect. No waiver or modification by either Party of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by the Party to be charged. The receipt and retention by the Landlord of Rent with knowledge of the breach of any provision of this Lease shall not be deemed a waiver of such breach.

**13.12  Cumulative Rights.**  Landlord and Tenant's rights under this Lease are cumulative and shall not be construed as exclusive of each other unless otherwise required by law.

**13.13  Notice.**  Any notice required or otherwise given pursuant to this Lease shall be given in writing and delivered by first-class mail or a reputable overnight delivery service, if to Tenant, at the Premises and if to Landlord, at the address stated above. Either Party may change such addresses from time to time by providing written notice as set forth above.

**13.14  Headings.**  The headings of the Sections of this Lease are for convenience only and are not to be considered in construing said Sections.

**13.15  Holdover.**  If Tenant holds-over in the Premises after the expiration or termination of this Lease without the consent of the Landlord, Tenant shall pay as hold-over rent a monthly rental rate of $5,500.00, unless otherwise agreed by the Parties in writing; provided, however, that nothing contained herein shall be construed to limit or preclude any other rights or remedies available to the Landlord at law or in equity by reason of such holding-over by Tenant, including, without limitation, the recovery of any

*Initials:*   Landlord _____   Tenant _____

Residential Lease, 341 Corrie Rd., Ann Arbor, MI 48105                              Page 10 of 10

sums or damages to which, in addition to the damages specified above, the Landlord may lawfully be entitled. A month-to-month tenancy shall be created by Tenant's hold-over, subject to the same terms and conditions of this Lease and shall be terminable on a thirty (30) day-notice by either Party, or on longer notice if required by law.

**13.16 Indemnification.** To the extent permitted by law, Tenant indemnifies and holds Landlord, Landlord's agents and the Premises, harmless from any and all liability for loss, claims, injury to or death of any person, including Tenant, or for damage to property arising from Tenant's use and occupation of the Premises, or from the acts or omissions of any person or persons, including Tenant, in or about the Premises with Tenant's express or implied consent, except Landlord's act of negligence.

**13.17 Neutral Construction.** Any ambiguities and/or inconsistencies in any of the terms of this Lease will be given neutral construction and shall not be construed against any particular Party as the "drafter" of such language.

**13.18 References in this Lease**. Whenever the context of this Lease requires, references to the singular number shall include the plural, and the plural shall include the singular, where appropriate; words denoting gender shall be construed to include the masculine, feminine and neutral where appropriate; and specific enumeration shall not exclude the general, but shall be considered as cumulative.

IN WITNESS WHEREOF, the Parties to this Lease have executed and delivered this Lease as of the Effective Date.

**LANDLORD:**

R & J GROUP HOLDINGS LLC

By: Jerry Watha
Its: Member

**TENANT:**

Azar Sadeghi-Staffeld, an individual

Ghazal Staffeld a/k/a Ghazal Jones, an individual

**Initials:**   Landlord _____   Tenant _____

## EXHIBIT A
## LEGAL DESCRIPTION

Real property located in the Village of Barton Hills, County of Washtenaw, State of Michigan, described as:

Commencing at an iron pipe in the South line of Section 8 at its intersection with the West line of Lot 4, Block 3, Supervisor's Plat of Barton Hills; thence North 20 degrees 12 minutes East 198.16 feet to a concrete monument for a PLACE OF BEGINNING; thence North 20 degrees 12 minutes 00 seconds East 217.77 feet to a concrete monument; thence North 20 degrees 12 minutes 00 seconds East 133.73 feet to a concrete monument, thence North 35 degrees 01 minute East 94.97 feet to a point on a curve; thence Easterly along a curve concave Southerly having a radius of 45.99 feet and central angle of 48 degrees 42 minutes 30 seconds 39.10 feet to a concrete monument in the Southerly right-of-way line of Conic Road at its Westerly end; thence North 83 degrees 49 minutes 0 seconds East 120.00 feet along the South line of Corrie Road to a concrete monument; thence South 6 degrees 00 minutes West 250.00 feet to a concrete monument; thence South 28 degrees 11 minutes 10 seconds West 227.14 feet to a concrete monument; thence North 87 degrees 02 minutes 42 seconds West 193.40 feet to the PLACE OF BEGINNING, being a part of parcel one of Lot 4 in Block 3 of Supervisor's Plat of Barton Hills, as recorded in Liber 9 of Plats, Pages 58, 59, and 60, Washtenaw County Records.

Tax Parcel Number IB-09-08-380-005

This agreement is made between the purchaser and the seller on November 11, 2024

For the property located at 341 Corrie Rd Ann Arbor, MI.


Buyer agrees to present a valid Purchase Agreement no later than Wednesday November 13,2024 @ 5pm

The P.A must present a Purchase price No less than $1,148,581.72

Must have a closing date No later than January 31,2025

Purchaser to pay all taxes, Recording fees, and transfer taxes .

There will be No Tax prorations.

**Any and all additional expenses incurred by seller  pertaining to the property From October 31,2024 thru January 31,2025 will be paid by the purchaser.**

Purchaser currently Resides in the home

This is an AS IS WHERE IS SALES

Seller to provide Free and clear title at the time of closing

Seller agrees to extend the current lease until January 31,2025

Purchaser agrees to continue making agreed monthly payments. Until the loan closes.

EXHIBIT 4



L: 5551 P: 595   6718546   LN
04/24/2024 09:37 AM   Total Pages: 3
Lawrence Kestenbaum, Washtenaw Co

Time Submitted for Recording
Date 4-24 20 24 Time 9:32am
Lawrence Kestenbaum
Washtenaw County Clerk/Register

## AFFIDAVIT AND NOTICE OF LIEN FOR
## RECOVERY OF NUISANCE ABATEMENT COSTS

Jeffrey David, being first duly sworn, states as follows:

1. I am the President of the Barton Hills Maintenance Corporation, a Michigan non-profit Corporation (the "Corporation") and am authorized to make this Affidavit and file this lien on its behalf.

2. The Corporation is responsible for maintaining the common areas within the Barton Hills Subdivision and for assuring that Barton Hills property owners comply with the By Laws and Deed Restrictions established by the Corporation.

3. The current occupants of the property described in Paragraph 6 below (the "Property") have permitted to exist on that property certain nuisance conditions that violate the provisions of the Barton Hills Deed Restrictions and the By Laws of the Corporation. Those nuisance conditions remain in existence as of the date of this lien.

4. The Corporation has incurred and will continue to incur costs and expenses in attempting to have the owner and the current occupants of that property remove those nuisance conditions.

5. The Corporation hereby places a lien on the Property to secure reimbursement of the costs and expenses described in Paragraph 4. The Corporation will quantify the then current amount of such costs and expenses, including without limitation, all attorney fees, court costs and other costs incurred in enforcing the Barton Hills Deed Restrictions and the By Laws of the Corporation, upon the request of a party in interest in this matter.

6. The Property is located in the Village of Barton Hills, County of Washtenaw, State of Michigan and is more particularly described as:

> Commencing at an iron pipe in the South line of Section 8 at its intersection with the West line of Lot 4, Block 3, Supervisor's Plat of Barton Hills; thence North 20 degrees 12 minutes East 198.16 feet to a concrete monument for a place of beginning; thence North 20 degrees 12 minutes 00 seconds East 217.77 feet to a concrete monument; thence North 20 degrees 12 minutes 00 seconds East 133.73 feet to a concrete monument; thence North 35 degrees 01 minute East 94.97 feet to a point on a curve; thence Easterly, along a curve concave Southerly having a radius of 45.99 feet and central angle of 48 degrees 42 minutes 30 seconds 39.10 feet to a concrete monument in the Southerly right-of-way line of Corrie Road at its Westerly end; thence North 83 degrees 49 minutes 00 seconds East 120 feet along the South line of Corrie Road to a concrete monument; thence South 06 degrees 00 minutes West 250.00 feet to a concrete monument; thence South 28 degrees 11 minutes 10 seconds West 227.14 feet to a concrete



Page 1 of 3

monument; thence North 87 degrees 02 minutes 42 seconds West 193.40 feet to the place of beginning.   Being a part of Parcel One of Lot 4 in Block 3 of Supervisor's Plat of Barton Hills, as recorded in Liber 9 of Plats, Pages 58, 59 and 60, Washtenaw County Records.  Described for tax purposes as follows: Commencing at the Southwest corner of Lot 4, Block 3, of Supervisor's Plat of Barton Hills; thence North 20 degrees 12 minutes East 268.84 feet for the place of beginning; thence North 20 degrees 12 minutes East 351.50 feet; thence North 35 degrees 00 minutes East 94.97 feet; thence Northeasterly 39.10 feet in the arc of a curve to the right with a radius of 44.99 feet, through a central angle of 48 degrees 42 minutes 30 seconds, the chord of which bears North 59 degrees 22 minutes 30 seconds East 37.94 feet; thence North 83 degrees 49 minutes East 120 feet; thence South 06 degrees West 250 feet; thence South 28 degrees 11 minutes 30 seconds West 227.14 feet; thence North 87 degrees 02 minutes 40 seconds West 193.4 feet to the place of beginning.  Being a part of Lot 4, Block 3, Supervisor's Plat of Barton Hills.

Commonly known as 341 Corrie Road, Ann Arbor, Michigan 48105
Tax Parcel No. 1B-09-08-380-005

7. According to Association's records, the owner of the Property is:
R&J Group Holdings, LLC
9930 Whittier, Detroit, Michigan 48224

8. All persons reading this Notice of Lien are advised of the following:

   a. The Corporation may recover its costs and reasonable attorney fees incurred in pursuing reimbursement of the amount described in Paragraph 4 above and/or such other amounts as may subsequently be assessed against the Property in accordance with the provisions of the Corporation Deed Restrictions and By Laws.  All such sums, including late charges, costs, interest, attorney fees and future assessments, are secured by the lien.

   b. Michigan law authorizes foreclosure of the lien by and also authorizes a suit at law for a money judgment without waiving or foreclosing the lien.

   c. A receiver may be appointed in an action to foreclose the lien to take possession of the Property.

   d. The Barton Hills Deed Restrictions and the By Laws of the Corporation provide additional or different remedies to the Association.  These remedies may include denial of the right to vote at meetings of the Corporation.  The Deed Restrictions and By Laws may be referred to for further information and remedies on default.

9. A copy of this lien was served on the owner named in Paragraph 7 above by first class mail, postage prepaid, addressed to it as stated in Paragraph 7 above, which is the last known address for the owner.

Barton Hills Maintenance Corporation

Dated: April 22, 2024

By: _____
Jeffrey David, President

STATE OF MICHIGAN        )
                                           ) ss.
COUNTY OF WASHTENAW )

On the 22rd day of April, 2024, before me personally appeared the aforementioned Jeffrey David, acting as the President for Barton Hills Maintenance Corporation, a Michigan non-profit corporation, and known to me to be the person who executed the above Notice of Lien, on behalf of said corporation, being so duly authorized to execute this Notice of Lien by the Board of Directors of said corporation.

DRAFTED BY & WHEN RECORDED
RETURN TO:                                          _____, Notary Public
Mark J. Eby                                          Washtenaw County, Michigan
Dever Eby & Issa, PLLC                     My Commission Expires: 1/31/29
301 N. Main Street, 2nd Floor            Acting in the County of Washtenaw
Ann Arbor, MI 48104

(mje_deverebyissa_com/Documents/Documents/Barton Hills Maintenance Corporation/Notice of Lien-Recovery of Nuisance Abatement.doc)

Page 3 of 3

# EXHIBIT 5



December/15/2024

Azar Staffeld

341 Corrie ,Ann Arbor MI, 48105

CONGRATULATIONS! I AM PLEASED TO INFORM YOU THAT YOU ARE PRE-APPROVED FOR A HOME LOAN BASED ON THE FOLLOWING TERMS, THIS PRE-APPROVAL IS VALID FOR 60 DAYS (ABOUT 2 MONTHS) FROM DECEMBER 15TH 2024.

Purchase price of $1,150,000

Program: Conventional

First Lien Mortgage Loan type: Fixed Term: 360 months (about 30 years)
Property type SFR

Additional documents required: valid sales contract, clear title, credit, Appraisal

Please contact me directly as needed.  Thank you for choosing NEXA Mortgage LLC

*Guy V Godboldo*    www.loansbyguy.com

*Guy V Godboldo I Independent LO I Recruiter*

*CELL 313-653-9749*

**313-653-9749**

**ggodboldo@nexamortgage.com**

**132332**

3100 W Ray Road #201 Office #209Chandler, AZ 85226





01/17/2024
Azar Staffeld
341 Corrie Road, Ann Arbor, Michigan 48105


Purchase Price: $1,150,000.00
First Lien Mortgage Loan Type: Fixed Term: 360 months (about 30 years)
Property Type: SFR
Program: FHA
Additional documents provided: valid sales contract, credit, appraisal


To Whom it may Concern,

 We are ready to proceed to the next step in closing this loan. We use Title Connect for our Michigan closings and we intend to continue using them. We have ordered the title work and discovered there is a lien on the title. Unless the lien is removed from the title, NEXA Mortgage or any other mortgage or title company cannot legally close this loan. Potential investors or banks cannot become the first lien holder and will not approve financing a mortgage on a property that has a lien on it.

Please inform the Seller that unless the lien is satisfied and the affidavit notice of lien for recovery and discharge of lien form is completed, NEXA Mortgage cannot legally proceed with this loan.

Please contact me directly as needed.  Thank you for choosing NEXA Mortgage LLC

*Guy V Godboldo*      *www.loansbyguy.com*

*Guy V Godboldo I Independent LO I Recruiter*

*CELL 313-653-9749*

**313-653-9749**
**ggodboldo@nexamortgage.com**
**132332**
3100 W Ray Road #201 Office #209Chandler, AZ 85226



EXHIBIT 6





# PURCHASE AGREEMENT
42705 Grand River Ave, Ste 201 Novi MI 48374 | 888.304.1447
www.3dxrealestate.com

**1. AGREEMENT TO SELL.** The undersigned Seller and Purchaser agree to sell and purchase the following real property located in the [City, Village, Township] of: **ANN ARBOR**_____, **Washtenaw County**_____ County, Michigan, described as follows: [legal description/tax ID No.] :OLD SID - IR.09.040.029.00 8IX 2-29 COM AT SW COR OF LOT 4, BLK 3, TH N 20 DEG 17' E MILI 84 FT FOR PL OF BEG, TH N 20 DEG 17' E 30 50 FT, TH N 30DEG 0' E 91 50 FT TH NELY____ known as [address] **341 CORRIE RD**_____ together with all improvements and appurtenances, including but not limited to all window treatments, shades, blinds, curtain rods, traverse rods, lighting fixtures, storm windows and doors, screens, awnings, TV antenna, satellite dish and accessories, water softener (rental units excluded), security system, central vacuum system and attachments, garage door openers and transmitters, fireplace enclosures, grates, logs and gas attachments, attached mirrors, landscaping, attached humidifiers and electric air filters, fuel in tanks at the time of possession, carpeting, if any, now on the premises, and: _____ (the "Property"). Seller and Purchaser agree that the personal property identified in this Purchase Agreement is being sold together with the Property and that the consideration for the personal property is contained in the Purchase Price for the Property. Seller agrees to provide Purchaser with a bill of sale containing standard warranties of title for the personal property being sold to Purchaser as so identified. Seller further agrees to transfer to Purchaser, to the extent such transfer or assignment is permitted, all warranties and guaranties relating to any equipment, fixtures, or personal property affixed to the Property, and/or to be conveyed to Purchaser. Seller further agrees to deliver to Purchaser all service manuals, operating instructions, owner's manuals, repair records, service records, and the like in Seller's possession relating to the Property or any personal property, fixtures, or equipment to be sold or conveyed to Purchaser.

Purchaser agrees to pay Seller the sum of: $**1,148,581.72**_____ (**One Million One Hundred Forty Eight Thousand Five Hundred Eighty One Dollars Seventy Two Cents**_____) Dollars (the "Purchase Price") subject to the existing building and use restrictions, easements, and zoning ordinances, if any, in accordance with the terms and subject to the conditions set forth in this Purchase Agreement.

**2. PURCHASER'S CLOSING COSTS.**
Seller agrees to contribute: **0.00**_____ of final sales price towards Purchasers: ☐ Pre-Paids ☐ Closing Costs ☐ Escrows

**3. PAYMENT.** This transaction shall be consummated by the subparagraph checked below: (Check box that applies)
☐ **A. CASH SALE.** Purchaser will pay the sales price in cash or certified funds, after delivery by Seller, of a Warranty Deed conveying marketable title.
☑ **B. NEW MORTGAGE.** This Agreement is contingent upon Purchaser's ability to secure a **Conventional** mortgage in the amount of $**1,148,581.72**. Purchaser agrees to pay the required down payment plus all prepaid items, mortgage costs, escrows and adjustments. Seller shall deliver to Purchaser the usual Warranty Deed conveying marketable title upon tender of the Purchase Price. Purchaser agrees to apply for said mortgage, within **5** days from the date of Seller's acceptance of this Agreement. Purchaser agrees to promptly and in good faith comply with the lender's request for necessary information required to process the loan application. If a firm commitment for the specified mortgage cannot be obtained within **75** days from the date of Seller's acceptance, this Agreement shall be null and void and the Deposit shall be returned to Purchaser. Denial of the specified mortgage shall render this Agreement null and void and the Deposit shall be returned to Purchaser.
☐ **C. LAND CONTRACT/OTHER. – SEE ADDENDUM.**

**4. APPRAISAL.** This transaction is subject to the property appraising at the agreed upon sales price, or higher. If property appraises below the sales price, Purchaser shall have the option to declare this offer null and void with a full refund of deposit.

**5. DEPOSIT.** The Broker is hereby authorized to present this Purchase Agreement to Seller, and will accept a deposit of $**10,000.00**____ which is to be held, once received, by Broker under Act No. 299 P.A. of 1980 and applied to the purchase price if the sale is consummated; or returned to Purchaser if the offer is rejected or withdrawn. If the Agreement is terminated pursuant to any conditions set forth within the agreement, parties agree that Selling Broker shall return the Deposit to Purchaser and Seller's remedies, if any, are limited to an award of damages equal to the amount of the Deposit.

**6. HOME PROTECTION PLAN.** Purchaser acknowledges notice of the availability of a home protection plan. **Purchaser:** ☑ Declines ☐ Accepts
Protection through: _____ [at]: ☐ Purchaser's expense ☐ Seller's expense. Cost Not to Exceed: $_____.

**7. FLOOD INSURANCE.** Purchaser may, at his expense, obtain a Flood Plain Certification within seven (7) days from the date of Seller's acceptance of this Agreement. If the Certification discloses that the property is in a Special Flood Hazard Area, Purchaser may notify Seller, in writing, within three (3) days from the date of the Certification, that Purchaser declares this offer null and void, and the deposit shall then be returned to Purchaser.

**PURCHASER(S) INITIALS:** ____ / _____              **SELLER(S) INITIALS:** ____ / _____
VS 3.0 | Rev. 11/22 | 3DX Real Estate, LLC – For use by active 3DX Real Estate Associates only, any other use is prohibited.
**Page 1 of 4**

**8. SELLER DISCLOSURES.** Purchaser acknowledges Seller's Disclosure Statements have been provided by Seller and, if the Property is residential housing built before 1978, a Lead-Based Paint and Lead-Based Paint Hazards Disclosure, prior to signing this Agreement. Furthermore, Purchaser acknowledges these and any other disclosures are (a) based upon Seller's knowledge and is not a warranty of any kind by Seller or Listing and Selling Brokers and their salespeople; (b) not substitution for any inspections or warranties Purchaser wishes to obtain; (c) provided solely by Seller and is not a representation made by Listing and Selling Brokers and their salespeople; and (d) a disclosure only and not intended to be a part of this Agreement. Seller authorizes Broker to distribute copies of the disclosures to any lender, appraiser and municipality, upon Purchaser's request. Seller represents, that there are no underground storage tanks, hazardous or toxic substances existing on, under, or above the Property as defined in any federal, state, or local law, regulation, rule, statute, or directive, nor is there any asbestos, urea formaldehyde insulation and the property does not contain any pollution or other environmental hazards other than any the Sellers disclosed on the Sellers Disclosure Statements. Furthermore, there are no undisclosed or latent defects affecting the Property and its improvements other than as set forth and identified on Seller's Disclosure Statement.

**9. HOMEOWNERS/CONDOMINIUM ASSOCIATION.** If there is a Homeowners/Condominium Association that has authority over the property, Seller is to provide Purchaser with a copy of the most recent financial statement, Master Deed (if any), by-laws and assessments and any other related information within seven (7) days of acceptance. If Purchaser does not notify Seller in writing within nine (9) days from the date of receipt of said documents that the Purchaser is dissatisfied with said documents, this Agreement shall be binding without regard to said documents. If Purchaser notifies Seller in writing that Purchaser is dissatisfied with said documents within the above specified time, then Purchaser may declare this Agreement void and any deposits shall be refunded.

**10. OCCUPANCY.**
☑ A. Keys immediately at Closing ☐ B. Within _____ days after closing by 5 p.m. From the date of closing to and including the date of vacating, Seller shall pay Purchaser $_____ per day as an occupancy charge. At closing, Seller shall deposit with Title Company $_____ to hold in escrow as an occupancy deposit and $_____ to hold in escrow as a damage deposit. Title Company shall pay to the Purchaser the amount of the occupancy charge and then reimburse Seller for any unused days upon Seller vacating the property.
**C. If tenants occupy the property, then:**
☐ Seller will have the tenants vacate the property before closing.
☐ Purchaser will be assigned all Landlord rights and security deposit and rents prorated to date of closing, with Purchaser assuming Landlord rights and obligations after date of closing.

Seller agrees to pay or reimburse Purchaser for all costs and expenses and incidental and consequential damages sustained by Purchaser incurred in recovering possession of the Property, which shall include, but not be limited to, mortgage payments, taxes, utilities, housing expense, storage fees, actual attorneys fees and any other costs or expenses which Seller may incur out of or are connected with Seller's failure to vacate the Property as required by this Agreement. Furthermore, any material damage to property caused by Seller during occupancy period, will result in monies escrowed for damage deposit, to be released to Purchaser for repair expenses. Seller shall have discretion to determine and define what constitutes material damage. If material damage amounts exceed deposit, Seller will be responsible for reimbursing for any additional monies directly to Purchaser. (The Escrow Agent or Broker has no obligation, implied or otherwise, for seeing that the premises are vacated or for the condition of the premises, etc.)

**11. TAXES/DUES/ASSESSMENTS.** Seller shall pay the following:
**A. Taxes.** All current/year real estate taxes which are due before date of closing, prorated and adjusted as of the date of closing in accordance with the Due Date basis of the municipality or taxing unit in which the property is located.
**B. Assessments.** Any and all assessments associated with the property, until the time of closing.
**C. Association.** All current year Current Homeowners, Subdivision or Condominium Association dues which are due before date of closing prorated between Seller and Purchaser as of the closing date on a due date basis. Capital or lateral charges shall be paid by Seller at closing.
**D. Water/Sewer.** Final water and sewage charges which are due up to the final day of occupancy, prorated and adjusted between Seller and Purchaser as of the date on which Seller vacates the Property and surrenders the keys to Purchaser. Escrow Agent shall retain and hold in escrow a minimum of $800 from the amount due Seller at closing for these charges. Escrow Agent shall remit the amount allocated to Seller and return the balance, if any, to Seller after receipt of the final bill or meter reading.

**12. EVIDENCE OF TITLE AND TITLE INSURANCE.**
**A. Commitment.** As evidence of title, Seller, at Seller's expense, agrees to furnish Purchaser within ten (10) days of Seller's acceptance of this Agreement, a commitment for title insurance in an amount not less than the Purchase Price and bearing a date later than the acceptance date of this Agreement, with the owner's policy to be issued pursuant to the commitment insuring marketable title (as defined below) to the Property in Purchaser.
**B. Without Standard Exceptions.** Seller agrees that the commitment for title insurance and the subsequent policy shall be issued without standard exceptions and that the policy issued will be updated to close any "gap" period between the date of closing and the date of the recording of the deed to Purchaser. Seller shall also provide Purchaser with a marked-up commitment for title insurance at the closing of this transaction guaranteeing that title is in the condition required under this paragraph.
**C. Owner Affidavit.** Seller shall execute an owner's affidavit and such other documents as the title insurance company or its agent typically requires for the issuance of a policy without standard exceptions, provided, however, that Purchaser shall pay for the cost of any survey required for the deletion of the standard exceptions.
**D. Marketable Title.** For purposes of this Agreement, marketable title shall mean fee simple title free and clear of any and all liens and encumbrances whatsoever, excepting only recorded and enforceable building and use restrictions, public utility easements of record, and zoning ordinances. Purchaser, at Purchaser's sole option, may elect to accept title in whatever condition it may be in and, in such event, marketable title shall mean the condition of title which Purchaser has elected to accept.
**E. Objection.** If objection to the title is made in writing, Seller, at Seller's sole option, shall have thirty (30) days from the date Seller is notified in writing of particular defects claimed, either (1) to fulfill the requirements or to remedy the title defects or (2) to refund the deposit in full termination of this Agreement. If Seller is able to comply with such requirements or remedy such defects within the time specified, as evidenced by written notification, revised commitment, or endorsement to commitment, Purchaser agrees to complete the sale within fourteen (14) days of receipt of a revised commitment or endorsement to commitment, subject to any other contingency contained in this Agreement. If, after reasonable efforts, Seller is unable to furnish satisfactory title within the time specified, the deposit shall be immediately refunded to Purchaser in full termination of this Agreement, unless Purchaser elects to proceed with the sale accepting such title as Seller is able to convey.

PURCHASER(S) INITIALS: _____ / _____                    SELLER(S) INITIALS: _____ / _____
VS 3.0 | Rev. 11/22 | 3DX Real Estate, LLC – Form for use by active 3DX Real Estate Associates only, any other use is prohibited.
**Page 2 of 4**

**13. PROPERTY INSPECTION.** Purchaser: ☐ **DOES** ☑ **DOES NOT** choose to have the Property inspected at Purchaser's expense, as Broker recommends. Seller shall grant an inspector of Purchaser's choice access to the Property to inspect and report upon the general condition of the Property, including but not limited to, any structure/s, plumbing, heating, mechanical, mold, radon, environmental, water, well, septic, lead based paint, electrical systems, etc. and determination of square footage. If the Property has been winterized, Seller shall, at his expense, de-winterize the Property and turn any utilities on prior to the inspection. The inspection shall be concluded within _____ calendar days from the date of Seller's acceptance of this Agreement. If the inspection discloses any defect in the Property which results in the Purchaser having cause to be dissatisfied with the Property, Purchaser shall notify Seller, in writing, within _____ days following the inspection, that Purchaser (a) declares this Agreement null and void and the Deposit shall be returned or (b) requests Seller to remedy the defect. Failure to notify Seller of a defect within this time period shall constitute a waiver of this paragraph by the Purchaser and he shall accept the Property AS IS. If the Seller is notified of a defect, Seller shall notify Purchaser, in writing, within _____ days, that Seller (a) will repair or provide for repair to eliminate the defect disclosed on the inspection report or (b) is unwilling to repair or provide for repair. If Seller declares this unwillingness to repair or provide for repair, Purchaser may (a) accept the Property AS IS or (b) declare this Agreement null and void and the Deposit shall be returned.

**14. MUNICIPALITY INSPECTION.** If the property is located in a municipality that requires an inspection prior to a sale, ~~Seller~~ will pay for necessary inspections and/or required repairs, if any, to obtain written approval of the municipality.

*Buyer    Renan fatah*

**15. WALK-THROUGH INSPECTION/PROPERTY CONDITION.** Seller agrees to keep the property and land in substantially the same condition as of the date of this Agreement and agrees to maintain heating, sewer, plumbing and electrical systems and any built-in appliances and equipment in normal working order, to keep the roof watertight and maintain the grounds. Seller further agrees to keep all utility services (electric, gas, water, etc.) operating until date of possession, and to provide the Purchaser with sufficient notification of occupancy date in order to arrange a transfer of the services. Seller agrees to leave the premises "broom clean" and free of occupants and debris upon vacating. Purchaser shall have the right to a walk-through inspection of the premises within forty-eight hours prior to closing in order to determine the property has been maintained in the condition agreed. Seller is responsible for any damage to the property, except for normal wear and tear, from the date of this offer until closing or vacating, whichever is later. If there is material damage, Purchaser has the option to cancel this Purchase Agreement and the deposit shall be immediately refunded to Purchaser, or Purchaser can proceed with the closing and either require that Seller repair the damage before the closing or deduct from the purchase price a fair and reasonable estimate of the cost to repair the property and assume the responsibility for the repair, thereby releasing Seller. Purchaser shall have discretion to determine and define what constitutes material damage or destruction. *Buyer occupies premises*

**16. PURCHASER SIDE TITLE.** Purchaser: ☑ Elects to have **Speedy Title** _____ provide Purchaser Side Title Insurance Policy and Closing Services.

**17. CLOSING.** The closing of this sale shall take place at a location designated by the mortgage lender, or absent that, at a place designated by the Listing Broker. Closing is to occur, on or before: **January 31st, 2025** . Seller shall provide a complete package of every document (other than loan documents) to be executed by Purchaser to Purchaser's Realtor or other designated representative within 48 hours of closing.

**18. CLOSING COSTS.** Purchaser agrees to pay customary closing fees to the title company or closing Agent who supervises the closing. Purchaser shall also pay all recording fees for the deed, security instrument, and mortgage loan costs. The Seller shall pay all transfer taxes and costs to convey clear title. ~~Purchaser agrees to pay to 3DX Real Estate, a Broker Compliance Fee of $495 at time of closing. Title fee is in addition to any commissions due to 3DX Real Estate.~~

**19. SELLER'S REPRESENTATIONS.** Seller represents and warrants to Purchaser as follows:
**A. No Litigation.** There is no pending litigation affecting all or any part of the Property, or Seller's interest in it.
**B. No Violations.** There are no uncorrected violations of any building codes and regulations, health codes, or zoning ordinances affecting the Property or the use or enjoyment of it.
**C. Division Rights.** Seller holds all possible division rights to the Property and will transfer all such division rights to Purchaser with the Deed. All representations and warranties shall survive the closing of this transaction and shall not be deemed merged into the Deed.

**20. MISCELLANEOUS.**
**A. AGREEMENT.** This Purchase Agreement supersedes any and all understandings and agreements and constitutes the entire agreement of all parties. No oral representations or statements through email, text message or other electronic transmission shall be considered a part of this agreement, unless specifically included in this document or similar addendum. All addendums must be in writing and signed by all parties to this Purchase Agreement.
**B. FACSIMILE/ELECTRONIC SIGNATURES.** The parties acknowledge and agree that facsimile or electronic signatures and initials are legally enforceable and binding.
**C. SUCCESSORS.** This Purchase Agreement binds Purchaser, Seller, their personal representatives, beneficiaries and heirs, and anyone succeeding to their interest in the property.
**D. LEGAL COUNSEL.** Broker recommends that Purchaser and Seller retain an attorney to protect their interests.
**E. DUE DILIGENCE.** Purchaser and Seller have the responsibility to perform their own due diligence in all matters of transaction. This includes verifying information such as, but not limited to contracts, disclosures, MLS data, advertisements, public record, municipality requirements and title work. Purchaser acknowledges that Broker has advised them to have the Property privately inspected by a qualified inspector. Purchaser acknowledges that Broker advised them to seek professional advice from experts of their choice, in the areas of law, tax, finance, lending, insurance, surveying, building, property inspection, hazardous material and/or structural engineering. Broker, Salespeople and its employees are not experts in these areas and cannot give such advice.
**F. HOLD HARMLESS.** Listing and Selling Brokers and their salespeople are not parties to this agreement. Furthermore, Listing and Selling Brokers specifically disclaim any responsibility for the condition of the Property, preparation of documents, the performance of this Agreement by the parties, or the outcome of this transaction. Purchaser and Seller hold Broker and their salespeople, brokers and employees harmless and do hereby indemnify them against all claims, actions or suits for damage of any nature.
**G. GOVERNING LAW.** This Agreement shall be governed by and construed according to the law of the State of Michigan, the state in which the Property is located.

**PURCHASER(S) INITIALS:** _____ / _____          **SELLER(S) INITIALS:** _____ / _____

**21. DEFAULT.** Willful failure to perform by Seller or Purchaser shall be an event of default under this Agreement. If Purchaser defaults, Seller may, at Seller's option, pursue all available legal and equitable remedies or terminate the Agreement and seek forfeiture of the Deposit as liquidated damages. If Seller defaults, Purchaser may at Purchaser's option, elect to enforce the terms of this Agreement, pursue all available legal and equitable remedies and may also terminate the Agreement and seek a refund of his Deposit. Seller and Purchaser agree that Listing and Selling brokers and their salespeople shall not be made parties to any action taken to enforce or terminate this Agreement.

**22. NOTICE OF AGENCY.** Seller and Purchaser acknowledge that they have received the form Disclosure Regarding Real Estate Agency Relationships explaining the different types of agency relationships. The following agency relationship(s) is/are hereby confirmed for this transaction:

Listing Agent (Broker) is acting as an agent of the:
Seller [____] Dual [____] Non-Agent

Selling Agent (Broker) is acting as an agent of the:
[____] Purchaser [____] Dual [____] Seller [____] Non-Agent

**23. ADDITIONAL CONDITIONS:**

**24. EXPIRATION OF OFFER.** This offer shall expire unless it is accepted by Seller prior to [time] _____ am / pm [date] _____ and may be withdrawn at any time prior to Seller's acceptance.

ATTENTION: There are many steps to a real estate transaction before a transaction is finalized. Purchaser and Seller are strongly cautioned to avoid incurring moving and other out-of-pocket expenses in reliance on the transaction, until the transaction is made final through a formal closing. Purchaser and Seller agree that 3DX Real Estate, its brokers, salespeople, and employees shall not be responsible or liable for any loss or damage of any sort incurred or claimed, as the result of any such reliance - including but not limited to moving expenses, property improvements, employment, lost wages or time lost marketing a property. Purchaser and Seller have agreed to hold harmless and indemnify 3DX Real Estate, its Brokers, Salespeople and Employees for any such reliance loss or damage.

**PURCHASER SIGNATURE:** By affixing Purchaser signature hereto, Purchaser makes the forgoing offer to purchase and acknowledges receipt of a copy of this offer.

Witness _____

Purchaser Signature X _____ Date 11/15/24
Purchaser Name Azar Staffeld  Time _____

Purchaser Signature X _____ Date ____/____/____
Purchaser Name _____ Time _____

**SELLER ACCEPTANCE:** By affixing Seller signature hereto, Seller accepts this offer to purchase and acknowledges receipt of a copy hereof. Seller directs that no further offers be presented after acceptance of this offer. Seller agrees that the Broker has procured said Purchase Agreement and has brought about this sale and agrees to pay Broker for services rendered a commission of: _____. (If blank, compensation paid as listed in MLS).

Witness _____

Seller Signature X _____ Date 11/17/24
Seller Name Rana Matar  Time 11

Seller Signature X _____ Date 11/17/24
Seller Name R & J GROUP HOLDINGS LLC  Time _____

The undersigned Purchaser hereby acknowledges receipt of a copy of the Seller's acceptance of the foregoing Purchase Agreement.

Purchaser Signature X _____ Date ____/____/____

Purchaser Signature X _____ Date ____/____/____

# ADDENDUM

### For the property located at:
### 341 CORRIE RD, ANN ARBOR, MI 48105

Purchaser to pay all taxes, recording fees and transfer taxes.
There will be no proration of taxes
Purchaser is responsible for any and all seller incurred expenses from October 31, 2024 to January 31, 2025 or closing whichever is sooner.
Seller agrees to extend current lease at $5,000 per month to January 31, 2025.
Purchaser agrees to continue to make all rent payments as agreed till closing.
Seller and purchaser agree that current security deposit of $10,000 will be used as Purchaser's EMD. If the transaction does not close for any reason the money will revert back to security deposit.
Property to be sold in it's as is condition.
All other terms remain the same.

X _____   11 / 15 / 24
  Buyer                              Date

X _____   11 / 15 / 24
  Witness                            Date

X _____   11 / 17 / 24
  Seller                             Date

X _____   11 / 17 / 24
  Seller                             Date

This agreement is made between the purchaser and the seller on November 11, 2024

For the property located at 341 Corrie Rd Ann Arbor, MI.

Buyer agrees to present a valid Purchase Agreement no later than Wednesday.November 13,2024 @ 5pm

The P.A must present a Purchase price No less than $1,148,581.72

Must have a closing date No later than January 31,2025

Purchaser to pay all taxes, Recording fees, and transfer taxes .

There will be No Tax prorations.

**Any and all additional expenses incurred by seller  pertaining to the property From October 31,2024 thru January 31,2025 will be paid by the purchaser.**

Purchaser currently Resides in the home

This is an AS IS WHERE IS SALES

Seller to provide Free and clear title at the time of closing

Seller agrees to extend the current lease until January 31,2025

Purchaser agrees to continue making agreed monthly payments. Until the loan closes.

# EXHIBIT 7

Approved, SCAO

| Original - Court | 2nd copy - Defendant |
|---|---|
| 1st copy - Defendant | 3rd copy - Plaintiff |

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| 14A-1 **JUDICIAL DISTRICT** | **JUDGMENT LANDLORD-TENANT** | 251C0573 |

**Court address**

4133 Washtenaw Ave., Ann Arbor, MI 48108

Court telephone no.

734-973-4545

**Plaintiff**
R & J Group Holdings, LLC

v

**Defendant**
Azar Sadeghi-Staffeld, Ghazal Staffeld aka Ghazal Jones
and all other occupants

**THE COURT FINDS:**

by ☒ hearing  ☐ default*  ☐ consent**

Anthony G. Mammina (P37684)
Mammina & Ajlouny, P.C.
370 E. Maple Road, Ste. 230
Birmingham, MI 48009
248-642-1330

☐ The court determines a valid waiver of rights exists and the terms of the consent judgment are fair.

**POSSESSION JUDGMENT**

Plaintiff/Attorney  ☐ Personal service

☐ 1. The plaintiff has a right to recover possession of the property.

☐ 2. There is now due to the plaintiff for nonpayment of rent and other money due under the lease:

| | | |
|---|---|---|
| a. Rent to retain possession | $ | _____ |
| b. Other money due............. | $ | _____ |
| c. Costs................................. | $ | _____ |
| d. Total ................................. | $ | _____ |

Azar Sadeghi-Staffeld, Ghazal Staffeld a/k/a Ghazal Jones
and all other occupants
341 Corrie Road
Ann Arbor, MI 48105
734-929-6969

☐ 3. The defendant has a right to retain possession.

Defendant/Attorney  ☐ Personal service

**IT IS ORDERED:**

☒ 4. ☐ a. The plaintiff can apply for an order evicting the defendant if the defendant does not pay the plaintiff or the court the amount due in item 2d above or does not move out on or before _____ RECEIVED

Date

☒ b. The plaintiff can apply for an order evicting the defendant if the defendant does not move out on or before *April 30th, 2025.* APR 08 2025

Date

☐ c. An immediate order of eviction shall be entered pursuant to MCL 600.5744(3). 14A-1 DISTRICT COURT

☒ 5. The defendant may be liable for money damages after moving if additional rent is owed or if there is damage to the property.

☐ 6. Acceptance of partial payment of the total amount due in item 2d above  ☐ will  ☐ will not  prevent the court from issuing an order evicting the defendant.

☒ 7. No money judgment is entered at this time.

**MONEY JUDGMENT**

☐ 8. A possession judgment was previously entered.

☐ 9. A money judgment, which will earn interest at statutory rates, is entered as follows:

| | | |
|---|---|---|
| Damages | $ | |
| Costs | $ | |
| Total | $ | |

10. **THE COURT FURTHER ORDERS:** *Defendants' Counter Plaintiff(s)*
*① Counter-Claim is DISMISSED and ② Motions Are Denied. [escrowed $4000 released to Plaintiff]*
*on 5/20/2025.*

Date

Judge _____  Bar no.

**YOU ARE ADVISED** that you may file a motion for a new trial, a motion to set aside a default judgment, or an appeal and appeal bond, which must comply with all court rules and must be filed in court by *4/18/2025* . You may want legal help.

☐ MCR 4.201(J) was explained to the parties.

*For a defendant on active military duty, default judgment shall not be entered except as provided by the Servicemembers Civil Relief Act.

**CERTIFICATE OF MAILING:** I certify that on this date I served a copy of this judgment on the parties or their attorneys by first-class mail addressed to their last-known addresses as defined in MCR 2.107(C)(3).

*4-8-25*   *KC*
Date       Deputy clerk

**Approved:** *4/8/2025*

Date       Plaintiff/Attorney

Date       Defendant/Attorney

DC 105  (11/23)  **JUDGMENT, LANDLORD-TENANT**

MCL 600.5744 , MCR 4.201(L)

# EXHIBIT K

**STATE OF MICHIGAN**

**WASHTENAW COUNTY CIRCUIT COURT**

KARL STAFFELD and AZAR STAFFELD,

     Plaintiffs,

-v-

BARTON HILLS MAINTENANCE CORPORATION,
BRIAN STOY, AMY STOY, and R & J GROUP HOLDINGS
LLC, jointly and severally,

     Defendants.

_____/

KARL STAFFELD and AZAR STAFFELD
Plaintiffs, *Pro Se*
341 Corrie Road
Ann Arbor, MI 48105
(734) 929-6969
azar.staffeld@gmail.com

_____/

Case No. 24 -　　　- CH
Hon.

     There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

**COMPLAINT AND JURY DEMAND**

    NOW COME Plaintiffs, KARL STAFFELD and AZAR STAFFELD, proceeding *Pro Se*, and for their Complaint and Jury Demand, respectfully state as follows:

**JURISDICTION AND VENUE**

1.    This is an action to quiet title to real property located in the City of Ann Arbor, County of Washtenaw, State of Michigan, having Parcel ID No. IB-09-08-380-005 and commonly known as: 341 Corrie Road, Ann Arbor, MI 48105 (hereafter the "Subject Property").

1

2. Plaintiffs, KARL STAFFELD and AZAR STAFFELD, are adult residents of the State of Michigan who are lawfully married and currently occupy the Subject Property and are purchasing the same under a note with Defendant, R & J GROUP HOLDINGS, LLC.

3. DEFENDANT, R & J GROUP HOLDINGS LLC, is a domestic limited liability company which maintains a registered office located at: 429 Delaford Court, Canton, MI 48188.

4. Defendant, BARTON HILLS MAINTENANCE CORPORATION, is a domestic nonprofit corporation which maintains a registered office located at: 767 Oakdale Road, Ann Arbor, MI 48105.

5. Defendants, BRIAN and AMY STOY, are adult residents of the State of Michigan who are married and reside together at 540 Barton Shore Drive, Ann Arbor, MI 48105.

6. At all times relevant to this matter, BARTON HILLS MAINTENANCE CORPORATION availed itself of the privilege and conducted business within the County of Washtenaw and State of Michigan.

7. The events giving rise to this cause of action took place in the City of Ann Arbor and this action relates to real property located within Washtenaw County, Michigan.

8. The amount in controversy exceeds Twenty-Five Thousand Dollars ($25,000.00), exclusive of interest and costs.

9. Moreover, Plaintiffs seek equitable and injunctive relief within the exclusive jurisdiction of this Court.

10. Jurisdiction and venue properly rest in this Court.

<u>COMMON FACTUAL ALLEGATIONS</u>

11. Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

12. This matter relates to the improper disruption of Plaintiffs' peaceable use and enjoyment of the Subject Property by Defendants Barton Hills Maintenance Corporation ("BHMC") and Brian and Amy Stoy (the "Stoys"), which started in the Fall of 2017.

13. At that time, Defendants BHMC and the Stoys began harassing Plaintiffs concerning the manner in which they maintain and improve the Subject Property.

14. Beginning in the Fall of 2017 and continuing through the present date, BHMC and the Stoys have effectively attempted to constructively evict the Plaintiffs from the Subject Property through their conduct and actions in:

    a) Intimidating and harassing Plaintiffs in the form of contacting the county sheriff and requesting their presence at several neighborhood homeowner's association meetings and at Plaintiffs' front door without notice or any lawful justification;

    b) Removing Plaintiffs' grandchildren from the neighborhood swimming pool because of their skin color, appearance, ethnicity, customs, and national origin;

    c) Trespassing by appearing at Plaintiffs' front door and in their backyard and taking pictures and video of Plaintiffs, their immediate and extended family members, and workers all without permission or lawful justification;

    d) Intimidation in the form of yelling at Plaintiffs' workers, berating them, dropping dead trees on them, creating a dangerous environment for Plaintiffs, their immediate and extended family members, and workers;

    e) Telling fictional stories depicting Plaintiffs and their family members in a most unsavory light to neighbors, friends, homeowner's association board members, and others;

    f) Falsely accusing Plaintiffs of creating, maintaining, and refusing to abate certain nuisance conditions at the Subject Property related to drainage and soil erosion;

    g) Invading Plaintiffs' privacy by photographing and video recording Plaintiffs and their immediate and extended family members from just

outside the property boundaries without Plaintiffs' consent and for no legitimate purpose;

h) Publishing said photographs and video to various social media sites for the targeted purpose of slandering Plaintiffs' good name and reputation in the local community;

i) Retaining counsel on behalf of the neighborhood homeowner's association for the unlawful purpose of threatening and intimidating Plaintiffs to force them from their home; and

j) Other manipulative conduct and harassing behavior to be identified at court proceedings following the competition of discovery.

15. The defamatory remarks, false accusations, and duplicitous social media posts by Defendants BHMC and the Stoys wrongly accuse Plaintiffs of unprofessional, dishonest, and threatening behavior and have harmed Plaintiff Azar Staffeld's reputation in the close-knit Middle Eastern community along with Plaintiff Karl Staffeld's business reputation, steering existing and potential clients away from him.

16. Moreover, as a direct and proximate result of the continued harassment and targeted smear campaign maintained by Defendants BHMC and the Stoys, Plaintiffs' working business relationship with Defendant lender R & J Group Holdings LLC ("R & J Group Holdings") has been disrupted, as R & J Group Holdings is now threatening to foreclose upon Plaintiffs' loan and initiate eviction proceedings in connection with the Subject Property.

17. Additionally, Defendant BHMC asserted a lien upon the Subject Property which has no basis in fact or law and serves as a cloud on title.

18. At all times relevant to this matter, Plaintiffs have made reasonable efforts to maintain the Subject Property in good condition, reasonable wear and tear excepted, keep the premises clean and sanitary, and not permit any deterioration or destruction of the Subject Property.

19. Plaintiffs are entitled to peaceful use, enjoyment, and possession of the Subject Property.

20. Despite repeated requests and demands, Defendants BHMC and the Stoys refuse to back down and permit Plaintiffs to enjoy the peaceable use of the Property while at the same time making reasonable repairs and improvements in efforts to properly maintain the home and surrounding yard.

21. In fact, Defendants BHMC and the Stoys have and are trespassing on the Subject Property and invading Plaintiffs' fundamental privacy rights, resulting in Karl and Azar Staffeld losing over fifty (50) workers as a direct result.

22. Moreover, Defendant BHMC stopped the work order on the permits they issued themselves and consequently Karl and Azar Staffeld have been unable to refinance the Subject Property.

23. As such, immediate injunctive action is needed on BHMC's stop work orders so that Karl and Azar Staffeld can finish the landscaping and drainage work this summer to avoid losing the home.

24. Moreover, immediate injunctive relief is required to compel Defendants BHMC and the Stoys to cease and desist in their unlawful conduct and impermissible disruption of Plaintiffs' fundamental rights.

## <u>COUNT I – QUIET TITLE</u>

25. Plaintiffs incorporate and reallege all above paragraphs as if set forth in full.

26. Plaintiffs seek equitable relief pursuant to MCL §600.2932 to quiet title against Defendant BHMC in connection with the Subject Property.

27. Plaintiffs and Defendant R & J Group Holdings are the rightful and equitable owners of the Subject Property described in this Complaint.

28. Based on the conduct outlined above, Defendant BHMC's asserted lien is false, fraudulent, tainted, and unlawful, and was filed in violation of Plaintiffs' and Defendant R & J Group Holdings' rights and interests.

29. Plaintiffs seek a judicial determination that title to the Subject Property is vested in the name of Plaintiffs and/or Defendant R & J Group Holdings, and Defendant BHMC be declared to have no right, title, or interest in the Subject Property.

30. The actions of Defendant BHMC are an attempt to encroach and unlawfully interfere with Plaintiffs and Defendant R & J Group Holdings' rights to, interest in, and peaceable use and enjoyment of, the Subject Property.

31. Plaintiffs have suffered special damages in having to prosecute this lawsuit in court costs and fees, and other consequential and incidental costs as a direct result of the actions and misconduct of Defendants as outlined above.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court enter Judgment in their favor and against Defendant BARTON HILLS MAINTENANCE CORPORATION as follows:

A. For a declaration of the rights and duties of the parties, specifically that Defendant BHMC's harassment and slander of Plaintiffs in connection with the real property located at 341 Corrie Road, Ann Arbor, MI 48105 is wrongful;

B. To dismiss the improper and unlawful lien asserted by Defendant BHMC and quiet title to the Subject Property in favor of Plaintiff and/or LLC Defendant R & J Group Holdings according to their respective rights and interests, as dictated under the terms of the note between the parties;

C. For reasonable costs and fees, and other consequential and incidental costs as special damages; and

D.  To grant such additional relief as the Court deems proper.

<u>**COUNT II – INJUNCTIVE RELIEF**</u>

32.  Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

33.  As a direct and proximate result of the actions and misrepresentations of Defendants BHMC and the Stoys, Plaintiffs will suffer, absent injunctive relief within the exclusive jurisdiction of this Court, irreparable injury for which his remedies at law are inadequate.

34.  The irreparable injury likely to be sustained by Plaintiffs includes, but is not limited to, loss of real property that is unique and irreplaceable due to its desirous location within the City of Ann Arbor and County of Washtenaw.

35.  Plaintiffs will further be irreparably harmed if a Temporary Restraining Order and Preliminary Injunction are not granted enjoining Defendants BHMC and the Stoys from further harassment and halting the threatened foreclosure action, as Plaintiffs will suffer irreparable damage to their personal credit causing inability to obtain home mortgage financing or other loans for up to seven (7) years.

36.  Injunctive relief is needed to prevent further irreparable injury to Plaintiffs as a direct and proximate result of Defendants' wrongful acts and abusive conduct as outlined above.

37.  Plaintiffs are likely to succeed on the merits of their claims, and any relative harm to Defendants, which are knowingly acting in contravention of the law and in violation of Plaintiffs' rights, is far outweighed by the continuing harm facing Plaintiffs.

38.  This Court has the requisite authority to award equitable remedies including preliminary injunctive relief.  *MCR 3.310*; *Silverman v Univ of Michigan Bd of Regents*, 445 Mich 209, 516 NW2d 54 (1994).

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request the following relief:

A. That the Court issue a Temporary Restraining Order pursuant to MCR 3.310(B), restraining Defendants BHMC and the Stoys, and their authorized representatives and agents, and other third parties claiming to have any interest in title to the Subject Property, from entering onto the Subject Property while this action is pending;

B. That the Court grant additional injunctive relief under MCR 3.310(B), directing Defendants BHMC and the Stoys, and all persons acting in concert with any of them, or pursuant to their permission or authority, to immediately cease and refrain from making further false, defamatory, and/or disparaging remarks concerning Plaintiffs, and immediately retract any statements portraying Plaintiffs in a false or negative light both verbally and in writing, and through publication on social media platforms;

C. That the Court issue a Temporary Restraining Order pursuant to MCR 3.310(B), enjoining Defendants BHMC and the Stoys, and their authorized representatives and agents, from further wrongdoing and/or acts of retaliation or aggression;

D. That the Court issue a Temporary Restraining Order pursuant to MCR 3.310(B), restraining Defendant R & J Group Holdings and their authorized representatives and agents, from commencing any foreclosure action that may be initiated in connection with the Subject Property while this action is pending;

E. That the Court issue a Temporary Restraining Order pursuant to MCR 3.310(B), directing Defendant R & J Group Holdings to provide Plaintiffs with actual notice of any and all actions that have been taken up to this point in time by said Defendant, or by any third party on Defendant's behalf, to initiate and/or complete foreclosure upon the Subject Property;

F. That the Court issue an Order to Show Cause and set a hearing date to compel the Defendants and any other interested third parties to show why this Temporary Restraining Order should not be made a Preliminary Injunction; and

G. Enter an award of interest, costs, and fees so wrongfully incurred by Plaintiffs.

## COUNT III – INTRUSION ON SECLUSION

39. Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

40. Defendants BHMC and the Stoys' conduct in photographing and video recording Plaintiffs and their immediate and extended family members while in the privacy of their home and back yard, from outside the property boundaries without consent and for no legitimate purpose whatsoever, served as an impermissible and unconscionable intrusion of Plaintiffs' privacy.

41. Plaintiffs' personal relationships and interaction with close family members including, but not limited to their grandchildren, are personal and private to Karl and Azar Staffeld.

42. Plaintiffs have a right to keep those interactions and relationships with close family private.

43. Defendants sought to intrude upon Plaintiffs' privacy rights by capturing photos and video of the Staffeld family and sharing the images and video clips with others in the neighborhood and with members of the homeowner's association board.

44. Defendants' actions in intruding on Plaintiffs' right to privacy were highly offensive to Plaintiffs and would be highly offensive to a reasonable person.

45. Defendants' invasion of Plaintiffs' privacy caused Plaintiffs to suffer extreme emotional distress and humiliation.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendants, BARTON HILLS MAINTENANCE CORPORATION and BRIAN and AMY STOY, jointly and severally, in whatever amount they may be found to be entitled, together with interest, costs, reasonable attorney fees, and any other relief the court deems just under the circumstances.

## COUNT IV – FRAUDULENT MISREPRESENTATION

46. Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

47. Defendants BHMC and the Stoys, through their authorized agents and representatives, knowingly and intentionally made false representations of material fact to Plaintiffs and other residents in the neighborhood concerning the Subject Property, with specific knowledge and intent to deceive Plaintiffs and others, to wrongfully deprive Plaintiffs of peaceful use and enjoyment of the property.

48. Defendants' representations were false when they were made.

49. Defendants' actions and conduct were deliberate and committed with malice aforethought.

50. Defendants knew their representations were false when they were made, or Defendants made them recklessly, without knowing whether they were true.

51. Defendants intended that Plaintiffs rely on said representations and conduct.

52. Plaintiffs in fact relied on Defendants' false representations and deceptive conduct.

53. As a direct and proximate result of Defendants' false representations and deceptive conduct, Plaintiffs suffered severe economic damages for the fraud procured as well as having to prosecute this matter.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendants, BARTON HILLS MAINTENANCE CORPORATION and BRIAN and AMY STOY, jointly and severally, in an amount not less than $2,500,000 to which Plaintiffs are found to be entitled, together with court costs, interest, and fees, and any other relief this Court deems just and equitable.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

54. Plaintiffs hereby incorporate and reallege all above paragraphs as if set forth in full herein.

55. The conduct of Defendants BHMC and the Stoys as described above was egregious in nature and should not be tolerated in civil society.

56. Moreover, Defendants' conduct as described above would naturally and foreseeably result in severe emotional distress to others including Plaintiffs.

57. Defendants' outrageous conduct proximately caused severe emotional distress to Plaintiffs.

58. The emotional distress suffered by Plaintiffs has physically manifested itself in symptoms including, but not limited to:

    a) Sleeplessness;

    b) Increased anxiety;

    c) Headaches and nausea;

    d) Undue stress;

    e) Nightmares;

    f) Loss of consortium; and

    g) Other injuries and physical manifestations as may appear while this case proceeds through the course of discovery and trial.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendants, BARTON HILLS MAINTENANCE CORPORATION and BRIAN and AMY STOY, jointly and severally, in an amount not less than $2,500,000 to which Plaintiffs are found to be entitled, together with court costs, interest, and fees, and any other relief this Court deems just and equitable.

## COUNT VI – DEFAMATION AND LIBEL

59. Plaintiffs hereby incorporate and reallege all above paragraphs as if set forth in full herein.

60. The communications outlined above by Defendants BHMC and the Stoys falsely accuse Plaintiffs of unprofessional, unethical, dishonest, and threatening behavior, and implicitly caused others to stay away from Plaintiffs and/or discontinue doing business with Plaintiffs.

61. Defendants negligently or with actual malice published false and defamatory statements regarding Plaintiffs to the public at large and to current neighbors of Plaintiffs and others in the local community.

62. The false and defamatory statements have a tendency to, and did, prejudice Plaintiffs in the conduct of their business and deter others from dealing with the Plaintiffs.

63. The statements Defendants made were not privileged and were defamation per se.

64. Plaintiffs have demanded, and Defendants have failed and/or refused to issue, retractions.

65. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered substantial economic injury, loss of good will, injury to their business reputations, loss of esteem and standing in the community, and loss of business opportunities.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendants, BARTON HILLS MAINTENANCE CORPORATION and BRIAN and AMY STOY, jointly and severally, in an amount not less than $2,500,000 to which Plaintiffs are found to be entitled, together with court costs, interest, and fees, and any other relief this Court deems just and equitable.

## COUNT VII – CIVIL CONSPIRACY

66. Plaintiffs hereby incorporate and reallege all above paragraphs as if set forth in full herein.

67. Defendants BHMC and the Stoys unlawfully, maliciously, and wrongfully conspired with one another with the specific intent and unlawful purpose of wrongfully clouding title to the Property in order to defraud Plaintiffs into paying additional sums in connection with the home and inhibit their use and enjoyment of the property.

68. The conduct of Defendants BHMC and the Stoys, as outlined above, was intentional and designed for an ulterior motive or purpose.

69. This conspiracy resulted in the tortious activities outlined in this Complaint.

70. As a direct and proximate result of the conspiracy and Defendants' unlawful, wrongful, and/or tortious acts, Plaintiffs have suffered significant damages.

71. Defendants BHMC and the Stoys are jointly and severally liable to Plaintiffs for all their injuries and damages, including both economic and non-economic damages sustained by Plaintiffs.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendants, BARTON HILLS MAINTENANCE CORPORATION and BRIAN and AMY STOY, jointly and severally, in an amount not less than $2,500,000 to which Plaintiffs are found to be entitled, together with court costs, interest, and fees, and any other relief this Court deems just and equitable.

Respectfully submitted,

By: _____
Karl Staffeld
*Plaintiff, Pro Se*

By: _____
　　Azar Staffeld
　　*Plaintiff, Pro Se*

Dated: June 3, 2024

## JURY DEMAND

　　Plaintiffs, KARL STAFFELD and AZAR STAFFELD, hereby demand a jury trial in this matter pursuant to MCR 2.508(B) for all claims triable by jury.

　　　　　　　　　　　Respectfully submitted,

　　By: _____
　　　　Karl Staffeld
　　　　*Plaintiff, Pro Se*

　　By: _____
　　　　Azar Staffeld
　　　　*Plaintiff, Pro Se*

Dated: June 3, 2024

14