# EXHIBIT O

# MORTGAGE

**When recorded, return to:**
**Marketplace Home Mortgage, L.L.C.**
**Attn: Final Document Department**
**c/o DocProbe**
**1125 Ocean Avenue**
**Lakewood, NJ 08701**

**This document was prepared by:**
**Marketplace Home Mortgage, L.L.C.**
**7380 France Avenue S, Suite 200**
**Edina, MN 55435**

**LOAN #: 570170991033**

[Space Above This Line For Recording Data]

**MIN 1002491-2000100053-3**
**MERS PHONE #: 1-888-679-6377**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **December 15, 2017,** together with all Riders to this document.

(B) "Borrower" is **DOROTHEA V STAFFELD, A SINGLE WOMAN.**

Borrower's address is **341 Corrie Road**
**Ann Arbor, MI 48105.**

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is **Marketplace Home Mortgage, L.L.C..**

Lender is **a Limited Liability Company,** organized and existing under the laws of

LOAN #: 570170991033

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider
☐ Balloon Rider
☐ 1-4 Family Rider
☐ V.A. Rider
☐ Condominium Rider
☐ Planned Unit Development Rider
☐ Biweekly Payment Rider
☐ Second Home Rider
☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the **County** [Type of Recording Jurisdiction] of **Washtenaw** [Name of Recording Jurisdiction]:

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**

which currently has the address of **341 Corrie Rd, Ann Arbor,** [Street] [City]

Michigan **48105** [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security

LOAN #: 570170991033

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender

LOAN #: 570170991033

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out

paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments

conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provided that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any

grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days

by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums

LOAN #: 570170991033

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_______________________________________________ (Seal)
DOROTHEA V STAFFELD DATE

State of MICHIGAN
County of __________

The foregoing instrument was acknowledged before me, ______________________, (Notary Public), this ____________________________ (date) by DOROTHEA V STAFFELD (name of person acknowledged).

________________________________________
______________________

State of MICHIGAN, County of __________

My Commission Expires: ______________________

Acting In the County of: ______________________

Lender: Marketplace Home Mortgage, L.L.C.
NMLS ID: 1082
Loan Originator: Brian K Goodman
NMLS ID: 181781

# EXHIBIT P

1 2 3 4 5 6 7 8

D C B A

CORRIE ROAD

Corrie Rd

310

NEW DRIVEWAY APPROACH

EXISTING DRIVEWAY

NEW DRIVEWAY

Supervisor's Plat Barton Hills

315

341

350

540

500

BARTON SHORE DRIVE

Barton Shore Dr

2015

0 100 200ft

NOTE: SCOPE OF ABX ENGINEERING SERVICES IS LIMITED TO PROPOSED NEW SECTION OF RETAINING WALL, NEW GUARD RAIL ALONG DRIVE AND PLACEMENT OF SOIL ALONG WEST AND SOUTH PERIMETER OF DRIVE.




PLOT PLAN

SCALE: AS SHOWN




| ISSUE | DATE | DESCRIPTION |
|---|---|---|
| D | 08/27/20 | BHV APPROVAL |
| C | 05/13/20 | PERMIT |
| B | 07/27/18 | PERMIT REVIEW |
| A | 07/17/18 | ASSOCIATION REVIEW |

PROJECT MANAGER KARL W STAFFELD

PROJECT NUMBER 18004




341 CORRIE ROAD
ANN ARBOR, MICHIGAN 48105







FILENAME A1.DWG

SCALE AS NOTED

SHEET



GENERAL NOTES:

1. SOIL TYPE IS PREDOMINATELY SANDY SOIL.
2. EXISTING ON-SITE DRAINAGE CONSISTS OF ONE EXISTING CULVERT AT THE NORTH EAST CORNER OF THE PROPERTY. THE CULVERT GRATE SHALL BE PROTECTED WITH A DANDY BAG FOR 1040 STORM COVERS OR EQUAL.
3. A NEW LOW POINT SWALE IS INDICATED ON THE PLAN. A NEW CUOVERT SHALL BE INSTALLED UNDERNEATH THE EXISTING ASPHALT. THE ASPHALT SHALL BE REPLACED.
4. THE SOIL FROM THE EXCAVATION SHALL BE DUMPED OVER THE SOUTH END OF THE EXISTING DRIVEWAY AND SPREAD ONTO THE GROUND BELOW. THE SOIL SHALL BE SEEDED AND STABILIZED WITH EROSION CONTROL BLANKETS.
5. ANY TEMPORARY STOCKPILING OF SOIL SHALL BE WITHIN THE EXTENT OF DISTURBED SOIL AREA AS SHOWN ON THE PLAN.
6. SILT FENCE TO BE INSTALLED AS SHOWN ON THE PLAN.
7. ALL DRAINAGE DITCHES AND SLOPES STEEPER THAN 1:4 SHALL BE STABILIZED WITH EROSION CONTROL BLANKETS.
8. SECURE STEEP SLOPE WITH 6" DIAMETER AND LARGER ROUND STONES. PREPARE SURFACE WITH LANDSCAPING FILTER FABRIC PRIOR TO STONE PLACEMENT.
9. CONNECT 3" PVC DRAIN PIPE TO (2) EXISTING STORM DRAINAGE PIPES FROM THE HOUSE. EXTEND PIPING TO THE SOUTH UNTIL IT EXTENDS OUT FROM THE HILL. PIPING TO BE BURIED AT A MINIMUM SLOPE OF 1/8" PER LINEAL FOOT DOWN.
10. OWNERS: KARL AND AZAR STAFFELD
ADDRESS: 341 CORRIE ROAD, ANN ARBOR, MICHIGAN 48105.
CONTACT NUMBER: (734) 417-0432
PROPERTY ID: IB-09-08-380-005
11. ALL WORK SHALL BE PERFORMED IN STRICT COMPLIANCE WITH APPLICABLE FEDERAL, STATE, AND LOCAL CODES AND REGULATIONS.
12. VERIFY THE SIZES, LOCATIONS, ELEVATIONS AND DETAILS OF THE EXISTING CONDITIONS THAT AFFECT THE WORK AND INFORM THE OWNER OF ANY DISCREPANCIES IN DIMENSIONS, SIZES, LOCATIONS AND CONDITIONS BEFORE PROCEEDING WITH THE WORK.
13. PROVIDE SHORING, BRACING, UNDERPINNING AND ANY OTHER MEANS REQUIRED TO PROTECT THE SAFETY, INTEGRITY AND STABILITY OF ALL NEW AND EXISTING CONSTRUCTION.
14. REVIEW ALL EXISTING CONDITIONS AT THE SITE, INCLUDING UTILITIES, SERVICES, ETC., AND SHALL BE RESPONSIBLE FOR ANY DAMAGE TO THE PROPERTY, NEW AND EXISTING CONSTRUCTION AND FOR UNAUTHORIZED DISRUPTIONS TO THE OWNER'S OPERATION, UTILITIES AND SERVICES.
15. NORMAL OPERATIONS WILL BE CONTINUED BY THE OWNER THROUGHOUT THE DURATION OF CONSTRUCTION. ANY INTERFERENCE, UTILITY OUTAGE, OR DISRUPTION TO THE OWNER'S OPERATION MUST BE COORDINATED WITH THE OWNER AND AUTHORIZED IN WRITING BEFORE PROCEEDING WITH WORK.
16. GEOTECHNICAL INFORMATION IS UNAVAILABLE FOR THE SITE. FOOTINGS SHALL BE CARRIED DOWN TO UNDISTURBED SOIL HAVING AN ASSUMED NET ALLOWABLE BEARING CAPACITY OF 2 KIPS PER SQUARE FOOT FOR AN ASSUMED MAXIMUM SETTLEMENT OF 1/2" OR LESS.
17. SOILS ASSUMED TO BE PREDOMINATLY SILTY SAND, UNIFIED SOIL CLASSIFICATION SYSTEM SM OR SC FOR EXISTING AND RELOCATED SOILS ON SITE.
18. DESIGN LATERAL EARTH PRESSURE IS EQUIVALENT FLUID PRESSURE OF 40 PSF
19. CONCRETE WORK SHALL CONFORM TO THE ACI STANDARD "BUILDING CODE REQUIREMENTS FOR REINFORCED CONCRETE" (ACI 318) AND THE ACI "MANUAL OF STANDARD PRACTICE FOR DETAILING REINFORCED CONCRETE STRUCTURES" (ACI 315).
20. CONCRETE (NORMAL WEIGHT), UNLESS OTHERWISE NOTED ON DRAWING, SHALL DEVELOP A MINIMUM COMPRESSIVE STRENGTH OF 3000 PSI AT 28 DAYS.
21. CONCRETE BAR REINFORCEMENT SHALL BE NEW BILLET STEEL CONFORMING TO ASTM 615-82 GR60.
22. MASONRY SHALL BE IN ACCORDANCE WITH ACI-530 SPECIFICATIONS FOR THE DESIGN AND CONSTRUCTIONS MASONRY STRUCTURE.
23. MASONRY UNITS SHALL CONFORM TO ASTM C-90, TYPE (I OR II), (LIGHT WEIGHT, MEDIUM WEIGHT, NORMAL WEIGHT) WITH A MINIMUM NET AREA 28-DAY COMPRESSIVE STRENGTH OF 3000 PSI.
24. MORTAR SHALL CONFORM TO ASTM 270, TYPE S ABOVE GRADE AND TYPE M BELOW GRADE.
25. GROUT SHALL BE "FINE GROUT" IN ACCORDANCE WITH ASTM C476. GROUT COMPRESSIVE STRENGTH SHALL BE 3000 PSI MIN.
26. MINIMUM MASONRY STRENGTH SHALL BE f'm=1500 PSI @ 28 DAYS. BASED ON EITHER THE UNIT STRENGTH METHOD OR PRISM TESTS PERFORMED IN ACCORDANCE WITH ASTM C39.




| ISSUE | DATE | DESCRIPTION |
|---|---|---|
| F | 08/27/20 | BHV APPROVAL |
| E | 05/14/20 | REVISED PLAN |
| D | 05/14/20 | REVISED PLAN |
| C | 05/13/20 | PERMIT |
| B | 06/13/19 | REVIEW |
| A | 07/17/18 | ASSOCIATION REVIEW |

PROJECT MANAGER KARL W STAFFELD

PROJECT NUMBER 18004




341 CORRIE ROAD
ANN ARBOR, MICHIGAN 48105

PARTIAL SITE PLAN
341 CORRIE ROAD




FILENAME A2.DWG

SCALE 1" = 20'-0"

SHEET A2




PROFILE

SCALE: VERT 1" = 5'-0"
HORIZ 1" = 20'-0"

LIMESTONE CAP
CONTINUOUS BOND BEAM WITH 2 - #4
SURFACE CMU WITH 6"x24" NATURAL STONE LEDGER PANELS APPLIED TO 1/2" MORTAR SKIM COAT
8"x8"x16" CMU CONCRETE BLOCK RETAINING WALL GROUT ALL CORES SOLID
WEEP HOLES AT 4'-0" OC
GRADE
#4 @ 24" OC (UP TO 3'-0" EARTH RETAINED) #4 @ 16" OC (GREATER THAN 3'-0" AND LESS THAN 5'-4" EARTH RETAINED)
GEO-TECH FILTER FABRIC
PEA STONE
4"ø PERFORATED DRAIN PIPE
36"x12" CONCRETE FOOTER
5'-4" MAXIMUM
3'-6" MINIMUM
#4
8" 8" 1'-6"

SECTION - RETAINING WALL (A / A2)

SCALE: 1" = 1'-0"
1/2 0 1 2 3

8'-0" O.C. 8'-0" O.C.
2"ø GRADE A53 STEEL SCH 40 PIPE PAINT BLACK
FIELD WELD CONNECTIONS TYP.
ASPHALT DRIVEWAY
8"ø CONCRETE PIER 42" DEEP
1'-6"
3'-6"
3'-6"

SECTION - GUARD RAIL (B / A2)

SCALE: 1" = 1'-0"
1/2 0 1 2 3

NOTE: SCOPE OF ABX ENGINEERING SERVICES IS LIMITED TO PROPOSED NEW SECTION OF RETAINING WALL, NEW GUARD RAIL ALONG DRIVE AND PLACEMENT OF SOIL ALONG WEST AND SOUTH PERIMETER OF DRIVE.

A B X
DESIGN LLC
PLANNING - ENGINEERING - PROJECT SERVICES
PO Box 803 - Northville, MI 48167 - 248 231-5838

| ISSUE | DATE | DESCRIPTION |
|---|---|---|
| F | 08/27/20 | BHV APPROVAL |
| E | 07/29/20 | REVISED PLAN |
| D | 05/14/20 | REVISED PLAN |
| C | 05/14/20 | REVISED PLAN |
| B | 05/13/20 | PERMIT |
| A | 07/17/18 | ASSOCIATION REVIEW |

PROJECT MANAGER KARL W STAFFELD
PROJECT NUMBER 18004




341 CORRIE ROAD
ANN ARBOR, MICHIGAN 48105



GAZEBO

GARAGE

FOR TYPICAL RETAINING WALL CONSTRUCTION REFER TO SECTION A DWG A3

2'-0"

5'-4"

EDGE OF DRIVEWAY

DRIVEWAY

DRIVEWAY

EXTEND EXISTING RETAINING WALL APPROXIMATELY 50'-0"

EXISTING RETAINING WALL

SECTION — LOOKING EAST C / A2

SCALE: 1/4" = 1'-0"

8 4 0 5 10

NOTE: SCOPE OF ABX ENGINEERING SERVICES IS LIMITED TO PROPOSED NEW SECTION OF RETAINING WALL, NEW GUARD RAIL ALONG DRIVE AND PLACEMENT OF SOIL ALONG WEST AND SOUTH PERIMETER OF DRIVE.

A B X
DESIGN LLC
PLANNING - ENGINEERING - PROJECT SERVICES
PO BOX 803 - NORTHVILLE, MI 48167 - 248 231-5838

| ISSUE | DATE | DESCRIPTION |
| --- | --- | --- |
| B | 08/27/20 | BHV APPROVAL |
| A | 08/03/20 | REVISED PLAN |

PROJECT MANAGER KARL W STAFFELD

PROJECT NUMBER 18004

STATE OF MICHIGAN CHRISTOPHER J. MILLER ENGINEER NO. 81004 LICENSED PROFESSIONAL ENGINEER 8-27-20

341 CORRIE ROAD
ANN ARBOR, MICHIGAN 48105

SECTION

FILENAME A4.DWG

SCALE 1/4" = 1'-0"

SHEET A4

1 2 3 4 5 6 7 8

CORRIE ROAD

EXISTING CATCH BASIN DRAINS UNDER THE STREET TO THE NORTH

NEW LOW POINT AND CULVERT

NEW RETAINING WALL

GAZEBO

GARAGE

HOUSE

341 CORRIE ROAD

MOVE EXCAVATED SOIL AND COVER WOOD PILE AT SOUTH END OF PROPERTY. SOIL SHALL BE SEEDED AND COVERED WITH SOIL EROSION CONTROL BLANKET

SLOPE DOWN

SLOPE DOWN

SLOPE DOWN

GENERAL NOTES:

1. SOIL TYPE IS PREDOMINATELY SANDY SOIL.
2. EXISTING ON-SITE DRAINAGE CONSISTS OF ONE EXISTING CULVERT AT THE NORTH EAST CORNER OF THE PROPERTY.
3. A LOW POINT SWALE IS INDICATED ON THE PLAN.
4. THE SOIL FROM THE EXCAVATION SHALL BE DUMPED OVER THE SOUTH END OF THE EXISTING DRIVEWAY AND SPREAD ONTO THE GROUND BELOW. THE SOIL SHALL BE SEEDED AND STABILIZED WITH EROSION CONTROL BLANKETS.
5. ALL DRAINAGE DITCHES AND SLOPES STEEPER THAN 1:4 SHALL BE STABILIZED WITH EROSION CONTROL BLANKETS.
6. OWNERS: KARL AND AZAR STAFFELD
   ADDRESS: 341 CORRIE ROAD, ANN ARBOR, MICHIGAN 48105.
   CONTACT NUMBER: (734) 417-0432
   PROPERTY ID: IB-09-08-380-005

D C B A

N

LANDSCAPE PLAN

SCALE: 1" = 30'-0"

10 0 30 60 90

NOTE: SCOPE OF ABX ENGINEERING SERVICES IS LIMITED TO PROPOSED NEW SECTION OF RETAINING WALL, NEW GUARD RAIL ALONG DRIVE AND PLACEMENT OF SOIL ALONG WEST AND SOUTH PERIMETER OF DRIVE.

ABX DESIGN LLC
PLANNING - ENGINEERING - PROJECT SERVICES
PO Box 803 - Northville, MI 48167 - 248 231-5838

| ISSUE | DATE | DESCRIPTION |
|---|---|---|
| B | 08/27/20 | BHV APPROVAL |
| A | 08/03/20 | ADDED PLAN |

**PROJECT MANAGER** KARL W STAFFELD

**PROJECT NUMBER** 18004

**341 CORRIE ROAD**
**ANN ARBOR, MICHIGAN 48105**

**LANDSCAPE PLAN**
**341 CORRIE ROAD**




**FILENAME** A5.DWG

**SCALE** 1" = 30'-0"

**SHEET** A5