# EXHIBIT A

6745565 L: 5578 P: 576 M
Total Pages: 7 02/06/2025 09:15 AM
Lawrence Kestenbaum
Washtenaw County, Michigan



## MORTGAGE

THIS MORTGAGE, made this 27th day of October 2023 (the "**Effective Date**"), by **Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones** (collectively, the "**Mortgagor**"), with an address of 341 Corrie Rd., Ann Arbor, MI 48105, in favor of **R & J Group Holdings, LLC** (the "**Mortgagee**"), with an address of 9930 Whittier Avenue, Detroit, MI 48224.

The Mortgagor, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, including, but not limited to, security for the Secured Debts, as that term is defined hereinbelow, hereby covenants and agrees as follows:

1.     **Mortgaged Property.** The Mortgagor hereby grants and warrants to Mortgagee a mortgage on real property located in the **Twp of Pittsfield** County of Washtenaw, State of Michigan, commonly known as 341 Payeur, Ann Arbor, MI 48108, and legally described as:

Commencing at the North ¼ post of Section, thence South 2085.25 feet in the North and South ¼ line, thence South 54 degrees 19 minutes West 900.2 feet in Southerly line of Payeur Road for a place of beginning; thence South 54 degrees 19 minutes West 250.00 feet; thence South 35 degrees 41 minutes East 350.00 feet, thence North 54 degrees 19 minutes East 250.00 feet, thence North 35 degrees 41 minutes West 350.00 feet to place of beginning, being part of the East ½ of the NW ¼ of Section 21, T3S R6E.

Tax Parcel Number L-12-21-300-004

together with all tenements, hereditaments and appurtenances belonging or in any way appertaining thereto which are now or shall hereafter be placed upon or attached thereto or thereupon (collectively, the "**Property**").

The Mortgagor covenants that Mortgagor is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. The Mortgagor warrants and will defend generally the title to the Property against all claims and demands.

2.     **Secured Debts.** The term "Secured Debts" includes, and this Mortgage will secure, any and all obligations, now existing or hereafter arising, including all extensions,

1

renewals, re-financings, modifications and replacements thereof and all interest, costs or other charges that accrue in connection therewith, due and owing, at any time, from the Mortgagor to the Mortgagee, including, but not limited to, a Promissory Note of even date herewith in favor of the Mortgagee in the principal amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), and any interest, costs and other fees which may accrue thereunder.

3.      **Payment of Principal and Interest; Other Charges.** The Mortgagor shall promptly pay when due, all principal, interest, fees and other charges due on the Secured Debts.

4.      **Charges; Liens.** The Mortgagor shall timely pay all taxes, assessments, fines and other charges attributable to the Property, including those which may attain priority over this Mortgage. At the request of Mortgagee, the Mortgagor shall upon payment promptly furnish to Mortgagee all notices of amounts to be paid under this Paragraph and shall promptly furnish to Mortgagee receipts evidencing all such payments. If the Mortgagee determines that any part of the Property is subject to a lien which may attain priority over this Mortgage, the Mortgagee may give the Mortgagor a notice identifying the lien and the Mortgagor shall satisfy such lien within 30 days of the date of mailing of such notice.

The Mortgagor shall be responsible for and shall pay, upon execution of this Mortgage, all costs, expenses and fees associated with the preparation of this Mortgage and the related Promissory Note, including all title fees, recording fees and attorney fees associated therewith.

5.      **Hazard or Property Insurance.** The Mortgagor shall keep any and all improvements now existing or hereafter existing on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which the Mortgagee requires insurance. This insurance shall be maintained in the amounts (in no event less than the full replacement value) and for the periods that the Mortgagee reasonably requires. The insurance carrier providing the insurance shall be chosen by the Mortgagor, subject to the Mortgagee's approval, which shall not be unreasonably withheld. If the Mortgagor fails to maintain coverage described above, the Mortgagee may, at the Mortgagee's option, obtain coverage to protect the Mortgagee's rights in the Property, with such cost being charged to Mortgagor as a protective advance.

All insurance policies and renewals shall be acceptable to the Mortgagee and shall include a standard mortgage clause, with the Mortgagee named as an additional loss payee. The Mortgagee shall have the right to hold copies of the policies and renewals. The Mortgagor shall promptly give to the Mortgagee proof that such insurance is in place prior to the Effective Date and provide Mortgagee with all receipts of paid premiums and renewal notices. In the event of loss, the Mortgagor shall give prompt notice to the insurance carrier and the Mortgagee. The Mortgagee may make proof of loss if same is not made promptly by the Mortgagor.

Unless the Mortgagee and the Mortgagor otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if restoration is practicable. If the restoration or repair is not economically feasible or the Mortgagee's security would be lessened, the insurance proceeds shall be applied to the Secured Debts, whether or not then due, with any excess paid to the Mortgagor. If the Mortgagor abandons the Property or does not answer within thirty (30) days of a notice from the Mortgagee that the insurance carrier has offered to settle a claim, then the Mortgagee may collect the insurance proceeds directly from the insurance carrier. The Mortgagee may use the proceeds to repair or restore the Property or to pay the Secured Debts, whether or not then due. The 30-day period will begin when the notice is given.

Unless the Mortgagee and the Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of scheduled payments or change the amount of any payments required as to the Secured Debts. If the Property is acquired by the Mortgagee, the Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to the Mortgagee to the extent of the balance due on the Secured Debts immediately prior to the acquisition.

6. **Preservation, Maintenance and Protection of the Property.** The Mortgagor shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. The Mortgagor shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that, in the Mortgagee's good faith judgment, could result in forfeiture of the Property or otherwise materially impair the lien created by this Mortgage.

7. **Protection of Mortgagee's Rights in the Property.** If the Mortgagor fails to perform the covenants and agreements contained in this Mortgage, or there is a legal proceeding that may significantly affect the Mortgagee's rights in the Property, (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations) then the Mortgagee may do and pay for whatever is necessary to protect the value of the Property and the Mortgagee's rights in the Property. The Mortgagee's actions may include paying any sums secured by a lien which has priority over this Mortgage, appearing in court, paying reasonable attorney fees and costs, and entering on the Property to make repairs. Although the Mortgagee may take action under this Paragraph, the Mortgagee shall not have any duty to do so.

Any amounts disbursed by the Mortgagee under this Paragraph shall become part of the Secured Debts secured by this Mortgage. Unless the Mortgagor and the Mortgagee agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the same rate assessed on advances under the Secured Debts and shall be payable, with interest, upon notice from the Mortgagee to the Mortgagor.

8. **Inspection.** The Mortgagee or its agent(s) may make reasonable entries upon and inspections of the Property during reasonable hours. The Mortgagee shall give

3

the Mortgagor reasonable notice prior to any such inspection and specify the reasonable cause for the inspection.

9. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to the Mortgagee.

In the event of a total taking of the Property, the proceeds shall be applied to the Secured Debts, whether or not then due, with any excess paid to the Mortgagor. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the Secured Debts, unless the Mortgagor and the Mortgagee otherwise agree in writing, the Secured Debts shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the Secured Debts immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to the Mortgagor. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the Secured Debts immediately before the taking, unless the Mortgagor and the Mortgagee otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the Secured Debts, whether or not the sums are then due.

Unless the Mortgagee and the Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the payments or balances due under the Secured Debts.

10. **Mortgagor Not Released; Forbearance by Mortgagee Not a Waiver.** An extension of the time for payment or modification of amortization of the Secured Debts granted by the Mortgagee to the Mortgagor shall not operate to release the liability of the Mortgagor or the Mortgagor' successors in interest. The Mortgagee shall not be required to commence proceedings against the Mortgagor or any successors in interest, extend time for payment or otherwise modify amortization of the Secured Debts by reason of any demand made by the Mortgagor or the Mortgagor' successors in interest. Any forbearance by the Mortgagee in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

11. **Successors and Assigns Bound.** The covenants and agreements of this Mortgage shall bind and benefit the successors and assigns of the Mortgagee and the Mortgagor, provided, however, that the Mortgagor may not assign or transfer any obligations or liabilities under this Mortgage without the prior written consent of the Mortgagee.

12. **Loan Charges.** If the Secured Debts are subject to a law which sets maximum charges and that law is ultimately interpreted so that the interest or other charges collected or to be collected in connection with the Secured Debts exceed the permitted limits, then: (a) any such charges shall be reduced by the amount necessary to

4

meet the permitted limit; and (b) any sums already collected from the Mortgagor which exceeded permitted limits will be refunded to the Mortgagor, in the form of a credit to any remaining principal or other balance due or if no amount whatsoever remains due under the Secured Debts, then by making a direct payment to the Mortgagor.

13. **Notices.** Any notice(s) to the Mortgagor provided for in this Mortgage shall be given by first class mail unless applicable law requires use of another method. The notice shall be directed to the address hereinabove or any other address the Mortgagor designates by notice to the Mortgagee. Any notice(s) to the Mortgagee shall be given by first class mail to the Mortgagee's address hereinabove or any other address the Mortgagee designates by notice to the Mortgagor. Any notice provided for in this Mortgage shall be deemed to have been given as of the date of mailing as provided in this Paragraph.

14. **Governing Law; Severability.** This Mortgage shall be governed by Michigan law and any action relating to the Property or this Mortgage shall be brought in the jurisdiction in which the Property is located. In the event that any provision or clause of this Mortgage or other documents relating to the Secured Debts conflicts with applicable law, such conflict shall not affect any other provisions of this Mortgage or other documents relating to the Secured Debts which can be given effect without the conflicting provision. To this end, the provisions of this Mortgage and any other documents relating to the Secured Debts are severable.

15. **Transfer of the Property or a Beneficial Interest in Mortgagor.** If all or any part of the Property or any interest in the Property is sold or transferred without the Mortgagee's prior written consent, the Mortgagee may, at its option, require immediate payment in full of all Secured Debts. However, this option shall not be exercised by the Mortgagee if such an exercise is prohibited by federal law as of the date of this Mortgage.

If the Mortgagee exercises this option to accelerate, Mortgagee shall give the Mortgagor notice of such acceleration. The notice shall provide a period of not less than thirty (30) days from the date the notice mailed for the Mortgagor to pay all Secured Debts. If the Mortgagor fails to pay the outstanding balance of the Secured Debts prior to the expiration of this period, the Mortgagee may invoke any remedies permitted by this Mortgage without further notice or demand to the Mortgagor.

16. **Hazardous Substances.** The Mortgagor has not previously and shall not hereafter cause or permit the presence, use, disposal, storage, or release of any hazardous substances, as defined by applicable environmental law, on or in the Property. The Mortgagor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any environmental law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of hazardous substances that are generally recognized to be appropriate to normal residential use or maintenance of the Property.

5

The Mortgagor shall promptly give Mortgagee written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any hazardous substance or environmental law of which the Mortgagor have actual knowledge. If the Mortgagor learn, or are notified by any governmental or regulatory authority, that any removal or other remediation of any hazardous substance affecting the Property is necessary, the Mortgagor shall promptly take all necessary remedial actions in accordance with environmental law.

17. **Acceleration; Remedies. The Mortgagee shall give notice to the Mortgagor prior to any acceleration following the Mortgagor's breach of any covenant or agreement in this Mortgage or of the Secured Debts under which acceleration is permitted. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than thirty (30) days from the date the notice is given to the Mortgagor, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the Secured Debts and sale of the Property. If the default is not cured on or before the date specified in the notice, the Mortgagee, at its option, may require immediate payment in full of all Secured Debts without further demand and may invoke the power of sale and any other remedies permitted by applicable law. The Mortgagee shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the Mortgagee invokes the power of sale, the Mortgagee shall give notice of sale to the Mortgagor in the manner provided in this Mortgage or as otherwise required by applicable law. The Mortgagee shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. The Mortgagee or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorney fees; (b) to all Secured Debts; and (c) any excess to the person or persons legally entitled to same.**

18. **Time is of the Essence.** Time is of the essence with respect to this Mortgage, including, but not limited to, the performance of the Mortgagor's obligations hereunder.

IN WITNESS WHEREOF, this Mortgage has been signed and sealed by the Mortgagor.

Azar Sadeghi-Staffeld

(signatures continue on following page)

6

STATE OF MICHIGAN )
)
COUNTY OF Macomb )
Acknowledged before me this 21 day of October 2023 by **Azar Sadeghi-Staffeld** for and on behalf of herself.

**TRACI MEYER**, Notary Public
**MACOMB** County, Michigan
My commission expires: **AUG 30, 2026**
Acting in **MACOMB** County

**Ghazal Staffeld a/k/a Ghazal Jones**

STATE OF MICHIGAN )
)
COUNTY OF Macomb )
Acknowledged before me this 21 day of October 2023 by **Ghazal Staffeld a/k/a Ghazal Jones** for and on behalf of herself.

| TRACI MEYER |
| NOTARY PUBLIC - MICHIGAN |
| MACOMB COUNTY |
| ACTING IN THE COUNTY OF Macomb |
| MY COMMISSION EXPIRES AUG. 30, 2026 |

, Notary Public
County, Michigan
My commission expires:
Acting in County

**Drafted by and return to**
Anthony G. Mammina
Mammina & Ajlouny, P.C.
370 E. Maple Road, Suite 230
Birmingham, MI 48009

# EXHIBIT B

# LEASE AGREEMENT

This Lease Agreement (the "Lease") is entered this 27th day of October 2023 (the "Effective Date") by and between **R & J Group Holdings, LLC** (the "**Landlord**"), with an address of 9930 Whittier Street, Detroit, MI 48224 and **Azar Sadeghi-Staffeld and Ghazal Staffeld a/k/a Ghazal Jones** (collectively, the "**Tenant**"), with an address of 341 Corrie Rd., Ann Arbor, MI 48105. Landlord and Tenant may each hereafter be referred to as a "Party" and collectively as the "Parties".

**NOTICE:  Michigan law establishes rights and obligations for parties to rental agreements. This agreement is required to comply with the Truth in Renting Act. If you have a question about the interpretation or legality of a provision of this agreement, you may want to seek assistance from a lawyer or other qualified person.**

That for and in consideration of the mutual agreements herein contained, for adequate consideration, the receipt and sufficiency of which is acknowledged by Landlord and Tenant, Landlord and Tenant hereby agree, covenant, represent and promise to and with each other, as follows:

1.    **Leased Premises, Term, Use, Inspection and Incorporation of Recitals.**

**1.1    Leased Premises.**    Landlord shall hereby lease to Tenant, and Tenant shall rent from Landlord, the entire premises located in the Village of Barton Hills, County of Washtenaw, State of Michigan, commonly known as 341 Corrie Rd., Ann Arbor, MI 48105 (the "**Premises**"), Tax Parcel Number IB-09-08-380-005, and as legally described on the attached Exhibit A.

**1.2    Original Term.**  This Lease shall commence on November 1, 2023 and, unless sooner terminated pursuant to law or any of the terms herein, shall continue for a lease term of 13 months expiring on November 30, 2024 (the "**Lease Term**").

**1.3    Conditional Renewal Option.** This Lease includes a conditional option to renew the Lease Term for an additional term of 12 months only upon the mutual agreement of the Parties as to the terms of such extension. Tenant must notify Landlord of Tenant's intent to renew the Lease Term at least 30 days in advance of the end of the Lease Term and the Parties must mutually agree upon all material terms of such renewal prior to the end of the Lease Term.

**1.4    Use of Premises.**  Tenant shall use the Premises as their residence for themselves and their immediate family only, and for no other purpose without the prior written consent of the Landlord. Tenant will comply with all applicable laws, rules, ordinances, statutes and orders regarding the use of the Premises, including all ordinances, rules and regulations of the local municipality.

Initials:    Landlord _____    Tenant _____

Residential Lease, 341 Corrie Rd., Ann Arbor, MI 48105                    Page 2 of 10

**1.5    Inspection / Condition of Premises.**  Tenant has inspected the Premises, the fixtures, the grounds, building and improvements and acknowledges that the Premises are in good and acceptable condition and are habitable and completed the Premises Inspection Inventory Checklist attached hereto as Exhibit B. If the condition of the Premises changes at any time during the Lease Term, Tenant shall promptly provide reasonable notice to Landlord. Tenant hereby accepts the Premises in its current "AS-IS" condition.

## 2.    Rent, Late Payments, Real Estate Taxes and Security Deposit.

**2.1    Rent.**  Tenant shall pay to Landlord during the Lease Term, as rent for the Premises, the amount of Five Thousand and 00/100 ($5,000.00) per month for 12 consecutive months beginning on December 1, 2023 ("Rent") and continuing on the 1st of each calendar month thereafter through the end of the Lease Term, for a total Rent payment for the Lease Term of Sixty Thousand and 00/100 Dollars ($60,000.00).

**2.2    Manner of Payment.**  Rent shall be paid by Tenant to the Landlord each month, in advance of the first day of each month at the address listed above.

**2.4    Late Fees.**  If any amount due under the Lease is more than 5 days late, Tenant agrees to pay a late fee of $50.00 for each incident or occurrence.

**2.5    Real Estate Taxes.**  During the Lease Term, Tenant shall be responsible for and pay all real estate taxes and assessments for the Premises as additional Rent.

**2.6    Security Deposit.**  On execution of this Lease, Tenant shall deposit with Landlord a security deposit of $10,000.00 (the "Deposit"), as security for the performance of Tenant's obligations under this Lease. Landlord may (but shall have no obligation to) use the Deposit or any part thereof to cure any breach or default of Tenant under this Lease, or to compensate Landlord for any damage that it incurs as a result of Tenant's failure to perform any of Tenant's obligations hereunder. Landlord is not limited to the Deposit to recoup damage costs, and Tenant remains liable for any balance due or damages to the Premises at the end of the Lease Term. Tenant shall not apply or deduct any portion of the Deposit from any month's Rent, including the last month of the Lease Term. If Tenant breaches any of the terms or conditions of this Lease, Tenant shall forfeit the Deposit, as permitted by law. **You must notify your Landlord in writing within 4-days after you move of a forwarding address where you can be reached and where you will receive mail; otherwise your Landlord shall be relieved of sending you an itemized list of damages and the penalties adherent to that failure.**

**2.7    Return of Deposit.**  In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, and shall not purchase the Premises in accordance with the option to purchase contained herein, the Deposit shall be returned to Tenant at the end of the Lease Term and after delivery of

*Initials:*    Landlord _____    Tenant _____

possession of the entire Premises to Landlord, subject, however, to any balance for unpaid Rent or damages to the Premises.

**3.     Option to Purchase.** The Tenant is hereby granted the option of purchasing the Premises at the end of the Lease Term (the "Purchase Option").

**3.1     Purchase Price.** The purchase price shall be One Million Fifty Thousand and 00/100 Dollars ($1,050,000.00) (the "**Purchase Price**") after the final Rent payment is made to Landlord, only if Tenant is not default of this Lease. To exercise the option, the Tenant must deliver to the Landlord written notice of Tenant's intent to purchase in advance of the expiration of the Lease Term and such written notice must specify a valid closing date which must occur within thirty (30) days of the expiration of the Lease Term, unless otherwise agreed to by Landlord in writing. Provided that the sale of the Premises closes within thirty (30) days of the expiration of the initial Lease Term, Tenant shall receive a credit of $50,000.00 toward the Purchase Price, which includes Landlord's retention of the Security Despoit as part of this credit. Landlord further agrees to apply a portion of the Purchase Price received by Landlord at the Closing of the sale contemplated herein to pay off any remaining balance due and owing to Landlord from Tenant under the Promissory Note dated October 27, 2023.

**3.2     Closing.** Landlord shall determine the title company at which settlement shall occur and shall inform Tenant of this location. Tenant agrees that closing costs in their entirety, including all taxes and assessments, the cost of title insurance, attorney fees, transfer taxes or other charges, shall be the sole responsibility of Tenant. No real estate commissions or any other commissions shall be paid in connection with the purchase/sale transaction contemplated by this Section.

**3.3     Exclusivity.** This option to purchase is exclusive to the Tenant named herein, is non-assignable and exists solely for the benefit of the Tenant. Should Tenant attempt to assign, convey, delegate, or transfer this option to purchase without the Landlord's express written permission, any such attempt shall be deemed null and void.

**3.4     Title to Premises.** The Landlord shall convey title to the Premises to Tenant by a warranty deed at closing. Tenant may obtain a title insurance policy for the Premises at Tenant's sole expense.

**4.     Default.**

**Initials:**   Landlord _____   Tenant _____

Residential Lease, 341 Corrie Rd., Ann Arbor, MI 48105                    Page 4 of 10

**4.1     Event of Default.**   The occurrence of any of the following events shall be deemed a "Default" under the terms of this Lease:

    A. Any representation or warranty of the Tenant made in this Lease shall be untrue when made, or shall, during the term of this Lease, become impaired, untrue or misleading;

    B. Tenant shall fail to pay Rent when due or perform or observe any term, condition, covenant or agreement set forth in this Lease;

    C. If Tenant files a bankruptcy petition under any chapter of Title 11 of the United States Bankruptcy Code, Tenant stipulates in advance to relief from the automatic stay provision, 11 U.S.C. § 362 in favor of Landlord for all purposes and by execution of this Lease, Tenant consents to entry of a stipulated order for relief from the automatic stay as set forth herein;  and

    D. If Tenant defaults, as defined herein, Landlord may have all remedies legally permitted, including termination of this Lease and the Purchase Option. Landlord shall serve a written, seven (7) day notice on Tenant specifying the nature of said default and if Tenant does not cure a default of which Tenant has been notified, or if the default cannot be completely cured or remedied in seven days, Landlord may at Landlord's option: (i) cure such default and add the cost of such cure to Tenant's financial obligations under this Lease; or (ii) declare Tenant in default and evict Tenant from the Premises in accordance with the laws of the State of Michigan. Landlord also may terminate this Lease and the Purchase Option if Tenant, a member of Tenant's household, or other person under Tenant's control, unlawfully manufactures, delivers, possesses with intent to deliver, or possesses a controlled substance on the Premises.

**4.2     Physical Remedies.**  If the notice provided for in Section 4.1(D) has been given, the Lease Term shall expire as defined herein, or if Tenant shall be in default of this Lease, then Landlord may, as permitted by law, dispossess Tenant by summary proceedings or otherwise, and retake possession of the Premises.

**4.3     Financial Remedies.**  In the event of any Default, re-entry, expiration and/or dispossession by summary proceedings or otherwise: (i) the Rent shall become due thereupon and be paid up to the time of such re-entry, dispossession or expiration, together with such damages and/or expenses Landlord may incur for legal expenses, attorney fees, costs, expenses or brokerage, and/or putting the Premises in good order to the extent permitted by the law of the State of Michigan; and/or (ii) Landlord may re-let the Premises or any part or parts thereof. Landlord may, at its sole option, hold Tenant liable for any difference between the Rent payable under this Lease during the balance

Initials:   Landlord_____   Tenant _____

of the Lease Term, and any Rent paid by a successive Tenant if the Premises are re-let. In the event that after default by Tenant, Landlord is unable to re-let the Premises during any remaining portion of the Lease Term, Landlord may at Landlord's option hold Tenant liable for the balance of the unpaid Rent under this Lease for the remainder of the Lease Term.

**5.     Quiet Enjoyment.** Landlord covenants and agrees with Tenant that upon Tenant timely remitting all required Rent to Landlord, and Tenant observing and materially performing all of the terms, covenants and conditions to be performed under this Lease and under any applicable ordinances, rules and regulations, Tenant may peaceably and quietly enjoy the Premises.

**6.     Assignment.** Tenant expressly covenants that Tenant shall not assign this Lease, including the Purchase Option, or sublease the Premises without the prior written consent of the Landlord. Landlord reserves the sole right and subjective discretion to approve or deny any assignment of this Lease or any sublease to any potential or prospective tenant. Any assignment or sublease without Landlord's written prior consent shall, at Landlord's option, terminate this Lease. No assignment, subleasing, occupancy or collection shall be deemed a waiver of the provisions of this Lease, or a release of Tenant from the further performance of covenants in this Lease. Landlord shall be free to sell, mortgage, assign, transfer or sell all or part of Landlord's interest in the Premises and/or the Lease without the approval or consent of the Tenant.

**7.     Possession and Tenant Responsibilities.**

**7.1     Possession and Surrender.** At the expiration of the Lease Term, if Tenant shall not have exercised the Purchase Option, Tenant shall peaceably surrender the Premises to Landlord in the same good condition as it was at the commencement of the Lease, subject only to ordinary wear and tear, and free of all debris and trash.

**7.2     Utilities and Services.** Tenant will be responsible for all utilities and services required on the Premises. Tenant shall put all utilities for the Premises in their name, maintain uninterrupted service throughout the Lease Term, and timely pay all utility bills. Tenant shall pay any penalties imposed by utility providers because of late payment of original bills. The utilities include, but are not limited to, water, electric, gas, cable, internet and cost of trash removal, if any. Tenant shall periodically, upon request of the Landlord, submit written proof that all utilities have been paid and are current with no past due amounts owed to any utility provider. Failure to do so shall be an event of Default of this Agreement.

**7.3     No Pets.** Tenant is not permitted to keep any pets on the Premises without the express prior written consent of Landlord, such consent being within the sole discretion of Landlord. The Tenant shall be responsible for all expenses, damages, destruction or other wear and tear caused by the pets.

*Initials:*    Landlord _____    Tenant _____

**7.4     Dangerous Materials.** Tenant shall not keep or have on or around the Premises any item of a dangerous, flammable or explosive nature that might unreasonably increase the risk of fire or explosion on or around the Premises or that might be considered hazardous by any responsible insurance company.

**7.5     Alterations and Improvements.** Tenant agrees not to make any alterations or additions to the Premises without the prior written consent of Landlord. If any alterations, additions, improvements or changes are made to or built on or around the Premises, same shall become the property of Landlord and remain as part of the Premises at the expiration or termination of this Lease, unless otherwise agreed to by the Parties in writing.

**7.6     Maintenance, Repair and Damage to Premises.** Tenant shall use and maintain the Premises in accordance with all applicable sanitary, housing, health, police and all other regulations imposed by governmental authorities. Tenant shall maintain the Premises in a clean and orderly manner; remove all garbage from the Premises in a clean and sanitary manner. Tenant shall also be responsible for all required and preventative maintenance to the Premises, including all plumbing, electrical, sewage and HVAC system, and any fire and flood damage repairs. Tenant shall pay for all damage caused to the Premises by Tenant, their guests and/or their invitees.

**7.7     Personal Property (Appliances).** Tenant acknowledges that any personal property of the Landlord situated or affixed to the Premises, such as appliances, window covers and other fixtures, shall be maintained by Tenant and remain upon the Premises upon vacating, in good condition, reasonable wear and tear excepted. Landlord shall retain all remedies against Tenant for any unlawful removal or conversion of such items/property.

**7.8     Smoke Detectors.** Smoke detectors have been installed within the Premises. During the Lease Term, Tenant is required to maintain all smoke detectors. Battery maintenance and verification of operation of the smoke detectors after the Lease Term commences are Tenant's responsibility.

**7.9     Damage to Premises.** In the event the Premises, or a portion thereof, are destroyed by fire, storm, earthquake or other casualty not caused by the negligence of Tenant, such that the entire Premises is rendered wholly uninhabitable, this Lease and the Purchase Option shall terminate from such time except for the purpose of enforcing rights that may have accrued hereunder. The Rent provided for herein shall then be accounted for by and between Landlord and Tenant up to the time of such injury, destruction or un-inhabitability of the Premises and Landlord shall refund to Tenant, pro-rata, previously paid Rent for periods occurring after such date. Should a portion of the Premises thereby be rendered uninhabitable, the Landlord shall have the option of either

*Initials:*    Landlord _____    Tenant _____

terminating this Lease and refunding Tenant's pro rata share of Rent commensurate with the time remaining under the Lease Term.

**7.10  Smoking.** Smoking on the Premises and in any buildings or structures upon the Premises is not permitted at any time.

**8.  Inspection of Premises.** Landlord and Landlord's agents, including, but not limited to, any management company of Landlord, shall have the right at all reasonable times during the Lease Term and any renewal thereof to enter the Premises for the purpose of inspecting the Premises and all buildings and improvements thereon. Tenant agrees to make the Premises available to Landlord for such inspections or to address an emergency. Except in an emergency situation, Landlord shall give Tenant a forty-eight (48) hour notice of Landlord's intent to enter.

**9.  Abandonment.** If at any time during the Lease Term, the Tenant abandons the Premises or any part thereof, Landlord may at Landlord's option obtain possession of the Premises by any legal means without liability to Tenant and may, at Landlord's option, terminate this Lease. Abandonment is defined as absence of the Tenant from the Premises for at least 30 days without notice to Landlord.

**10.  Security System.** Tenant understands that Landlord is not responsible to provide any security alarm system or other security for Tenant or the Premises. In the event any alarm system is provided, Tenant understands that such alarm system is not warranted to be complete in all respects or to be sufficient to protect Tenant or the Premises. Tenant releases Landlord from any loss, damage, claim or injury resulting from the failure of any alarm system, security or from the lack of any alarm system or security.

**11.  Insurance.** Tenant shall each be responsible for maintaining appropriate insurance for the entire Premises, including standard hazard, fire and flood insurance for the full replacement value of the Premises and the personal property therein, as well as general liability insurance coverage. Tenant understands that Landlord will not provide any insurance coverage whatsoever for the Premises or for Tenant's property. Landlord will not be responsible for any loss of Tenant's property or damages to the Premises, whether by theft, fire, riots, strikes, acts of God or otherwise, and the liability for any such damages will be that of Tenant. Tenant shall provide Landlord, on a monthly basis, written proof that the Premises are properly insured in a manner satisfactory to Landlord.

**12.  Intent to Purchase.** As of the Effective Date, it is the Tenant's herein intent to purchase the Premises from Landlord in accordance with the terms and conditions of this Lease prior to or after the expiration of the Lease Term. All of the terms and conditions of the purchase/sale of the Premises are governed by this Lease and nothing to the contrary shall be deemed as part of the sale/purchase of the Premises or otherwise alter the terms of this Lease unless a written addendum to this Lease is signed by both Landlord and Tenant.

*Initials:*  Landlord _____   Tenant _____

Residential Lease, 341 Corrie Rd., Ann Arbor, MI 48105                     Page 8 of 10

**13.    No Other Representations, Construction; Governing Law; Consents; Acknowledgements.**

    **13.1    No Other Representations.** Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant in executing and delivering this Lease is not relying upon, any warranties, representations, promises, understandings or statements, except to the extent that they are expressly set forth in this Lease.

    **13.2    Entire Agreement.** THIS WRITTEN LEASE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH REGARD TO THE TENANT'S LEASE OF THE PREMISES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. The Parties make no representations or warranties to each other, except as contained in this Lease. All prior agreements and understandings between the Parties hereto with respect to the transactions contemplated hereby, whether verbal or in writing, are superseded by, and are deemed to have been merged into, this Lease unless otherwise expressly provided herein.  This Lease shall be binding on, and inure to the benefit of, the Parties hereto and their permitted successors and assigns as stated in this Lease, but no other party shall have or claim any third party beneficiary rights under this Agreement.

    **13.3    Construction and Severability.** If any of the provisions of this Lease, or the application thereof to any person or circumstances, shall, to any extent, be held invalid or unenforceable for any reason, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

    **13.4    Counterparts or E-mail.** This Lease may be executed in counterparts, including by e-mail transmission, each of which shall be deemed an original and all of which together shall constitute one document.

    **13.5    Time of Essence.** Time and strict and punctual performance are of the essence with respect to each provision of this Lease.

    **13.6    Survival of Representations and Warranties.** The representations, warranties and covenants of the Parties contained herein shall survive the consummation of the transactions contemplated in this Lease, subject to any time period limitations specified herein.

    **13.7    Further Cooperation.** The Tenant shall each execute and deliver to the Landlord all further documents or instruments reasonably requested by Landlord to effect

Initials:   Landlord _____   Tenant _____

the intent of this Lease. Any request by Landlord under this Section shall be accompanied by the document proposed for signature, in form and substance satisfactory to Landlord.

**13.8   Venue and Choir e of Law.** The Parties agree that any litigation between the Parties concerning this Lease shall be brought in the State of Michigan, County of Oakland, in the appropriate Circuit or District Court. This Agreement shall be interpreted in accordance with and any dispute shall be governed by the laws of the State of Michigan.

**13.9   Modifications.** This Lease may be amended, waived, discharged or terminated only by and through a written instrument signed by all Parties.

**13.10  Binding Effect.** The covenants and conditions contained in this Lease shall apply to and bind the Parties and the heirs, legal representatives, successors and permitted assigns of the Parties.

**13.11  No Waiver.** The failure of Landlord to insist in any instance upon the strict keeping, observance or performance of any provision of this Lease or to exercise any election in this Lease shall not be construed as a waiver or relinquishment of such provision in the future, but the same shall continue and remain in full force and effect. No waiver or modification by either Party of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by the Party to be charged. The receipt and retention by the Landlord of Rent with knowledge of the breach of any provision of this Lease shall not be deemed a waiver of such breach.

**13.12  Cumulative Rights.** Landlord and Tenant's rights under this Lease are cumulative and shall not be construed as exclusive of each other unless otherwise required by law.

**13.13  Notice.** Any notice required or otherwise given pursuant to this Lease shall be given in writing and delivered by first-class mail or a reputable overnight delivery service, if to Tenant, at the Premises and if to Landlord, at the address stated above. Either Party may change such addresses from time to time by providing written notice as set forth above.

**13.14  Headings.** The headings of the Sections of this Lease are for convenience only and are not to be considered in construing said Sections.

**13.15  Holdover.** If Tenant holds-over in the Premises after the expiration or termination of this Lease without the consent of the Landlord, Tenant shall pay as hold-over rent a monthly rental rate of $5,500.00, unless otherwise agreed by the Parties in writing; provided, however, that nothing contained herein shall be construed to limit or preclude any other rights or remedies available to the Landlord at law or in equity by reason of such holding-over by Tenant, including, without limitation, the recovery of any

*Initials:* Landlord _____   Tenant _____

sums or damages to which, in addition to the damages specified above, the Landlord may lawfully be entitled. A month-to-month tenancy shall be created by Tenant's hold-over, subject to the same terms and conditions of this Lease and shall be terminable on a thirty (30) day-notice by either Party, or on longer notice if required by law.

**13.16  Indemnification.** To the extent permitted by law, Tenant indemnifies and holds Landlord, Landlord's agents and the Premises, harmless from any and all liability for loss, claims, injury to or death of any person, including Tenant, or for damage to property arising from Tenant's use and occupation of the Premises, or from the acts or omissions of any person or persons, including Tenant, in or about the Premises with Tenant's express or implied consent, except Landlord's act of negligence.

**13.17  Neutral Construction.** Any ambiguities and/or inconsistencies in any of the terms of this Lease will be given neutral construction and shall not be construed against any particular Party as the "drafter" of such language.

**13.18  References in this Lease.** Whenever the context of this Lease requires, references to the singular number shall include the plural, and the plural shall include the singular, where appropriate; words denoting gender shall be construed to include the masculine, feminine and neutral where appropriate; and specific enumeration shall not exclude the general, but shall be considered as cumulative.

IN WITNESS WHEREOF, the Parties to this Lease have executed and delivered this Lease as of the Effective Date.

**LANDLORD:**

R & J GROUP HOLDINGS LLC

By: Jerry Watha
Its: Member

**TENANT:**

Azar Sadeghi-Staffeld, an individual

Ghazal Staffeld a/k/a Ghazal Jones, an individual

Initials:   Landlord _____   Tenant _____

**EXHIBIT A**
**LEGAL DESCRIPTION**

Real property located in the Village of Barton Hills, County of Washtenaw, State of Michigan, described as:

Commencing at an iron pipe in the South line of Section 8 at its intersection with the West line of Lot 4, Block 3, Supervisor's Plat of Barton Hills; thence North 20 degrees 12 minutes East 198.16 feet to a concrete monument for a PLACE OF BEGINNING; thence North 20 degrees 12 minutes 00 seconds East 217.77 feet to a concrete monument; thence North 20 degrees 12 minutes 00 seconds East 133.73 feet to a concrete monument, thence North 35 degrees 01 minute East 94.97 feet to a point on a curve; thence Easterly along a curve concave Southerly having a radius of 45.99 feet and central angle of 48 degrees 42 minutes 30 seconds 39.10 feet to a concrete monument in the Southerly right-of-way line of Conic Road at its Westerly end; thence North 83 degrees 49 minutes 0 seconds East 120.00 feet along the South line of Corrie Road to a concrete monument; thence South 6 degrees 00 minutes West 250.00 feet to a concrete monument; thence South 28 degrees 11 minutes 10 seconds West 227.14 feet to a concrete monument; thence North 87 degrees 02 minutes 42 seconds West 193.40 feet to the PLACE OF BEGINNING, being a part of parcel one of Lot 4 in Block 3 of Supervisor's Plat of Barton Hills, as recorded in Liber 9 of Plats, Pages 58, 59, and 60, Washtenaw County Records.

Tax Parcel Number IB-09-08-380-005

This agreement is made between the purchaser and the seller on November 11, 2024

For the property located at 341 Corrie Rd Ann Arbor, MI.


Buyer agrees to present a valid Purchase Agreement no later than Wednesday November 13,2024 @ 5pm

The P.A must present a Purchase price No less than $1,148,581.72

Must have a closing date No later than January 31,2025

Purchaser to pay all taxes, Recording fees, and transfer taxes .

There will be No Tax prorations.

**Any and all additional expenses incurred by seller  pertaining to the property From October 31,2024 thru January 31,2025 will be paid by the purchaser.**

Purchaser currently Resides in the home

This is an AS IS WHERE IS SALES

Seller to provide Free and clear title at the time of closing

Seller agrees to extend the current lease until January 31,2025

Purchaser agrees to continue making agreed monthly payments. Until the loan closes.

# EXHIBIT C





# PURCHASE AGREEMENT

42705 Grand River Ave, Ste 201 Novi MI 48374 | 888.304.1447
www.3dxrealestate.com

**1. AGREEMENT TO SELL.** The undersigned Seller and Purchaser agree to sell and purchase the following real property located in the [City, Village, Township] of: <u>ANN ARBOR</u>, <u>Washtenaw County</u> County, Michigan, described as follows: [legal description/tax ID No.] <u>SOLD STD - IRON 5/4D-028-00 BOX 2-29 COM AT SW COR OF LOT 4, BLK 3, TH N 20 DEG 12' E 148 84 FT FOR PL OF BEG, TH N 20 DEG 12' E 34 50 FT, TH N 50DEG 0' E 94 50 FT, TH N E</u> known as [address] <u>341 CORRIE RD</u> together with all improvements and appurtenances, including but not limited to all window treatments, shades, blinds, curtain rods, traverse rods, lighting fixtures, storm windows and doors, screens, awnings, TV antenna, satellite dish and accessories, water softener (rental units excluded), security system, central vacuum system and attachments, garage door openers and transmitters, fireplace enclosures, grates, logs and gas attachments, attached mirrors, landscaping, attached humidifiers and electric air filters, fuel in tanks at the time of possession, carpeting, if any, now on the premises, and: _____ (the "Property"). Seller and Purchaser agree that the personal property identified in this Purchase Agreement is being sold together with the Property and that the consideration for the personal property is contained in the Purchase Price for the Property. Seller agrees to provide Purchaser with a bill of sale containing standard warranties of title for the personal property being sold to Purchaser as so identified. Seller further agrees to transfer to Purchaser, to the extent such transfer or assignment is permitted, all warranties and guaranties relating to any equipment, fixtures, or personal property affixed to the Property, and/or to be conveyed to Purchaser. Seller further agrees to deliver to Purchaser all service manuals, operating instructions, owner's manuals, repair records, service records, and the like in Seller's possession relating to the Property or any personal property, fixtures, or equipment to be sold or conveyed to Purchaser.

Purchaser agrees to pay Seller the sum of: $<u>1,148,581.72</u> (<u>One Million One Hundred Forty Eight Thousand Five Hundred Eighty One Dollars Seventy Two Cents</u>) Dollars (the "Purchase Price") subject to the existing building and use restrictions, easements, and zoning ordinances, if any, in accordance with the terms and subject to the conditions set forth in this Purchase Agreement.

**2. PURCHASER'S CLOSING COSTS.**
Seller agrees to contribute: <u>0.00</u> of final sales price towards Purchasers: ☐ Pre-Paids ☐ Closing Costs ☐ Escrows

**3. PAYMENT.** This transaction shall be consummated by the subparagraph checked below: (Check box that applies)
☐ **A. CASH SALE.** Purchaser will pay the sales price in cash or certified funds, after delivery by Seller, of a Warranty Deed conveying marketable title.
☑ **B. NEW MORTGAGE.** This Agreement is contingent upon Purchaser's ability to secure a <u>Conventional</u> mortgage in the amount of $<u>1,148,581.72</u>. Purchaser agrees to pay the required down payment plus all prepaid items, mortgage costs, escrows and adjustments. Seller shall deliver to Purchaser the usual Warranty Deed conveying marketable title upon tender of the Purchase Price. Purchaser agrees to apply for said mortgage, within <u>5</u> days from the date of Seller's acceptance of this Agreement. Purchaser agrees to promptly and in good faith comply with the lender's request for necessary information required to process the loan application. If a firm commitment for the specified mortgage cannot be obtained within <u>75</u> days from the date of Seller's acceptance, this Agreement shall be null and void and the Deposit shall be returned to Purchaser. Denial of the specified mortgage shall render this Agreement null and void and the Deposit shall be returned to Purchaser.
☐ **C. LAND CONTRACT/OTHER. – SEE ADDENDUM.**

**4. APPRAISAL.** This transaction is subject to the property appraising at the agreed upon sales price, or higher. If property appraises below the sales price, Purchaser shall have the option to declare this offer null and void with a full refund of deposit.

**5. DEPOSIT.** The Broker is hereby authorized to present this Purchase Agreement to Seller, and will accept a deposit of $<u>10,000.00</u> which is to be held, once received, by Broker under Act No. 299 P.A. of 1980 and applied to the purchase price if the sale is consummated; or returned to Purchaser if the offer is rejected or withdrawn. If the Agreement is terminated pursuant to any conditions set forth within the agreement, parties agree that Selling Broker shall return the Deposit to Purchaser and Seller's remedies, if any, are limited to an award of damages equal to the amount of the Deposit.

**6. HOME PROTECTION PLAN.** Purchaser acknowledges notice of the availability of a home protection plan. **Purchaser:** ☑ Declines ☐ Accepts Protection through: _____ [at]: ☐ Purchaser's expense ☐ Seller's expense. Cost Not to Exceed: $_____.

**7. FLOOD INSURANCE.** Purchaser may, at his expense, obtain a Flood Plain Certification within seven (7) days from the date of Seller's acceptance of this Agreement. If the Certification discloses that the property is in a Special Flood Hazard Area, Purchaser may notify Seller, in writing, within three (3) days from the date of Certification, that Purchaser declares this Agreement null and void, and the deposit shall then be returned to Purchaser.

**PURCHASER(S) INITIALS:** _____ / _____          **SELLER(S) INITIALS:** _____ / _____

**8. SELLER DISCLOSURES.** Purchaser acknowledges Seller's Disclosure Statements have been provided by Seller and, if the Property is residential housing built before 1978, a Lead-Based Paint and Lead-Based Paint Hazards Disclosure, prior to signing this Agreement. Furthermore, Purchaser acknowledges these and any other disclosures are (a) based upon Seller's knowledge and is not a warranty of any kind by Seller or Listing and Selling Brokers and their salespeople; (b) not substitution for any inspections or warranties Purchaser wishes to obtain; (c) provided solely by Seller and is not a representation made by Listing and Selling Brokers and their salespeople; and (d) a disclosure only and not intended to be a part of this Agreement. Seller authorizes Broker to distribute copies of the disclosures to any lender, appraiser and municipality, upon Purchaser's request. Seller represents, that there are no underground storage tanks, hazardous or toxic substances existing on, under, or above the Property as defined in any federal, state, or local law, regulation, rule, statute, or directive, nor is there any asbestos, urea formaldehyde insulation and the property does not contain any pollution or other environmental hazards other than any the Sellers disclosed on the Sellers Disclosure Statements. Furthermore, there are no undisclosed or latent defects affecting the Property and its improvements other than as set forth and identified on Seller's Disclosure Statement.

**9. HOMEOWNERS/CONDOMINIUM ASSOCIATION.** If there is a Homeowners/Condominium Association that has authority over the property, Seller is to provide Purchaser with a copy of the most recent financial statement, Master Deed (if any), by-laws and assessments and any other related information within seven (7) days of acceptance. If Purchaser does not notify Seller in writing within nine (9) days from the date of receipt of said documents that the Purchaser is dissatisfied with said documents, this Agreement will be binding without regard to said documents. If Purchaser notifies Seller in writing that Purchaser is dissatisfied with said documents within the above specified time, then Purchaser may declare this Agreement void and any deposits shall be refunded.

**10. OCCUPANCY.**
☑ **A. Keys Immediately at Closing** ☐ **B. Within** _____ **days after closing by 5 p.m.** From the date of closing to and including the date of vacating, Seller shall pay Purchaser $_____ per day as an occupancy charge. At closing, Seller shall deposit with Title Company $_____ to hold in escrow as an occupancy deposit and $_____ to hold in escrow as a damage deposit. Title Company shall pay to the Purchaser the amount of the occupancy charge and then reimburse Seller for any unused days upon Seller vacating the property.
**C. If tenants occupy the property, then:**
☐ Seller will have the tenants vacate the property before closing.
☐ Purchaser will be assigned all Landlord rights and security deposit and rents prorated to date of closing, with Purchaser assuming Landlord rights and obligations after date of closing.

Seller agrees to pay or reimburse Purchaser for all costs and expenses and incidental and consequential damages sustained by Purchaser incurred in recovering possession of the Property, which shall include, but not be limited to, mortgage payments, taxes, utilities, housing expense, storage fees, actual attorneys fees and any other costs or expenses which Seller, as a result of or are connected with Seller's failure to vacate the Property as required by this Agreement. Furthermore, any material damage to property caused by Seller during occupancy period, will result in monies escrowed for damage deposit, to be released to Purchaser for repair expenses. Seller shall have discretion to determine and define what constitutes material damage. If material damage amounts exceed deposit, Seller will be responsible for reimbursing for any additional monies, directly to Purchaser. (The Escrow Agent or Broker has no obligation, implied or otherwise, for seeing that the premises are vacated or for the condition of the premises, etc.)

**11. TAXES/DUES/ASSESSMENTS.** Seller shall pay the following:
**A. Taxes.** All current year real estate taxes which are due before date of closing, prorated and adjusted as of the date of closing in accordance with the Due Date basis of the municipality or taxing unit in which the property is located.
**B. Assessments.** Any and all assessments associated with the property, until the time of closing.
**C. Association.** All current year Current Homeowners, Subdivision or Condominium Association dues which are due before date of closing, prorated between Seller and Purchaser as of the closing date on a due date basis. Capital or lateral charges shall be paid by Seller at closing.
**D. Water/Sewer/** Final water and sewage charges which are due up to the final day of occupancy, prorated and adjusted between Seller and Purchaser as of the date on which Seller vacates the Property and surrenders the keys to Purchaser. Escrow Agent shall retain and hold in escrow a minimum of $800 from the amount due Seller at closing for these charges. Escrow Agent shall remit the amount allocated to Seller and return the balance, if any, to Seller after receipt of the final bill or meter reading.

**12. EVIDENCE OF TITLE AND TITLE INSURANCE.**
**A. Commitment.** As evidence of title, Seller, at Seller's expense, agrees to furnish Purchaser within ten (10) days of Seller's acceptance of this Agreement, a commitment for title insurance in an amount not less than the Purchase Price and bearing a date later than the acceptance date of this Agreement, with the owner's policy to be issued pursuant to the commitment insuring marketable title (as defined below) to the Property in Purchaser.
**B. Without Standard Exceptions.** Seller agrees that the commitment for title insurance and the subsequent policy shall be issued without standard exceptions and that the policy issued will be updated to close any "gap" period between the date of closing and the date of the recording of the deed to Purchaser. Seller shall also provide Purchaser with a marked-up commitment for title insurance at the closing of this transaction guaranteeing that title is in the condition required under this paragraph.
**C. Owner Affidavit.** Seller shall execute an owner's affidavit and such other documents as the title insurance company or its agent typically requires for the issuance of a policy without standard exceptions, provided, however, that Purchaser shall pay for the cost of any survey required for the deletion of the standard exceptions.
**D. Marketable Title.** For purposes of this Agreement, marketable title shall mean fee simple title free and clear of any and all liens and encumbrances whatsoever, excepting only recorded and enforceable building and use restrictions, public utility easements of record, and zoning ordinances. Purchaser, at Purchaser's sole option, may elect to accept title in whatever condition it may be in and, in such event, marketable title shall mean the condition of title which Purchaser has elected to accept.
**E. Objection.** If objection to the title is made in writing, Seller, at Seller's sole option, shall have thirty (30) days from the date Seller is notified in writing of particular defects claimed, either (1) to fulfill the requirements or to remedy the title defects or (2) to refund the deposit in full termination of this Agreement. If Seller is able to comply with such requirements or remedy such defects within the time specified, as evidenced by written notification, revised commitment, or endorsement to commitment, Purchaser agrees to complete the sale within fourteen (14) days of receipt of a revised commitment or endorsement to commitment, subject to any other contingency contained in this Agreement. If, after reasonable efforts, Seller is unable to furnish satisfactory title within the time specified, the deposit shall be immediately refunded to Purchaser in full termination of this Agreement, unless Purchaser elects to proceed with the sale accepting such title as Seller is able to convey.

**PURCHASER(S) INITIALS:** _____ / _____          **SELLER(S) INITIALS:** _____ / _____
VS 3.0 | Rev. 11/22 | 3DX Real Estate, LLC – Form for use by active 3DX Real Estate Associates only, any other use is prohibited.
**Page 2 of 4**

**13. PROPERTY INSPECTION.** Purchaser: ☐ DOES ☑ DOES NOT choose to have the Property inspected at Purchaser's expense, as Broker recommends. Seller shall grant an inspector of Purchaser's choice access to the Property to inspect and report upon the general condition of the Property, including but not limited to, any structure/s, plumbing, heating, mechanical, mold, radon, environmental, water, well, septic, lead based paint, electrical systems, etc. and determination of square footage. If the Property has been winterized, Seller shall, at his expense, de-winterize the Property and turn any utilities on prior to the inspection. The inspection shall be concluded within _____ calendar days from the date of Seller's acceptance of this Agreement. If the inspection discloses any defect in the Property which results in the Purchaser having cause to be dissatisfied with the Property, Purchaser shall notify Seller, in writing, within _____ days following the inspection, that Purchaser (a) declares this Agreement null and void and the Deposit shall be returned or (b) requests Seller to remedy the defect. Failure to notify Seller of a defect within this time period shall constitute a waiver of this paragraph by the Purchaser and he shall accept the Property AS IS. If the Seller is notified of a defect, Seller shall notify Purchaser, in writing, within _____ days, that Seller (a) will repair or provide for repair to eliminate the defect disclosed on the inspection report or (b) is unwilling to repair or provide for repair. If Seller declares his unwillingness to repair or provide for repair, Purchaser may (a) accept the Property AS IS or (b) declare this Agreement null and void and the Deposit shall be returned.

**14. MUNICIPALITY INSPECTION.** If the property is located in a municipality that requires an inspection prior to a sale, ~~Seller~~ will pay for necessary inspections and/or required repairs, if any, to obtain written approval of the municipality. *Buyer     Ranan/atah*

**15. WALK-THROUGH INSPECTION/PROPERTY CONDITION.** Seller agrees to keep the property and land in substantially the same condition as of the date of this Agreement and agrees to maintain heating, sewer, plumbing and electrical systems and any built-in appliances and equipment in normal working order, to keep the roof watertight and maintain the grounds. Seller further agrees to keep all utility services (electric, gas, water, etc.) operating until date of possession, and to provide the Purchaser with sufficient notification of occupancy date in order to arrange a transfer of the services. Seller agrees to leave the premises "broom clean" and free of occupants and debris upon vacating. Purchaser shall have the right to a walk-through inspection of the premises within forty-eight hours prior to closing in order to determine the property has been maintained in the condition agreed. Seller is responsible for any damage to the property, except for normal wear and tear, from the date of this offer until closing or vacating, whichever is later. If there is material damage, Purchaser has the option to cancel this Purchase Agreement and the deposit shall be immediately refunded to Purchaser, or Purchaser can proceed with the closing and either require that Seller repair the damage before the closing or deduct from the purchase price a fair and reasonable estimate of the cost to repair the property and assume the responsibility for the repair, thereby releasing Seller. Purchaser shall have discretion to determine and define what constitutes material damage or destruction. *Buyer occupies premises*

**16. PURCHASER SIDE TITLE.** Purchaser: ☑ Elects to have <u>Speedy Title</u> provide Purchaser Side Title Insurance Policy and Closing Services.

**17. CLOSING.** The closing of this sale shall take place at a location designated by the mortgage lender, or absent that, at a place designated by the Listing Broker. Closing is to occur, on or before: <u>January 31st, 2025</u> . Seller shall provide a complete package of every document (other than loan documents) to be executed by Purchaser to Purchaser's Realtor or other designated representative within 48 hours of closing.

**18. CLOSING COSTS.** Purchaser agrees to pay customary closing fees to the title company or closing Agent who supervises the closing. Purchaser shall also pay all recording fees for the deed, security instrument, and mortgage loan costs. The Seller shall pay all transfer taxes and costs to convey clear title. ~~Purchaser agrees to pay to 3DX Real Estate, a Broker Compliance Fee of $495 at time of closing. Title fee is in addition to any commissions due to 3DX Real Estate.~~

**19. SELLER'S REPRESENTATIONS.** Seller represents and warrants to Purchaser as follows:
**A. No Litigation.** There is no pending litigation affecting all or any part of the Property, or Seller's interest in it.
**B. No Violations.** There are no uncorrected violations of any building codes and regulations, health codes, or zoning ordinances affecting the Property or the use or enjoyment of it.
**C. Division Rights.** Seller holds all possible division rights to the Property and will transfer all such division rights to Purchaser with the Deed. All representations and warranties shall survive the closing of this transaction and shall not be deemed merged into the Deed.

**20. MISCELLANEOUS.**
**A. AGREEMENT.** This Purchase Agreement supersedes any and all understandings and agreements and constitutes the entire agreement of all parties. No oral representations or statements through email, text message or other electronic transmission shall be considered a part of this agreement, unless specifically included in this document or similar addendum. All addendums must be in writing and signed by all parties to this Purchase Agreement.
**B. FACSIMILE/ELECTRONIC SIGNATURES.** The parties acknowledge and agree that facsimile or electronic signatures and initials are legally enforceable and binding.
**C. SUCCESSORS.** This Purchase Agreement binds Purchaser, Seller, their personal representatives, beneficiaries and heirs, and anyone succeeding to their interest in the property.
**D. LEGAL COUNSEL.** Broker recommends that Purchaser and Seller retain an attorney to protect their interests.
**E. DUE DILIGENCE.** Purchaser and Seller have the responsibility to perform their own due diligence in all matters of transaction. This includes verifying information such as, but not limited to contracts, disclosures, MLS data, advertisements, public record, municipality requirements and title work. Purchaser acknowledges that Broker has advised them to have the Property privately inspected by a qualified inspector. Purchaser acknowledges that Broker advised them to seek professional advice from experts of their choice, in the areas of law, tax, finance, lending, insurance, surveying, building, property inspection, hazardous material and/or structural engineering. Broker, Salespeople and its employees are not experts in these areas and cannot give such advice.
**F. HOLD HARMLESS.** Listing and Selling Brokers and their salespeople are not parties to this agreement. Furthermore, Listing and Selling Brokers specifically disclaim any responsibility for the condition of the Property, preparation of documents, the performance of this Agreement by the parties, or the outcome of this transaction. Purchaser and Seller hold Broker and their salespeople, brokers and employees harmless and do hereby indemnify them against all claims, actions or suits for damage of any nature.
**G. GOVERNING LAW.** This Agreement shall be governed by and construed according to the law of the State of Michigan, the state in which the Property is located.

**PURCHASER(S) INITIALS:** _____ / _____          **SELLER(S) INITIALS:** _____ / _____

VS 3.0 | Rev. 11/22 | 3DX Real Estate, LLC - Open for use by active 3DX Real Estate Associates only, any other use is prohibited.
**Page 3 of 4**

**21. DEFAULT.** Willful failure to perform by Seller or Purchaser shall be an event of default under this Agreement. If Purchaser defaults, Seller may, at Seller's option, pursue all available legal and equitable remedies or terminate the Agreement and seek forfeiture of the Deposit as liquidated damages. If Seller defaults, Purchaser may at Purchaser's option, elect to enforce the terms of this Agreement, pursue all available legal and equitable remedies and may also terminate the Agreement and seek a refund of his Deposit. Seller and Purchaser agree that Listing and Selling brokers and their salespeople shall not be made parties to any action taken to enforce or terminate this Agreement.

**22. NOTICE OF AGENCY.** Seller and Purchaser acknowledge that they have received the form Disclosure Regarding Real Estate Agency Relationships explaining the different types of agency relationships. The following agency relationship(s) is/are hereby confirmed for this transaction:

_____
Listing Agent (Broker) is acting as an agent of the:
Seller [___] Dual [___] Non-Agent

_____
Selling Agent (Broker) is acting as an agent of the:
[___] Purchaser [___] Dual [___] Seller [___] Non-Agent

**23. ADDITIONAL CONDITIONS:**

**24. EXPIRATION OF OFFER.** This offer shall expire unless it is accepted by Seller prior to [time] _____ am / pm [date] _____ and may be withdrawn at any time prior to Seller's acceptance.

ATTENTION: There are many steps to a real estate transaction before a transaction is finalized. Purchaser and Seller are strongly cautioned to avoid incurring moving and other out-of-pocket expenses in reliance on the transaction, until the transaction is made final through a formal closing. Purchaser and Seller agree that 3DX Real Estate, its brokers, salespeople, and employees shall not be responsible or liable for any loss or damage of any sort incurred or claimed, as the result of any such reliance - including but not limited to moving expenses, property improvements, employment, lost wages or time lost marketing a property. Purchaser and Seller have agreed to hold harmless and indemnify 3DX Real Estate, its Brokers, Salespeople and Employees for any such reliance loss or damage.

**PURCHASER SIGNATURE:** By affixing Purchaser signature hereto, Purchaser makes the forgoing offer to purchase and acknowledges receipt of a copy of this offer.

Witness _____  Purchaser Signature X _____ Date 11 / 15 / 24
11/15/24                        Purchaser Name Azar Staffeld                    Time _____

Purchaser Signature X _____ Date ____/____/____
Purchaser Name _____ Time _____

**SELLER ACCEPTANCE:** By affixing Seller signature hereto, Seller accepts this offer to purchase and acknowledges receipt of a copy hereof. Seller directs that no further offers be presented after acceptance of this offer. Seller agrees that the Broker has procured said Purchase Agreement and has brought about this sale and agrees to pay Broker for services rendered a commission of: _____. (If blank, compensation paid as listed in MLS).

Witness _____  Seller Signature X _Rana Matar_ Date 11 / 17 / 24
Seller Name Rana Matar                      Time 11

Seller Signature X _Rana Matar_ Date 11 / 17 / 24
Seller Name R & J GROUP HOLDINGS LLC        Time ___

*The undersigned Purchaser hereby acknowledges receipt of a copy of the Seller's acceptance of the foregoing Purchase Agreement.*

Purchaser Signature X _____ Date ____/____/____

Purchaser Signature X _____ Date ____/____/____

# ADDENDUM

### For the property located at:
### 341 CORRIE RD, ANN ARBOR, MI 48105

Purchaser to pay all taxes, recording fees and transfer taxes.
There will be no proration of taxes
Purchaser is responsible for any and all seller incurred expenses from October 31, 2024 to January 31, 2025 or closing whichever is sooner.
Seller agrees to extend current lease at $5,000 per month to January 31, 2025.
Purchaser agrees to continue to make all rent payments as agreed till closing.
Seller and purchaser agree that current security deposit of $10,000 will be used as Purchaser's EMD. If the transaction does not close for any reason the money will revert back to security deposit.
Property to be sold in it's as is condition.
All other terms remain the same.

X _____  11 /15 /24
Buyer                        Date

X _____  11 /15 /24
Witness                      Date

X _____  11 /17/24
Seller                       Date

X _____  11 /17/24
Seller    R & J Group Holdings LLC    Date

This agreement is made between the purchaser and the seller on November 11, 2024

For the property located at 341 Corrie Rd Ann Arbor, MI.

Buyer agrees to present a valid Purchase Agreement no later than Wednesday.November 13,2024 @ 5pm

The P.A must present a Purchase price No less than $1,148,581.72

Must have a closing date No later than January 31,2025

Purchaser to pay all taxes, Recording fees, and transfer taxes .

There will be No Tax prorations.

**Any and all additional expenses incurred by seller  pertaining to the property From October 31,2024 thru January 31,2025 will be paid by the purchaser.**

Purchaser currently Resides in the home

This is an AS IS WHERE IS SALES

Seller to provide Free and clear title at the time of closing

Seller agrees to extend the current lease until January 31,2025

Purchaser agrees to continue making agreed monthly payments. Until the loan closes.

# EXHIBIT D

## 341 PAYEUR RD, Ann Arbor, MI 48108-9720

FORECLOSURE NOTICE   Soble PLC | 31800 Northwestern Hwy. Suite 350 | Farmington Hills, MI 48334 - 888-789-1715 THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. PLEASE CONTACT OUR OFFICE AT THE NUMBER ABOVE IF YOU ARE IN ACTIVE MILITARY DUTY.  ATT: PURCHASERS: This sale may be rescinded by the foreclosing mortgagee, in that event, your damages, if any shall be limited solely to the return of the bid amount tendered at sale, plus interest.  MORTGAGE SALE – Default has been made in the conditions of a certain mortgage made by R AND J GROUP HOLDINGS, LLC, a Michigan Limited Liability Company, AS SECURITY FOR INDEBTEDNESS, whose address is 9930 Whittier Avenue, Detroit, MI 48224 TO AZAR SADEGHI-STAFFELD and GHAZAL STAFFELD a/k/a GHAZAL JONES, mortgagees, dated October 27, 2023, and recorded February 6, 2025 in Liber 5578, Page 576, Washtenaw County Records and on which mortgage there is claimed to be due at the date hereof the sum of Two Hundred Fifty Two Thousand Five Hundred ($252,500.00) Dollars, including interest at 1% per annum. Notice of foreclosure by advertisement. Notice is given under section 3212 of the revised judicature act of 1961, 1961 PA 236, MCL 600.3212, that said mortgage will be foreclosed by a sale of the mortgaged premises, or some part of them, at public venue, at the place of holding of the Washtenaw County Circuit Court in Ann Arbor, MI, at 10:00 a.m., on August 27, 2025.  The amount due on the mortgage may be greater on the day of the sale. Placing the highest bid at the sale does not automatically entitle the purchaser to free and clear ownership of the property. A potential purchaser is encouraged to contact the county register of deeds office or a title insurance company, either of which may charge a fee for this information Said premises are situated in the City of Ann Arbor, Township of Pittsfield, Washtenaw County, Michigan, described more particularly as follows:   Commencing at a point on the North and South 1/4 line of Section 21, T3S, R6E, Pittsfield Township, Washtenaw County, Michigan, 2085.25 feet South of the North Quarter post of said Section, and on the South line of Payer Road; thence South 54 degrees 19 minutes 00 seconds West along the South line of Payer Road 900.20 feet for a Place of Beginning: thence South 54 degrees 19 minutes 00 seconds W 125 feet; thence South 35 degrees 41 minutes 00 seconds E 350 feet thence North 54 degrees 19 minutes 00 seconds East 125.00 feet; thence North 35 degrees 41 minutes 00 seconds W 350 feet to the Place of Beginning; being a part of the West 1/2 of Section 21. Also that parcel of land described as: Commencing at the North 1/4 corner of Section 21, T3S, R6E, Pittsfield Township, Washtenaw County, Michigan; thence South along the North and South 1/4 line of said Section 2085.25 feet to the intersection of the North and South 1/4 line of said Section and the Southeast line of Payer Road; thence along the Southeast line of Payer Road, South 54 degrees 19 minutes West 1025.2 feet to the Place of Beginning; thence South 35 degrees 41 minutes E 350.0 feet; thence South 54 degrees 19 minutes West 125.0 feet; thence North 35 degrees 41 minutes West 350.0 feet; thence North 54 degrees 19 minutes E 125.0 feet being a part of the Southwest 1/4 of said Section.  Commonly Known As: 341 PAYEUR RD, Ann Arbor MI 48108-9720  Parcel ID: L-12-21-300-004  The redemption period shall be 6 months from the date of such sale, unless determined abandoned in accordance with MCL 600.3241a or MCL 600.3241a, in which case the redemption period shall be 1 month from the date of such sale, or as to MCL 600.3241a only, 15 days from the MCL 600.3241A(b) notice, whichever is later. 1 If the above referenced property is sold at a foreclosure sale under Chapter 600 of the Michigan Compiled Laws, under MCL 600.3278, the borrower will be held responsible to the person who buys the property at the mortgage foreclosure sale or to the mortgage holder for damaging the property during the redemption period.  Attention homeowner: If you are a military service member on active duty, if your period of active duty has concluded less than 90 days ago, or if you have been ordered to active duty, please contact the attorney for the party foreclosing the mortgage at the telephone number stated in this notice.  Dated: July 16, 2025  AZAR SADEGHI-STAFFELD and  GHAZAL STAFFELD a/k/a  GHAZAL JONES  341 Corrie Rd.  Ann Arbor, MI 48105  Mortgagee  R and J Group Holdings, LLC  ? Attorneys: Soble PLC  31800 Northwestern Hwy #350  Farmington Hills, MI 48334  888 789 1715

(07-24)(08-21)