U.S. DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KARL STAFFELD AND AZAR STAFFELD,
     Plaintiffs,

                                             Case No: 4:24-cv-12811
                                             Hon. Shalina D. Kumar

-v-

WELLS FARGO BANK, N.A., a subsidiary of
WELLS FARGO & COMPANY,
420 Montgomery Street
San Francisco, CA 94104

     Defendant.

_____/

| | |
|---|---|
| Karl Staffeld and Azar Staffeld<br>Plaintiffs, *Pro Se*<br>341 Payeur Road Ann Arbor, MI 48108<br>(734) 929-6969<br>karlstaffeld@gmail.com | Miranda M. Boulahanis (P86222)<br>TROUTMAN PEPPER LOCKE LLP<br>4000 Town Center, Suite 1800<br>Southfield, MI 48075<br>(248) 469-4749<br>miranda.boulahanis@troutman.com |
| | Mark D. Kundmueller Esq. (P66306)<br>TROUTMAN PEPPER LOCKE LLP<br>222 Central Park Avenue, Suite 2000<br>Virginia Beach, Virginia 23462<br>(757) 687-7564<br>mark.kundmueller@troutmen.com |

_____/

**THE PLAINTIFFS' SECOND AMENDED COMPLAINT**

NOW COME Plaintiffs, KARL STAFFELD and AZAR STAFFELD, appearing in this matter *Pro Se*, and for their THE PLAINTIFFS' SECOND AMENDED COMPLAINT and Jury Demand against Defendants, WELLS FARGO BANK. N.A., a subsidiary of WELLS FARGO & COMPANY states the following:

**JURISDICTION AND VENUE**

This is an action for civil damages and equitable/injunctive relief concerning real property rightfully owned by Plaintiffs and located in the City of Ann Arbor, County of Washtenaw, State of Michigan, commonly known as 341 Corrie Road, Ann Arbor, MI 48105 (hereafter, the "Subject Property").

Plaintiffs, KARL STAFFELD and AZAR STAFFELD, are adult residents of the State of Michigan who are lawfully married and peaceably occupied the Subject Property.

Defendant, WELLS FARGO BANK, N.A., a subsidiary of WELLS FARGO & COMPANY ("Wells Fargo Bank"), is a multi-national financial services and lending corporation which regularly conducts business in the State of Michigan and upon information and belief has a principal corporate office address of 420 Montgomery Street, San Francisco, CA 94104.

Previous Defendant, R & J GROUP HOLDINGS, LLC ("R & J") is a Michigan limited liability company engaged in the business of lending, property management, and other real estate services.

At all times relevant, Defendants Wells Fargo Bank and R & J conducted business in the State of Michigan and the subject mortgage loan transactions took place in Michigan.

This Court has jurisdiction over this matter under 28 U.S.C. § 1331 and under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 to 1692(p).

Based upon the facts outlined above, jurisdiction and venue properly rest in this Court.

<u>F</u><u>ACTUAL</u> <u>A</u><u>LLEGATIONS</u>

Plaintiff incorporates and realleges all above paragraphs as if set forth in full herein. The Subject Property was purchased in December of 2017 in the name of Dorothea Vermilion Staffeld, Plaintiff Karl Staffeld's deceased mother and Azar Staffeld's mother-in-law, under a written mortgage loan contract with Wells Fargo Bank. At the time of purchase, Dorothea Vermilion Staffeld secured mortgage insurance through the bank which provided that if the purchaser should pass away within one year, the then-owed principal and interest loan balance would be satisfied by the mortgage insurance (Exhibit B – Section 10 – Mortgage Contract).

Dorothea Vermillion Staffeld passed away exactly 11 months after the loan agreement was signed. However, prior to passing away she transferred ownership of the Subject Property by Quit Claim Deed to Karl and Azar Staffeld and they are the rightful heirs of Dorothea Staffeld. Therefore, Plaintiffs became the title owners of the Subject Property and were making the full payment of the mortgage amount according to mortgage insurance guidelines. Wells Fargo Bank has mandated and claimed to have mortgage loan insurance policy but has refused to acknowledge that the policy is effective. The Plaintiff asserts that the mortgage insurance policy should have paid the balance of the mortgage to Wells Fargo (Exhibit A - Section 10 - Mortgage Contract).

During the global health pandemic, Plaintiffs lost their jobs and were unable to make all the mortgage loan payments on the Subject Property for one-and-a-half years. Based on their change in financial circumstances, Plaintiffs reached out directly to Wells Fargo Bank and were assured by several representatives that they could make installment payments upon their return to work to become current or the rear Ridge balance will be added to the end of the mortgage balance and seek a loan modification as well in their own names. At the same time, Plaintiffs were specifically advised by Wells Fargo Bank representatives to be identified during discovery that the Subject

3

Property would not be foreclosed upon while Plaintiffs brought the loan account current and sought to be approved for a loan modification. Meanwhile, while Plaintiffs attempted in good faith to secure a loan modification application and attach supporting documents through Wells Fargo Bank and submitted timely and according to their instructions and were waiting for the results of their loan modification application, the bank-initiated foreclosure proceedings without proper notice to Plaintiffs and sold it.

Wells Fargo Bank never sent Plaintiffs written notice that their loan modification application had been denied. Instead, the bank claimed that an authorized representative called Plaintiffs and left a message from an unknown 800 telephone number. Plaintiffs never received any such messages from Wells Fargo Bank or any loan servicer on behalf of the bank, nor did they receive anything in writing through the mail, or otherwise, concerning the bank's denial of their loan modification application which required face-to-face intervention required by law. Despite these failures by the bank to communicate with Plaintiffs as title owners of the real property in question, upon information and belief Wells Fargo Bank foreclosed the property on Dorothea Staffeld and sold the Subject Property without following the statutory requirements for lawfully foreclosing upon real property in Michigan.

Further, Wells Fargo Bank, collected the mortgage payments since Dorothea Staffeld passed away in November 2018 to 2020 when the pandemic governmental mandatory shutdown occurred. Wells Fargo refused to allow Plaintiffs to refinance the home or modify the then-existing mortgage loan agreement upon reasonable terms and conditions for which Plaintiffs attempted to become approved on their primary residence. Despite repeated requests by Plaintiffs, Wells Fargo Bank has failed, refused, and/or neglected to adjudicate Plaintiffs' loan modification application in good faith and further refused to allow Plaintiffs additional time to secure refinancing on arms-length terms at market rates.

4

Thereafter, Defendants bank unlawfully, in bad faith, and in predatory fashion, initiated foreclosure proceedings on the Subject Property in violation of Plaintiffs' statutory rights and in direct contravention of the specific representations of Defendant bank's authorized agents. The State of Michigan is a Non-Judicial and Judicial Foreclosure State, and the Plaintiffs are entitled to the protection and legal requirements governed under MCL 600.3205 and the Federal Fair Debt Collection Practices Act, codified at 15 U.S.C. §§ 1692 to 1692(p). When foreclosure proceedings are initiated, Michigan law provides safeguards before real property can be sold as part of a foreclosure proceeding and persons with interests in real property are entitled to certain due-process protection in connection with foreclosure proceedings. The Michigan legislature has made it clear that notice in foreclosure proceedings under the current process must provide constitutional due process. *MCL 211.78(2)*.

As outlined in *Dow v State*, 396 Mich 192, 240 NW2d 450 (1976), "an elementary and fundamental requirement of due process in the proceeding which is to be accorded finality is notice reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Dow* at 396 Mich at 205–206. Despite such requirements, Plaintiffs never received notice that foreclosure proceedings were commenced or that the Property had been sold on the Sheriff sale of June 1, 2023, without Plaintiffs  knowledge, nor following a judicial foreclosure or foreclosure by advertisement; nor had they been served with notice concerning their statutory redemption rights.

Finally, under the FDCPA, Plaintiffs had a right to dispute the validity of the alleged mortgage loan balance prior to foreclosure proceedings being initiated and were never afforded this opportunity. Following the foreclosure sale, R & J obtained title to the Subject Property and entered into a written Lease Agreement whereby Plaintiffs rented the premises from R & J for one year at a monthly rate of $5,000.00 with the exclusive right to purchase the Property at an agreed-upon price

at lease end. Plaintiffs complied with their material obligations under the Lease Agreement and kept the Subject Property in good condition, reasonable wear and tear excepted, throughout the rental term. On October 5, 2024, Plaintiffs notified Defendants R & Js' principal members, Jerry Watha and Rana Mata, in person and in writing, that they were prepared to close on the purchase of the Subject Property at the price specified in the Lease Agreement between the parties. Plaintiffs also notified R & J (through managing member Jerry Watha) of their genuine efforts to secure conventional financing to purchase the property at the price agreed to in advance by the parties, after having leased the property for a year at a significant rental rate. R & J breached all outstanding contracts with Plaintiffs. Then, evicted the Plaintiffs and the matter was settled with second Defendant R & J.

Michigan law provides that every contract imposes upon each party a duty of good faith in its performance and enforcement. This "good faith" duty requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v United of Oakland, Inc*, 193 Mich App 146, 152; 483 NW2d 652 (1992). The phrase "good faith" is "a standard [of] measuring the state of mind, perceptions, honest beliefs, and intentions of the parties." *Miller v Riverwood Recreation Ctr, Inc*, 215 Mich App 561, 570; 546 NW2d 684 (1996). To act in "good faith" means to conduct oneself with "an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage." *Id*. at 571. "Bad faith" is generally defined as an "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty," involving something more than honest errors of judgment. *Id.* at 571.

As a result of Wells Fargo's conduct and failures, Plaintiffs were compelled to rent the Subject Property at a high rate of rent while seeking financing in the amount of $1,150,000 to stay in their home. Moreover, Plaintiffs have been compelled to pay R & J and incurred tremendous amount

of loss between one Defendant guilty of breach and the others; Wells Fargo, guilty of Wrongful

Lending Practices.

## COUNT VIII – VIOLATION OF THE FAIR LENDING PRACTICES ACT

105.   Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

106.   At all times relevant, Defendant Wells Fargo Bank, N.A., was engaged in the business of

originating, servicing, and modifying residential mortgage loans, including the loan at issue

for the Subject Property.

107.   Plaintiffs, as title owners and successor mortgagors of the Subject Property, were entitled to

fair, non-discriminatory treatment and full disclosure of all material terms and conditions of

their mortgage loan, as required by federal law.

108.   Defendant failed to provide Plaintiffs with clear, accurate, and timely disclosures regarding

the terms of the mortgage loan, including but not limited to interest rates, fees, payment

schedules, and modification options. While Plaintiffs only owed $37,553.76 in rearage, but

Wells Fargo demanded $69,000.

109.   Plaintiffs, Staffelds, applied through State of Michigan MISHDA Program and were waiting

for a decision on full payment assistance from a State of Michigan grant for the amount they

fell behind in mortgage when Wells Fargo surprised everyone and sold the property in the

Sheriff's Sale.

110.   Defendant imposed excessive and unjustified fees and charges on Plaintiffs' mortgage

account subsequent to the pandemic, which were not commensurate with Plaintiffs'

creditworthiness or prevailing market conditions.

111.   Defendant refused to offer Plaintiffs reasonable loan modification or refinancing options,

despite Plaintiffs' repeated requests and eligibility under Federal Relief Programs, including those enacted in response to the global health pandemic.

112. Defendant targeted Plaintiffs for unfavorable loan terms and conditions, exploiting their financial distress and vulnerability, and failed to act in good faith in servicing the loan.

113. Defendant's conduct constitutes a pattern or Practice of Predatory Lending and servicing, in violation of the Fair Lending Practices Act.

114. As a direct and proximate cause of Defendant Wells Fargo Bank's violations outlined above, Plaintiffs suffered financial harm, loss of property rights, clouded title, emotional distress, and other damages as set forth herein. During their ownership, Staffelds made several updates to the property. R & J purchased the property in redemption for $530,000 and sold it for $1,299,000 ; all the product of Staffeld's labor (Exhibit B - List of Improvements).

115. The summary of wrongful actions by Wells Fargo:

   1. They did not pay HUD/FHA the 1.75% premium to HUD and did not secure mortgage insurance.

   2. They did not recognize the ownership of Staffelds and foreclosed the mortgage on a deceased person (Dorothea Staffeld).

   3. They sold the property without notice to Staffelds and/or providing them an opportunity to rectify the amount they fell behind; another violation of HUD regulations.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendant, WELLS FARGO BANK, N.A., in an additional amount not less than $1,299,000.00 where property was sold and to which Plaintiffs are found to be entitled, and further grant any other such relief this Court deems necessary and just.

### COUNT IX – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

116. Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

117. Defendant, Wells Fargo Bank, N.A. is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq*., which requires mortgage lenders and servicers to provide timely and accurate disclosures, respond to borrower inquiries, and refrain from abusive or predatory practices.

118. Defendant failed to provide Plaintiffs with written notice of the denial of their loan modification application, as required by RESPA and other federal regulations.

119.  Defendant did not respond to Plaintiffs qualified written requests for information regarding the status of their mortgage loan, modification application, and foreclosure proceedings.

120. Defendant initiated foreclosure proceedings without providing Plaintiffs with proper notice and an opportunity to cure the alleged default, in violation of RESPA's notice and procedural requirements.

121. Defendant's conduct constitutes a pattern or practice of non-compliance with RESPA's protections for borrowers.

122. As a direct and proximate result of Defendant's violations, Plaintiffs suffered financial

harm, loss of property rights, clouded title, emotional distress, and other damages as set forth herein.

123. By settlement dated April 8, 2016 between Department of Justice and Wells Fargo Bank, Wells Fargo Bank admits that it certified that loans were eligible for FHA Mortgage Insurance when they were not, and that it did not disclose thousands of faulty mortgage loans to HUD; Wells Fargo did it again in this case.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendant, WELLS FARGO BANK, N.A., in an additional amount not less than $1,299,000.00 to which Plaintiffs are found to be entitled, and further grant any other such relief this Court deems necessary and just.

## COUNT X – FALSE FINANCIAL CERTIFICATION TO HUD

124. Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

125. At all times relevant, Defendant Wells Fargo Bank, N.A. was required to provide truthful and accurate financial certifications to the U.S. Department of Housing and Urban Development ("HUD") regarding the status of mortgage insurance on the Subject Property.

126. Defendant falsely certified to HUD that the underlying mortgage for the Subject Property was insured under applicable federal programs (Exhibit A - Section 10 – Mortgage Contract), when in fact it was not insured. Such conduct violates federal law, including 18 U.S.C. § 1001, which prohibits knowingly and willfully making false statements or representations in

10

any matter within the jurisdiction of the federal government, including HUD. *See also* 31 U.S.C. §§ 3729–3733 (False Claims Act), which imposes liability for knowingly submitting false or fraudulent claims for payment to the federal government that mandates paying 1.75% of loan value as mortgage insurance premium to Federal Government by the Lender.

127. HUD regulations further provide, at 24 CFR § 291.621, that mortgagees may be disqualified for submitting fraudulent information or false certifications in connection with HUD-insured mortgages.

128. The Sixth Circuit has affirmed convictions for conspiracy to defraud the United States by providing false information to HUD for mortgage insurance. See *United States v. Wendlandt*, No. 11-2018 (6th Cir. 2013) (affirming conviction for false statements to HUD).

129. As a direct and proximate result of Defendant Wells Fargo Bank's false certification, Plaintiffs lost their place of residence forever and suffered damages as set forth herein.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendant, WELLS FARGO BANK, N.A., in an additional amount not less than $1,299,000.00 to which Plaintiffs are found to be entitled, and further grant any other such relief this Court deems necessary and just.

## COUNT XI – IMPROPER MORTGAGE LENDING PRACTICES BY NON-COMPLIANCE WITH FHA REGULATIONS

130. Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

131. Defendant Wells Fargo Bank, N.A. is subject to the Federal Housing Administration

("FHA") regulations governing the origination, servicing, and foreclosure of FHA-insured mortgage loans, including those set forth in 24 CFR Parts 200–203.

132. Defendant failed to comply with FHA regulations, including but not limited to:

    a)  Failure to provide required notices and disclosures to Plaintiffs.

    b)  Failure to offer loss mitigation options as mandated by FHA guidelines.

    c)  Failure to properly service and administer the mortgage loan in accordance with FHA requirements.

    d)  Reckless underwriting while relying on government insurance.

    e)  Wells Fargo took advantage of Staffelds while driven faulty loans that should have been designed to help millions of Americans buy their dream homes and have killed the loan quality for loan quantity; driven to maximize their own profits with the cost of loss of homes for Staffelds.

133. Such non-compliance violates the Fair Housing Act, 42 U.S.C. §§ 3601–3619, and related HUD regulations. The Sixth Circuit has recognized that actions affecting housing availability and compliance with FHA requirements can violate the Fair Housing Act. See *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 344 (6th Cir. 1994) (recognizing FHA violations for actions affecting housing availability); *Pickett v. City of Cleveland*, 140 F.4th 300 (6th Cir. 2025) (clarifying standing and predominance standards for FHA disparate-impact class actions).

134. HUD and the Department of Justice have taken enforcement actions against lenders for non-compliance with FHA requirements. See DOJ Appellate Section – Housing

(Exhibit C – Certified Admission Of Wrongdoing By Wells Fargo To Department Of

Justice).

135. As a direct and proximate result of Defendant Wells Fargo Bank's violations, Plaintiffs suffered financial harm, loss of property rights, emotional distress, and other damages as set forth herein.

WHEREFORE, Plaintiffs, KARL STAFFELD and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendant, WELLS FARGO BANK, N.A., in an additional amount not less than $1,299,000.00 to which Plaintiffs are found to be entitled, and further grant any other such relief this Court deems necessary and just.

## COUNT XII – PREDATORY LENDING AND COLLECTION PRACTICES

136. Plaintiffs incorporate and reallege all above paragraphs as if set forth in full herein.

137. Federal and state laws regulate Predatory Lending, including interest rate caps and bans on abusive practices.

138. Defendant Wells Fargo Bank, N.A. engaged in a pattern or Practice of Predatory Lending and Collection practices, including but not limited to:

a) Imposing excessive and unjustified fees and charges on Plaintiffs' mortgage account.

b) Targeting Plaintiffs for unfavorable loan terms and conditions, exploiting their financial distress and vulnerability.

c) Initiating foreclosure and collection actions in bad faith and without proper notice or opportunity to cure.

d) Failing to act in good faith in servicing and modifying the mortgage loan.

139. Such conduct violates federal and state law, including the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 et seq., which requires clear disclosure of loan terms and prohibits unfair lending practices; the Home Ownership and Equity Protection Act (HOEPA), 15 U.S.C. § 1639, which provides protections against high-cost, predatory mortgage loans; and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692–1692p, which prohibits abusive, deceptive, and unfair debt collection practices.

140. The Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5531, further prohibits unfair, deceptive, or abusive acts or practices (UDAAP) in consumer financial products.

141. The Sixth Circuit and other courts have enforced consumer protection laws and penalized predatory lenders. See *United States ex rel. Wall v. Circle C Construction LLC*, 813 F.3d 616 (6th Cir. 2016) (discussing damages in false certification cases under the False Claims Act); see also FDIC Consumer Lending Compliance and NACCA guidance on predatory lending.

142. As a direct and proximate result of Defendant's predatory practices, Plaintiffs suffered financial harm, loss of property rights, emotional distress, and other damages as set forth herein.

WHEREFORE, Plaintiffs, KARL and AZAR STAFFELD, respectfully request that this Honorable Court grant a Judgment in their favor and against Defendant, WELLS FARGO BANK, N.A., in an additional amount not less than $1,299,000.00 to which Plaintiffs are found to be entitled, and further grant any other such relief this Court deems necessary and just.

Respectfully submitted,

By: _s/ Karl Staffeld_
    Karl Staffeld
    *Plaintiff, Pro Se*

By: _s/ Azar Staffeld_
    Azar Staffeld
    *Plaintiff, Pro Se*

Dated: December 17, 2025

### JURY DEMAND

Plaintiffs, KARL STAFFELD and AZAR STAFFELD, hereby demand a jury trial in this matter pursuant to MCR 2.508(B) for all claims triable by jury.

Respectfully submitted,


By: *s/ Karl Staffeld*
Karl Staffeld
*Plaintiff, Pro Se*


By: *s/ Azar Staffeld*
Azar Staffeld
*Plaintiff, Pro Se*


Dated: December 17, 2025

## CERTIFICATE  OF SERVICE

I hereby certify that on December 17, 2025, I served the foregoing THE PLAINTIFFS'

SECOND AMENDED COMPLAINT, via USPS first-class mail to the attorneys of record for the

parties to this matter and upon:

> Miranda M. Boulahanis (P86222)
> TROUTMAN PEPPER LOCKE LLP
> 4000 Town Center, Suite 1800
> Southfield, MI 48075
> 248-469-4749
> miranda.boulahanis@troutman.com

> Mark D. Kundmueller Esq. (P66306)
> TROUTMAN PEPPER LOCKE LLP
> 222 Central Park Avenue, Suite 2000
> Virginia Beach, Virginia 23462
> (757) 687-7564
> mark.kundmueller@troutmen.com

> Respectfully submitted,

> By /s/: *Karl Staffeld*
> Karl Staffeld
> Plaintiff, *Pro Se*

Dated: December 17, 2025

# EXHIBIT A

**341 CORRIE MORTGAGE – SECTION 10. Mortgage Insurance.**

**Extraction from Page 5 of 9, Wells Fargo and Staffeld Mortgage Contract**

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provided that an affiliate of Lender takes a share of the insurer's risk in exchange (or a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has -if any -with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

# EXHIBIT B

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| CREATE CIRCULAR DRIVE WITH STONE RETAINING WALL AND WALL LIGHTING<br>150-foot retaining wall with drainage and lighting | $ 57,000 | $ 15,100 | $ 72,100 |
| 4,000 SQUARE FOOT MARBLE FLOORS<br>Installed Marble flooring on Upper level, Main level, and Lower level | $ 48,000 | $ 29,500 | $ 77,500 |
| HOT TUB<br>Installed hot tub, elecrtical supply | $ 2,000 | $ 6,200 | $ 8,200 |
| DRY SAUNA<br>Installed electrical supply | $ 1,700 | $ 5,000 | $ 6,700 |
| 525 SQUARE FOOT WORKSHOP / EXCAVATION / CONCRETE FLOOR / LIGHTING / POWER / PAINT / VENTILATION<br>Excavate lower level below the living room to create workshop | $ 44,600 | $ 14,000 | $ 58,600 |
| EXTERIOR HOUSE PAINT | $ 18,100 | $ 8,400 | $ 26,500 |
| ALL EXTERIOR STONE WORK<br>Installed natural stone on all exposed brick and concrete | $ 19,600 | $ 20,100 | $ 39,700 |
| INSTALL STONE PANELS ON THREE FIREPLACE SURROUNDS<br>Installed natural stone on existing brick | $ 5,000 | $ 4,600 | $ 9,600 |
| RESTORED GAZEBO AND INSTALLED LIGHTING<br>Cleaned and stained exposed wood | $ 4,200 | $ 3,800 | $ 8,000 |
| NEW FROSTED GLASS FRONT DOORS<br>Removed single entry door and replaced with double door | $ 1,200 | $ 3,920 | $ 5,120 |
| LOWER LEVEL LIVING AREA WITH BEDROOM, SPA BATHROOM, KITCHEN AND LIVING AREA, WALKOUT TO PATIO<br>Renovate entire lower level area to be a stand alone suite | $ 42,000 | $ 18,200 | $ 60,200 |
| RENOVATED LAUNDRY ROOM / CABINETS / COUNTERTOP / FLOORING<br>Created laundry room with space for ironing and folding clothes | $ 3,950 | $ 3,250 | $ 7,200 |
| BASEMENT ACCESS DOOR TO WORKSHOP<br>Created second egress from new workroom | $ 3,200 | $ 2,400 | $ 5,600 |
| INSTALLED STRUCTURAL COLUMNS WITH SPREAD FOOTERS THROUGH THE WORKSHOP FOR FUTURE EXPANSION OF THE UPPER LIVING ROOM AREA<br>Created structural columns to support future beam to allow the expansion of the living room above. | $ 13,500 | $ 3,200 | $ 16,700 |
| REMOVED EXISTING KITCHEN WALL AND DINING ROOM WALLS FOR OPEN CONCEPT LIVING ROOM KITCHEN AREA<br>Removed the walls that shut out the view to the backyard. | $ 4,500 | $ 13,200 | $ 17,700 |
| NEW KITCHEN / CABINET / COUNTERTOPS / REFRIDERATOR / DISHWASHER /   10 BURNER STOVE / APPLIANCES<br>New open kitchen layout for center island and much needed storage | $ 27,000 | $ 32,750 | $ 59,750 |
| MODIFY EXISTING STEEL HANDRAIL TO SECOND FLOOR<br>Modified the existing stair handrail to be more decorative. | $ 2,500 | $ 1,600 | $ 4,100 |

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| INSTALLING PAVERS FOR EAST SIDE STAIRS<br><br>Removed unsafe stepping stones and brick stairs from master bedroom down to back patio. Installed paver steps and cut drainage trench to prevent erosion on that side of the house.<br><br>Material: Pavers, bedding sand, base material. Equipment: Compactor, screed board, level, string lines, saw for cutting pavers. Excavate the site to the required depth; Ensure minimum slope for drainage; Compact soil; Spread crushed stone; Compact; Maintain slope; Lay pavers; Joint sand; Cut drainage trench next to stairs; Remove construction debris. | $ 3,750 | $ 2,260 | $ 6,010 |
| CUTTING AND DISPOSAL OF DEAD TREES DURING NOVEMBER 2023 THROUGH FEBRUARY 2025<br><br>There were over one hundred-forty dead trees ranging in size from 24" diameter to 2" diameter that had to be removed from the property to prevent loss of life and property. Many of the trees had fallen across the property lines of our house and our neighbors' houses. The scrub brush was also removed. We removed all debris as instructed by Barton Hills Village Inspectors.<br><br>Conduct a site inspection; Provide PPE; hard hats, gloves, eye and ear protection. Equipment: Chainsaws, pole saws, wedges, ropes, rigging gear. Remove brush, debris; Section the trunk, logs, and branches, Stack logs; Load large trunks for disposal; Rake and clear site; Remove all equipment. | $ 59,000 | $ 3,000 | $ 62,000 |
| INSTALLED EXTERIOR ROPE LIGHTING AT ROOF EDGE<br><br>Installed exterior rope lighting along underside of roof overhang to prevent falling into ditch at night as instructed by BHV Inspectors<br><br>Install weatherproof outlet; Route wiring; Attach rope light clips; Insert rope lighting into clips; Connect rope lighting to power | $ 21,200 | $ 14,000 | $ 35,200 |
| ENTRYWAY PATIO SEATING AREA / PAVER INSTALLATION / DRAINAGE PIPING<br><br>Removed existing trees and concrete steps to install entryway drainage manhole. Pipe storm water drainage manhole outlet across driveway to grade. Install pavers. Expand steps to front door. Install frosted glass double entry door. As instructed by Ann Arbor Township Inspector.<br><br>Material: Pavers, bedding sand, base material. Equipment: Compactor, screed board, level, string lines, saw for cutting pavers. Install catch basin and drainage piping; Extend piping under driveway to grade; Excavate the site to the required depth; Ensure minimum slope for drainage; Compact soil; Spread crushed stone; Compact; Maintain slope; Lay pavers; Joint sand; Remove construction debris. | $ 17,500 | $ 5,000 | $ 22,500 |

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| PAVER INSTALLATION FOR WRAP AROUND PORCH ON SOUTH AND WEST SIDE OF HOUSE | $ 17,800 | $ 3,800 | $ 21,600 |
| Secure grade at south and west side of house with excavated soil from circular driveway. Extend storm drainage from roof downspouts and compact soil for Paver installation .As instructed by Ann Arbor Township Inspector. | | | |
| Material: Pavers, bedding sand, base material. Equipment: Compactor, screed board, level, string lines, saw for cutting pavers. Excavate the site to the required depth; Ensure minimum slope for drainage; Compact soil; Spread crushed stone; Compact; Maintain slope; Lay pavers; Joint sand; Remove construction debris. | | | |
| BACK PORCH PAVERS | $ 7,500 | $ 1,700 | $ 9,200 |
| Back porch pavers were installed to prevent dirt erosion as instructed by Ann Arbor Township Inspector. | | | |
| Material: Pavers, bedding sand, base material. Equipment: Compactor, screed board, level, string lines, saw for cutting pavers. Excavate the site to the required depth; Ensure minimum slope for drainage; Compact soil; Spread crushed stone; Compact; Maintain slope; Lay pavers; Joint sand; Remove construction debris. | | | |
| INSTALLING STANDBY GENERATOR | $ 1,750 | $ 15,450 | $ 17,200 |
| The existing 15 Kilowatt standby generator was found to have a seized engine and damaged generator bearings. Replaced with a 26 Kilowatt Generac standby generator purchased at Lowe's. | | | |
| Provide PPE: hard hats, gloves, eye/ear protection. Materials: Standby generator unit with Pre-fabricated base. Equipment: Electrical tools, grounding rods, and cable. Install pad and position generator; Connect fuel line; Wire unit; Install grounding system; Connect generator control; Conduct load test; Remove tools, lifting equipment, and debris from site. | | | |
| UPDATED CITY WATER SUPPLY PIPING FOR LOWER LEVEL | $ 4,750 | $ 1,510 | $ 6,260 |
| Repair and replace existing potable water piping in second bathroom area due to storm damage as instructed by Ann Arbor Township Inspector. | | | |
| Materials: piping, fixtures, crimp rings, pipe supports, hangers, insulation, and manifold; Mount manifolds; Connect main supply lines;  each fixture location in continuous runs where possible; Use insulation where required; Pressure test; system; Insulate hot water; Connect to fixtures | | | |

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| TWO NEW AIR CONDITIONING SYSTEMS<br>Replaced two air conditioning compressors, cooling coils, and line sets when they stopped working.<br><br>Air conditioning units, line sets, and cooling coils installed by Mechanical Contractor | $ 3,800 | $ 11,100 | $ 14,900 |
| REPAIR ROOF AND SECOND FLOOR BATHROOM CEILING DUE TO STORM HAIL DAMAGED ON 05/24/24<br>Repair roof leak and damage to second floor bathroom ceiling falling into the bathroom shower while our granddaughter was using it on 05/26/24. Removed damaged drywall, lighting, and piping.<br><br>Identify damaged areas' EPDM membrane patches or compatible repair tape; Materials: EPDM primer, bonding adhesive, sealant, and cleaning solution; Equipment: utility knife, scissors, rollers, measuring tape, chalk line; PPE: gloves, safety glasses, non-slip footwear, fall protection gear: Clean damaged area; Cut membrane patch: Apply EPDM primer: Install Patch: Remove tools, debris, and waste materials. | $ 15,200 | $ 3,500 | $ 18,700 |
| REMODEL SECOND FLOOR BATHROOM<br>Remodel second floor bathroom due to storm damage. Completely gutted bathroom. New framing, plumbing, marble floor, paint, vanity, hardware, etc.<br><br>Materials: fixtures, tiles, lighting, cabinets, hardware; Remove existing fixtures; Demolition and remove debris; Install new PEX piping; Install new shower valves, tub drains, and toilet flange; Install new wiring for lights, outlets, exhaust fan; Repair damaged floor subfloor; New framing; Install moisture-resistant drywall or cement board in wet areas; Apply waterproofing membrane; Lay floor tiles; Install wall tiles; Grout tiles; Install toilet, vanity, sinks, faucets, and showerheads; Mount mirrors, towel bars, shelves, and other accessories; Prime and paint; Apply caulking; Remove construction debris. | $ 9,100 | $ 12,500 | $ 21,600 |
| PLANTED TREES ALONG ROADWAY<br>Plant ornamental trees along edge of circular driveway, main drive, and roadway to prevent erosion.<br><br>Verify planting locations; Call Miss Dig; Materials: Trees, mulch, topsoil, compost/fertilizer. Equipment: Shovels, augers, wheelbarrows, hoses, stakes; Excavate holes; Position tree; Backfill and Water; layer of organic mulch; Site cleanup. | $ 1,200 | $ 500 | $ 1,700 |

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| INSTALLED DRAINAGE MANHOLE AND CULVERTS AT BASE OF DRIVEWAY<br><br>Extended garage roof drains and drains from backside of circular driveway retaining wall to new manhole at base of driveway because water was going to neighbors' driveway. Install culvert from manhole across main drive to discharge water into neighbors culvert. Install second culvert at base of main driveway to facilitate curb drainage at street.<br><br>Call Miss Dig; Provide PPE; Excavate; Place and compact granular bedding; Maintain slope; Sealant at joints; Place backfill; Compact backfill; Grade the site to direct surface water into culvert. Clear site of debris. | $ 2,000 | $ 720 | $ 2,720 |
| ENCLOSE BOTTOM OF SOUTH PORCH DECK<br>Enclose bottom of porch deck with shiplap siding, paint to match house exterior.<br><br>Attach treated lumber where skirting will be fastened; Cut panels; Fasten skirting panels to the support framing; Paint to match house. | $ 3,050 | $ 850 | $ 3,900 |

| IMPROVEMENT TOTALS | $ 465,650 | $ 261,110 | $ 726,760 |
|---|---|---|---|
| | LABOR | MATERIALS | TOTAL |

# EXHIBIT C




## U.S. Department of Housing and Urban Development

# Archives

# HUD Archives: News Releases



## Department of Justice

**CIV**
**(202) 514-2007**
**TTY (866) 544-5309**

**For Release**
**Friday**
**April 8, 2016**

## WELLS FARGO BANK AGREES TO PAY $1.2 BILLION FOR IMPROPER MORTGAGE LENDING PRACTICES
### *Wells Fargo Bank Admits That It Certified that Loans Were Eligible for FHA Mortgage Insurance When They Were Not, and That It Did Not Disclose Thousands of Faulty Mortgage Loans to HUD*

WASHINGTON - The Department of Justice announced today that the United States has settled civil mortgage fraud claims against Wells Fargo Bank, N.A. (Wells Fargo) and Wells Fargo executive Kurt Lofrano, stemming from Wells Fargo's participation in the Federal Housing Administration (FHA) Direct Endorsement Lender Program. In the settlement, Wells Fargo agreed to pay $1.2 billion and admitted, acknowledged and accepted responsibility for, among other things, certifying to the Department of Housing and Urban Development (HUD), during the period from May 2001 through December 2008, that certain residential home mortgage loans were eligible for FHA insurance when in fact they were not, resulting in the Government having to pay FHA insurance claims when some of those loans defaulted. The agreement resolves the United States' civil claims in its lawsuit in the Southern District of New York, as well as an investigation conducted by the U.S. Attorney's Office for the Southern District of New York regarding Wells Fargo's FHA origination and underwriting practices subsequent to the claims in its lawsuit and an investigation conducted by the U.S. Attorney's Office for the Northern District of California into whether American Mortgage Network, LLC (AMNET), a mortgage lender acquired by Wells Fargo in 2009, falsely certified and submitted ineligible residential mortgage loans for FHA insurance.

The settlement was approved today by U.S. District Judge Jesse M. Furman for the Southern District of New York. Read the settlement (https://www.justice.gov/opa/file/839796/download).

"This settlement is another step in the Department of Justice's continuing efforts to hold accountable FHA approved lenders that unlawfully submitted false claims at the expense of American homeowners and taxpayers," said Principal Deputy Assistant Attorney General Benjamin C. Mizer, head of the Justice Department's Civil Division. "In addition to today's resolution with Wells Fargo, the department has pursued similar misconduct by numerous other lenders, returning more than $4 billion to the FHA fund and the Treasury and filing suit where appropriate. We remain committed to protecting the public fisc from all who seek to abuse it, whether they do business on Wall Street or Main Street."

"This Administration remains committed to holding lenders accountable for their lending practices," said Secretary Julián Castro for HUD. "The $1.2 billion settlement with Wells Fargo is the largest recovery for loan origination violations in FHA's history. Yet, this monetary figure can never truly make up for the countless families that lost homes as a result of poor lending practices."

"Today, Wells Fargo, one of the biggest mortgage lenders in the world, has been held responsible for years of reckless underwriting, while relying on government insurance to deal with the damage," said U.S. Attorney Preet Bharara for the Southern District of New York. "Wells Fargo has long taken advantage of the FHA mortgage insurance program, designed to help millions of Americans realize the dream of home ownership, to write thousands and thousands of faulty loans. Driven to maximize profits, Wells Fargo employed shoddy underwriting practices to drive up loan volume, at the expense of loan quality. Even though Wells Fargo identified through internal quality assurance reviews thousands of problematic loans, the bank decided not to report them to HUD. As a result, while Wells Fargo enjoyed huge profits from its FHA loan business, the government was left holding the bag when the bad loans went bust. With today's settlement, Wells Fargo has finally resolved the years-long litigation, adding to the list of large financial institutions against which this office has successfully pursued civil fraud prosecutions."

"Misconduct in the mortgage industry helped lead to a destructive financial crisis that spanned the globe," said Acting U.S. Attorney Brian Stretch for the Northern District of California. "American Mortgage Network's origination of FHA-insured loans that did not comply with government requirements also caused major losses to the public fisc. Today's settlement demonstrates the Department of Justice's resolve to pursue remedies against those who engaged in this type of misconduct."

"This matter is not just a failure by Wells Fargo to comply with federal requirements in FHA's Direct Endorsement Lender program - it's a failure by one of our trusted participants in the FHA program to demonstrate a commitment to integrity and to ordinary Americans who are trying to fulfill their dreams of homeownership," said Inspector General David A. Montoya for HUD.

According to the second amended complaint filed in Manhattan federal court, the government had alleged:

Wells Fargo has been a participant in the Direct Endorsement Lender program, a federal program administered by FHA. As a Direct Endorsement Lender, Wells Fargo has the authority to originate, underwrite and certify mortgages for FHA insurance. If a Direct Endorsement Lender approves a mortgage loan for FHA insurance and the loan later defaults, the holder or servicer of the loan may submit an insurance claim to HUD for the outstanding balance of the defaulted loan, along with any associated costs, which HUD must then pay. Under the Direct Endorsement Lender program, neither the FHA nor HUD reviews a loan for compliance with FHA requirements before it is endorsed for FHA insurance. Direct Endorsement Lenders are therefore required to follow program rules designed to ensure that they are properly underwriting and certifying mortgages for FHA insurance and maintaining a quality control program that can prevent and correct any deficiencies in their underwriting. The quality control program requirements include conducting a full review of all loans that go 60 days into default within the first six payments, known as "early payment defaults"; taking prompt and adequate corrective action upon discovery of fraud or serious underwriting problems; and disclosing to HUD in writing all loans containing evidence of fraud or other serious underwriting deficiencies. Wells Fargo failed to comply with these basic requirements.

First, between at least May 2001 and October 2005, Wells Fargo, the largest HUD-approved residential mortgage lender, engaged in a regular practice of reckless origination and underwriting of its FHA retail loans, all the while knowing that it would not be responsible when the defective loans went into default. To maximize its loan volume (and profits), Wells Fargo elected to hire temporary staff to churn out and approve an ever increasing quantity of FHA loans, but neglected to provide this inexperienced staff with proper training. At the same time, Wells Fargo's management applied pressure on its underwriters to approve more and more FHA loans. The bank also imposed short turnaround times for deciding whether to approve the loans, employed lax underwriting standards and controls and paid bonuses to underwriters and other staff based on the number of loans approved. Predictably, as a result, Wells Fargo's loan volume and profits soared, but the quality of its loans declined significantly. Yet, when Wells Fargo's senior management was repeatedly advised by its own quality assurance reviews of serious problems with the quality of the retail FHA loans that the Bank was originating, management disregarded the findings and failed to implement proper and effective corrective measures, leaving HUD to pay hundreds of millions of dollars in claims for defaulted loans.

Second, Wells Fargo failed to self-report to HUD the bad loans that it was originating, in violation of FHA program reporting requirements. During the period 2002 through 2010, HUD required Direct Endorsement Lenders to perform post-closing reviews of the loans that they originated and to report to HUD in writing loans that contained fraud or other serious deficiencies. This requirement provided HUD with an opportunity to investigate the defective loans and request reimbursement for any claim that HUD had paid or request indemnification for any future claim, as appropriate. During this nine-year period, Wells Fargo, through its post-closing reviews, internally identified thousands of defective FHA loans that it was required to self-report to HUD, including a substantial number of loans that had gone into "early payment default." However, instead of reporting these loans to HUD as required, Wells Fargo engaged in virtually no self-reporting during the four-year period from 2002 through 2005 and only minimal self-reporting after 2005.

In his capacity as Vice President of Credit-Risk - Quality Assurance at Wells Fargo, Lofrano executed on Wells Fargo's behalf the annual certifications required by HUD for the Bank's participation in the Direct Endorsement Lender program for certain years. Lofrano also organized and participated in the working group responsible for creating and implementing Wells Fargo's self-reporting policies and procedures. In contravention of HUD's requirements, that group failed to report to HUD loans that Wells Fargo had internally identified as containing material underwriting findings. Moreover, Lofrano received Wells Fargo quality assurance reports identifying thousands of FHA loans with material findings - very few of which Wells Fargo reported to HUD.

*    *    *

As part of the settlement, Wells Fargo has admitted, acknowledged and accepted responsibility for, among other things, the following conduct: During the period from May 2001 through, on or about Dec. 31, 2008, Wells Fargo submitted to HUD certifications stating that certain residential home mortgage loans were eligible for FHA insurance when in fact they were not, resulting in the Government having to pay FHA insurance claims when certain of those loans defaulted. From May 2001 through January 2003, Wells Fargo's quality assurance group conducted monthly internal reviews of random samples of the retail FHA mortgage loans that the Bank had already originated, underwritten, and closed, which identified for most of the months that in excess of 25 percent of the loans and in several consecutive months, more than 40 percent of the loans, had a material finding. For a number of the months during the period from February 2003

through September 2004, the material finding rate was in excess of 20 percent. A "material" finding was defined by Wells Fargo generally as a loan file that did not conform to internal parameters and/or specific FHA parameters, contained significant risk factors affecting the underwriting decision and/or evidenced misrepresentation.

Wells Fargo also admitted, acknowledged and accepted responsibility for the following additional conduct: Between 2002 and October 2005, Wells Fargo made only one self-report to HUD, involving multiple loans. During that same period, the Bank identified through its internal quality assurance reviews approximately 3,000 FHA loans with material findings. Further, during the period between October 2005 and December 2010, Wells Fargo only self-reported approximately 300 loans to HUD. During that same period, Wells Fargo's internal quality assurance reviews identified more than 2,900 additional FHA loans containing material findings that the Bank did not self-report to HUD. The government was required to pay FHA insurance claims when certain of these loans that Wells Fargo identified with material findings defaulted.

Lofrano admitted, acknowledged, and accepted responsibility for, among other things, the following matters in which he participated: From Jan. 1, 2002, until Dec. 31, 2010, he held the position of Vice President of Credit Risk – Quality Assurance at Wells Fargo; in that capacity, he supervised the Decision Quality Management group; in 2004, he was asked to organize a working sub-group to address reporting to HUD; in or about October 2005, he organized a working group that drafted Wells Fargo's new self-reporting policy and procedures; and during the period October 2005 through Dec. 31, 2010, based on application of the Bank's new self-reporting policy and by committee decision, Wells Fargo did not report to HUD the majority of the FHA loans that the Bank's internal quality assurance reviews had identified as having material findings.

*     *     *

 Principal Deputy Assistant Attorney General Mizer thanked the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Northern District of California for their diligent pursuit and successful resolution of this matter and the Commercial Litigation Branch, HUD's Office of General Counsel and HUD's Office of Inspector General, for their extraordinary support.

The case settled by today's settlement is captioned United States v. Wells Fargo Bank, N.A., et. al., 12-cv-7527 (S.D.N.Y.)

###

Content Archived: January 1, 2018



FOIA          Privacy          Web Policies and Important Links          

U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410
Telephone: (202) 708-1112 TTY: (202) 708-1455

