U.S. DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KARL STAFFELD AND AZAR STAFFELD,

        Plaintiffs,

-v-

WELLS FARGO BANK, N.A., a subsidiary of
WELLS FARGO & COMPANY,
420 Montgomery Street
San Francisco, CA 94104

        Defendant.

Case No: 4:24-cv-12811

Hon. Shalina D. Kumar
United States District Judge

Hon. David R. Grand
United States Magistrate Judge

_____/

Karl Staffeld and Azar Staffeld
Plaintiffs, *Pro Se*
341 Payeur Road Ann Arbor, MI 48108
(734) 929-6969
karlstaffeld@gmail.com

Miranda M. Boulahanis (P86222)
TROUTMAN PEPPER LOCKE LLP
500 Woodward Avenue, Suite 2800
Detroit, Michigan 48226
(248) 469-4749
miranda.boulahanis@troutman.com

Mark D. Kundmueller Esq. (P66306)
TROUTMAN PEPPER LOCKE LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
(757) 687-7564
mark.kundmueller@troutmen.com

_____/

**OBJECTION TO ORDER STRIKING PLAINTIFFS**

**SECOND AMENDED COMPLAINT UNDER FED. R. CIV. P. 15(a)(2)**

## <u>INTRODUCTION</u>

Pursuant to the Order issued dated December 18, 2025, based on Fed. R. Civ. P. 15(a)(1) which was received by Plaintiffs on January 12, 2026, and striking the amendment to the Complaint and instructing the Plaintiffs to answer the Defendant Wells Fargo's motion to dismiss dated November 24, 2025; Plaintiffs are hereby informing this Honorable Court that the answer for Defendants Motion to Dismiss and responded to timely on December 4, 2025, (Exhibit A – Pacer Register of Actions, ECF No. 63) (Exhibit A – Pacer Register of Actions, ECF No. 64)  Which was uploaded again to the PACER system on January 2, 2026, and mailed via certified mail to Defendant (Exhibit A – Pacer Register of Actions, ECF No. 68).

During the in-person hearing on August 4, 2025, before the Honorable Judge David R. Grand, The Honorable Judge instructed the Plaintiffs and Defendants on several issues pertaining the case. The <u>first</u> instruction was for the Defendants; Wells Fargo Bank and R&J Group Holdings to settle with Plaintiffs. The <u>second</u> instruction was for the Plaintiffs to collect and compile the extensive answer to Defendants Wells Fargo's discovery and Interrogatory questions which was sent certified mail to the Defendant. The <u>third</u> instruction was for the Plaintiffs to amend their Complaints to reflect both Defendants' violations against HUD and FHA guidelines, Federal statutes, governing guidelines to mortgage contracts, and violations to the terms of their contracts with Plaintiffs.

R&J Group Holdings (R&J), the second Defendant, had served and was contemplating to forclose and sell in Sheriffs Sale Plaintiffs' now primary residence, their second property, on September 1, 2025. (Exhibit A – Pacer Register of Actions, ECF No. 63) (Exhibit B - Notice of Sheriffs Sale). The effectiveness of instructions by this Honorable Court was as such that R&J postponed the foreclosure and Sheriffs Sale of the second property scheduled for September 1, 2025, to October 1, 2025. Plaintiffs and R&J went through extensive mediations, and on September

2

19, 2025, finally they settled their dispute. The agreement was so the Attorneys for R&J would notify the Court of settlement agreement, but they did not do that as far as Plaintiffs know. Plaintiffs waited until the second week of November, 2025, for R&J's Attorneys to notify the Court and Wells Fargo. After having conversations with Wells Fargo's Attorney on the second week of November and coming to consensus with her, the Plaintiffs drafted and submitted the Second Amended Complaint on December 17, 2025, which was certified mailed to Wells Fargo's Attorney (Exhibit C - Receipt of Certified Mail of Second Amended Complaint) per consensus with Wells Fargo's Attorney and Honorable Court's instruction.

The second amendment to the complaint is necessary because after Plaintiffs' mutual settlement with R&J, they needed to be eliminated as Defendants. Striking the Second Amended Complaint is therefore improper and harms the Plaintiffs' position to continue the proposed pleadings due to several issues that were raised during the hearing that need to be addressed by this Honorable Court. For example, the issue of RESPA,  and HUD and FHA guidelines violations by Wells Fargo, Predatory Lending Practices, and the issue of certification to HUD for existence of mortgage insurance that did not exist. Striking the Amended Complaint would cause undue delay, prejudice, and futility to Plaintiffs. Therefore, The Plaintiffs are asking this Honorable Court to kindly reconsider its position and allow the Plaintiffs the Second Amended Complaint; especially since the Defendant, Wells Fargo, did not raise any objection and their Attorney verbally agreed to the amendment.

## **GROUNDS FOR OBJECTION**

The Plaintiffs position has significantly changed after making the settlement agreement with R&J. It is necessary to strike R&J out of the complaint and pursue the case by Plaintiffs only

against the Wells Fargo Bank. The Plaintiffs waited too long for R&J's Attorney to file a motion and take R&J out of the proceedings; Plaintiffs so far have not received the proof of any Motion by R&J's Attorney. Striking the second amendment to the complaint that reflects the dismissal of the case against R&J would be improper and unfair to all parties involved. According to Fed. R. Civ. P. 16(b) and Fed. R. Civ. P. 15(a)(2), the Plaintiffs request for amendment is done in good faith without prejudicing the other party and applies to early on amendments balancing liberal amendment principles with efficiency. The elimination of R&J as Defendant, adding Wells Fargo's further violations per this Court's instructions and the consent of Wells Fargo's Attorney supersedes prior versions of Complaint and making denial problematic.

Additionally, due to the move from previous address by Plaintiffs and an ailment of Azar Staffeld and her kidney surgery which delayed the discovery responses by Plaintiffs, the full discovery and interrogatory answers since have been completed by Plaintiffs. Per instruction of this Honorable Court the Plaintiffs have completely and in detail responded to all discovery and interrogatories by Wells Fargo which required, due to illness of Plaintiff, additional time, and effort. However, it is in fact Wells Fargo that filed for summary disposition to surpass and avoid answering the discovery and interrogatories which obviously would prove the case for the benefit of Plaintiffs.

Plaintiffs agreed to meet and confer with Wells Fargos' Attorney to discuss Wells Fargo's answer to discovery and interrogatories on January 13, 2026 at 3:30 pm. Unfortunately, due to Azar Staffelds Emergency Room visit, the meeting was cancelled but the Plaintiffs are in the process of rescheduling that meeting.

Striking the second amendment to the complaint has been done pursuant to Fed. R. Civ. P. 15(a) as a matter of course, a party can amend without the Courts permission when amendment is necessary and freely when justice so requires. According to Fed. R. Civ. P. 15(b) conforming to

4

evidence of settling with a party is a newly raised issue that should be treated when amendment does not need the Defendants' consent, especially when the Court instructed the Plaintiffs to do so in this case. According to Fed. R. Civ. P. 15(d) in the case of new event; settlement with one of the Defendants here, the statue permits adding events or transactions that occurred after the original pleading requiring only the Court's permission and not Defendants consent. Consequently, Fed. R. Civ. P. 15 promotes fairness and efficiency by allowing flexibility in pleadings that balances pleadings to prevent surprise and protects parties against unnecessary pleadings; here excluding R&J in proceedings. Therefore, an implied consent by the Defendants by eliminating the second Defendant R&J, in lieu of written consent, is what Fed. R. Civ. P. 15 has intended by allowing amendment to the complaint.

## **ARGUMENT**

According to Rule 15(d) the Court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the initial pleading to be supplemented. When certain issues are not raised in the initial pleadings the court should freely permit an amendment when doing so will aid in presenting the merits of the case and objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. Here, Wells Fargo has not even objected to the amended complaint.

When an amendment to a pleading relates back to the date of the original pleading, the law allows such amendment, because the claim or defense that arises out of the conduct transaction or occurrence that may not be set out in the original pleading.

According to Fed. R. Civ. P. 15(c)(1)(b) if the amendment changes the conformity with the evidence is an example of good cause and interaction with Fed. R. Civ. P. 16(b)(4) standard applies

here; Showing justice requires violation of FHA and HUD by false certification to HUD's of existence of mortgage insurance, Improper Mortgage Lending Practices by Wells Fargo by non-compliance with FHA regulations to provide copy of amended complaint against 42 U.S.C. §§ 3601-3619 and enforcement actions by HUD and DOJ has to be included in complaint. Defendant failed to comply with FHA regulations, including but not limited to:

  a) Failure to provide required notices and disclosures to Plaintiffs.

  b) Failure to offer loss mitigation options as mandated by FHA guidelines.

  c) Failure to properly service and administer the mortgage loan in accordance with FHA requirements.

  d) Reckless underwriting while relying on government insurance.

  e) Wells Fargo took advantage of Staffelds while driven faulty loans that should have been designed to help millions of Americans buy their dream homes and have killed the loan quality for loan quantity; driven to maximize their own profits with the cost of loss of homes for Staffelds.

## **LEGAL STANDARD**

In order to prevent Plaintiffs from needless remittance of new action before the Courts, especially when the commencement of the original action have made clear the right to relief, this Court has discretion to permit supplemental pleadings especially when the facts in original pleading are unclear. Cf. Blau v. Lamb, 191 F. Supp. 906 (S.D.N.Y. 1961). If the amendment does not attempt to deal with questions of statue of limitation, usually amendment to pleadings are allowed especially in operation of the doctrine of laches, that allows availability of all defenses to the

Defendant and inclusion of all principles applicable to the complaint to be brought before the Court to determine the finality of the claim, or all claims once and for all, and to preserve the judicial economy.

While Plaintiffs fully agree with the Honorable Judge to bring all applicable claims against the Wells Fargo, it appears that the existence of a mortgage insurance which should have been secured by the Mortgagee, Wells Fargo, to protect the Plaintiffs after the Mortgagor passed away within one year (death and disability within a year standard) remains one of the main three issues of this case. Inclusion of RESPA violation within the Amended Complaint is an issue that the Plaintiffs and the Attorney of the Defendant agreed to be brought forward.

The HUD and FHA guidelines dictates that Wells Fargo Bank and any other Mortgagee must abide by certain Standard Lending Practices and provide all FHA mortgages with mortgage insurance; and pay 1.75% of the loan amount in participation of Federal Housing Administration Direct Endorsement Lender Program. Had Wells Fargo secured FHA mortgage insurance, the government would have paid to Wells Fargo the entire amount of outstanding mortgage subsequent to insurance claim in the case of death and disability within one year. Wells Fargo by violation of section ten of the mortgage contract, falsified the certification and assurance to the Plaintiffs that their mortgage is in fact insured (Exhibit D - Mortgage Contract Section 10). The Department of Justice holds FHA approved lenders accountable in case of primary residence. Wells Fargo Bank in fact did not pay the insurance premiums at the expense of American homeowners and taxpayers (Staffelds) and jeopardized the viability of mortgage industry by not paying the mortgage insurance premiums when it was appropriate (primary residence). The requirement of mortgage insurance is an effort by the government in commitment of protecting the public and to prevent families from the loss of their homes as a result of poor lending practices. Wells Fargo remains the biggest mortgage lender in the world and should be held responsible for reckless underwriting and to

7

shatter and rob Plaintiffs' and their family members' roof over their heads. Wells Fargo unilaterally and wrongfully foreclosed based on three caveats;

a) They should have made a claims against mortgage insurance.

b) They should have approved Plaintiffs' application for Loan Modification.

c) For the $33,000 rearage as a result of the Pandemic economic disaster they should have made a workable arrangements with Plaintiffs and allow the Staffelds to preserve their home.

The Department of Justice has received a tremendous number of civil mortgage fraud claims against Wells Fargo Bank N.A., and Wells Fargo agreed to settle with DOJ and HUD and paid $1.2 billion dollars of penalties which directly as a result of Wells Fargo's failure to provide FHA loans' mortgage insurance for qualified residential home mortgages. (Exhibit E – DOJ and HUD punishment of Wells Fargo Bank).

Had Wells Fargo provided the Plaintiffs with proper notification of its adverse decisions, face to face consultation as is required by HUD, and communication of its intent to foreclose and sell the Plaintiffs' home, Staffelds would have been able to secure loans from friends or family and or a lender that was not a loan shark (like R&J), they could have saved the roof over their heads. It is in fact as a direct result of Wells Fargo's violations to the terms of mortgage contract, HUD requirements, and a constitutional and FHA's proof of service requirements that the loss of residence happened to Staffelds.

## CONCLUSION AND PRAYER FOR RELIEF

NOW COME Plaintiffs, KARL STAFFELD and AZAR STAFFELD, appearing in this matter *Pro Se*, and for their THE PLAINTIFFS' SECOND AMENDED COMPLAINT and Jury Demand against Defendants, WELLS FARGO BANK. N.A., a subsidiary of WELLS FARGO & COMPANY maintain that the Amendment to the complaint is proper, sound, and is based on compliance with the FRCP (specifically Fed. R. Civ. P. 15). In no way this amended complaint would pose an undue prejudice to the Defendant and is done in good faith. The amendment recommendation was done by the instruction of this Honorable Court and is clearly articulating changes to parties of the Complaint and discovery of facts essential to the claim. Therefore, The Plaintiffs are asking this Honorable Court to grant the objection and allow the second amendment of the complaint effectuate.

Respectfully submitted,

By:  *s/ Karl Staffeld*
    Karl Staffeld
    *Plaintiff, Pro Se*

By:  *s/ Azar Staffeld*
    Azar Staffeld
    *Plaintiff, Pro Se*

Dated: January 18, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2026, I served the foregoing OBJECTION TO ORDER

STRIKING PLAINTIFFS SECOND AMENDED COMPLAINT UNDER FED. R. CIV. P. 15(A)(2),

via USPS first-class mail to the Attorneys of record for the parties to this matter and upon:

> Miranda M. Boulahanis (P86222)
> TROUTMAN PEPPER LOCKE LLP
> 500 WOODWARD AVENUE, SUITE 2800
> DETROIT, MICHIGAN 48226
> 248-469-4749
> miranda.boulahanis@troutman.com

> Mark D. Kundmueller Esq. (P66306)
> TROUTMAN PEPPER LOCKE LLP
> 222 Central Park Avenue, Suite 2000
> Virginia Beach, Virginia 23462
> (757) 687-7564
> mark.kundmueller@troutmen.com

Respectfully submitted,

By /s/: *Karl Staffeld*
       Karl Staffeld
       Plaintiff, *Pro Se*

Dated: January 18, 2026

# EXHIBIT A

Query    Reports ▾    Utilities ▾    Help    Log Out

**4:24-cv-12811-SDK-DRG** Staffeld et al v. Wells Fargo Bank, N.A.
Shalina D. Kumar, presiding
David R. Grand, referral
**Date filed:** 10/24/2024
**Date of last filing:** 01/15/2026

# History

| Doc. No. | Dates | | Description |
|---|---|---|---|
| 1 | *Filed & Entered:* | 10/24/2024 | Complaint |
| 2 | *Filed & Entered:*<br>*Terminated:* | 10/24/2024<br>11/21/2024 | Application to Proceed Without Prepaying Fees or Costs |
| 4 | *Filed & Entered:* | 10/25/2024 | Regarding Parties Responsibility to Notify Court of Address Changes |
| | *Filed & Entered:* | 11/21/2024 | Certificate of Service |
| 5 | *Filed & Entered:* | 11/21/2024 | Order on Application to Proceed Without Prepaying Fees or Costs |
| 6 | *Filed & Entered:* | 11/21/2024 | Directing Service by the US Marshal |
| | *Filed:*<br>*Entered:* | 12/03/2024<br>12/05/2024 | Service Documents Received |
| 7 | *Filed:*<br>*Entered:* | 12/03/2024<br>12/04/2024 | Summons Issued |
| | *Filed & Entered:* | 12/06/2024 | Certificate of Service |
| 8 | *Filed & Entered:* | 12/06/2024 | Order Referring Pretrial Matters to Magistrate Judge |
| 9 | *Filed & Entered:* | 12/06/2024 | Acknowledgment |
| 10 | *Filed & Entered:*<br>*Terminated:* | 12/30/2024<br>09/04/2025 | Motion |
| 11 | *Filed:*<br>*Entered:* | 01/07/2025<br>01/08/2025 | Return of Service of Document Executed |
| 13 | *Filed:*<br>*Entered:* | 01/07/2025<br>01/08/2025 | Certificate of Service/Summons Returned Executed |
| 12 | *Filed & Entered:* | 01/08/2025 | Notice of Correction |
| 14 | *Filed & Entered:* | 01/09/2025 | Answer to Complaint |
| 15 | *Filed & Entered:* | 01/09/2025 | Statement of Disclosure of Corporate Affiliations |
| 16 | *Filed & Entered:* | 01/09/2025 | Notice of Appearance |
| 17 | *Filed & Entered:* | 01/21/2025 | Response to Motion |
| | *Filed & Entered:* | 01/28/2025 | Certificate of Service |
| 18 | *Filed & Entered:* | 01/28/2025 | Order |
| 19 | *Filed & Entered:* | 02/28/2025 | Amended Complaint |
| 20 | *Filed & Entered:* | 02/28/2025 | Jury Demand |
| 21 | *Filed & Entered:* | 03/11/2025 | Answer to Amended Complaint |
| 22 | *Filed & Entered:* | 03/25/2025 | Motion to Dismiss |

Case 4:24-cv-12811-SDK-DRG   ECF No. 78, PageID.1677   Filed 01/20/26   Page 13 of 26

| | | | |
|---|---|---|---|
| | Terminated: | 01/06/2026 | |
| 23 | Filed & Entered: | 03/25/2025 | Notice of Appearance |
| | Filed & Entered: | 04/01/2025 | Certificate of Service |
| 24 | Filed & Entered: | 04/01/2025 | Order Requiring Responsive Pleading |
| 25 | Filed & Entered: | 04/02/2025 | Certificate of Service |
| 26 | Filed:<br>Entered: | 04/16/2025<br>04/17/2025 | Letter |
| 27 | Filed:<br>Entered: | 04/16/2025<br>04/17/2025 | Docket Annotation |
| 28 | Filed:<br>Entered: | 04/16/2025<br>04/17/2025 | Docket Annotation |
| 29 | Filed:<br>Entered: | 04/16/2025<br>04/17/2025 | Docket Annotation |
| 30 | Filed:<br>Entered: | 04/16/2025<br>04/17/2025 | Certificate of Service |
| 31 | Filed & Entered: | 04/24/2025 | Notice (Other) |
| 32 | Filed & Entered: | 04/24/2025 | Notice (Other) |
| | Filed & Entered: | 05/23/2025 | Certificate of Service |
| 33 | Filed & Entered: | 05/23/2025 | Order to Show Cause |
| 34 | Filed & Entered: | 05/29/2025 | Docket Annotation |
| 35 | Filed:<br>Entered: | 06/09/2025<br>06/10/2025 | Response to Motion |
| 36 | Filed:<br>Entered: | 06/09/2025<br>06/10/2025 | Docket Annotation |
| 37 | Filed:<br>Entered: | 06/09/2025<br>06/10/2025 | Certificate of Service |
| 38 | Filed:<br>Entered: | 06/09/2025<br>06/10/2025 | Certificate of Service |
| 39 | Filed & Entered: | 06/16/2025 | Reply to Response to Motion |
| 40 | Filed:<br>Entered:<br>Terminated: | 06/16/2025<br>06/17/2025<br>01/06/2026 | Motion to Expedite |
| 41 | Filed:<br>Entered: | 07/01/2025<br>07/02/2025 | Notice of Change of Address/Contact Information |
| 42 | Filed & Entered: | 07/14/2025 | Notice of Appearance |
| 43 | Filed & Entered:<br>Terminated: | 07/14/2025<br>01/15/2026 | Motion to Compel |
| | Filed & Entered: | 07/18/2025 | Certificate of Service |
| 44 | Filed & Entered:<br>Terminated: | 07/18/2025<br>09/04/2025 | Report and Recommendation |
| 45 | Filed & Entered: | 07/18/2025 | Notice of Hearing on Motion |
| | Filed & Entered: | 07/21/2025 | Certificate of Service |
| 46 | Filed & Entered: | 07/21/2025 | Order |
| | Filed: | 08/04/2025 | Motion Hearing |

| | | | |
|---|---|---|---|
| | *Entered:* | 08/05/2025 | |
| [47](#) | *Filed & Entered:* | 08/04/2025 | Motion |
| | *Terminated:* | 01/06/2026 | |
| [48](#) | *Filed:* | 08/04/2025 | Motion for Protective Order |
| | *Entered:* | 08/05/2025 | |
| | *Terminated:* | 01/15/2026 | |
| | *Filed & Entered:* | 08/05/2025 | Certificate of Service |
| [50](#) | *Filed & Entered:* | 08/05/2025 | Order to Strike |
| | *Filed & Entered:* | 08/11/2025 | Certificate of Service |
| [51](#) | *Filed & Entered:* | 08/11/2025 | Report and Recommendation |
| | *Terminated:* | 01/06/2026 | |
| [52](#) | *Filed:* | 08/12/2025 | Motion to Expedite |
| | *Entered:* | 08/13/2025 | |
| | *Terminated:* | 08/18/2025 | |
| [53](#) | *Filed:* | 08/12/2025 | Motion to Expedite |
| | *Entered:* | 08/13/2025 | |
| | *Terminated:* | 08/18/2025 | |
| [54](#) | *Filed & Entered:* | 08/18/2025 | Response to Motion |
| [55](#) | *Filed & Entered:* | 08/18/2025 | Notice (Other) |
| [56](#) | *Filed & Entered:* | 08/18/2025 | Response to Motion |
| | *Filed & Entered:* | 08/21/2025 | Certificate of Service |
| [57](#) | *Filed & Entered:* | 08/21/2025 | Report and Recommendation |
| | *Terminated:* | 01/06/2026 | |
| | *Filed & Entered:* | 09/04/2025 | Certificate of Service |
| [58](#) | *Filed & Entered:* | 09/04/2025 | Order Adopting Report and Recommendation |
| [59](#) | *Filed & Entered:* | 11/24/2025 | Motion |
| [60](#) | *Filed & Entered:* | 11/25/2025 | Motion to Dismiss |
| | *Terminated:* | 01/15/2026 | |
| [61](#) | *Filed & Entered:* | 11/26/2025 | Order Requiring Responsive Pleading |
| [62](#) | *Filed & Entered:* | 11/26/2025 | Report and Recommendation |
| | *Terminated:* | 01/15/2026 | |
| [63](#) | *Filed:* | 12/04/2025 | Response to Motion |
| | *Entered:* | 12/05/2025 | |
| [64](#) | *Filed & Entered:* | 12/16/2025 | Response to Motion |
| | *Filed & Entered:* | 12/18/2025 | Certificate of Service |
| [66](#) | *Filed & Entered:* | 12/18/2025 | Order |
| [67](#) | *Filed & Entered:* | 12/23/2025 | Notice of Change of Address/Contact Information |
| [68](#) | *Filed & Entered:* | 01/02/2026 | Reply to Response to Motion |
| [69](#) | *Filed & Entered:* | 01/06/2026 | Order Adopting Report and Recommendation |
| [70](#) | *Filed & Entered:* | 01/06/2026 | Order Adopting Report and Recommendation |
| [73](#) | *Filed & Entered:* | 01/15/2026 | Order |
| [74](#) | *Filed & Entered:* | 01/15/2026 | Order |
| [75](#) | *Filed & Entered:* | 01/15/2026 | Order on Motion to Compel |
| [76](#) | *Filed & Entered:* | 01/15/2026 | Notice of Hearing on Motion |

| 77 | *Filed & Entered:* 01/15/2026 | 🌐 Order Adopting Report and Recommendation |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/18/2026 11:20:18 | | | |
| **PACER Login:** | karlstaffeldcom1 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 4:24-cv-12811-SDK-DRG |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# EXHIBIT B

## 341 PAYEUR RD, Ann Arbor, MI 48108-9720

FORECLOSURE NOTICE   Soble PLC | 31800 Northwestern Hwy. Suite 350 | Farmington Hills, MI 48334 - 888-789-1715 THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. PLEASE CONTACT OUR OFFICE AT THE NUMBER ABOVE IF YOU ARE IN ACTIVE MILITARY DUTY.   ATT: PURCHASERS: This sale may be rescinded by the foreclosing mortgagee, in that event, your damages, if any shall be limited solely to the return of the bid amount tendered at sale, plus interest.   MORTGAGE SALE – Default has been made in the conditions of a certain mortgage made by R AND J GROUP HOLDINGS, LLC, a Michigan Limited Liability Company, AS SECURITY FOR INDEBTEDNESS, whose address is 9930 Whittier Avenue, Detroit, MI 48224 TO AZAR SADEGHI-STAFFELD and GHAZAL STAFFELD a/k/a GHAZAL JONES, mortgagees, dated October 27, 2023, and recorded February 6, 2025 in Liber 5578, Page 576, Washtenaw County Records and on which mortgage there is claimed to be due at the date hereof the sum of Two Hundred Fifty Two Thousand Five Hundred ($252,500.00) Dollars, including interest at 1% per annum. Notice of foreclosure by advertisement. Notice is given under section 3212 of the revised judicature act of 1961, 1961 PA 236, MCL 600.3212, that said mortgage will be foreclosed by a sale of the mortgaged premises, or some part of them, at public venue, at the place of holding of the Washtenaw County Circuit Court in Ann Arbor, MI, at 10:00 a.m., on August 27, 2025.   The amount due on the mortgage may be greater on the day of the sale. Placing the highest bid at the sale does not automatically entitle the purchaser to free and clear ownership of the property. A potential purchaser is encouraged to contact the county register of deeds office or a title insurance company, either of which may charge a fee for this information Said premises are situated in the City of Ann Arbor, Township of Pittsfield, Washtenaw County, Michigan, described more particularly as follows:   Commencing at a point on the North and South 1/4 line of Section 21, T3S, R6E, Pittsfield Township, Washtenaw County, Michigan, 2085.25 feet South of the North Quarter post of said Section, and on the South line of Payer Road; thence South 54 degrees 19 minutes 00 seconds West along the South line of Payer Road 900.20 feet for a Place of Beginning: thence South 54 degrees 19 minutes 00 seconds W 125 feet; thence South 35 degrees 41 minutes 00 seconds E 350 feet thence North 54 degrees 19 minutes 00 seconds East 125.00 feet; thence North 35 degrees 41 minutes 00 seconds W 350 feet to the Place of Beginning; being a part of the West 1/2 of Section 21. Also that parcel of land described as: Commencing at the North 1/4 corner of Section 21, T3S, R6E, Pittsfield Township, Washtenaw County, Michigan; thence South along the North and South 1/4 line of said Section 2085.25 feet to the intersection of the North and South 1/4 line of said Section and the Southeast line of Payer Road; thence along the Southeast line of Payer Road, South 54 degrees 19 minutes West 1025.2 feet to the Place of Beginning; thence South 35 degrees 41 minutes E 350.0 feet; thence South 54 degrees 19 minutes West 125.0 feet; thence North 35 degrees 41 minutes West 350.0 feet; thence North 54 degrees 19 minutes E 125.0 feet being a part of the Southwest 1/4 of said Section.   Commonly Known As: 341 PAYEUR RD, Ann Arbor MI 48108-9720   Parcel ID: L-12-21-300-004   The redemption period shall be 6 months from the date of such sale, unless determined abandoned in accordance with MCL 600.3241a or MCL 600.3241a, in which case the redemption period shall be 1 month from the date of such sale, or as to MCL 600.3241a only, 15 days from the MCL 600.3241A(b) notice, whichever is later. 1 If the above referenced property is sold at a foreclosure sale under Chapter 600 of the Michigan Compiled Laws, under MCL 600.3278, the borrower will be held responsible to the person who buys the property at the mortgage foreclosure sale or to the mortgage holder for damaging the property during the redemption period.   Attention homeowner: If you are a military service member on active duty, if your period of active duty has concluded less than 90 days ago, or if you have

been ordered to active duty, please contact the attorney for the party foreclosing the mortgage at the telephone number stated in this notice.   Dated: July 16, 2025  AZAR SADEGHI-STAFFELD and  GHAZAL STAFFELD a/k/a  GHAZAL JONES  341 Corrie Rd.  Ann Arbor, MI 48105  Mortgagee  R and J Group Holdings, LLC  ? Attorneys: Soble PLC  31800 Northwestern Hwy #350  Farmington Hills, MI 48334  888 789 1715
(07-24)(08-21)

# EXHIBIT C



**UNITED STATES POSTAL SERVICE.**

SALINE
108 N MAPLE RD
SALINE, MI 48176-9998
www.usps.com

12/17/2025                           10:42 AM

TRACKING NUMBERS
9589 0710 5270 2245 7112 05
9589 0710 5270 2245 7112 12

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)



TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® | 1 | | $3.00 |

Envelope
Virginia Beach, VA 23462
Weight: 0 lb 5.60 oz
Estimated Delivery Date
Customer Service
1-800-ASK-USPS
(1-800-275-8777)

Agents do not have any additional
information other than what is provided on
USPS.com.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device,



or call 1-800-410-7420.

UFN: 258380-0176
Receipt #: 840-54810048-2-7518848-2
Clerk: 66

PROOF of MAILING
12/17/2025
4:24-CV-12811



U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

Southfield, MI 48075

| Certified Mail Fee | $5.30 | |
| $ | $4.40 | |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | $3.00 | |

Postmark Here
DEC 17 2025
12/17/2025

Total Postage and Fees
$ $12.70

Sent To   MIRANDA BOULAHANIS
Street and Apt. No., or PO Box No.  4000 TOWN CENTER, STE 1800
City, State, ZIP+4®  SOUTHFIELD, MI 48075

PS Form 3800, January 2023 PSN 7530-02-000-9047   See Reverse for Instructions



U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

Virginia Beach, VA 23462

| Certified Mail Fee | $5.30 | |
| $ | $4.40 | |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | $3.00 | |

Postmark Here
DEC 17 2025
12/17/2025

Total Postage and Fees
$12.70

Sent To   MARK KUNDMUELLER
Street and Apt. No., or PO Box No.  222 CENTRAL PARK AVE. STE 2000
City, State, ZIP+4®  VIRGINIA BEACH, VA 23462

PS Form 3800, January 2023 PSN 7530-02-000-9047   See Reverse for Instructions

# EXHIBIT D

**341 CORRIE MORTGAGE – SECTION 10. Mortgage Insurance.**

**Extraction from Page 5 of 9, Wells Fargo and Staffeld Mortgage Contract**

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provided that an affiliate of Lender takes a share of the insurer's risk in exchange (or a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has -if any -with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

# EXHIBIT E





## HUD Archives: News Releases



𝕯𝖊𝖕𝖆𝖗𝖙𝖒𝖊𝖓𝖙 𝖔𝖋 𝕵𝖚𝖘𝖙𝖎𝖈𝖊

CIV
(202) 514-2007
TTY (866) 544-5309

For Release
Friday
April 8, 2016

### WELLS FARGO BANK AGREES TO PAY $1.2 BILLION FOR IMPROPER MORTGAGE LENDING PRACTICES
*Wells Fargo Bank Admits That It Certified that Loans Were Eligible for FHA Mortgage Insurance When They Were Not, and That It Did Not Disclose Thousands of Faulty Mortgage Loans to HUD*

WASHINGTON - The Department of Justice announced today that the United States has settled civil mortgage fraud claims against Wells Fargo Bank, N.A. (Wells Fargo) and Wells Fargo executive Kurt Lofrano, stemming from Wells Fargo's participation in the Federal Housing Administration (FHA) Direct Endorsement Lender Program. In the settlement, Wells Fargo agreed to pay $1.2 billion and admitted, acknowledged and accepted responsibility for, among other things, certifying to the Department of Housing and Urban Development (HUD), during the period from May 2001 through December 2008, that certain residential home mortgage loans were eligible for FHA insurance when in fact they were not, resulting in the Government having to pay FHA insurance claims when some of those loans defaulted. The agreement resolves the United States' civil claims in its lawsuit in the Southern District of New York, as well as an investigation conducted by the U.S. Attorney's Office for the Southern District of New York regarding Wells Fargo's FHA origination and underwriting practices subsequent to the claims in its lawsuit and an investigation conducted by the U.S. Attorney's Office for the Northern District of California into whether American Mortgage Network, LLC (AMNET), a mortgage lender acquired by Wells Fargo in 2009, falsely certified and submitted ineligible residential mortgage loans for FHA insurance.

The settlement was approved today by U.S. District Judge Jesse M. Furman for the Southern District of New York. Read the settlement (https://www.justice.gov/opa/file/839796/download).

"This settlement is another step in the Department of Justice's continuing efforts to hold accountable FHA approved lenders that unlawfully submitted false claims at the expense of American homeowners and taxpayers," said Principal Deputy Assistant Attorney General Benjamin C. Mizer, head of the Justice Department's Civil Division. "In addition to today's resolution with Wells Fargo, the department has pursued similar misconduct by numerous other lenders, returning more than $4 billion to the FHA fund and the Treasury and filing suit where appropriate. We remain committed to protecting the public fisc from all who seek to abuse it, whether they do business on Wall Street or Main Street."

"This Administration remains committed to holding lenders accountable for their lending practices," said Secretary Julián Castro for HUD. "The $1.2 billion settlement with Wells Fargo is the largest recovery for loan origination violations in FHA's history. Yet, this monetary figure can never truly make up for the countless families that lost homes as a result of poor lending practices."

"Today, Wells Fargo, one of the biggest mortgage lenders in the world, has been held responsible for years of reckless underwriting, while relying on government insurance to deal with the damage," said U.S. Attorney Preet Bharara for the Southern District of New York. "Wells Fargo has long taken advantage of the FHA mortgage insurance program, designed to help millions of Americans realize the dream of home ownership, to write thousands and thousands of faulty loans. Driven to maximize profits, Wells Fargo employed shoddy underwriting practices to drive up loan volume, at the expense of loan quality. Even though Wells Fargo identified through internal quality assurance reviews thousands of problematic loans, the bank decided not to report them to HUD. As a result, while Wells Fargo enjoyed huge profits from its FHA loan business, the government was left holding the bag when the bad loans went bust. With today's settlement, Wells Fargo has finally resolved the years-long litigation, adding to the list of large financial institutions against which this office has successfully pursued civil fraud prosecutions."

"Misconduct in the mortgage industry helped lead to a destructive financial crisis that spanned the globe," said Acting U.S. Attorney Brian Stretch for the Northern District of California. "American Mortgage Network's origination of FHA-insured loans that did not comply with government requirements also caused major losses to the public fisc. Today's settlement demonstrates the Department of Justice's resolve to pursue remedies against those who engaged in this type of misconduct."

"This matter is not just a failure by Wells Fargo to comply with federal requirements in FHA's Direct Endorsement Lender program - it's a failure by one of our trusted participants in the FHA program to demonstrate a commitment to integrity and to ordinary Americans who are trying to fulfill their dreams of homeownership," said Inspector General David A. Montoya for HUD.

According to the second amended complaint filed in Manhattan federal court, the government had alleged:

Wells Fargo has been a participant in the Direct Endorsement Lender program, a federal program administered by FHA. As a Direct Endorsement Lender, Wells Fargo has the authority to originate, underwrite and certify mortgages for FHA insurance. If a Direct Endorsement Lender approves a mortgage loan for FHA insurance and the loan later defaults, the holder or servicer of the loan may submit an insurance claim to HUD for the outstanding balance of the defaulted loan, along with any associated costs, which HUD must then pay. Under the Direct Endorsement Lender program, neither the FHA nor HUD reviews a loan for compliance with FHA requirements before it is endorsed for FHA insurance. Direct Endorsement Lenders are therefore required to follow program rules designed to ensure that they are properly underwriting and certifying mortgages for FHA insurance and maintaining a quality control program that can prevent and correct any deficiencies in their underwriting. The quality control program requirements include conducting a full review of all loans that go 60 days into default within the first six payments, known as "early payment defaults"; taking prompt and adequate corrective action upon discovery of fraud or serious underwriting problems; and disclosing to HUD in writing all loans containing evidence of fraud or other serious underwriting deficiencies. Wells Fargo failed to comply with these basic requirements.

First, between at least May 2001 and October 2005, Wells Fargo, the largest HUD-approved residential mortgage lender, engaged in a regular practice of reckless origination and underwriting of its FHA retail loans, all the while knowing that it would not be responsible when the defective loans went into default. To maximize its loan volume (and profits), Wells Fargo elected to hire temporary staff to churn out and approve an ever increasing quantity of FHA loans, but neglected to provide this inexperienced staff with proper training. At the same time, Wells Fargo's management applied pressure on its underwriters to approve more and more FHA loans. The bank also imposed short turnaround times for deciding whether to approve the loans, employed lax underwriting standards and controls and paid bonuses to underwriters and other staff based on the number of loans approved. Predictably, as a result, Wells Fargo's loan volume and profits soared, but the quality of its loans declined significantly. Yet, when Wells Fargo's senior management was repeatedly advised by its own quality assurance reviews of serious problems with the quality of the retail FHA loans that the Bank was originating, management disregarded the findings and failed to implement proper and effective corrective measures, leaving HUD to pay hundreds of millions of dollars in claims for defaulted loans.

Second, Wells Fargo failed to self-report to HUD the bad loans that it was originating, in violation of FHA program reporting requirements. During the period 2002 through 2010, HUD required Direct Endorsement Lenders to perform post-closing reviews of the loans that they originated and to report to HUD in writing loans that contained fraud or other serious deficiencies. This requirement provided HUD with an opportunity to investigate the defective loans and request reimbursement for any claim that HUD had paid or request indemnification for any future claim, as appropriate. During this nine-year period, Wells Fargo, through its post-closing reviews, internally identified thousands of defective FHA loans that it was required to self-report to HUD, including a substantial number of loans that had gone into "early payment default." However, instead of reporting these loans to HUD as required, Wells Fargo engaged in virtually no self-reporting during the four-year period from 2002 through 2005 and only minimal self-reporting after 2005.

In his capacity as Vice President of Credit-Risk - Quality Assurance at Wells Fargo, Lofrano executed on Wells Fargo's behalf the annual certifications required by HUD for the Bank's participation in the Direct Endorsement Lender program for certain years. Lofrano also organized and participated in the working group responsible for creating and implementing Wells Fargo's self-reporting policies and procedures. In contravention of HUD's requirements, that group failed to report to HUD loans that Wells Fargo had internally identified as containing material underwriting findings. Moreover, Lofrano received Wells Fargo quality assurance reports identifying thousands of FHA loans with material findings - very few of which Wells Fargo reported to HUD.

*       *       *

As part of the settlement, Wells Fargo has admitted, acknowledged and accepted responsibility for, among other things, the following conduct: During the period from May 2001 through, on or about Dec. 31, 2008, Wells Fargo submitted to HUD certifications stating that certain residential home mortgage loans were eligible for FHA insurance when in fact they were not, resulting in the Government having to pay FHA insurance claims when certain of those loans defaulted. From May 2001 through January 2003, Wells Fargo's quality assurance group conducted monthly internal reviews of random samples of the retail FHA mortgage loans that the Bank had already originated, underwritten, and closed, which identified for most of the months that in excess of 25 percent of the loans and in several consecutive months, more than 40 percent of the loans, had a material finding. For a number of the months during the period from February 2003

through September 2004, the material finding rate was in excess of 20 percent. A "material" finding was defined by Wells Fargo generally as a loan file that did not conform to internal parameters and/or specific FHA parameters, contained significant risk factors affecting the underwriting decision and/or evidenced misrepresentation.

Wells Fargo also admitted, acknowledged and accepted responsibility for the following additional conduct: Between 2002 and October 2005, Wells Fargo made only one self-report to HUD, involving multiple loans. During that same period, the Bank identified through its internal quality assurance reviews approximately 3,000 FHA loans with material findings. Further, during the period between October 2005 and December 2010, Wells Fargo only self-reported approximately 300 loans to HUD. During that same period, Wells Fargo's internal quality assurance reviews identified more than 2,900 additional FHA loans containing material findings that the Bank did not self-report to HUD. The government was required to pay FHA insurance claims when certain of these loans that Wells Fargo identified with material findings defaulted.

Lofrano admitted, acknowledged, and accepted responsibility for, among other things, the following matters in which he participated: From Jan. 1, 2002, until Dec. 31, 2010, he held the position of Vice President of Credit Risk – Quality Assurance at Wells Fargo; in that capacity, he supervised the Decision Quality Management group; in 2004, he was asked to organize a working sub-group to address reporting to HUD; in or about October 2005, he organized a working group that drafted Wells Fargo's new self-reporting policy and procedures; and during the period October 2005 through Dec. 31, 2010, based on application of the Bank's new self-reporting policy and by committee decision, Wells Fargo did not report to HUD the majority of the FHA loans that the Bank's internal quality assurance reviews had identified as having material findings.

*     *     *

 Principal Deputy Assistant Attorney General Mizer thanked the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Northern District of California for their diligent pursuit and successful resolution of this matter and the Commercial Litigation Branch, HUD's Office of General Counsel and HUD's Office of Inspector General, for their extraordinary support.

The case settled by today's settlement is captioned United States v. Wells Fargo Bank, N.A., et. al., 12-cv-7527 (S.D.N.Y.)

###

Content Archived: January 1, 2018






U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410
Telephone: (202) 708-1112 TTY: (202) 708-1455