**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KARL STAFFELD AND AZAR STAFFELD,

     Plaintiffs,

-v-

WELLS FARGO BANK, N.A., et al.,

     Defendants.

Case No: 4:24-cv-12811
Hon. Shalina D. Kumar
Hon. David R. Grand

_____/

Karl Staffeld and Azar Staffeld
341 Payeur Road, Ann Arbor, MI 48108
karlstaffeld@gmail.com
734-929-6181

_____/

**PLAINTIFFS' ANSWER TO DEFENDANT RESPONSE TO DEFENDANT WELLS FARGO BANK, N.A.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION (ECF NO. 83) AND MOTION OF RELIEF FROM THAT JUDGEMENT ACCORDING TO RULES 59, 52, AND 50(B)**

**TABLE OF CONTENTS**

Introduction …………………………………………………………..…………1

Issues Presented……………………………………………………..……..…2-5

Analysis of the Issues………………………………………….................……5-26

Prayer…………………………………………………………………..…...26

**TABLE OF AUTHORITIES**

**CASES**

*Osborne v. Metro. Gov't of Nashville*, 935 F.3d 521, 523 (6th Cir. 2019) ………………..... 6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2D 265 (1986) …………………….. 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202 (1986) …………….. 7

*Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861 (2014) ………………………………….. 7

*Estate of Kimmell ex rel. Kimmell v. Seven Up Bottling Co.*, F.2d 410, 412 (4th Cir. 1993) …………………………………………………………………………….………7

*Williams v. Am. Family Mut. Ins. Co.*, No. 2:09-CV-00675, 2012 WL 1574825. at *4 n.2(D. Nev. May 2, 2012) …………………………………………………………….. 8

*Z.F. v. Adkins*, No. 2:18-CV-00042, 2019 WL 1559022, at *3 (W.D. Va. Apr. 10, 2019) (quoting *Oris v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)) ………………………..... 8

*United States v. Premises Known as 608 Taylor Ave.*, 584 F.2d 1297 (3d Cir. 1978) …….. 10

*Fleet Real Estate Funding Corp. v. Smith*, 366 N.W.2d 232 (Mich. Ct. App. 1985) …….. 10

*Dow v. State*, 396 Mich. 192, 240 NW 2d 450 (1976) …………………………………….. 12

*United States v. Premises Known as 608 Taylor Ave.*, 584 F.2d 1297 (3d Cir. 1978) …….. 12

*Fleet Real Estate Funding Corp. v. Smith*, 366 N.W.2d 232 (Mich. Ct. App. 1985) ….. 12, 16

*Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973) ……………….…... 14

*Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) ………………………………….. 14

*Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004) ………………………………….. 14

*Wells Fargo Bank, N.A. v. Smith*, 2016 WL 8711207 (E.D. Mich. 2016) ……………..... 16

*United States v. Wendlandt*, No. 11-2018 (6th Cir. 2013) ………………………………..... 22

*Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 344 (6th Cir. 1994) …..….. 23

*Pickett v. City of Cleveland*, 140 F.4th 300 (6th Cir. 2025) ………………………………….. 23

*United States ex rel. Wall v. Circle C Construction LLC*, 813 F.3d 616 (6th Cir. 2016) ….. 25

**OTHER AUTHORITIES**

Presidential Executive Order 13945, § 3(b), 85 Fed. Reg. 49935 (Aug. 11, 2020) …….…..
………………………………………………………………………………1, 11, 14, 15

Constitution of the United States 14th Amendment ………………………………….…...... 2, 17

Real Estate Settlement Procedure Act (RESPA) ………………………………………..….. 4

Fair Debt Collection Act (FDCPA) ……………………………………………………….... 4

Fair Lending Practices Act…………………………………………………………….…..... 4, 19

Home Ownership And Equity Protection Act (HOEPA) …………………………………….. 4

HUD Handbook 4000.1, III.A.2.k …………………………………………………….…...... 11

HUD Mortgagee Letters (including ML 2020-27) ……………………………………….….. 11, 14

*HUD Mortgagee Letter 2020-27* ………………………………………………………….…... 12

HUD Mortgagee Letter 2021-05 (Feb. 16, 2021) …………………………………………….. 14

HUD Mortgagee Letter 2021-15 (June 25, 2021) ……………………………………….…..... 15

National Housing Act, 12 U.S.C. § 1701 et seq. ………………………………….………….. 16

HUD regulations at 24 C.F.R. Part 203 …………………………………………….….. 16

Real Estate Settlement Procedure Act (RESPA) 12 U.S.C. §§ 2601 *et seq*.…………... 19, 21

Fair Debt Collection Act (FDCPA) , 15 U.S.C. §§ 1692–1692p ……………………... 19, 24

Home Ownership and Equity Protection Act (HOEPA) 15 U.S.C. § 1639…………….. 19, 24

State of Michigan MISHDA Program ……………………………………………….. 20

Federal Relief Programs …………………………………………………………... 20

18 U.S.C. § 1001 …………………………………………………………………... 22

31 U.S.C. §§ 3729–3733 ………………………………………………………….. 22

24 CFR § 291.621 ……………………………………………………………….... 22

24 CFR Parts 200–203 …………………………………………………………….. 23

42 U.S.C. §§ 3601–3619 ………………………………………………………….. 23

Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 et seq. …………………………….24

Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5531 ……... 25

Unfair, Deceptive, or Abusive Acts or Practices (UDAAP) …………………………... 25

**STATUTES**

Rule 50(b) …………………………………………………………………………... 1, 2, 9

Rule 52 ……………………………………………………………………………... 1, 2, 9

Rule 59 ……………………………………………………………………………... 1, 2, 8

Rule 6(b) …………………………………………………………………..………... 2

Rule 56 ……………………………………………………………………………... 5

Code of Civil Procedure Section 437c ………………………………………………5

28 U.S.C. § 636(b)(1) ……………………………………………………………... 6

Rule 72(b)(3) ……………………………………………………………..………. 6

Rule 56(a) …………………………………………………………………………….... 7,8

Rule 56(b) ………………………………………………………………………….... 7

L.R. 11(c)(1) ……………………………………………………………………….... 7

L.R. 56(b) ………………………………………………………………………….... 7

Rule 56(d) ………………………………………………………………………… 8, 15

Rule 26(a) ………………………………………………………………………….... 8

Rule 60(b) ………………………………………………………………………….... 8

24 C.F.R. § 203.604(b) …………………………………………………………….. 11

Rule 8 …………………………………………………………………………….... 13

Rule 15(a) ………………………………………………………………………….... 14

Rule 26(a)(1) …………………………………………………………………….... 15

Rule 26(f) …………………………………………………………………………. 15

Rule 12(c) …………………………………………………………………….... 17

NOW COME Plaintiffs, KARL STAFFELD and AZAR STAFFELD, appearing in this matter *Pro Se*, and for their reply to Plaintiffs' answer to Defendant response to Defendant Wells Fargo Bank, N.A.'s response in opposition to Plaintiffs' objections to report and recommendation (ECF No. 83) and motion of relief from that judgement according to Rules 59, 52, and 50(b), states the following:

### INTRODUCTION

Undeniable facts of this case:

1.  The Defendant DID NOT pay for the mortgage insurance.

2.  The Defendant VIOLATED the Presidential Executive Order No. 13945.

3.  The Defendant DID NOT send a NOTICE OF DENIAL for loan modification application to Plaintiffs.

4.  The Defendant DID NOT send a NOTICE OF FORECLOSURE to Plaintiffs.

5.  The Defendant DID NOT send a NOTICE OF SHERIFF'S SALE to Plaintiffs.

6.  The Defendant is a habitual fraud according to the Department of Justice.


We are asking this Court to report the Defendant to Department of Justice again for repeating the same fraudulent activities and for defrauding American families and Plaintiffs out of their primary residence.

### ISSUES PRESENTED

1.  Whether the Court should grant Plaintiffs' objection to Magistrates recommendation for not addressing several of the Plaintiffs' claims in original and amended complaints?

1

Plaintiffs Answer:            Yes.

Defendant Answers:           No.

The Court Should Answer:   Yes.

2.  Whether the Court should deny Defendant's motion to dismiss according to Rule 59 for amended findings, Rule 52, and one for judgement notwithstanding the verdict, and Rule 50(b) that prescribes in which the practice by motion  is permitted to be granted for Plaintiffs under Rule 6(b). Upon the principles that applies in this action that has endeavored to ascertain all the remedies and types of relief heretofore available by coram nobis, coram vobis, audita querela, bill of review, or bill in the nature of a bill of review?

Plaintiffs Answer:            Yes.

Defendant Answers:           No.

The Court Should Answer:   Yes.

3.  Whether the Defendant, by bombarding the Court and the Plaintiffs, is attempting to divert this Court's attention from the main issues in complaint and amended complaint?

Plaintiffs Answer:            Yes.

Defendant Answers:           No.

The Court Should Answer:   Yes.

4.  Whether the Defendant committed Fraud by misrepresentation to HUD, FHA, and the Court knowingly, maliciously, and purposefully did not secure this loan with mortgage insurance, did not pay the insurance premium to the government , and violated the mortgage loan contract and governmental mandates to secure the mortgage with mortgage insurance?

Plaintiffs Answer: Yes.

Defendant Answers: No.

The Court Should Answer: Yes.

5. Whether the Defendant violated the Presidential Pandemic mandate to stop foreclosure?

Plaintiffs Answer: Yes.

Defendant Answers: No.

The Court Should Answer: Yes.

6. Whether the Defendant violated the HUD/FHA governmental mandate on the Plaintiffs' application for loan modification?

Plaintiffs Answer: Yes.

Defendant Answers: No.

The Court Should Answer: Yes.

7. Whether the Defendant violated the legal requirements according to the Constitution of the United States 14th Amendment by notifying the Plaintiffs of the adverse action of foreclosure of their primary residence home and sent proper notices to them?

Plaintiffs Answer: Yes.

Defendant Answers: No.

The Court Should Answer: Yes.

8. Whether the Defendant violated the governmental mandates according to HUD and FHA and rules of State of Michigan for Sherriff's Sales of the property and abstained from posting the notice of Sheriff's Sale on the door of the Plaintiffs' primary residential home to notified

3

them of Sheriff's Sale?

        Plaintiffs Answer:        Yes.

        Defendant Answers:        No.

        The Court Should Answer:    Yes.

9. Whether the Defendant violated Plaintiffs' rights by:

    a) Not Granting Grant of quiet title.

    b) Breach of contract.

    c) Violations of Real Estate Settlement Procedure Act (RESPA).

    d) Violation of Fair Debt Collection Act (FDCPA).

    e) Violation of Fair Lending Practices.

    f) Fraudulent Misrepresentation.

    g) Unjust Enrichment.

    h) False Financial Certification to HUD and FHA.

    i) Improper Mortgage Lending Practices and Predatory Lending And Collection Practices.

    j) Violation of Home Ownership And Equity Protection Act (HOEPA).

        Plaintiffs Answer:        Yes.

        Defendant Answers:        No.

        The Court Should Answer:    Yes.

10. Whether the Department of Justice penalized the Defendant because it was guilty of the exact same violation of breach of contract under mortgage loans of millions of American families by NOT PROVIDING THE MORTGAGEES WITH MORTGAGE INSURANCE THAT

4

IS MANDATORY BY THE  GOVERNMENT?

Plaintiffs Answer:            Yes.

Defendant Answers:            Yes.

The Court Should Answer:    Yes.

### ANALYSIS OF THE ISSUES

During the in person hearing the honorable magistrate recommended two main instructions to the parties; One, to settle the claim with the Plaintiffs. And two, for the Plaintiffs to amend their complaint to reflect "all" the violations by Wells Fargo, the Defendant. The Plaintiffs secured a high-interest loan and settled with R&J Group Holdings, LLC (R&J), one of the Defendants. The Plaintiffs also amended their complaints as instructed by the Honorable Magistrate. Plaintiffs are extremely baffled and surprised by the recommendation of the Magistrate for grant of summary judgment. Had Plaintiffs known of this recommendation they would not ever have secured a high-interest loan to settle with R&J the second Defendant.

A.        Whether the Court should grant Plaintiffs' objection to Magistrates recommendation for not addressing several Plaintiffs' claims in original and amended complaint. Grant of the summary judgement is improper because the summary judgement is ONLY permitted when there is no genuine dispute over material facts of the case. According to Rule 56, summary judgement cannot be granted by default even if there is a complete failure to respond to the motion by Plaintiffs. Therefore, granting the summary judgement is unconstitutional in this case because the sufficiency of Defendant's evidence is in dispute. The grant of summary judgement is not permitted at the founding and thus could not be the right meant to be "preserved." According to Code of Civil Procedure Section 437c, to prevail a summary judgement, the moving party, the Defendant, bears the

5

burden of demonstrating that there is no genuine issue as to any material fact and that they are entitled to judgement as a matter of law. This Defendant has not stated any and all of the facts of this case that was presented by the Plaintiffs is untrue and has not provided any documentation to present to this Court whatsoever that indicates that all the documents of the case presented by the Plaintiffs are wrong, untrue, or fictitious; therefore, admitted to all the facts. The issue is if the Defendant is not disputing any of the facts of this case, or presenting any of the facts of its own, this court should find for Plaintiffs. On one hand, the Defendant disputes all the genuine issues presented by Plaintiffs. on the other hand, none of the material facts presented by the Plaintiffs have been disputed. This legal strategy creates a high burden of proof by the Defendant, and it only strengthens the position of the Plaintiffs because the Defendant does not show this Court that no genuine issue to any material fact does not exist but it cannot be granted summary judgement as a matter of law. The revealing evidence by the Plaintiffs especially on causation for damages as a result of Defendant's wrongdoings creates a big hole in Defendant's motion for summary judgement. The Defendant fails to present this Court with factual disputes therefore; a reasonable jury will find against the Defendant. The Plaintiffs under the law would clearly be entitled to win based on the facts of the case which the Defendant so admits.

Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(3), the District Judge must conduct a *de novo* review of those portions of the R&R to which specific objections are made. In the Federal Sixth Circuit, "*denovo*" review is defined as a non-deferential, fresh examination of a lower Court's legal conclusions, acting "anew" without giving any presumption of correctness to the original ruling. *Osborne v. Metro. Gov't of Nashville*, 935 F.3d 521, 523 (6th Cir. 2019). In performing that review, the Court must accept well-pleaded factual allegations as true, draw all reasonable inferences in Plaintiffs' favor, and construe Pro Se filings liberally so that potentially meritorious claims are not forfeited by technical pleading errors.

6

Further, Sixth Circuit law and established precedent is clear that summary judgment based upon the pleadings is appropriate **only** where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)* (emphasis added). The Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2D 265 (1986), that the moving party bears the initial burden of showing the absence of a genuine issue of material fact. Likewise, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202 (1986), instructs that Courts must view the evidence in the light most favorable to the **non-moving party** and draw all reasonable inferences **in that party's favor** (emphasis added). If reasonable minds could differ on the facts, summary judgment must be denied. See also *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861 (2014).

When a party moves for summary judgement, that party carries the "burden of showing that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Estate of Kimmell ex rel. Kimmell v. Seven Up Bottling Co.*, F.2d 410, 412 (4th Cir. 1993). Defendant Wells Fargo has failed to carry this burden, as required by Rule 56(a).

Wells Fargo's motion is devoid of substantive legal reasoning and argument. Wells Fargo's motion is rife with substantive and procedural deficiencies. Most glaringly, the motion contains no "statement of facts," nor does it include any "supporting reasons." Local Civ. R. 11(c)(1); *see also* Local Civ. R. 56(b) (requiring that motions for summary judgment contain "a separately captioned section setting fourth ... the material facts claimed to be undisputed together with specific record citations in support thereof.") Indeed, Wells Fargo has made no effort to explain why it is entitled to summary judgment on any of Plaintiffs' claims. The closest comes in declaring - in conclusory fashion - that "there is no genuine dispute as to any of the material facts and/or as to any necessary Qualified Immunity. But that is simply a restatement of Rule 56(a)'s standard, not a "showing" that the standard has been met. This defect alone warrants the denial of Wells Fargo's motion. Wells

7

Fargo has not identified which passages are most relevant to their motion (and why), nor have they provided any of the surrounding text to contextualize those fragments that do appear in their motion. See *Williams v. Am. Family Mut. Ins. Co.*, No. 2:09-CV-00675, 2012 WL 1574825. at *4 n.2 (D. Nev. May 2, 2012). In addition, Wells Fargo has filed a motion for summary judgement containing numerous unsworn assertions. As this Court should have explained, it is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment. *Z.F. v. Adkins*, No. 2:18-CV-00042, 2019 WL 1559022, at *3 (W.D. Va. Apr. 10, 2019) (quoting *Oris v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)).

Finally, although Wells Fargo has identified a few judicial decisions that allegedly "appl[y] to this case," it makes no effort to explain why any of those cases - none of which are binding in this Court - are relevant to its motion. Again, Wells Fargo's motion contains no legal argument whatsoever. Wells Fargo has not even attempted to "show[]" that it is "entitled to judgment as a matter of law," Rule 56(a), and it is not the Court's responsibility to remedy this defect. Wells Fargo's motion should have been denied. Therefore, the recommendation of the R&R is erroneous according to Rule 56(d) because it never afforded Plaintiffs a chance to conduct discovery and the summary judgement motion should have been dismissed because Wells Fargo has never complied with the mandatory discovery according to Rule 26(a)(1). Consequently, this objection should serve as a motion to relief from R&R under Rule 60(b) because the Recommender made improper recommendation and manifested error of law since a mistake has occurred rather than arguing all the issues presented. The Recommender has ignored the statement of genuine issues in dispute and all the Plaintiffs evidentiary documents and submissions were overlooked.

      B.      Whether the Court should deny Defendants motion to dismiss according to Rule 59

for amended findings, Rule 52, and one for judgement notwithstanding the verdict, and Rule 50(b) that prescribes in which the practice by motion  is permitted to be granted for Plaintiffs under Rule 6(b). Upon the principles that applies in this action that has endeavored to ascertain all the remedies and types of relief heretofore available by coram nobis, coram vobis, audita querela, bill of review, or bill in the nature of a bill of review.

Next, the Judicial Referee's Report recommends dismissal of all claims on the basis that Wells Fargo's arguments are 'unrebutted,' while simultaneously concluding that Plaintiffs' FHA/HUD arguments are 'non-responsive' because they were not cited in the Complaint. Plaintiffs object because this reasoning effectively prevents Plaintiffs from using governing legal standards to rebut Wells Fargo's dispositive motion.

Whether the loan at issue is federally-backed and subject to HUD servicing requirements; whether Wells Fargo followed applicable loss-mitigation steps; whether notices were provided; and whether foreclosure proceeded during periods in which Federal directives restricted such action are all fact-intensive questions. Many of the details relevant to those issues (servicing notes, call logs, denial letters, notice mailings, loss mitigation timelines, investor/FHA status codes, and foreclosure referrals) are uniquely in Wells Fargo's possession. Dismissing at the pleadings stage, without discovery, improperly deprives Plaintiffs of the opportunity to test those facts.

Plaintiff's requested equitable relief seeks, among other things, a declaration that the foreclosure was wrongful and an order quieting title. Plaintiffs' theory is that the foreclosure should be set aside because the process was not lawfully pursued and Plaintiffs were denied required notices and an opportunity to obtain relief. FHA/HUD servicing duties and pandemic-era protections supply strong legal support for the proposition that a foreclosure can be invalid where required loss mitigation steps and notice protections are not satisfied.

9

Even if 'quiet title' is characterized as a remedy in some contexts, Plaintiffs' pleading asserts an equitable claim that the foreclosure is invalid and seeks judicial determination of rights in the Property. The FHA/HUD framework reinforces the plausibility of that invalidity theory and should be considered as part of the equitable analysis rather than excluded.

C.     Whether the Defendant, by bombarding the Court and the Plaintiffs, is attempting to divert this Court's attention from the main issues in complaint and amended complaint.

Under these Federal directives, mortgage lenders and servicers were required to:

a)    Halt all foreclosure and eviction actions on FHA-insured mortgages except for vacant or     abandoned properties;

b)    Offer forbearance to any borrower who requested assistance due to COVID-19 hardship;

c)    Evaluate borrowers for all available loss mitigation options before initiating foreclosure;  and

d)    Provide clear and timely notice to borrowers regarding their rights and the status of any loss mitigation application.

**Enforcement and Judicial Recognition**

Federal Courts have recognized that these Executive Orders and HUD Mortgagee Letters are binding on mortgage servicers and provide enforceable rights to borrowers. See *United States v. Premises Known as 608 Taylor Ave.*, 584 F.2d 1297 (3d Cir. 1978) (HUD regulations incorporated into FHA mortgages are enforceable by borrowers); *Fleet Real Estate Funding Corp. v. Smith*, 366 N.W.2d 232 (Mich. Ct. App. 1985) (failure to comply with HUD servicing requirements may preclude foreclosure.

**Application to the Plaintiffs**

Plaintiffs lost employment due to the pandemic and promptly notified Wells Fargo, seeking forbearance and loan modification as permitted under Federal law. Despite these protections, Wells Fargo initiated foreclosure without providing the required forbearance, loss mitigation evaluation, or proper notice, in direct violation of Executive Order 13945 and HUD guidance.

**1) Loss Mitigation Requirements**

HUD regulations require lenders to engage in loss mitigation efforts before initiating foreclosure. See 24 C.F.R. § 203.604(b). Specifically, lenders must make a reasonable effort to arrange a face-to-face interview with the borrower, assess the borrower's financial situation, and explore alternatives to foreclosure, such as forbearance, loan modification, or repayment plans. "Before initiating foreclosure, the mortgagee must have a face-to-face interview with the mortgagor or make a reasonable effort to arrange such a meeting." *24 C.F.R. § 203.604(b)*.

**2) Forbearance and Modification Options**

HUD's loss mitigation program requires mortgage lenders and servicers to evaluate borrowers for all available options, including special forbearance, FHA-HAMP loan modification, and partial claim relief. See HUD Handbook 4000.1, III.A.2.k. These options are designed to help borrowers retain their homes and avoid foreclosure.

**3) Foreclosure Moratoria During the Global Health Pandemic**

During the COVID-19 pandemic, HUD issued multiple Mortgagee Letters (including ML 2020-27) prohibiting foreclosure and eviction actions on FHA-insured mortgages except for vacant or abandoned properties. Servicers were required to offer forbearance to any borrower experiencing financial hardship due to COVID-19 and could not initiate or proceed with foreclosure while forbearance or loss mitigation was pending. "Mortgagees must not initiate or proceed with

11

foreclosure or eviction for FHA-insured single-family mortgages, except for properties that are vacant or abandoned." *HUD Mortgagee Letter 2020-27*.

### 4) Notice and Due Process

FHA regulations and Michigan law require that borrowers receive adequate notice of default, the opportunity to cure, and clear communication regarding the status of any loss mitigation application. See *Dow v. State*, 396 Mich. 192, 240 NW 2d 450 (1976) (due process requires notice reasonably calculated to apprise interested parties of foreclosure).

### 5) Judicial Enforcement

Federal Courts have recognized that HUD regulations incorporated into FHA mortgages are enforceable by borrowers. See *United States v. Premises Known as 608 Taylor Ave.*, 584 F.2d 1297 (3d Cir. 1978); *Fleet Real Estate Funding Corp. v. Smith*, 366 N.W.2d 232 (Mich. Ct. App. 1985) (failure to comply with HUD servicing requirements may preclude foreclosure).

### 6) Summary as Applied to Wells Fargo Bank

In sum, Wells Fargo, as the lender and servicer of an FHA-insured mortgage, was required to comply with all HUD loss mitigation and notice requirements, and to honor Federal foreclosure moratoria during the COVID-19 public health emergency. Plaintiffs' allegations, supported by the record, show that Wells Fargo failed to comply with these protections, thereby rendering the foreclosure improper and precluding summary judgment.

D.      Whether the Defendant committed Fraud by misrepresentation to HUD, FHA, and the Court knowingly, maliciously, and purposefully did not secure this loan with mortgage insurance, did not pay the insurance premium to the government , and violated the mortgage loan contract and governmental mandates to secure the mortgage with mortgage insurance.

Plaintiffs' opposition brief focused on FHA regulations, HUD servicing requirements, and COVID-era Executive Orders, but concludes that Plaintiffs may not 'introduce new claims or legal theories' in opposition because those authorities were not expressly cited in the operative pleading. Plaintiffs object to this characterization and its legal consequence.

First, Rule 8 requires a short and plain statement showing entitlement to relief; it does not require a Plaintiff to plead every statute, regulation, or legal theory by name. Plaintiffs' filings consistently assert that Wells Fargo's foreclosure was improper, undertaken without proper notice, and pursued while Plaintiffs sought loss mitigation and/or modification relief. Those allegations are the core of Plaintiffs' claims for equitable relief and damages. FHA/HUD servicing requirements and COVID-era moratoria are legal standards that illuminate whether the foreclosure conduct alleged was lawful; they are not 'new claims' simply because Plaintiffs cited them in briefing.

Second, the R&R's approach is particularly inappropriate where Plaintiffs are Pro Se. Courts routinely permit Pro Se litigants to clarify and develop legal arguments in response to dispositive motions, especially where the underlying factual narrative remains the same.

Third, even if the Court concludes that additional FHA-specific factual allegations (e.g., the federally-backed nature of the loan and incorporation of HUD servicing duties) should be pleaded with greater specificity, the proper remedy is to allow amendment in the interest of justice—not to dismiss the case at the pleadings stage without addressing whether amendment would cure any perceived deficiency.

E.      Whether the Defendant violated the Presidential Pandemic mandate to stop foreclosure.

If the Court, for whatever reason, determines that Plaintiffs' Complaint does not expressly allege

13

sufficient FHA-specific facts (such as the FHA-insured status of the loan or incorporation of HUD servicing duties into the mortgage), then Plaintiffs request leave to amend. Plaintiffs have already articulated the FHA/HUD servicing and COVID-moratorium theory in their opposition filing, and amendment would clarify – not transform – the case.

Leave to amend should be freely given when justice so requires, particularly for *Pro Se* litigants. Federal Rule of Civil Procedure 15(a) contemplates that a Court will freely grant leave to file an amended complaint when the interests of justice so require. In fact, the Sixth Circuit has a liberal policy of permitting amendments to ensure cases are decided on the merits. *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973).

Moreover, District Courts must afford pleadings filed by *Pro Se* Plaintiffs **additional leniency**, given their unfamiliarity with pleading and procedural requirements. See *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) ("Pro Se complaints are to be held 'to less stringent standards than formal pleadings drafted by lawyers' and should therefore be liberally construed." (quoting *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004)).

In response to Executive Order 13945, HUD issued a series of Mortgagee Letters providing specific instructions to mortgage servicers regarding foreclosure and eviction moratoria for FHA-insured mortgages:

a) HUD Mortgagee Letter 2020-27 (Dec. 17, 2020): Extended the foreclosure and eviction moratorium for FHA-insured single-family mortgages through July 31, 2021. "Mortgagees must not initiate or proceed with foreclosure or eviction for FHA-insured single-family mortgages, except for properties that are vacant or abandoned."

b) HUD Mortgagee Letter 2021-05 (Feb. 16, 2021): Further extended the moratorium

14

and clarified that servicers must offer forbearance to any borrower experiencing financial hardship due to COVID-19. "Borrowers with FHA-insured mortgages who are experiencing financial hardship due to COVID-19 are entitled to request and receive forbearance, regardless of delinquency status."

c)   HUD Mortgagee Letter 2021-15 (June 25, 2021): Provided additional loss mitigation options, including COVID-19 Recovery Modification and COVID-19 Recovery Standalone Partial Claim, to help borrowers retain their homes.

On August 8, 2020, the President issued Executive Order 13945, which directed Federal agencies to take all appropriate actions to prevent evictions and foreclosures for renters and homeowners affected by the COVID-19 pandemic. The Order specifically instructed the Secretary of Housing and Urban Development (HUD) to "take action, as appropriate and consistent with applicable law, to promote the ability of renters and homeowners to avoid eviction or foreclosure resulting from hardships caused by COVID-19." See Executive Order 13945, § 3(b), 85 Fed. Reg. 49935 (Aug. 11, 2020).

This Executive Order recognized the unprecedented financial hardship facing millions of Americans and mandated that Federal agencies use their authority to protect those with federally-backed mortgages, including FHA loans.

F.   Whether the Defendant violated the HUD/FHA governmental mandate on the Plaintiffs' application for loan modification. According to Federal Rules of Civil Procedure 56(d) (Rule) the Defendant filed the motion for summary disposition before the Plaintiff had a chance to conduct discovery or any fact finding. The Defendant Wells Fargo did not comply with Rule 26(a)(1)

that mandates parties in Federal lawsuits to disclose the specific core information to the opposing side without waiting for formal discovery requests. These mandatory initial disclosures should have been made within 14 days after the Rule 26(f) discovery conference which Defendant refused to conduct and took away the Plaintiffs right to covering witnesses' documents, damages, and insurance agreement that are relevant to disputed facts; a fact-driven necessity in this case.

Plaintiffs' objections focus particularly on the FHA/HUD servicing requirements and COVID-era foreclosure protections that bear directly on the propriety of the foreclosure conduct challenged in this case. Furthermore, the nature of the underlying FHA mortgage loan along with Defendant's violation of Federal protections enacted during the COVID-19 global health pandemic dictate that the motion for summary judgment be denied and Plaintiffs should be afforded a full and fair opportunity to present their various claims to a jury of their peers.

In this case, the mortgage securing the purchase of the Subject Property was insured and originated under terms consistent with FHA-backed loans, which are governed by the National Housing Act, 12 U.S.C. § 1701 et seq., and HUD regulations at 24 C.F.R. Part 203. FHA mortgages are not ordinary private loans; they are federally insured and subject to a comprehensive regulatory framework designed to protect homeowners, especially during periods of financial hardship. Courts have recognized that FHA lenders *must* comply with HUD servicing requirements before foreclosure. See *Wells Fargo Bank, N.A. v. Smith*, 2016 WL 8711207 (E.D. Mich. 2016); see also *Fleet Real Estate Funding Corp. v. Smith*, 366 N.W.2d 232 (Mich. Ct. App. 1985) (failure to comply with HUD servicing requirements may preclude foreclosure).

As outlined in Plaintiffs' Response in Opposition to Defendant Wells Fargo Bank's Motion for Summary Judgment, Defendant's motion should respectfully be **denied**, as genuine issues of material fact exist for the trier of fact concerning Wells Fargo Bank's conduct in foreclosing upon Plaintiffs' home without Plaintiffs any wrongdoing.

Plaintiffs' Amended Complaint alleges that, during the COVID-19 pandemic, Plaintiffs lost employment and were unable to make all mortgage payments; that Plaintiffs contacted Wells Fargo seeking relief; that Wells Fargo representatives assured Plaintiffs they could bring the account current and pursue modification; and that the bank initiated foreclosure without proper notice while Plaintiffs were awaiting loss mitigation results, including without written notice of any denial. These factual allegations, taken as true, are precisely the kind of servicing and communication conduct governed by FHA/HUD loss-mitigation requirements and related Federal servicing directives.

In addition, Plaintiffs' Response in Opposition explains that, for FHA-insured mortgages, HUD servicing regulations require pre-foreclosure loss mitigation (including reasonable efforts to arrange a face-to-face meeting) and that HUD Mortgagee Letters during COVID-19 prohibited initiating or proceeding with foreclosure on FHA-insured single-family mortgages except for vacant or abandoned properties and required servicers to offer forbearance to borrowers experiencing hardship. Plaintiffs' factual allegations that foreclosure proceeded while Plaintiffs sought relief and did not receive proper notice plausibly overlap with these requirements.

At the Rule 12(c) stage, Plaintiffs need only plausibly allege a set of facts that, if proven, could entitle them to relief. Because the FHA/HUD framework directly informs whether a foreclosure was 'proper' under the circumstances alleged, the Court should not exclude FHA/HUD standards from consideration as legal context for Plaintiffs' existing wrongful-foreclosure and notice-based allegations.

G.      Whether the Defendant violated the legal requirements according to the Constitution of the United States 14th Amendment by notifying the Plaintiffs of the adverse action of foreclosure of their primary residence home and sent proper notices to them.

Under any reading of its motion, Wells Fargo cannot prevail on the present summary-judgment record memorandum supported by argument and citations to the record, it still would be unable to demonstrate an entitlement to relief on Plaintiffs procedure act. Based upon this strict standard and construing the facts and evidence in a light most favorable to Plaintiffs, who are the victims of clear predatory lending and enforcement practices here, and drawing all reasonable inferences in Plaintiffs' favor, this Honorable Court should DISREGARD the Report and Recommendation of the Judicial Referee and DENY Defendants' Motion for Summary Judgment on the Pleadings.

H.      Whether the Defendant violated the governmental mandates according to HUD and FHA and rules of State of Michigan for Sherriff's Sales of the property and abstained from posting the notice of Sheriff's Sale on the door of the Plaintiffs' primary residential home to notify them of Sheriff's Sale.

Wells Fargo Bank never sent Plaintiffs written notice that their loan modification application had been denied. Instead, the bank claimed that an authorized representative called Plaintiffs and left a message from an unknown 800 telephone number. Plaintiffs never received any such messages from Wells Fargo Bank or any loan servicer on behalf of the bank, nor did they receive anything in writing through the mail, or otherwise, concerning the bank's denial of their loan modification application which required face-to-face intervention required by law. Despite these failures by the bank to communicate with Plaintiffs as title owners of the real property in question, upon information and belief Wells Fargo Bank foreclosed the property on Dorothea Staffeld and sold the Subject Property without following the statutory requirements for lawfully foreclosing upon real property in Michigan.

18

Further, Wells Fargo Bank, collected the mortgage payments since Dorothea Staffeld passed away in November 2018 to 2020 when the pandemic governmental mandatory shutdown occurred. Wells Fargo refused to allow Plaintiffs to refinance the home or modify the then-existing mortgage loan agreement upon reasonable terms and conditions for which Plaintiffs attempted to become approved on their primary residence. Despite repeated requests by Plaintiffs, Wells Fargo Bank has failed, refused, and/or neglected to adjudicate Plaintiffs' loan modification application in good faith and further refused to allow Plaintiffs additional time to secure refinancing on arms-length terms at market rates.

I.      Whether the Defendant violated the Plaintiffs' rights by claims on:

a) Quiet title.

b) Breach of Contract.

c) Violations of Real Estate Settlement Procedure Act (RESPA).

d) Violation of Fair Debt Collection Act (FDCPA).

e) Violation of Fair Lending Practices.

f) Fraudulent Misrepresentation.

g) Unjust Enrichment.

h) False financial certification to HUD.

i) Improper mortgage lending practices and predatory lending and collection practices.

j) Home Ownership and Equity Protection Act (HOEPA).

Plaintiffs, as title owners and successor mortgagors of the Subject Property, were entitled to fair, non-discriminatory treatment and full disclosure of all material terms and conditions of their mortgage loan, as required by federal law.

19

Defendant failed to provide Plaintiffs with clear, accurate, and timely disclosures regarding the terms of the mortgage loan, including but not limited to interest rates, fees, payment schedules, and modification options. While Plaintiffs only owed $37,553.76 in rearage, but Wells Fargo demanded $69,000.

Plaintiffs, Staffelds, applied through State of Michigan MISHDA Program and were waiting for a decision on full payment assistance from a State of Michigan grant for the amount they fell behind in mortgage when Wells Fargo surprised everyone and sold the property in the Sheriff's Sale.

Defendant imposed excessive and unjustified fees and charges on Plaintiffs' mortgage account subsequent to the pandemic, which were not commensurate with Plaintiffs' creditworthiness or prevailing market conditions.

Defendant refused to offer Plaintiffs reasonable loan modification or refinancing options, despite Plaintiffs' repeated requests and eligibility under Federal Relief Programs, including those enacted in response to the global health pandemic.

Defendant targeted Plaintiffs for unfavorable loan terms and conditions, exploiting their financial distress and vulnerability, and failed to act in good faith in servicing the loan.

Defendant's conduct constitutes a pattern or Practice of Predatory Lending and Servicing, in violation of the Fair Lending Practices Act.

As a direct and proximate cause of Defendant Wells Fargo Bank's violations outlined above, Plaintiffs suffered financial harm, loss of property rights, clouded title, emotional distress, and other damages as set forth herein. During their ownership, Staffelds made several updates to the property. R & J purchased the property in redemption for $530,000 and sold it for $1,299,000 ; all the product of Staffeld's labor (Exhibit A - List of Improvements).

20

The summary of wrongful actions by Wells Fargo:

a)  They did not pay HUD/FHA the 1.75% premium to HUD and did not secure mortgage insurance.

b)  They did not recognize the ownership of Staffelds and foreclosed the mortgage on a deceased person (Dorothea Staffeld).

c)  They sold the property without notice to Staffelds and/or providing them an opportunity to rectify the amount they fell behind; another violation of HUD regulations.

Defendant, Wells Fargo Bank, N.A. is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq*., which requires mortgage lenders and servicers to provide timely and accurate disclosures, respond to borrower inquiries, and refrain from abusive or predatory practices.

Defendant failed to provide Plaintiffs with written notice of the denial of their loan modification application, as required by RESPA and other federal regulations.

 Defendant did not respond to Plaintiffs qualified written requests for information regarding the status of their mortgage loan, modification application, and foreclosure proceedings.

Defendant initiated foreclosure proceedings without providing Plaintiffs with proper notice and an opportunity to cure the alleged default, in violation of RESPA's notice and procedural requirements.

Defendant's conduct constitutes a pattern or practice of non-compliance with RESPA's protections for borrowers.

As a direct and proximate result of Defendant's violations, Plaintiffs suffered financial

harm, loss of property rights, clouded title, emotional distress, and other damages as set forth herein.

By settlement dated April 8, 2016 between Department of Justice and Wells Fargo Bank, Wells Fargo Bank admits that it certified that loans were eligible for FHA Mortgage Insurance when they were not, and that it did not disclose thousands of faulty mortgage loans to HUD; Wells Fargo did it again in this case.

At all times relevant, Defendant Wells Fargo Bank, N.A. was required to provide truthful and accurate financial certifications to the U.S. Department of Housing and Urban Development ("HUD") regarding the status of mortgage insurance on the Subject Property.

Defendant falsely certified to HUD that the underlying mortgage for the Subject Property was insured under applicable federal programs (Exhibit B - Section 10 – Mortgage Contract), when in fact it was not insured. Such conduct violates federal law, including 18 U.S.C. § 1001, which prohibits knowingly and willfully making false statements or representations in any matter within the jurisdiction of the federal government, including HUD. *See also* 31 U.S.C. §§ 3729–3733 (False Claims Act), which imposes liability for knowingly submitting false or fraudulent claims for payment to the federal government that mandates paying 1.75% of loan value as mortgage insurance premium to Federal Government by the Lender.

HUD regulations further provide, at 24 CFR § 291.621, that mortgagees may be disqualified for submitting fraudulent information or false certifications in connection with HUD-insured mortgages.

The Sixth Circuit has affirmed convictions for conspiracy to defraud the United States by providing false information to HUD for mortgage insurance. See *United States v. Wendlandt*, No. 11-2018 (6th Cir. 2013) (affirming conviction for false statements to HUD).

22

As a direct and proximate result of Defendant Wells Fargo Bank's false certification, Plaintiffs lost their place of residence forever and suffered damages as set forth herein.

Defendant Wells Fargo Bank, N.A. is subject to the Federal Housing Administration ("FHA") regulations governing the origination, servicing, and foreclosure of FHA-insured mortgage loans, including those set forth in 24 CFR Parts 200–203.

Defendant failed to comply with FHA regulations, including but not limited to:

a) Failure to provide required notices and disclosures to Plaintiffs.

b) Failure to offer loss mitigation options as mandated by FHA guidelines.

c) Failure to properly service and administer the mortgage loan in accordance with FHA requirements.

d) Reckless underwriting while relying on government insurance.

e) Wells Fargo took advantage of Staffelds while driven faulty loans that should have been designed to help millions of Americans buy their dream homes and have killed the loan quality for loan quantity; driven to maximize their own profits with the cost of loss of homes for Staffelds.

Such non-compliance violates the Fair Housing Act, 42 U.S.C. §§ 3601–3619, and related HUD regulations. The Sixth Circuit has recognized that actions affecting housing availability and compliance with FHA requirements can violate the Fair Housing Act. See *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 344 (6th Cir. 1994) (recognizing FHA violations for actions affecting housing availability); *Pickett v. City of Cleveland*, 140 F.4th 300 (6th Cir. 2025) (clarifying standing and predominance standards for FHA disparate-impact class actions).

23

HUD and the Department of Justice have taken enforcement actions against lenders for non-compliance with FHA requirements. See DOJ Appellate Section – Housing (Exhibit C – Certified Admission Of Wrongdoing By Wells Fargo To Department Of Justice).

As a direct and proximate result of Defendant Wells Fargo Bank's violations, Plaintiffs suffered financial harm, loss of property rights, emotional distress, and other damages as set forth herein.

Federal and state laws regulate Predatory Lending, including interest rate caps and bans on abusive practices.

Defendant Wells Fargo Bank, N.A. engaged in a pattern or Practice of Predatory Lending and Collection practices, including but not limited to:

a) Imposing excessive and unjustified fees and charges on Plaintiffs' mortgage account.

b) Targeting Plaintiffs for unfavorable loan terms and conditions, exploiting their financial distress and vulnerability.

c) Initiating foreclosure and collection actions in bad faith and without proper notice or opportunity to cure.

d) Failing to act in good faith in servicing and modifying the mortgage loan.

Such conduct violates federal and state law, including the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 et seq., which requires clear disclosure of loan terms and prohibits unfair lending practices; the Home Ownership and Equity Protection Act (HOEPA), 15 U.S.C. § 1639, which provides protections against high-cost, predatory mortgage loans; and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692–1692p, which prohibits abusive, deceptive, and unfair debt collection practices.

24

The Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5531, further prohibits Unfair, Deceptive, or Abusive Acts or Practices (UDAAP) in consumer financial products.

The Sixth Circuit and other courts have enforced consumer protection laws and penalized predatory lenders. See *United States ex rel. Wall v. Circle C Construction LLC*, 813 F.3d 616 (6th Cir. 2016) (discussing damages in false certification cases under the False Claims Act); see also FDIC Consumer Lending Compliance and NACCA guidance on predatory lending.

As a direct and proximate result of Defendant's predatory practices, Plaintiffs suffered financial harm, loss of property rights, emotional distress, and other damages as set forth herein.

J.        Whether the Department of Justice penalized the defendant, Wells Fargo, because it was guilty of the exact same violation of breach of contract under mortgage loans of millions of American families by NOT PROVIDING THE MORTGAGEES WITH MORTGAGE INSURANCE THAT IS MANDATORY BY THE GOVERNMENT. The Department of Justice has settled civil mortgage fraud claims against Wells Fargo Bank, N.A., which Wells Fargo agreed to pay $1.2 Billion and admitted, acknowledged, and accepted responsibility for certifying mortgages to Department of Housing and urban development, HUD and FHA, insurance and failed to pay for those loans when they defaulted. Wells Fargo admitted fraudulent loan origination and underwriting practices and False Certification to the government. Wells Fargo was held accountable for FHA approved loans that was unlawfully submitted and false claims was made at the expense of American homeowners and taxpayers. The DOJ attempted protecting the public from abuse of lenders; especially Wells Fargo, to prevent countless families such as Plaintiffs that lost their homes as a result of Wells Fargo's poor and illegal lending practices. Wells Fargo was held responsible for years of

25

reckless underwriting including relying on government insurance to deal with the damages. According to Southern District of New York finding; Wells Fargo has long taken advantage of the FHA mortgage insurance program designed to help millions of Americans realize the dream of home ownership to write thousands and thousands of faulty loans to maximize their profit at the expense of loan quality and has sold thousands of problematic loans and decided not to report them to HUD. Therefore, this loan can be considered one of the examples of Wells Fargo's misconduct in the mortgage industry that helps lead to destructive financial crisis for this FHA-insured mortgage that caused major loss of Plaintiffs' primary residence as a result.

## PRAYER

The overwhelming proof that the Defendant has violated several rules pertaining this mortgage loan with the Plaintiffs and has not provided one single exhibit or proof that they have not violated all the rules, calls for Plaintiffs' to ask this Honorable Court to deny all the Defendants frivolous, malicious, and unjustifiable motions and remand this case back to the Magistrate to decide on the merits of the case that has yet to be decided upon.

Respectfully submitted,

By: _Karl Staffeld_
Karl Staffeld
*Plaintiff, Pro Se*

By: _Azar Staffeld_
Azar Staffeld
*Plaintiff, Pro Se*

Dated: May 20, 2026

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2026, I served the foregoing *Plaintiffs' Answer To Defendant Response To Defendant Wells Fargo Bank, N.A.'s Response In Opposition To Plaintiffs' Objections To Report And Recommendation (ECF No. 83) And Motion Of Relief From That Judgement According To Rules 59, 52, And 50(b),* via USPS first-class mail to the Attorneys of record for the parties to this matter and upon:

Miranda M. Boulahanis (P86222)
TROUTMAN PEPPER LOCKE LLP
500 WOODWARD AVENUE, SUITE 2800
DETROIT, MICHIGAN 48226
248-469-4749
miranda.boulahanis@troutman.com


Mark D. Kundmueller Esq. (P66306)
TROUTMAN PEPPER LOCKE LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
(757) 687-7564
mark.kundmueller@troutmen.com


Respectfully submitted,

By: _____
Karl Staffeld
Plaintiff, *Pro Se*


Dated: May 20, 2026

27

# EXHIBIT A

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| CREATE CIRCULAR DRIVE WITH STONE RETAINING WALL AND WALL LIGHTING<br>150-foot retaining wall with drainage and lighting | $ 57,000 | $ 15,100 | $ 72,100 |
| 4,000 SQUARE FOOT MARBLE FLOORS<br>Installed Marble flooring on Upper level, Main level, and Lower level | $ 48,000 | $ 29,500 | $ 77,500 |
| HOT TUB<br>Installed hot tub, elecrtical supply | $ 2,000 | $ 6,200 | $ 8,200 |
| DRY SAUNA<br>Installed electrical supply | $ 1,700 | $ 5,000 | $ 6,700 |
| 525 SQUARE FOOT WORKSHOP / EXCAVATION / CONCRETE FLOOR / LIGHTING / POWER / PAINT / VENTILATION<br>Excavate lower level below the living room to create workshop | $ 44,600 | $ 14,000 | $ 58,600 |
| EXTERIOR HOUSE PAINT | $ 18,100 | $ 8,400 | $ 26,500 |
| ALL EXTERIOR STONE WORK<br>Installed natural stone on all exposed brick and concrete | $ 19,600 | $ 20,100 | $ 39,700 |
| INSTALL STONE PANELS ON THREE FIREPLACE SURROUNDS<br>Installed natural stone on existing brick | $ 5,000 | $ 4,600 | $ 9,600 |
| RESTORED GAZEBO AND INSTALLED LIGHTING<br>Cleaned and stained exposed wood | $ 4,200 | $ 3,800 | $ 8,000 |
| NEW FROSTED GLASS FRONT DOORS<br>Removed single entry door and replaced with double door | $ 1,200 | $ 3,920 | $ 5,120 |
| LOWER LEVEL LIVING AREA WITH BEDROOM, SPA BATHROOM, KITCHEN AND LIVING AREA, WALKOUT TO PATIO<br>Renovate entire lower level area to be a stand alone suite | $ 42,000 | $ 18,200 | $ 60,200 |
| RENOVATED LAUNDRY ROOM / CABINETS / COUNTERTOP / FLOORING<br>Created laundry room with space for ironing and folding clothes | $ 3,950 | $ 3,250 | $ 7,200 |
| BASEMENT ACCESS DOOR TO WORKSHOP<br>Created second egress from new workroom | $ 3,200 | $ 2,400 | $ 5,600 |
| INSTALLED STRUCTURAL COLUMNS WITH SPREAD FOOTERS THROUGH THE WORKSHOP FOR FUTURE EXPANSION OF THE UPPER LIVING ROOM AREA<br>Created structural columns to support future beam to allow the expansion of the living room above. | $ 13,500 | $ 3,200 | $ 16,700 |
| REMOVED EXISTING KITCHEN WALL AND DINING ROOM WALLS FOR OPEN CONCEPT LIVING ROOM KITCHEN AREA<br>Removed the walls that shut out the view to the backyard. | $ 4,500 | $ 13,200 | $ 17,700 |
| NEW KITCHEN / CABINET / COUNTERTOPS / REFRIDERATOR / DISHWASHER /   10 BURNER STOVE / APPLIANCES<br>New open kitchen layout for center island and much needed storage | $ 27,000 | $ 32,750 | $ 59,750 |
| MODIFY EXISTING STEEL HANDRAIL TO SECOND FLOOR<br>Modified the existing stair handrail to be more decorative. | $ 2,500 | $ 1,600 | $ 4,100 |

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| INSTALLING PAVERS FOR EAST SIDE STAIRS<br><br>Removed unsafe stepping stones and brick stairs from master bedroom down to back patio. Installed paver steps and cut drainage trench to prevent erosion on that side of the house.<br><br>Material: Pavers, bedding sand, base material. Equipment: Compactor, screed board, level, string lines, saw for cutting pavers. Excavate the site to the required depth; Ensure minimum slope for drainage; Compact soil; Spread crushed stone; Compact; Maintain slope; Lay pavers; Joint sand; Cut drainage trench next to stairs; Remove construction debris. | $ 3,750 | $ 2,260 | $ 6,010 |
| CUTTING AND DISPOSAL OF DEAD TREES DURING NOVEMBER 2023 THROUGH FEBRUARY 2025<br><br>There were over one hundred-forty dead trees ranging in size from 24" diameter to 2" diameter that had to be removed from the property to prevent loss of life and property. Many of the trees had fallen across the property lines of our house and our neighbors' houses. The scrub brush was also removed. We removed all debris as instructed by Barton Hills Village Inspectors.<br><br>Conduct a site inspection; Provide PPE; hard hats, gloves, eye and ear protection. Equipment: Chainsaws, pole saws, wedges, ropes, rigging gear. Remove brush, debris; Section the trunk, logs, and branches, Stack logs; Load large trunks for disposal; Rake and clear site; Remove all equipment. | $ 59,000 | $ 3,000 | $ 62,000 |
| INSTALLED EXTERIOR ROPE LIGHTING AT ROOF EDGE<br><br>Installed exterior rope lighting along underside of roof overhang to prevent falling into ditch at night as instructed by BHV Inspectors<br><br>Install weatherproof outlet; Route wiring; Attach rope light clips; Insert rope lighting into clips; Connect rope lighting to power | $ 21,200 | $ 14,000 | $ 35,200 |
| ENTRYWAY PATIO SEATING AREA / PAVER INSTALLATION / DRAINAGE PIPING<br><br>Removed existing trees and concrete steps to install entryway drainage manhole. Pipe storm water drainage manhole outlet across driveway to grade. Install pavers. Expand steps to front door. Install frosted glass double entry door. As instructed by Ann Arbor Township Inspector.<br><br>Material: Pavers, bedding sand, base material. Equipment: Compactor, screed board, level, string lines, saw for cutting pavers. Install catch basin and drainage piping; Extend piping under driveway to grade; Excavate the site to the required depth; Ensure minimum slope for drainage; Compact soil; Spread crushed stone; Compact; Maintain slope; Lay pavers; Joint sand; Remove construction debris. | $ 17,500 | $ 5,000 | $ 22,500 |

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| PAVER INSTALLATION FOR WRAP AROUND PORCH ON SOUTH AND WEST SIDE OF HOUSE<br><br>Secure grade at south and west side of house with excavated soil from circular driveway. Extend storm drainage from roof downspouts and compact soil for Paver installation .As instructed by Ann Arbor Township Inspector.<br><br>Material: Pavers, bedding sand, base material. Equipment: Compactor, screed board, level, string lines, saw for cutting pavers. Excavate the site to the required depth; Ensure minimum slope for drainage; Compact soil; Spread crushed stone; Compact; Maintain slope; Lay pavers; Joint sand; Remove construction debris. | $ 17,800 | $ 3,800 | $ 21,600 |
| BACK PORCH PAVERS<br>Back porch pavers were installed to prevent dirt erosion as instructed by Ann Arbor Township Inspector.<br><br>Material: Pavers, bedding sand, base material. Equipment: Compactor, screed board, level, string lines, saw for cutting pavers. Excavate the site to the required depth; Ensure minimum slope for drainage; Compact soil; Spread crushed stone; Compact; Maintain slope; Lay pavers; Joint sand; Remove construction debris. | $ 7,500 | $ 1,700 | $ 9,200 |
| INSTALLING STANDBY GENERATOR<br>The existing 15 Kilowatt standby generator was found to have a seized engine and damaged generator bearings. Replaced with a 26 Kilowatt Generac standby generator purchased at Lowe's.<br><br>Provide PPE: hard hats, gloves, eye/ear protection. Materials: Standby generator unit with Pre-fabricated base. Equipment: Electrical tools, grounding rods, and cable. Install pad and position generator; Connect fuel line; Wire unit; Install grounding system; Connect generator control; Conduct load test; Remove tools, lifting equipment, and debris from site. | $ 1,750 | $ 15,450 | $ 17,200 |
| UPDATED CITY WATER SUPPLY PIPING FOR LOWER LEVEL<br>Repair and replace existing potable water piping in second bathroom area due to storm damage as instructed by Ann Arbor Township Inspector.<br><br>Materials: piping, fixtures, crimp rings, pipe supports, hangers, insulation, and manifold; Mount manifolds; Connect main supply lines;  each fixture location in continuous runs where possible; Use insulation where required; Pressure test; system; Insulate hot water; Connect to fixtures | $ 4,750 | $ 1,510 | $ 6,260 |

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| TWO NEW AIR CONDITIONING SYSTEMS<br><br>Replaced two air conditioning compressors, cooling coils, and line sets when they stopped working.<br><br>Air conditioning units, line sets, and cooling coils installed by Mechanical Contractor | $ 3,800 | $ 11,100 | $ 14,900 |
| REPAIR ROOF AND SECOND FLOOR BATHROOM CEILING DUE TO STORM HAIL DAMAGED ON 05/24/24<br><br>Repair roof leak and damage to second floor bathroom ceiling falling into the bathroom shower while our granddaughter was using it on 05/26/24. Removed damaged drywall, lighting, and piping.<br><br>Identify damaged areas' EPDM membrane patches or compatible repair tape; Materials: EPDM primer, bonding adhesive, sealant, and cleaning solution; Equipment: utility knife, scissors, rollers, measuring tape, chalk line; PPE: gloves, safety glasses, non-slip footwear, fall protection gear: Clean damaged area; Cut membrane patch: Apply EPDM primer: Install Patch: Remove tools, debris, and waste materials. | $ 15,200 | $ 3,500 | $ 18,700 |
| REMODEL SECOND FLOOR BATHROOM<br><br>Remodel second floor bathroom due to storm damage. Completely gutted bathroom. New framing, plumbing, marble floor, paint, vanity, hardware, etc.<br><br>Materials: fixtures, tiles, lighting, cabinets, hardware; Remove existing fixtures; Demolition and remove debris; Install new PEX piping; Install new shower valves, tub drains, and toilet flange; Install new wiring for lights, outlets, exhaust fan; Repair damaged floor subfloor; New framing; Install moisture-resistant drywall or cement board in wet areas; Apply waterproofing membrane; Lay floor tiles; Install wall tiles; Grout tiles; Install toilet, vanity, sinks, faucets, and showerheads; Mount mirrors, towel bars, shelves, and other accessories; Prime and paint; Apply caulking; Remove construction debris. | $ 9,100 | $ 12,500 | $ 21,600 |
| PLANTED TREES ALONG ROADWAY<br>Plant ornamental trees along edge of circular driveway, main drive, and roadway to prevent erosion.<br><br>Verify planting locations; Call Miss Dig; Materials: Trees, mulch, topsoil, compost/fertilizer. Equipment: Shovels, augers, wheelbarrows, hoses, stakes; Excavate holes; Position tree; Backfill and Water; layer of organic mulch; Site cleanup. | $ 1,200 | $ 500 | $ 1,700 |

**341 CORRIE ROAD**
**IMPROVEMENTS**
**FROM 12/27/2017 TO 6/27/2025**

| DESCRIPTION | LABOR | MATERIALS | TOTAL |
|---|---|---|---|
| INSTALLED DRAINAGE MANHOLE AND CULVERTS AT BASE OF DRIVEWAY<br><br>Extended garage roof drains and drains from backside of circular driveway retaining wall to new manhole at base of driveway because water was going to neighbors' driveway. Install culvert from manhole across main drive to discharge water into neighbors culvert. Install second culvert at base of main driveway to facilitate curb drainage at street.<br><br>Call Miss Dig; Provide PPE; Excavate; Place and compact granular bedding; Maintain slope; Sealant at joints; Place backfill; Compact backfill; Grade the site to direct surface water into culvert. Clear site of debris. | $ 2,000 | $ 720 | $ 2,720 |
| ENCLOSE BOTTOM OF SOUTH PORCH DECK<br>Enclose bottom of porch deck with shiplap siding, paint to match house exterior.<br><br>Attach treated lumber where skirting will be fastened; Cut panels; Fasten skirting panels to the support framing; Paint to match house. | $ 3,050 | $ 850 | $ 3,900 |

| | IMPROVEMENT TOTALS | $ 465,650 LABOR | $ 261,110 MATERIALS | $ 726,760 TOTAL |
|---|---|---|---|---|

# EXHIBIT B

**341 CORRIE MORTGAGE – SECTION 10. Mortgage Insurance.**

**Extraction from Page 5 of 9, Wells Fargo and Staffeld Mortgage Contract**

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provided that an affiliate of Lender takes a share of the insurer's risk in exchange (or a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has -if any -with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

# EXHIBIT C

Case 4:24-cv-12811-SDK-DRG ECF No. 92, PageID.1874 Filed 05/21/26 Page 43 of 45



# U.S. Department of Housing and Urban Development


Archives

# HUD Archives: News Releases



Department of Justice

| | |
|---|---|
| **CIV**<br>**(202) 514-2007**<br>**TTY (866) 544-5309** | **For Release**<br>**Friday**<br>**April 8, 2016** |

## WELLS FARGO BANK AGREES TO PAY $1.2 BILLION FOR IMPROPER MORTGAGE LENDING PRACTICES

***Wells Fargo Bank Admits That It Certified that Loans Were Eligible for FHA Mortgage Insurance When They Were Not, and That It Did Not Disclose Thousands of Faulty Mortgage Loans to HUD***

WASHINGTON - The Department of Justice announced today that the United States has settled civil mortgage fraud claims against Wells Fargo Bank, N.A. (Wells Fargo) and Wells Fargo executive Kurt Lofrano, stemming from Wells Fargo's participation in the Federal Housing Administration (FHA) Direct Endorsement Lender Program. In the settlement, Wells Fargo agreed to pay $1.2 billion and admitted, acknowledged and accepted responsibility for, among other things, certifying to the Department of Housing and Urban Development (HUD), during the period from May 2001 through December 2008, that certain residential home mortgage loans were eligible for FHA insurance when in fact they were not, resulting in the Government having to pay FHA insurance claims when some of those loans defaulted. The agreement resolves the United States' civil claims in its lawsuit in the Southern District of New York, as well as an investigation conducted by the U.S. Attorney's Office for the Southern District of New York regarding Wells Fargo's FHA origination and underwriting practices subsequent to the claims in its lawsuit and an investigation conducted by the U.S. Attorney's Office for the Northern District of California into whether American Mortgage Network, LLC (AMNET), a mortgage lender acquired by Wells Fargo in 2009, falsely certified and submitted ineligible residential mortgage loans for FHA insurance.

The settlement was approved today by U.S. District Judge Jesse M. Furman for the Southern District of New York. Read the settlement (https://www.justice.gov/opa/file/839796/download).

"This settlement is another step in the Department of Justice's continuing efforts to hold accountable FHA approved lenders that unlawfully submitted false claims at the expense of American homeowners and taxpayers," said Principal Deputy Assistant Attorney General Benjamin C. Mizer, head of the Justice Department's Civil Division. "In addition to today's resolution with Wells Fargo, the department has pursued similar misconduct by numerous other lenders, returning more than $4 billion to the FHA fund and the Treasury and filing suit where appropriate. We remain committed to protecting the public fisc from all who seek to abuse it, whether they do business on Wall Street or Main Street."

"This Administration remains committed to holding lenders accountable for their lending practices," said Secretary Julián Castro for HUD. "The $1.2 billion settlement with Wells Fargo is the largest recovery for loan origination violations in FHA's history. Yet, this monetary figure can never truly make up for the countless families that lost homes as a result of poor lending practices."

"Today, Wells Fargo, one of the biggest mortgage lenders in the world, has been held responsible for years of reckless underwriting, while relying on government insurance to deal with the damage," said U.S. Attorney Preet Bharara for the Southern District of New York. "Wells Fargo has long taken advantage of the FHA mortgage insurance program, designed to help millions of Americans realize the dream of home ownership, to write thousands and thousands of faulty loans. Driven to maximize profits, Wells Fargo employed shoddy underwriting practices to drive up loan volume, at the expense of loan quality. Even though Wells Fargo identified through internal quality assurance reviews thousands of problematic loans, the bank decided not to report them to HUD. As a result, while Wells Fargo enjoyed huge profits from its FHA loan business, the government was left holding the bag when the bad loans went bust. With today's settlement, Wells Fargo has finally resolved the years-long litigation, adding to the list of large financial institutions against which this office has successfully pursued civil fraud prosecutions."

"Misconduct in the mortgage industry helped lead to a destructive financial crisis that spanned the globe," said Acting U.S. Attorney Brian Stretch for the Northern District of California. "American Mortgage Network's origination of FHA-insured loans that did not comply with government requirements also caused major losses to the public fisc. Today's settlement demonstrates the Department of Justice's resolve to pursue remedies against those who engaged in this type of misconduct."

"This matter is not just a failure by Wells Fargo to comply with federal requirements in FHA's Direct Endorsement Lender program - it's a failure by one of our trusted participants in the FHA program to demonstrate a commitment to integrity and to ordinary Americans who are trying to fulfill their dreams of homeownership," said Inspector General David A. Montoya for HUD.

According to the second amended complaint filed in Manhattan federal court, the government had alleged:

Wells Fargo has been a participant in the Direct Endorsement Lender program, a federal program administered by FHA. As a Direct Endorsement Lender, Wells Fargo has the authority to originate, underwrite and certify mortgages for FHA insurance. If a Direct Endorsement Lender approves a mortgage loan for FHA insurance and the loan later defaults, the holder or servicer of the loan may submit an insurance claim to HUD for the outstanding balance of the defaulted loan, along with any associated costs, which HUD must then pay. Under the Direct Endorsement Lender program, neither the FHA nor HUD reviews a loan for compliance with FHA requirements before it is endorsed for FHA insurance. Direct Endorsement Lenders are therefore required to follow program rules designed to ensure that they are properly underwriting and certifying mortgages for FHA insurance and maintaining a quality control program that can prevent and correct any deficiencies in their underwriting. The quality control program requirements include conducting a full review of all loans that go 60 days into default within the first six payments, known as "early payment defaults"; taking prompt and adequate corrective action upon discovery of fraud or serious underwriting problems; and disclosing to HUD in writing all loans containing evidence of fraud or other serious underwriting deficiencies. Wells Fargo failed to comply with these basic requirements.

First, between at least May 2001 and October 2005, Wells Fargo, the largest HUD-approved residential mortgage lender, engaged in a regular practice of reckless origination and underwriting of its FHA retail loans, all the while knowing that it would not be responsible when the defective loans went into default. To maximize its loan volume (and profits), Wells Fargo elected to hire temporary staff to churn out and approve an ever increasing quantity of FHA loans, but neglected to provide this inexperienced staff with proper training. At the same time, Wells Fargo's management applied pressure on its underwriters to approve more and more FHA loans. The bank also imposed short turnaround times for deciding whether to approve the loans, employed lax underwriting standards and controls and paid bonuses to underwriters and other staff based on the number of loans approved. Predictably, as a result, Wells Fargo's loan volume and profits soared, but the quality of its loans declined significantly. Yet, when Wells Fargo's senior management was repeatedly advised by its own quality assurance reviews of serious problems with the quality of the retail FHA loans that the Bank was originating, management disregarded the findings and failed to implement proper and effective corrective measures, leaving HUD to pay hundreds of millions of dollars in claims for defaulted loans.

Second, Wells Fargo failed to self-report to HUD the bad loans that it was originating, in violation of FHA program reporting requirements. During the period 2002 through 2010, HUD required Direct Endorsement Lenders to perform post-closing reviews of the loans that they originated and to report to HUD in writing loans that contained fraud or other serious deficiencies. This requirement provided HUD with an opportunity to investigate the defective loans and request reimbursement for any claim that HUD had paid or request indemnification for any future claim, as appropriate. During this nine-year period, Wells Fargo, through its post-closing reviews, internally identified thousands of defective FHA loans that it was required to self-report to HUD, including a substantial number of loans that had gone into "early payment default." However, instead of reporting these loans to HUD as required, Wells Fargo engaged in virtually no self-reporting during the four-year period from 2002 through 2005 and only minimal self-reporting after 2005.

In his capacity as Vice President of Credit-Risk - Quality Assurance at Wells Fargo, Lofrano executed on Wells Fargo's behalf the annual certifications required by HUD for the Bank's participation in the Direct Endorsement Lender program for certain years. Lofrano also organized and participated in the working group responsible for creating and implementing Wells Fargo's self-reporting policies and procedures. In contravention of HUD's requirements, that group failed to report to HUD loans that Wells Fargo had internally identified as containing material underwriting findings. Moreover, Lofrano received Wells Fargo quality assurance reports identifying thousands of FHA loans with material findings - very few of which Wells Fargo reported to HUD.

*    *    *

As part of the settlement, Wells Fargo has admitted, acknowledged and accepted responsibility for, among other things, the following conduct: During the period from May 2001 through, on or about Dec. 31, 2008, Wells Fargo submitted to HUD certifications stating that certain residential home mortgage loans were eligible for FHA insurance when in fact they were not, resulting in the Government having to pay FHA insurance claims when certain of those loans defaulted. From May 2001 through January 2003, Wells Fargo's quality assurance group conducted monthly internal reviews of random samples of the retail FHA mortgage loans that the Bank had already originated, underwritten, and closed, which identified for most of the months that in excess of 25 percent of the loans and in several consecutive months, more than 40 percent of the loans, had a material finding. For a number of the months during the period from February 2003

through September 2004, the material finding rate was in excess of 20 percent. A "material" finding was defined by Wells Fargo generally as a loan file that did not conform to internal parameters and/or specific FHA parameters, contained significant risk factors affecting the underwriting decision and/or evidenced misrepresentation.

Wells Fargo also admitted, acknowledged and accepted responsibility for the following additional conduct: Between 2002 and October 2005, Wells Fargo made only one self-report to HUD, involving multiple loans. During that same period, the Bank identified through its internal quality assurance reviews approximately 3,000 FHA loans with material findings. Further, during the period between October 2005 and December 2010, Wells Fargo only self-reported approximately 300 loans to HUD. During that same period, Wells Fargo's internal quality assurance reviews identified more than 2,900 additional FHA loans containing material findings that the Bank did not self-report to HUD. The government was required to pay FHA insurance claims when certain of these loans that Wells Fargo identified with material findings defaulted.

Lofrano admitted, acknowledged, and accepted responsibility for, among other things, the following matters in which he participated: From Jan. 1, 2002, until Dec. 31, 2010, he held the position of Vice President of Credit Risk – Quality Assurance at Wells Fargo; in that capacity, he supervised the Decision Quality Management group; in 2004, he was asked to organize a working sub-group to address reporting to HUD; in or about October 2005, he organized a working group that drafted Wells Fargo's new self-reporting policy and procedures; and during the period October 2005 through Dec. 31, 2010, based on application of the Bank's new self-reporting policy and by committee decision, Wells Fargo did not report to HUD the majority of the FHA loans that the Bank's internal quality assurance reviews had identified as having material findings.

*       *       *

 Principal Deputy Assistant Attorney General Mizer thanked the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Northern District of California for their diligent pursuit and successful resolution of this matter and the Commercial Litigation Branch, HUD's Office of General Counsel and HUD's Office of Inspector General, for their extraordinary support.

The case settled by today's settlement is captioned United States v. Wells Fargo Bank, N.A., et. al., 12-cv-7527 (S.D.N.Y.)

###

Content Archived: January 1, 2018







U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410
Telephone: (202) 708-1112 TTY: (202) 708-1455